**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **DAIRY PRODUCTIONS SYSTEMS-** | ) | **Case No. 10-11752-JDW** |
| **GEORGIA LLC, DAIRY** | ) | |
| **PRODUCTIONS SYSTEMS, LLC,** | ) | |
| **DAIRY PRODUCTIONS SYSTEMS-** | ) | |
| **MISSISSIPPI, LLC, NEW FRONTIER** | ) | |
| **DAIRY, LLC, and HEIFER** | ) | |
| **HAVEN, LLC** | ) | **Jointly Administered** |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DEBTORS  MOTION PURSUANT TO SECTIONS 105(a) AND 363(c)
OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING
THE CONTINUED USE OF EXISTING (A) CASH MANAGEMENT
SYSTEM AND BANK ACCOUNTS AND (B) BUSINESS FORMS**

Dairy Production Systems - Georgia LLC, ("DPS-Georgia") Dairy Production Systems, LLC ("DPS"), Dairy Production Systems - Mississippi, LLC, ("DPS-Mississippi") New Frontier Dairy, LLC, ("New Frontier Dairy") and Heifer Haven, LLC ("HH"; DPS-Georgia, DPS, DPS Mississippi, New Frontier Dairy, and HH are collectively, the "Debtors") hereby file this motion (the  Motion Regarding Cash Management ) seeking the entry of an order under 11 U.S.C. §§ 105(a) and 363(c) authorizing the continued use of their existing (a) cash management system and bank accounts, and (b) business forms.

I.    **GENERAL BACKGROUND**

1.    On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to operate their businesses and manage their properties as the debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.      No creditors' committee has yet been appointed in the Bankruptcy Cases.

**A.      Description of the Debtors' Businesses**

3.      Each of the Debtors are single-member limited liability companies formed under the laws of the state of Colorado and currently wholly owned and solely managed by David P. Sumrall ("Mr. Sumrall").  By virtue of their common ownership, the Debtors are affiliates of one another as that term is defined in section 101(2) of the Bankruptcy Code.  As more specifically described below, the Debtors own and/or operate five (5) dairy farms located in Florida, Georgia, Mississippi, and Texas.  The Debtors' gross revenue on a consolidated basis was approximately $57,248,119 and $47,967,685, in 2008 and 2009 respectively.

4.      DPS was formed in October of 2004, and is headquartered in High Springs, Florida.  DPS operates in Florida two separate dairy operations, known as the Branford Farm and the Bell Farm, both acquired through merger of Aurora Dairy – Florida, LLC simultaneous with the purchase of all the membership interests of that entity.  Currently, DPS owns an aggregate of approximately 3,174 head of cattle (at capacity the two farms would own approximately 4,500 head of cattle), with a permitted milking herd capacity of 3,750 head.  The two DPS farms are approximately 15 miles apart in Gilchrist County, Florida.  DPS owns a total of 1,049 acres, approximately 560 acres of which are irrigated and yield crops that account for approximately 40% of the two herds' forage needs (the balance of forage needs is produced by surrounding local area farmers and supplemented with necessary grains and protein).  DPS also has dairy parlors, newly constructed, state-of-the-art freestall housing for the milking herds, and various other customary dairy improvements located on the premises of the farms.

5.      DPS-Mississippi was formed in May of 2005 and owns assets contributed from Aurora Dairy – Mississippi, LLC, (an LLC formerly owned by Mr. Sumrall and now dissolved)

consisting of approximately 1,390 head of cattle (at capacity it would own approximately 1,800 head of cattle) and a 240 acre farm located near Jackson, Mississippi (the "Edwards Farm"). DPS-Mississippi purchases its forage needs locally, and imports its grain and protein needs.

6.     DPS-Georgia was formed in November of 2008 and owns the operating assets acquired from Aurora Dairy - Georgia, LLC ("Aurora-Georgia"), exclusive of the real property owned by Aurora-Georgia.  DPS–Georgia owns approximately 3,490 head of cattle (at capacity it would own approximately 4,200 head of cattle), along with equipment and dairy improvements located on a 1,065-acre farm leased from Aurora-Georgia (the "Aurora-Georgia Farm").  DPS–Georgia's lease agreement with Aurora-Georgia provides it with an option to purchase the Aurora-Georgia Farm.  The Aurora-Georgia Farm includes 500 irrigated acres which account for approximately 50% of the herd's forage needs.

7.     HH was formed in May of 2007 and raises the heifer calves which were born in the DPS and DPS–Georgia operations.  HH contracts with independent growers who carry these animals through maturation to calving-age, at which point the heifers are purchased by the appropriate operation and become a part of that production facility.  HH does not own any real estate or equipment.  HH capitalizes the costs of heifer raising monthly and then discharges those costs at the time of purchase.  Heifers are sold at cost and booked into the appropriate entity's cattle inventory at that same cost.

8.     New Frontier Dairy was formed in December of 2007 and owns three milking parlors located on approximately 1,000 acres in Dublin, Texas (the "New Frontier Farm").  Milk from New Frontier Dairy is marketed through Lone Star Milk Producers cooperative.  Currently, New Frontier Dairy owns approximately 2,500 head of cattle (at capacity the farm would own

approximately 4,500 head of cattle), and the real property and equipment to operate the New Frontier Farm.

### B.     Description of the Debtors' Senior Secured Debt

9.     On or about September 6, 2007, New Frontier Bank of Greeley, Colorado ("NFB") made a loan to DPS in the original principal amount of $2.825 million (the "First DPS Loan") as evidenced by a Promissory Note and Security Agreement dated September 6, 2007 made payable by DPS to NFB in the original principal amount of $2,825,000.00. The First DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by a deed to secure debt on the Aurora-Georgia owned Aurora-Georgia Farm, and all furniture, fixtures, and equipment owned by DPS and Aurora-Georgia.

10.     On or about October 19, 2007, NFB made a loan to DPS in the original principal amount of $6.8 million (the "Second DPS Loan") as evidenced by a Promissory Note dated October 19, 2007 made payable by DPS to NFB in the original principal amount of $6,800,000.00. The Second DPS Loan (and all other debts of DPS to NFB and its successors and assigns up to the original principal amount of the Second DPS Note) is secured by Branford Farm. In addition to serving as collateral for the Second DPS Loan, Branford Farm is also encumbered by a second mortgage securing an $800,000 promissory note from Mr. Sumrall, personally, to Marcus B. Peperzak ("Peperzak"). Upon information and belief, Peperzak transferred and assigned this note to AFS (as defined below) or one of its affiliates pursuant to a settlement agreement by and between Peperzak and AFS.

11.     On or about January 15, 2009, NFB made a loan to DPS in the original principal amount of $2,978,129.00 (the "Third DPS Loan") as evidenced by a Promissory Note dated January 15, 2009 made payable by DPS to NFB in the original principal amount of

$2,978,129.00. The Third DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by Bell Farm. In addition to serving as collateral for the Third DPS Loan, Bell Farm is also encumbered by a second mortgage securing a $900,000 promissory note from Sumrall, personally, to Peperzak. Upon information and belief, Peperzak transferred and assigned this note to AFS (as defined below) or one of its affiliates pursuant to a settlement agreement by and between Peperzak and AFS.

12.     On or about March 19, 2009, NFB made a loan to DPS in the original principal amount of $8.6 million (the "Fourth DPS Loan"; the First DPS Loan, the Second DPS Loan, the Third DPS Loan, and the Fourth DPS Loan are, collectively, the "DPS Loans") as evidenced by a Promissory Note and Security Agreement dated March 19, 2009 made payable by DPS to NFB in the original principal amount of $8.6 million. The Fourth DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by, among other things, DPS's accounts, crops, equipment, farm products, general intangibles, inventory, livestock, and milk sale proceeds.

13.     On or about January 20, 2009, NFB made a loan to DPS-Georgia in the original principal amount of $10.1 million (the "DPS-Georgia Loan"), as evidenced by a Promissory Note and Security Agreement dated January 20, 2009 made payable by DPS-Georgia to NFB in the original principal amount of $10.1 million. The DPS-Georgia Loan (and all other debts of DPS-Georgia to NFB and its successors and assigns) is secured by, among other thing, DPS-Georgia's accounts, equipment, feed, general intangibles, livestock, and milk sale proceeds.

14.     On or about July 11, 2005, NFB made a loan to DPS-Mississippi in the original principal amount of $3.25 million (the "First DPS- Mississippi Loan") as evidenced by a Promissory Note and Security Agreement dated July 11, 2005 made payable by DPS-

Mississippi to NFB in the original principal amount of $3.25 million, as modified by a Debt Modification Agreement dated as of August 19, 2008, and as further modified by a Debt Modification Agreement dated as of August 28, 2008.  The First DPS- Mississippi Loan (and all other debts of DPS- Mississippi to NFB and its successors and assigns) is secured by the Edwards Farm.

15.    On or about May 22, 2006, NFB made a loan to DPS- Mississippi in the original principal amount of $4.512 million (the "Second DPS-Mississippi Loan"; the First DPS-Mississippi Loan and the Second DPS-Mississippi Loan are, collectively, the "DPS-Mississippi Loans") as evidenced by a Promissory Note and Security Agreement dated May 22, 2006 made payable by DPS-MS to NFB in the original principal amount of $4.512 million, as modified by a Commercial Debt Modification Agreement dated as of May 14, 2007, as further modified by a Debt Modification Agreement dated as of May 18, 2008, and as further amended by a Debt Modification Agreement dated as of December 23, 2008.  The Second DPS-Mississippi Loan (and all other debts of DPS-Mississippi to NFB and its successors and assigns) is secured by, among other things, DPS-Mississippi's accounts, crops, equipment, farm products and supplies, feed, inventory, and livestock.

16.    On or about June 21, 2007, NFB made a loan to HH in the original principal amount of $5.012 million (the "HH Loan") evidenced by a Promissory Note and Security Agreement dated June 21, 2007 made payable by HH to NFB in the original principal amount of $5.012 million, as modified by a Debt Modification Agreement dated June 25, 2008.  The HH Loan (and all other debts of HH to NFB and its successors and assigns) is secured by HH's livestock.

17.    On or about December 28, 2007, NFB made a loan to New Frontier Dairy in the original principal amount of $8.6 million (the "First New Frontier Dairy Loan") as evidenced by a Promissory Note dated December 28, 2007 made payable by New Frontier Dairy to NFB in the original principal amount of $8.6 million.  The First New Frontier Dairy Loan (and all other debts of New Frontier Dairy to NFB and its successors and assigns) is secured by the New Frontier Farm.

18.    On or about July 3, 2008, NFB made a loan to New Frontier Dairy in the original principal amount of $12.03 million (the "Second New Frontier Dairy Loan" and, together with the First New Frontier Dairy Loan, the "New Frontier Dairy Loans"; the DPS Loans, the DPS-Georgia Loan, the DPS-Mississippi Loans, the HH Loan, and the New Frontier Dairy Loans are, collectively, the "NFB Loans") evidenced by a Promissory Note dated July 3, 2008 made payable by New Frontier Dairy to NFB in the original principal amount of $12.03 million, as modified by a Debt Modification Agreement dated December 10, 2008, which Debt Modification Agreement reduced the credit limit under the Second New Frontier Loan from $12.03 million to $9.03 million, as further modified by a Debt Modification Agreement dated December 29, 2008, as further modified by a Debt Modification Agreement dated March 20, 2009, and as further modified by a Debt Modification Agreement dated March 23, 2009.

19.    The aggregate original principal amount of the NFB Loans was $64,707,129. As of the Petition Date, the principal and accrued interest under the NFB Loans was approximately $76,189,872.63.  The NFB Loans are each personally guaranteed by Mr. Sumrall. Upon information and belief, to the extent Mr. Peperzak was a guarantor on some of the NFB

Loans, he was released therefrom by AFS pursuant to a settlement agreement between Peperzak and AFS.

        C.      **Events Leading up to Bankruptcy**

       20.     On April 10, 2009, the Colorado Division of Banking closed NFB, and the Federal Deposit Insurance Corporation ("FDIC") was named the receiver for NFB. The FDIC subsequently auctioned the NFB Loans, and upon information and belief, Agricultural Funding Solutions, LLC ("AFS") acquired the NFB Loans with an outstanding balance (principal and interest) on the date of auction of approximately $70 million for approximately $22 million.[1]

       21.     The failure of NFB coincided with a severe downturn in the U.S. dairy industry that has occurred over the past 24 to 36 months and continued into 2010.  From November, 2008 to February, 2009, the all-milk price fell precipitously from $17.10 per hundred weight ("CWT") to $11.60 per CWT.   Prices remained below $12.00 per CWT until they began to rise in August, 2009.  There are a number of reasons for this precipitous decline. The global recession appears to be a major factor.  In addition to reducing domestic demand, the global recession has had dramatic effects on over-all U.S. agricultural exports, falling from a peak of $10.6 billion in October, 2008 to a low of $7.3 billion in September, 2009, before rebounding to $10.0 billion in December, 2009.  On a ME (mature equivalent) skim-solids basis, U.S. dairy exports reached a high of 7.6 billion pounds in the second quarter of 2008 and then declined to a low of 5.1 billion pounds in the first quarter of 2009, before rising to 6.3 billion pounds in the fourth quarter of 2009.  The increase in milk production through 2008, sluggish domestic demand in 2008

---

[1]       Upon information and belief, AFS obtained "insider information" providing it with an unfair advantage in the auction of the NFB Loans, and in violation of the FDIC's rules and regulations, as well as, Federal Law.  The Debtors intend to prove that AFS's use of such information and other conduct merits subordination of AFS' claims pursuant to Section 510(c) of the Bankruptcy Code and applicable law.

and 2009, and falling export volumes in late 2008 and early 2009, created a milk surplus, driving down milk prices in early 2009.

22.     The sharp decline in milk prices occurred in conjunction with significant increases in feed prices and other operational costs.  From September, 2007 until September, 2008 corn prices averaged $4.20 per bushel and from October, 2007 until October, 2008 soybean meal prices averaged $335.94 per ton.  These prices can be compared against expected average costs for corn and soybean meal for the September/October, 2009 to September/October, 2010 period of $3.35 - $3.95 per bushel and $270 to $320, respectively, which still are high by historic measures.

23.     The decrease in milk prices and the increase in feed costs collectively created a negative impact on the Debtors' respective revenues causing severe negative cash flow problems and compromising the Debtors' ability to service the NFB Loans.  These cash flow problems were exacerbated by the failure of NFB that left the Debtors without a banking relationship during one of the tightest credit markets in history.  Despite being faced with these issues, the Debtors diligently pursued and exhausted all possible refinancing sources.  All attempts to refinance the NFB Loans, both while the NFB loans were held by the FDIC and after AFS purportedly purchased the NFB loans, failed.

24.     After the FDIC auction, the Debtors were contacted by AFS to restructure its NFB Loans and to provide the Debtors with additional financing of $3.5 million to enable the Debtors to purchase the dairy cows needed to fill the Debtors' dairies to capacity and to complete the construction on the Bell Farm (the "Additional Financing"). The Debtors in good faith attempted on numerous occasions to arrive at an acceptable restructure of the NFB Loans and terms for the Additional Financing with AFS.  All efforts have proved fruitless.

25.     On or about September 15, 2010, AFS filed a lawsuit (CIRCUIT CIVIL CASE

NO. 2010-CA-0103) against DPS, Mr. Sumrall, and several other defendants in the Circuit Court

of the Eight Judicial Circuit, Gilchrist County, Florida (the "Florida Action") seeking, among

other things, foreclosure, the appointment of a receiver, and the collection of the NFB Loans.

On October 5, 2010, AFS filed an Emergency Motion for Appointment of a Receiver and

Request for Expedited Hearing in the Florida Action.   AFS did not provide notice of this

emergency motion to the Debtors until October 6, 2010.   On or about October 6, 2010, AFS filed

a lawsuit against DPS-Georgia in the Superior Court of Mitchell County Georgia seeking, among

other things, the appointment of a receiver, and the collection of the NFB Loans.   On or about

October 6, 2010, AFS filed a lawsuit against DPS-Mississippi in the Chancery Court for the

Second Judicial District of Hinds County, Mississippi seeking, among other things, the

appointment of a receiver, and the collection of the NFB Loans.   On or about October 6, 2010,

AFS filed a lawsuit against New Frontier Dairy in the 266th Judicial District Court, Erath

County, Texas seeking, among other things, the appointment of a receiver, and the collection of

the NFB Loans.

26.     As a result of (i) the decrease in milk prices and (ii) the Debtors inability to find

financing to enable them to purchase the dairy cows needed to fill the dairies to capacity

(currently they are at approximately 60 to 65% of capacity) and to complete the construction on

the Bell Farm, the Debtors' gross revenue on a consolidated basis dropped from $57,248,119 in

2008 to $47,967,685, in 2009.

27.     Given the Debtors' severe negative cash flow problems in large part caused by the

decrease in milk prices and the increase in feed costs over the last several years, AFS's refusal to

provide the Additional Financing as represented to enable the Debtors to purchase the dairy cows

needed to fill the Debtors' dairies to capacity and to complete the construction on the Bell Farm, the Debtors' inability to refinance or restructure the NFB Loans, and to prevent AFS's pending foreclosure and receivership, the Debtors decided to file the instant Chapter 11 cases.

28.     Additional information about the Debtors' businesses and the events leading up to the commencement of the Debtors' bankruptcy cases (the "Bankruptcy Cases") can be found in the Declaration of David P. Sumrall, President and CEO of the Debtors, in Support of Chapter 11 Petitions and First-Day Orders (the "Sumrall Declaration"), which was filed contemporaneously with this Motion Regarding Cash Management, and is incorporated herein by reference.

## II.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Bankruptcy Cases and with respect to this Motion Regarding Cash Management in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## III.     REQUEST FOR RELIEF

30.     By this Motion Regarding Cash Management, the Debtors seek entry of an order (a) authorizing the continued use of their existing cash management system and bank accounts, and (b) authorizing the continued use of their existing business forms.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for Region 21 that require the Debtors to close all prepetition bank accounts, open new accounts designated as the debtor in possession accounts, and obtain new business forms and stationary.

31.     The Debtors utilize nine (9) bank accounts.  Requiring the Debtors to shut down their existing bank accounts and open new accounts would significantly impede the Debtors ability to manage their cash efficiently and effectively.  Closing these accounts will result in

delays and administrative costs to the Debtors  bankruptcy estates whereas preserving a

business as usual  atmosphere by utilizing the existing bank accounts will facilitate the

stabilization of the Debtors  business operations.

32.    The Debtors have just a few checks outstanding on prepetition amounts owed, all

of such checks out of the Operating Accounts (defined below) are identified on   Exhibit A   and

all of such checks out of the Payroll Accounts (defined below) are identified in Exhibit   B.

The Debtors are therefore able to ensure the protections afforded by opening new bank accounts

without undertaking the administrative expenses and inevitable delays associated with doing so.

Moreover, to avoid the delays and needless banking fees and expenses that would be associated

with replacing all of the Debtors  checks and forms, the Debtors request that the Court allow the

Debtors to print   Debtor in Possession   on their existing checks and forms, ordering new checks

and forms marked   Debtor in Possession   only after their original stocks are depleted in the

ordinary course of business.

### A.    The Continuation of Existing Bank Accounts

33.    The Debtors' businesses require the collection, payment, and transfer of funds

through nine (9) bank accounts (the "Bank Accounts"), which consist of five (5) operating

accounts (the "Operating Accounts," and each an "Operating Account") and four (4) payroll

accounts (the "Payroll Accounts," and each a "Payroll Account").  The Operating Accounts are:

DPS-Georgia's operating account (account number xxxxxxxx-3446), DPS's operating account

(account number xxxxxxxx-7035), DPS-Mississippi's operating account (account number

xxxxxxxx-7145), New Frontier Dairy's operating account (account number xxxxxxxx8403), and

HH's operating account (account number xxxxxxxx-8306).  The Payroll Accounts are:  DPS-

Georgia's payroll account (account number xxxxxxxx-3763), DPS's payroll account (account

number xxxxxxxx-7801), DPS-Mississippi's payroll account (account number xxxxxxxx-3750),

and New Frontier Dairy's payroll account (account number xxxxxxxx-3776).  HH does not

maintain a payroll account.  The Operating Accounts are all at Bank of America, NA

("Bank of America") located in High Springs, Florida.  The Payroll Accounts for DPS-Georgia,

DPS-Mississippi, and New Frontier Dairy are also at Bank of America and in High Springs,

Florida.  However, DPS s Payroll Account is at Capital City Bank (  Capital  ; Bank of America

and Capital are collectively, the "Banks") located in Bell and High Springs, Florida.

34.    The Operating Accounts are dual-purpose accounts and serve as the Debtors

primary operating accounts.  The Debtors filter all of their cash deposits and their account

payables through the Operating Accounts.  Specifically, the Debtors  all of their account

receivables and any other cash received from operations into their respective Operating

Accounts.  The Debtors also utilize the Operating Accounts to fund all outgoing payments to

vendors that are necessary for the operation and maintenance of the Debtors' businesses.

Occasionally, the Debtors will make inter-company transfers between each other.  All inter-

company transfers are made exclusively by check, and the Debtors  document such transfers

with a corresponding debit and credit in the applicable Debtors  Operating Accounts.

35.    The Debtors utilize the Payroll Accounts for the sole purpose of funding each

respective Debtors' payroll.  The Debtors' fund the Payroll Accounts by transferring the amount

of money that is necessary to fund payroll from the Operating Accounts.  The Debtors do not use

the Payroll Accounts for any other purpose other than the Debtors' employee payroll.

36.    The Operating Guidelines and Reporting Requirements promulgated by the

Office of the United States Trustee for Region 21 require that a Chapter 11 debtor close its

prepetition bank accounts and open new accounts.  This requirement is designed to (a) provide a

clear line of demarcation between prepetition and postpetition transactions and operations, and

(b) block the inadvertent payment of prepetition claims through the payment of checks drawn

prior to the commencement of a debtor s case.   The Debtors can achieve the goals of the Operating Guidelines without closing its existing Bank Accounts and opening new ones.

37.     All of the Debtors  checks and transfers are initiated from the Operating Accounts, and the Debtors will therefore be able to identify all prepetition checks and other forms of payment outstanding on the Petition Date, and will notify the Banks not to pay such checks or obligations, except to the extent such payments have been authorized by an Order of this Court.  The Debtors have written a few prepetition checks out of the Operating Accounts that remain outstanding as of the Petition Date that are identified in Exhibit A to this Motion Regarding Cash Management.  The Debtors have the ability to notify the Banks not to pay such checks or obligations.  Further, the Debtors last made payroll on October 4, 2010.  The Debtors have written a few prepetition checks out of the Payroll Accounts that remain outstanding as of the Petition Date.  These checks are identified in Exhibit  B  to this Motion Regarding Cash Management.  The Debtors have filed a separate motion substantially contemporaneous with this Motion Regarding Cash Management requesting authorization form this Court to honor outstanding prepetition checks to the Debtors  employees.  As of the Petition Date, the Debtors have not sought the Court s authorization to honor any prepetition checks (other than checks to the Debtors  employees) or obligations out of the Bank Accounts.

38.     Because of the monetary expense and administrative burden that would be imposed if the Debtors were required to close all of their old accounts and open new accounts, requiring the Debtors to do so immediately following the Petition Date and on an emergency basis would not be in the best interests of the Debtors  bankruptcy estates.  Substantially all of the Debtors  funds are held in the Operating Accounts.  Closing the Debtors  Bank Accounts and opening debtor in possession accounts would only distract the Debtors from the Debtors reorganization efforts.   Furthermore,  since  at  this  point  the  Debtors  have  not  requested

permission to honor any prepetition checks in the Bankruptcy Cases (other than checks to the Debtors  employees), the risk frequently associated with allowing a debtor in bankruptcy to maintain its bank accounts is not present here.  Accordingly, it will be simple for the Debtors to direct the Banks not to pay any prepetition checks or obligations, except to the extent such payment is authorized by a subsequent Order of the Court.  This fact supports a finding that, because the risk associated with third party liability on prepetition checks is not present, it is appropriate that this court grant the Debtors authority to maintain their existing Bank Accounts.

39.     In other cases of similar size and complexity, courts have recognized that the strict enforcement of the bank account closing requirement does not serve the purposes of Chapter 11.  Accordingly, bankruptcy courts, including courts in this region, have regularly entered orders authorizing debtors to maintain its prepetition bank accounts.  *See, e.g., In re Pike Nursery Holding, LLC*, Case No. 07-79129 (Bankr. N.D. Ga. Nov. 16, 2007); *In re Galey & Lord, Inc. et al,*. Case No. 04-43098 (Bankr. N.D. Ga. Aug. 19, 2004); *In re Dan River Inc., et al.*, Case No. 04-10990 (Bankr. N.D. Ga. Apr. 1, 2004); *In re Centennial HealthCareCorp.*, Case No. 02-74974 (Bankr. N.D. Ga. Dec. 24, 2002); s*ee also In re Sharper Image Corp.*, Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008); *In re Lillian Vernon Corp.*, Case No. 08-10323 (Bankr. D. Del. Feb. 21, 2008).

40.     A similar waiver of the bank account closing requirement in the Bankruptcy Cases is necessary.  Specifically, the Debtors request that the existing Bank Accounts be deemed debtor in possession accounts and that their maintenance and continued use, with the same account numbers, styles, and document forms (including checks) as during the prepetition period, be authorized, subject only to: (a) designation of such accounts in the books and records of the Debtors and by the affected financial institutions as debtor in possession accounts, (b) the Debtors  printing of  Debtor in Possession  on their existing stock of checks and forms,

and (c) a prohibition against honoring prepetition checks without specific authorization from this Court.

41.     The Debtors will advise the Banks not to honor checks issued prior to the Petition Date, except as may be authorized by this Court.  By so advising the Banks, and because substantially all of the Debtors  cash is held in the Operating Accounts at Bank of America, the Debtors will achieve the goals of the bank account closing requirement - (a) establishing a clear demarcation between prepetition and postpetition checks, and (b) blocking the inadvertent payment of prepetition checks - without disrupting the Debtors  ongoing business operations. In addition, the Debtors request authority to open and close bank accounts as may be appropriate to avoid unnecessary fees and costs or to better facilitate the operation of their businesses.

**B.     Continued Use of Checks and Business Forms**

42.     The Debtors maintain only nine (9) accounts from which payments can be made, and substantially all of the Debtors  payments are made out of the Operating Accounts.  The Debtors currently have a one to two month stock of checks for the Operating Accounts. The Debtors request a waiver of the requirement that they replace their current checks and business forms with checks and business forms that will refer to the Debtors as  Debtors in Possession.   The Debtors have the ability to and propose that they instead print  Debtors in Possession  on their current stock of checks and forms.  Most vendors doing business with the Debtors will be aware of the Debtors  status as Chapter 11 debtors in possession.  Changing correspondence and business forms would be duplicative, because the new Debtors are able to print  Debtor in Possession  on their existing stock, as well as expensive and disruptive to the Debtors  business operations.

43.     Other bankruptcy courts have allowed debtors to use their prepetition business forms without the  debtor in possession  label, or to print its current stock with  Debtor in

Possession,  at least until the debtor s existing supply of business forms and checks were depleted. *See, e.g., In re Pike Nursery Holding, LLC*, Case No. 07-79129 (Bankr. N.D. Ga. Nov. 16, 2007); *In re Rhodes*, Case No. 04-78434 (Bankr. N.D. Ga. Nov. 5, 2004); *In re Galey & Lord, Inc., et al.*, Case No. 04-43098 (Bankr. N.D. Ga. Aug. 19, 2004); *In re Dan River Inc.*, et al., Case No. 04-10990 (Bankr. N.D. Ga. Apr. 1, 2004); *In re Centennial HealthCare Corp.*, Case No. 02-74974 (Bankr. N.D. Ga. Dec. 24, 2002); *In re The New Power Co.*, No. 02-10835 (Bankr. N.D. Ga. June 17, 2002); *see also In re Sharper Image Corp.*, Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008); *In re Lillian Vernon Corp.*, Case No. 08-10323 (Bankr. D. Del. Feb. 21, 2008).

44.    Requiring an immediate change to new checks and forms would impose unnecessary administrative expenses and demands on the Debtors at a time when the Debtors management team needs to be focused on ensuring that the Debtors  businesses are operating consistent with the provisions of Chapter 11, including the requirement that the Debtors not pay any outstanding prepetition invoices to vendors (unless otherwise authorized by this Court), and focusing on the Debtors  efforts to reorganize. Even if the Debtors order new checks and forms at this time, there would be a significant delay before such documents would be received, thereby causing further disruption to the Debtors  business operations. The Debtors therefore seek the authority to continue to use their existing supply of checks and business forms, printing a notation on the same to reflect their status as  Debtors in Possession.

## IV.    SATISFACTION OF BANKRUPTCY RULE 6003(B) AND WAIVER OF STAY PURSUANT TO 6004(H)

45.    Bankruptcy Rule 6003 provides that  [e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant  (b) a motion to use, sell, lease, or otherwise incur and obligation regarding

property of the estate      Fed. R. Bankr. P. 6003(b).  Bankruptcy Rule 6004(h) provides that

[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until

the expiration of 14 days after the entry of the order, unless the court orders otherwise.

Fed. R. Bankr. P. 6004(h).  Based on the foregoing, and the Sumrall Declaration, the Debtors

respectfully submit that the instant facts satisfy the requirements for a waiver of the rule in order

to avoid immediate and irreparable harm that would result from the requirement that the Debtors

discontinue the use of their existing Bank Accounts, checks, and forms.  For the same reasons,

the Debtors request that the Court waive the 14-day stay provided by Bankruptcy Rule 6004(h)

and that the relief requested herein should become effective and enforceable immediately upon

the entry of an order granting such relief.

## V.    <u>NOTICE</u>

46.    Notice of this Motion Regarding Cash Management has been given to the

following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee

for the Middle District of Georgia; (b) the Debtors' twenty (20) largest unsecured creditors on a

consolidated basis; (c) counsel for Agricultural Funding Solutions, LLC, the Debtors' prepetition

senior secured lender; (d) Gilchrist County Taxing Authorities, PO Box 37, Trenton, FL 32693;

(e) Eddie Fair, Hinds County Tax Collector, PO Box 51, Raymond, MS 39154; (f) Jackie

Batchelor T.C., Mitchell County, PO Box 373, Camilla, GA 31730; (g) Jennifer Carey, Erath

County Tax Assessor, 320 W. College, Stephenville, TX 76401; and (h) all other parties required

to receive service under Rule 2002 of the Bankruptcy Rules.  In light of the nature of the relief

requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court: (i) grant this Motion

Regarding Cash Management and the relief requested herein; (ii) enter the proposed order

attached hereto as   Exhibit C  ; and (iii) grant such other and further relief as it deems just and proper.

Respectfully submitted this 7th day of October, 2010.

ARNALL GOLDEN GREGORY LLP

/s/ Sean C. Kulka
Neil C. Gordon (Bar No. 302387)
Sean C. Kulka (Bar No. 648919)
Zachary D. Wilson (Bar No. 102079)
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
Telephone: (404) 873-8500

*Proposed Attorneys for Debtors and
Debtors-in-Possession*

**EXHIBIT A**

**OUTSTANDING PREPETITION CHECKS**

**OPERATING ACCOUNTS**

**As of Close of Business 10/6/10**

**EXHIBIT B**

**OUTSTANDING PREPETITION CHECKS**

**PAYROLL ACCOUNTS**

**As of Close of Business 10/6/10**

**EXHIBIT C**

**PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **DAIRY PRODUCTIONS SYSTEMS-** | ) | **Case No. 10-11752-JDW** |
| **GEORGIA LLC, DAIRY** | ) | |
| **PRODUCTIONS SYSTEMS, LLC,** | ) | |
| **DAIRY PRODUCTIONS SYSTEMS-** | ) | |
| **MISSISSIPPI, LLC, NEW FRONTIER** | ) | |
| **DAIRY, LLC, and HEIFER** | ) | |
| **HAVEN, LLC** | ) | **Jointly Administered** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

**ORDER APPROVING DEBTORS  MOTION PURSUANT TO**
**SECTIONS 105(a) AND 363(c) OF THE BANKRUPTCY CODE**
**FOR AN ORDER AUTHORIZING THE CONTINUED USE OF**
**EXISTING (A) CASH MANAGEMENT SYSTEM AND**
**BANK ACCOUNTS AND (B) BUSINESS FORMS**

Upon consideration of the Motion for an Order Approving Debtors  Motion Pursuant to

Section 105(a) and 363(c) of the Bankruptcy Code for an Order Authorizing the Continued Use

of Existing (A) Bank Accounts and (B) Business Forms (the   Motion Regarding Cash

Management )[1] filed by Dairy Production Systems - Georgia LLC, ("DPS-Georgia") Dairy Production Systems, LLC ("DPS"), Dairy Production Systems - Mississippi, LLC, ("DPS-Mississippi") New Frontier Dairy, LLC, ("New Frontier Dairy") and Heifer Haven, LLC ("HH"; DPS-Georgia, DPS, DPS Mississippi, New Frontier Dairy, and HH are collectively, the "Debtors"); and the Declaration of David P. Sumrall, President and CEO of the Debtors, in Support of Chapter 11 Petitions and First-Day Orders (the "Sumrall Declaration"); and the Court having jurisdiction to consider the Motion Regarding Cash Management and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion Regarding Cash Management and relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion Regarding Cash Management having been provided; and having considered the oral arguments presented at the hearing on the Motion Regarding Cash Management; and good cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion Regarding Cash Management is **GRANTED**.

2.      Those certain existing deposit agreements between the Debtors and the Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect.

3.      The Debtors are authorized to: (a) maintain and utilize their cash management system and the Bank Accounts, in substantially the same manner as described in the Motion Regarding Cash Management; (b) agree to and implement ordinary course changes to the Bank

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion Regarding Cash Management.

Accounts; and (c) open and close bank accounts; provided, however, that prior to opening any new bank accounts or closing any Bank Accounts the Debtors shall provide notice of their intention with respect thereto to the Office of the United States Trustee for the Middle District of Georgia.

4.      The Banks are authorized, without further Order of this Court, to deduct from the appropriate accounts of the Debtors their customary fees and expenses associated with the nature of the deposit and cash management services rendered to the Debtors (the   Bank Fees  ) on a postpetition basis, and further, to charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including, without limitation, returned items that result from automated clearing house transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

5.      The Banks are authorized to accept and honor all representations from the Debtors as to which checks, drafts and/or wires should be honored or dishonored consistent with any order(s) of this Court and governing law, whether such checks, drafts or wires are dated prior to, on or subsequent to the Petition Date.   Should the Banks honor a prepetition check, automated clearing house debit, wire transfer, or other item drawn on any account that is the subject of this Order (a) at the direction of the Debtors to honor such prepetition check or item, and (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, it shall not be deemed to be nor shall be liable to the Debtors or their estates or otherwise in violation of this Order.

6.      The Banks are prohibited from exercising any rights of setoff that they may have on account of prepetition obligations owing by the Debtors to the Banks, or their affiliates, unless otherwise ordered by this Order or further order of this Court.

7.      The Debtors are authorized to continue to use the business forms substantially in the forms existing immediately prior to the Petition Date upon imprinting  Debtor in Possession  on such forms.  Once the Debtors  existing check stocks have been used, any future checks ordered by the Debtors shall include the legend   Debtor in Possession.

8.      The requirements set forth in Rule 6003(b) of the Federal Rules of Bankruptcy Procedures are satisfied by the contents of the Motion Regarding Cash Management or are otherwise deemed waived.

9.      Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

***<strong>END OF DOCUMENT</strong>***

Prepared and presented by:

/s/ Sean C. Kulka
Neil C. Gordon (Bar No. 302387)
Sean C. Kulka (Bar No. 648919)
Zachary D. Wilson (Bar No. 102079)
171 17th Street, N.W., Suite 2100
Atlanta. GA 30363-1031
Telephone: (404) 873-8500
Facsimile: (404) 883-8501

*Proposed Attorneys for Debtors*
*and Debtors-in-Possession*