**THIS DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

|  |  |  |
|---|---|---|
|  | x |  |
| IN RE: | : |  |
|  | : | Chapter 11 |
| DAIRY PRODUCTION SYSTEMS - GEORGIA, LLC, | : |  |
| DAIRY PRODUCTION SYSTEMS, LLC, | : | Case No. 10-11752 |
| DAIRY PRODUCTION SYSTEMS - MISSISSIPPI, LLC, | : |  |
| NEW FRONTIER DAIRY, LLC, and | : | (Jointly Administered) |
| HEIFER HAVEN, LLC | : |  |
| Debtors. | x |  |

**PROPOSED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR CHAPTER 11 PLAN OF REORGANIZATION FOR DAIRY PRODUCTION SYSTEMS - GEORGIA, LLC AND ITS AFFILIATED DEBTORS PROPOSED BY AGRICULTURAL FUNDING SOLUTIONS, LLC**

Dated: September 8, 2011

GREENBERG TRAURIG, LLP

David B. Kurzweil
John J. Dyer
3290 Northside Parkway
Suite 400
Atlanta, Georgia 30327
Telephone: (678) 553-2100
Facsimile: (678) 553-2400

Attorneys for Agricultural Funding Solutions, LLC

# TABLE OF CONTENTS

Page

ARTICLE I INTRODUCTION ...................................................................................... 1

    A.    Overview of Chapter 11 ...................................................................... 1

    B.    Purpose of Disclosure Statement ...................................................... 2

    C.    Disclosure Statement Enclosures ...................................................... 2

        1.    The Plan (Exhibit "A"); and .............................................. 2

        2.    Liquidation Analysis ("Exhibit "B") ................................ 2

    D.    Approval of Disclosure Statement ...................................................... 3

    E.    Confirmation Hearing .......................................................................... 3

ARTICLE II OVERVIEW OF THE PLAN ................................................................... 3

    A.    Summary of Plan and Treatment of Claims Under the Plan .................... 4

    B.    No Substantive Consolidation Under the Plan ...................................... 8

    C.    Voting on Plan ...................................................................................... 8

ARTICLE III DESCRIPTION OF THE DEBTORS' BUSINESSES AND REASONS FOR
    FILING CHAPTER 11 CASES ............................................................ 10

    A.    Overview of Debtors' Business .......................................................... 10

        1.    The Debtors' Ownership Structure ............................................ 10

        2.    The Debtors' Businesses .......................................................... 10

    B.    Prepetition Debt Structure .................................................................. 12

        1.    The DPS Loans ........................................................................ 12

        2.    The DPS-GA Loans .................................................................. 13

        3.    The DPS-MS Loans .................................................................. 13

        4.    The Heifer Haven Loan ............................................................ 13

        5.    The New Frontier Loans ............................................................ 13

        6.    The Peperzak Loans .................................................................. 14

| | | | |
|---|---|---|---|
| C. | | Amounts Outstanding Under and Encumbered By the DPS Loans and Peperzak Loans | 15 |
| D. | | Other Prepetition Obligations of the Debtors | 15 |
| E. | | Events Leading to the Chapter 11 Cases | 15 |
| | 1. | Diminishing Milk Prices | 15 |
| | 2. | Increasing Feed Prices and Other Operational Costs | 16 |
| | 3. | The Debtors' Default under the DPS Loans | 16 |
| | 4. | AFS' Acquisition of the DPS Loans | 16 |
| F. | | Pending Litigation Against the Debtors | 17 |

ARTICLE IV SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES ...... 17

| | | | |
|---|---|---|---|
| A. | | The Debtors' Post-Petition Financial Performance | 17 |
| B. | | Filing and First Day Orders | 18 |
| C. | | Cash Collateral Use | 18 |
| D. | | Appointment of Creditors' Committee | 18 |
| E. | | Adversary Proceeding | 19 |
| F. | | The Aurora Dairy | 19 |
| G. | | Retention of Professionals | 20 |
| | 1. | The Debtors | 20 |
| | 2. | The Committee | 20 |
| | 3. | The Lender | 20 |
| H. | | Claims Process and Bar Date | 20 |
| | 1. | Schedules and Statements | 20 |
| | 2. | Proof of Claim Bar Date for Pre-Petition Claims Other Than Governmental Claims | 21 |
| | 3. | Administrative Expense Bar Date | 22 |

ATL 18,236,281 131498.010100

I.      Assumption and/or Rejection of Certain Executory Contracts and Unexpired Leases .................................................................................................. 22

      1.    Leases of Non-Residential Real Estate ....................................................... 22

      2.    Dairy Replacement Management, LLC ....................................................... 22

J.      Expiration of Debtors' Exclusivity ..................................................................... 23

ARTICLE V SUMMARY OF THE PLAN OF REORGANIZATION ....................................... 23

      A.    Classification and Treatment of Claims and Equity Interests .............................. 23

      1.    Unclassified Claims .................................................................................... 23

      2.    Classified Claims ....................................................................................... 25

      3.    Reservation of Rights Regarding Claims and Equity Interests ................... 27

      4.    Limitation to Full Recovery ....................................................................... 27

      B.    Claims and Distribution ..................................................................................... 28

      1.    Distribution Agent ...................................................................................... 28

      2.    Distributions Under the Plan ....................................................................... 28

      3.    Timing of Distributions .............................................................................. 28

      4.    Disputed Claims Reserve ............................................................................ 29

      5.    Unclaimed Property .................................................................................... 29

      6.    Distributions to Holders of Claims Generally ........................................... 30

      7.    Setoffs ........................................................................................................ 31

      8.    Control of Claims Resolution Process by Liquidation Trust and Liquidation Trustee .................................................................................... 32

      9.    Distributions Under Twenty-Five Dollars .................................................. 32

      10.   Fractional Distributions .............................................................................. 32

      11.   Final Distribution ....................................................................................... 32

      C.    Means for Implementation of the Plan ................................................................ 32

      1.    Overview of Plan ....................................................................................... 32

ATL 18,236,281 131498.010100

2. Effective Date Transactions ...................................................................... 33

3. Effective Date Funding ............................................................................ 34

4. Post-Effective Date Funding .................................................................... 34

5. Employees ................................................................................................ 34

6. Estate Assets Transferred to DairyCo ...................................................... 35

7. Assumed Liabilities ................................................................................. 35

8. Corporate (or Equivalent) Action ............................................................ 35

9. Other Documents and Actions ................................................................. 36

10. Operations Between the Confirmation Date and the Effective Date .......... 36

11. Dissolution of Debtors ............................................................................. 36

12. Conditions Precedent to the Effective Date ............................................. 36

13. Waiver of Conditions to Effectiveness ..................................................... 38

14. Effect of Nonoccurrence of the Conditions to Effectiveness ..................... 39

15. Further Authorization ............................................................................. 39

16. No Substantive Consolidation .................................................................. 39

17. Securities Registration Exemption ........................................................... 39

18. Cancellation of Instruments and Equity Interests ..................................... 39

19. Operating Reports ................................................................................... 40

20. Disposition of Books and Records ........................................................... 40

D. Liquidation Trust .............................................................................................. 40

1. Establishment of Liquidation Trust .......................................................... 40

2. Appointment of Liquidation Trustee ........................................................ 40

3. Liquidation Trust Assets .......................................................................... 41

4. Treatment of Liquidation Trust for Federal Income Tax Purposes; No
   Successor in-Interest. ............................................................................... 42

5. Investments of Cash ................................................................................ 43

iv

6. Responsibilities of the Liquidation Trustee ................................................. 43

7. Liquidation Trust Expenses ....................................................................... 44

8. Repayment of DairyCo Liquidation Trust Loan Obligations. .................... 45

9. Bonding of Liquidation Trustee .................................................................. 45

10. Fiduciary Duties of the Liquidation Trustee ............................................... 45

11. Dissolution of the Liquidation Trust ........................................................... 45

12. Full and Final Satisfaction against Liquidation Trust ................................ 45

13. Limitation of Liability ................................................................................. 46

14. Reliance on Documents .............................................................................. 47

15. Requirement of Undertaking ....................................................................... 47

E. The Releases and Exculpation ............................................................................. 47

1. Estate Release ............................................................................................ 47

2. Sumrall/AFS Release .................................................................................. 48

3. Releases by Holders of Claims ................................................................... 48

4. Exculpation ................................................................................................. 49

F. Procedures for Resolving Disputed Claims ......................................................... 50

1. Objections to Claims ................................................................................... 50

2. Disputed Claims .......................................................................................... 50

3. Subordination of Claims ............................................................................. 50

4. Estimation of Claims ................................................................................... 50

5. No Distribution in Respect of Disallowed Claims ...................................... 50

G. Effect of Confirmation ......................................................................................... 51

1. Release of Liens and Cancellation of Instruments ..................................... 51

2. Revesting and Vesting; Retention and Enforcement of Claims .................. 51

3. Injunction .................................................................................................... 52

ATL 18,236,281 131498.010100

4. Discharge of Claims and Equity Interests .................................................. 52

5. Term of Injunctions or Stays ...................................................................... 53

H. Executory Contracts ...................................................................................... 53

1. Assumption and Assignment of Certain Executory Contracts ................... 53

2. Assumption and Assignment Conditioned upon Consummation
of the Plan ................................................................................................ 54

3. Rejection of Remaining Contracts and Leases ......................................... 54

4. Treatment of Rejection Damages Claims ................................................. 54

I. Administrative Provisions ............................................................................... 54

1. Retention of Jurisdiction .......................................................................... 54

2. Failure of the Bankruptcy Court to Exercise Jurisdiction ........................ 57

3. Governing Law ........................................................................................ 57

4. Amendments ............................................................................................ 58

5. Modification, Revocation or Withdrawal of The Plan .............................. 58

6. Exemption from Certain Transfer Taxes ................................................. 58

7. Compromise of Controversies ................................................................. 59

8. Insurance Preservation and Proceeds ....................................................... 59

9. Successors and Assigns ............................................................................ 59

10. Confirmation Order and Plan Control ...................................................... 59

11. Dissolution of the Committee .................................................................. 60

12. Severability ............................................................................................. 60

13. Headings .................................................................................................. 60

14. Notices .................................................................................................... 60

15. No Admissions ........................................................................................ 60

ARTICLE VI VOTING ON AND CONFIRMATION OF THE PLAN .................................... 61

A. General ........................................................................................................... 61

ATL 18,236,281 131498.010100

B.     Acceptances Necessary for Confirmation ............................................................ 61

C.     Voting Under the Plan ..................................................................................... 61

D.     Acceptance by Impaired Creditors ................................................................... 62

E.     Confirmation Without Acceptance by All Impaired Classes ............................... 63

       1.     No Unfair Discrimination ........................................................... 64

       2.     Fair and Equitable Test .............................................................. 64

F.     Feasibility ....................................................................................................... 65

       1.     DairyCo ..................................................................................... 65

       2.     DairyCo Ownership .................................................................... 68

       3.     Equity Contribution ................................................................... 68

       4.     Debt Structure ........................................................................... 68

       5.     The Plan is Feasible ................................................................... 69

G.     Best Interests Test ........................................................................................... 69

H.     Confirmation and Consummation Procedure ...................................................... 70

       1.     Solicitation of Votes .................................................................. 70

       2.     Contents of Solicitation Package ................................................ 71

       3.     Temporary Allowance of Claims for Voting Purposes ................... 71

       4.     Voting ....................................................................................... 72

       5.     The Confirmation Hearing .......................................................... 72

       6.     Consummation ........................................................................... 73

ARTICLE VII SECURITIES REGISTRATION EXEMPTION ................................................... 73

A.     Securities Registration Exemption .................................................................... 73

B.     Section 1145 of the Bankruptcy Code ............................................................... 73

ARTICLE VIII CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .... 74

A.     Tax Consequences to the Debtors ..................................................................... 75

    B.      Tax Consequences to Certain Holders of Allowed Claim ................................... 77

          1.      General Tax Consequences to Holders of Allowed Claims........................ 77

          2.      Accrued Interest and OID ........................................................................... 77

          3.      Receipt of Beneficial Interests in the Liquidation Trust ............................. 77

          4.      The Exchange of the AFS Secured Claims .................................................. 78

          5.      The Treatment of the DairyCo Equity Interests as Partnership Interests.... 78

          6.      Holders of Administrative Expense Claims, Fee Claims and Priority Tax Claims. ................................................................................................. 79

    C.      Information Reporting and Withholding ............................................................. 80

    D.      Non-United States Claimholders ........................................................................ 80

ARTICLE IX RISK FACTORS ........................................................................................ 81

    A.      Bankruptcy Considerations................................................................................. 81

    B.      Proponent Cannot State with any Degree of Certainty the Number or Amount of Claims that will be Allowed. .............................................................. 81

    C.      Risk That Proceeds From Causes of Action Will be Less than Projected. ........... 81

    D.      Risk that, if the Plan is Not Confirmed, then the Debtors' Bankruptcy Cases May Be Converted To Liquidations Under Chapter 7. ............................. 81

    E.      Alternative/Competing Plans .............................................................................. 82

    F.      Relief from the Automatic Stay .......................................................................... 82

ARTICLE X ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ........................................................................................................ 82

    A.      General ................................................................................................................ 82

    B.      Alternative Plans of Reorganization .................................................................. 82

    C.      Sale of Assets Under Section 363 With Follow-On Plan .................................... 83

    D.      Liquidation Under Chapter 7 ............................................................................. 83

ARTICLE XI MISCELLANEOUS ................................................................................... 83

    A.      Disclaimers ......................................................................................................... 83

B.      Information Contained Herein Is for Soliciting Votes.......................................... 85

C.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement ......... 85

D.      No Admissions Made............................................................................................ 85

E.      Failure to Identify Litigation Claims or Projected Objections............................. 85

F.      No Waiver of Right to Object or Right to Recover Transfers and Assets............ 85

G.      Potential Exists for Inaccuracies, and the Proponent has No Duty to Update...... 86

H.      No Representations Outside this Disclosure Statement Are Authorized.............. 86

I.      Rules of Interpretation ........................................................................................ 86

J.      Computation of Time........................................................................................... 87

K.      References to Monetary Figures .......................................................................... 87

ARTICLE XII SUMMARY, RECOMMENDATION AND CONCLUSION............................ 87

Exhibits to the Disclosure Statement:
Exhibit <u>A</u> -      The Plan
Exhibit <u>B</u> -      Liquidation Analysis

# ARTICLE I
## INTRODUCTION

This Proposed Disclosure Statement (the "Disclosure Statement") has been prepared pursuant to section 1125 of Chapter 11, title 11 of the United States Code (the "Bankruptcy Code") and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and describes the terms and provisions of the Chapter 11 Plan of Reorganization (the "Plan") for Dairy Production Systems - Georgia, LLC, a Colorado limited liability company ("DPS-GA"), Dairy Production Systems, LLC, a Colorado limited liability company ("DPS"), Dairy Production Systems - Mississippi, LLC, a Colorado limited liability company ("DPS-MS"), New Frontier Dairy, LLC, a Colorado limited liability company ("New Frontier") and Heifer Haven, LLC, a Colorado limited liability company ("Heifer Haven"; DPS-GA, DPS, DPS-MS, New Frontier and Heifer Haven may be referred to individually as a "Debtor" and collectively, as the "Debtors") that is proposed by Agricultural Funding Solutions, LLC ("AFS", the "Lender" or the "Proponent") and was simultaneously filed with the United States Bankruptcy Court for the Middle District of Georgia (the "Bankruptcy Court"). A copy of the Plan is attached hereto as Exhibit "A." Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in Article I of the Plan.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history as well as significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan, as well as the Plan confirmation process.

**For a summary of the Plan, please see Article V hereof. For a discussion of certain factors to be considered prior to voting, please see Articles VI, VIII, IX and X hereof.**

A.     Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, Chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the Chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a Chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor, and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited

- 1 -

exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed Chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

B.      Purpose of Disclosure Statement

The Proponent has prepared this Disclosure Statement in connection with its solicitation of acceptances of the Plan. The purpose of this Disclosure Statement is to provide Holders of Claims with sufficient information to make an informed decision as to whether to accept or reject the Plan. Each Holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. **THE VOTING DEADLINE IS _____, 2011.**

The Plan is a legally binding arrangement. No summary of the Plan should be relied upon in determining whether to accept or reject the Plan.

**Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement shall have the meanings ascribed to them in the Plan.**

C.      Disclosure Statement Enclosures

Attached as Exhibits to the Disclosure Statement are the following documents:

1.      The Plan (Exhibit "A"); and

2.      Liquidation Analysis ("Exhibit "B").

All exhibits to the Plan will be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court fifteen (15) days prior to the deadline for filing objections to confirmation of the Plan, or in accordance with such other deadline as may be established in the order approving this Disclosure Statement (the "Disclosure Statement Order") or another Final Order of the Bankruptcy Court. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement, once filed, by making a written request or telephone call to the following:

John J. Dyer
Greenberg Traurig, LLP
3290 Northside Parkway, Suite 400
Atlanta, Georgia  30327
Telephone: (678) 553-2100
Email: dyerj@gtlaw.com

D.     Approval of Disclosure Statement

On _____, 2011, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the Holders of Claims to make informed judgments as to whether to accept or reject the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.**

E.     Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2011, at _____ [a.m.] [p.m.], before the Honorable James D. Walker, United States Bankruptcy Court, 201 W. Broad Avenue, Albany, Georgia _____. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before _____, 2011, at _____ [a.m.] [p.m.] (Eastern Time), in the manner described in the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned date of the Confirmation Hearing.

**THE PROPONENT BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO HOLDERS OF CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF EVERY CLASS OF CLAIMS. ACCORDINGLY, THE PROPONENT RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

If you have any questions about the Plan, this Disclosure Statement or the Voting Procedures, please call John Dyer at 678-553-2100.

**ARTICLE II**
**OVERVIEW OF THE PLAN**

The following is a summary of the Plan, which is intended to provide parties in interest with a concise description of the Plan. THIS SUMMARY IS NOT A COMPLETE DESCRIPTION OF THE PLAN AND DOES NOT SUBSTITUTE FOR THE PLAN AND THE DISCLOSURE STATEMENT, BOTH OF WHICH SHOULD BE READ CAREFULLY IN THEIR ENTIRETY. This summary is provided for convenience only, and in the event of any discrepancy between this summary overview and the terms of the Plan, the Plan controls.

The Proponent believes that the Plan provides the best recoveries possible for Holders of Allowed Claims and strongly recommend that, if such Holders are entitled to vote, they vote to accept the Plan. As discussed in further detail in this Disclosure Statement, the Proponent believes that any alternative to confirmation, such as liquidation or attempts by another entity to file an alternative plan or reorganization, could result in significant delays, litigation, additional costs and lower recoveries. The Proponent believes that the Plan offers the prospect of superior recovery to any other practical alternatives.

- 3 -

A.     Summary of Plan and Treatment of Claims Under the Plan

The Plan provides for, among other things, (a) the transfer of substantially all of the assets of each of the Debtors to various acquiring entities (together, "DairyCo"), which will be 100% owned by AFS or its designee(s), free and clear of all Claims, liens, charges, encumbrances and interests except as otherwise specifically provided in the Plan; (b) a settlement with AFS of the AFS Causes of Action in exchange for funding of the Plan; and (c) establishment and implementation of a Liquidation Trust for the purposes of (i) evaluating, prosecuting and resolving all Disputed Claims against the Debtors' Estates; (ii) prosecution of the Avoidance Actions, to the extent not settled or resolved prior to the Effective Date of the Plan; (iii) holding and liquidating any Estate Assets not transferred to DairyCo; and (iv) the making of distributions under the Plan. The Plan is expected to become effective on the Effective Date, which is expected to occur within fifteen (15) days after entry of the Confirmation Order, upon satisfaction of certain conditions precedent as described in the Plan and in more detail below.

The Plan classifies and provides for treatment of each of the Claims and Equity Interests as summarized in the following table:

| Class | Description | Treatment | Entitled to Vote | Estimated[1] Amount | Estimated Recovery |
|---|---|---|---|---|---|
| -- | Administrative Expense Claims | Each Holder of an Allowed Administrative Expense Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim: (a) Cash equal to the amount of such Allowed Administrative Expense Claim; or (b) such other treatment as to which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Administrative Expense Claim will have agreed upon in writing. | N/A | Total:[2] $41,972-$1,150,538  DPS: $41,972-$638,356  DPS-GA: $0-$344,108  DPS-MS: $0-$63,460  New Frontier: $0-$104,614  Heifer Haven: $0 | 100%  100%  100%  100%  100% |

[1]     The estimated amounts for each category of claims are estimates only and do not take into account potential objections to Claims. Therefore, the estimated amounts of Claims within each Class may be lower or higher than the actual amount Allowed depending upon the outcome of any objections thereto and any order of the Bankruptcy Court.

[2]     These estimated amounts are as of July 31, 2011 and do not include any purported post-petition insider payables or inter-company payables. The ranges provided assume, on the low end, that DairyCo will assume payment of certain ordinary course post-petition payables, and on the high end, that DairyCo will not assume any ordinary course post-petition payables.

| | | | | | |
|---|---|---|---|---|---|
| -- | Fee Claims | Unless the Bankruptcy Court has entered a Final Order allowing a Fee Claim prior to the entry of the Confirmation Order, each Person who holds or asserts a Fee Claim incurred before the Effective Date will be required to file with the Bankruptcy Court and serve on all parties required to receive notice of filings in the Chapter 11 Cases a Fee Application within thirty (30) days after the Effective Date. The failure to file and serve such Fee Application timely and properly will result in the Fee Claim being forever barred and discharged. To the extent necessary to give effect to the Plan, entry of the Confirmation Order will amend and supersede any previously entered orders of the Bankruptcy Court regarding procedures for the payment of Fee Claims. <br><br> A Fee Claim, with respect to which a Fee Application has been timely and properly filed and served pursuant to the Plan, will become an Allowed Fee Claim only to the extent allowed by Final Order of the Bankruptcy Court, and will be paid in accordance with such Final Order. | N/A | Total:[3] <br> $1,106,076 <br><br> DPS: <br> $265,456 <br><br> DPS-GA: <br> $265,456 <br><br> DPS-MS: <br> $265,456 <br><br> New Frontier: <br> $265,456 <br><br> Heifer Haven: <br> $44,243 | <br><br> 100% <br><br><br> 100% <br><br><br> 100% <br><br><br> 100% <br><br><br> 100% |
| -- | Priority Tax Claims | Each Holder of an Allowed Priority Tax Claim will receive, at the sole option of the Proponent or the Liquidation Trustee, as applicable, in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) | N/A | Total: <br><br> $54,638 | 100% |

---

[3]   These estimated amounts are as of August, 2011. Professional fees are allocated among the various Debtors to obligate each Debtor, except Heifer Haven, with 24% of such fees.  Heifer Haven incurs 4% of the total fees.  The Proponent expressly reserves any and all rights to object to the Fee Claims.

| | | | | | |
|---|---|---|---|---|---|
| | | Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter; (b) regular installment payments in Cash in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as to which the Proponent or the Liquidation Trustee, as appropriate, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing. | | | |
| 1 | Priority Non-Tax Claims | Each Holder of an Allowed Priority Non Tax Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Non Tax Claim: (a) Cash equal to the amount of such Allowed Priority Non Tax Claim; or (b) such other treatment which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Priority Non Tax Claim have agreed upon in writing. | No Unimpaired Deemed to Accept | Total: 343,633 | 100% |
| 2 | AFS Secured Claim | Each Holder of an Allowed AFS Secured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed AFS Secured Claim, their Pro Rata Share of (a) the DairyCo Equity Interests and (b) the DairyCo Notes. | Yes | Total: $77,166,958 DPS: $25,732,257 DPS-GA: $11,891,042 DPS-MS: $8,812,162 New Frontier: $24,758,517 Heifer Haven: | 64% 49% 61% 37% 31% |

| | | | | | |
|---|---|---|---|---|---|
| | | | | $5,972,980 | |
| 3 | Allowed Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Other Secured Claim (a) one of the treatments specified in section 1124 of the Bankruptcy Code; or (b) such other treatment which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing. | No Unimpaired Deemed to Accept | Total: $2,663,504 DPS: $890,102 DPS-GA: $717,569 DPS-MS: $680,057 New Frontier: $375,776 Heifer Haven: $0 | 100% 100% 100% 100% 100% |
| 4 | Allowed Unsecured Claims | Each Holder of an Allowed Unsecured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Unsecured Claim, their Pro Rata Share of the Liquidation Trust Proceeds. Upon the Effective Date of the Plan, the Holders of the Allowed AFS Deficiency Claims and any Allowed Unsecured Claims of Sumrall, which Claims are included in Class 4, will be deemed to have waived any and all rights to Distributions on account of their respective Allowed Class 4 Claims only with respect to the DairyCo Liquidation Trust Contribution, and they otherwise will be entitled to receive their Pro Rata Share of the Liquidation Trust Proceeds. | Yes | Total:[4] $12,478,394,03 DPS: $4,327,311.32 DPS-GA: $6,311,708.81 DPS-MS: $767,629.54 New Frontier: $972,015.60 Heifer Haven: $99,728.76 AFS Unsecured Deficiency Claim: $38,385,773[5] Sumrall Allowed | >2% >2% >2% >2% >2% Unknown Unknown |

[4]   The amounts of Claims provided include inter-company Claims and are net of the Allowed AFS Deficiency Claims and any Allowed Unsecured Claims of Sumrall. The estimated recovery is based on a $250,000 Distribution and assuming a 100% payment to Holders of Convenience Claims. Actions pursued post-confirmation by the Liquidation Trustee may alter the amounts provided herein.

ATL 18,236,281 131498.010100

| | | | | Unsecured Claim: $750,758[6] | |
|---|---|---|---|---|---|
| 5 | Allowed Convenience Class Claims | Each Holder of an Allowed Convenience Class Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Convenience Class Claim, 100% of their Allowed Convenience Class Claim, which amounts will be paid from the DairyCo Liquidation Trust Contribution. | Yes | Total: $58,613<br><br>DPS: $16,294<br><br>DPS-GA: $11,880<br><br>DPS-MS: $14,876<br><br>New Frontier: $15,461<br><br>Heifer Haven: $101 | <br><br>100%<br><br>100%<br><br>100%<br><br>100%<br><br>100% |
| 6 | Equity Interests | All Class 6 Equity Interests will be extinguished on the Effective Date. | No Impaired Deemed to Reject | N/A | |

### B.    No Substantive Consolidation Under the Plan

**The Proponent has filed the Plan as a joint Chapter 11 plan; however, the Plan does not seek to substantively consolidate the Debtors' estates into one legal entity.** Therefore, the Plan must be confirmed on behalf of each one of the Debtors separately, on an estate-by-estate basis. In addition, each Holder of a Claim entitled to vote on the Plan will receive a separate Ballot to vote to accept or reject the Plan on account of its Claim with respect to each Debtor. For more information on this topic, please refer to Article V.C.16 below.

### C.    Voting on Plan

Not every Holder of a Claim or Equity Interest is entitled to vote on the Plan. As prescribed by the Bankruptcy Code and the Bankruptcy Rules, Claims asserted against, and Interests in, the Debtors are placed into Classes. The Plan designates six (6) separate Classes of Claims and Equity Interests. The classification and the treatment of each Class is discussed in

---

[5]    See Article III.C for an itemization of the AFS Deficiency Claim on a Debtor-by-Debtor basis. This number is on a consolidated basis.

[6]    This amount is on a consolidated basis.

detail below.  Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are Impaired and will be receiving or retaining property under the Plan are entitled to vote to accept or reject the Plan. Accordingly, the Proponent is seeking acceptance of the Plan by Holders of Claims in Classes 2, 4 and 5, which are Impaired, and may be receiving a Distribution under the Plan.  Holders of Claims in Classes 1 and 3 are Unimpaired.  Accordingly, Holders of Claims in these Classes are deemed to accept the Plan and are therefore not entitled to vote to accept or reject the Plan, see section of the Plan, entitled, "Provisions for Treatment of Claims and Interests Classified in the Plan."  Holders of Equity Interests in  Class 6 will neither be receiving a Distribution nor receiving or retaining any interest in the Debtors, DairyCo, the Estates, the Estate Assets or other property or interests in property thereof on account of such Equity Interests.  Accordingly, Holders of Equity Interests in Class 6 are deemed to reject the Plan and, therefore, not entitled to vote to accept or reject the Plan, see section of the Plan, entitled, "Provisions for Treatment of Claims and Interests Classified in the Plan."

As set forth in the Plan, the Holder of any Claim that, as of the Voting Record Date, (a) has been Disallowed, (b) is the subject of a pending objection, or (c) was listed on the Debtors' Schedules as unliquidated in amount, Contingent or Disputed (if no contrary Proof of Claim with respect to such Claim has been timely filed) or a Proof of Claim with respect to which was filed on or before the Bar Date pursuant to the provisions of the Bar Date Order and such Proof of Claim asserts such Claim as unliquidated in amount, Contingent or Disputed, shall not be entitled to vote on the Plan, unless on or prior to the Voting Record Date the Bankruptcy Court enters a Final Order directing otherwise; provided, however, that if only a portion of such Claim has been Disallowed, objected to or listed or asserted (as applicable) as unliquidated, Contingent or Disputed, such Holder shall be entitled to vote the remainder of such Claim in an amount determined pursuant to the Disclosure Statement Order. Unless otherwise provided in this Disclosure Statement, if you are not entitled to vote solely because your Claim is the subject of a pending objection, you may apply to the Bankruptcy Court for an order allowing your Claim for voting purposes only, in accordance with the Disclosure Statement Order.

To be counted, Holders of Impaired Claims entitled to vote shall cast their vote to accept or reject the Plan in accordance with the instructions on the ballot (the "Ballot") provided as part of the Solicitation Package (as defined below).  Such Ballots should be cast in accordance with the solicitation procedures established pursuant to the Disclosure  Statement Order.  Any Ballot received after the Voting Deadline Date, which is _____, 2011, shall be counted in the sole discretion of the Proponent.

- 9 -

## ARTICLE III

## DESCRIPTION OF THE DEBTORS' BUSINESSES AND REASONS FOR FILING CHAPTER 11 CASES

A.    Overview of Debtors' Business

    1.    The Debtors' Ownership Structure

Each of the Debtors is a single-member limited liability company that is 100% owned by David P. Sumrall ("Sumrall").  The Debtors are organized under the laws of the State of Colorado.

    2.    The Debtors' Businesses

The Debtors consist of five limited liability companies, four of which operate five large commercial dairies and one of which operates a heifer-growing operation, all in the South and Southeast United States.  The four dairy companies own and operate five dairy farms located in Florida, Georgia, Mississippi and Texas (the "Dairies").

DPS owns and operates two dairy operations in Florida: one in Bell, Florida and the other in Branford, Florida. DPS-GA owns and operates a dairy farm located in Baconton, Georgia.  DPS-MS owns and operates a dairy farm located in Edwards, Mississippi.  New Frontier owns and operates a dairy farm located in Dublin, Texas.  Each of these operations is a member in a dairy cooperative to which it sells all its milk.  In June, 2011, the Debtors produced approximately 165,642 hundredweight of milk, which in turn generated approximately $4,140,617 in proceeds.

Heifer Haven raises the heifer calves born at DPS, DPS-GA and DPS-MS from approximately three months in age until they are mature. At that time, they are impregnated and returned to the Debtors' dairy herds to produce milk.

The operations of the Dairies are conducted partially on real estate owned by the Debtors and partially on leased real estate.[7]  As of August 1, 2011, the Debtors maintained a total herd count of approximately 10,889 head of mature cows, and 4,529 head of young stock. In addition, the Debtors each own or lease all the assets necessary to conduct their operations, including buildings, improvements, fixtures, equipment, permits and licenses.  Combined, the Debtors employ approximately 300 people.

    a.    *DPS - The Bell Dairy*

DPS owns and operates two dairy operations in Florida.  The first such operation is located in Bell, Florida (the "Bell Dairy").  The Bell Dairy is comprised of 456 acres of land

---

[7] Certain information set forth herein was supplied by the Debtors and has not been confirmed by the Proponent.  Therefore, the Proponent makes no warranty or representation as to its accuracy or veracity.

owned by the DPS and of 322 acres of leased property. The Bell Dairy currently has the capacity to milk approximately 800 cows. Renovation and expansion of barns already on the premises will double the Bell Dairy's milking capacity.

As of August, 2011, the Bell Dairy had approximately 1,033 head of cattle, of which 763 were milking.

The Bell Dairy's facilities include a facility to raise young calves. Calves born at the Debtors' dairy operations in Florida, Georgia and Mississippi are transferred to the Bell Dairy and raised there until they are 3 months in age. At that time they are transferred to Heifer Haven, where they are raised until they are ready to be incorporated into one of the Debtors' herds for milk production.

### b. *DPS - The Branford Dairy*

The second of DPS' dairy operations is located in Branford, Florida (the "Branford Dairy"). The Branford Dairy is located on 593 acres of land owned by DPS and approximately 130 acres of leased land.

The Branford Dairy has the capacity to house approximately 2,500 head of cattle, including 2,050 milking cattle, at any time. As of August, 2011, the Branford Dairy's herd was comprised of 2,160 head of cattle, of which 1,695 were milking.

### c. *DPS-GA*

DPS-GA operates a dairy located in Baconton, Georgia (the "DPS-GA Dairy"). The DPS-GA Dairy is located on 1,500 acres of land leased under two separate leases and has a total herd capacity of 4,320 cows and milking capacity of 3,400 cows. As of August, 2011, the DPS-GA Dairy's herd was comprised of 3,827 head of cattle, of which 2,985 were milking.

### d. *DPS-MS*

DPS-MS operates a dairy located in Edwards, Mississippi (the "DPS-MS Dairy"). The DPS-MS Dairy is comprised of approximately 220 acres of land owned by DPS-MS and approximately 250 acres of leased land.

DPS-MS has a milking capacity of 1,500 cows. As of August, 2011, the DPS-MS Dairy's herd was comprised of 1,465 head of cattle, of which 1,116 were milking.

### e. *New Frontier*

New Frontier operates a dairy located in Dublin, Texas (the "New Frontier Dairy"). The New Frontier Dairy is comprised of approximately 826 acres of land owned by New Frontier and an additional 250 acres of land that are leased. The New Frontier Dairy has a maximum herd capacity of 4,500 head of cattle and milking capacity of 3,600 cows.

As of August, 2011, the New Frontier Dairy's herd was comprised of 2,359 head of cattle, of which 1,830 were milking.

- 11 -

f. *Heifer Haven*

Heifer Haven administers a calf-raising operation and does not own or operate dairies. Heifer calves birthed on dairies owned by DPS, DPS-GA, and DPS-MS are transferred to the Bell Dairy to be raised until they are three months in age, and then are transferred to Heifer Haven. Heifer calves birthed at the New Frontier Dairy are sold to third parties for approximately $100 per heifer calf. Male calves birthed at all the Debtors' farms are sold to third party cattle purchasers for approximately $20 per head.

Once relocated to the Bell Dairy, heifer calves are housed, fed and raised for approximately 16 weeks until they reach 300 pounds. At this point, these heifer calves are transferred to Heifer Haven and raised to maturity. Eventually, each heifer grows into a "Replacement Springer," i.e. a mature heifer impregnated for the first time, and is transferred back to DPS, DPS-GA or DPS-MS prior to calving and commencing milking. No cash is exchanged between Heifer Haven and the other Debtors in connection with the transfer of calves to Heifer Haven or the transfer of Replacement Springers back to those other Debtors. Heifer Haven does not own any operating assets other than calves, and it contracts out all calf-raising responsibilities to third parties.

B.     Prepetition Debt Structure

As of the Petition Date, each of the Debtors had significant prepetition indebtedness consisting of amounts outstanding under various loans. A brief description of each of these loans is as follows:

1.     The DPS Loans

On or about September 6, 2007, New Frontier Bank of Greeley, Colorado ("NFB") made a loan to DPS in the original principal amount of $2,825,000 (the "First DPS Loan") as evidenced by a Promissory Note and Security Agreement dated September 6, 2007, made payable by DPS to NFB in the original principal amount of $2,825,000.00.

On or about October 19, 2007, NFB made a loan to DPS in the original principal amount of $6,800,000 (the "Second DPS Loan") as evidenced by a Promissory Note dated October 19, 2007, made payable by DPS to NFB in the original principal amount of $6,800,000. The Second DPS Loan (and all other debts of DPS to NFB and its successors and assigns up to the original principal amount of the Second DPS Note) is secured by Branford Dairy.

On or about January 15, 2009, NFB made a loan to DPS in the original principal amount of $2,978,129 (the "Third DPS Loan") as evidenced by a Promissory Note dated January 15, 2009, made payable by DPS to NFB in the original principal amount of $2,978,129. The Third DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by the Bell Farm.

On or about March 19, 2009, NFB made a loan to DPS in the original principal amount of $8,600,000 (the "Fourth DPS Loan"; the First DPS Loan, the Second DPS Loan, the Third DPS Loan, and the Fourth DPS Loan are collectively, the "DPS Loans") as evidenced by a Promissory Note and Security Agreement dated March 19, 2009, made payable by DPS to NFB

- 12 -

in the original principal amount of $8,600,000. The Fourth DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by, among other things, DPS's accounts, crops, equipment, farm products, general intangibles, inventory, livestock, and milk sale proceeds.

2.      The DPS-GA Loans

On or about January 20, 2009, NFB made a loan to DPS-GA in the original principal amount of $10,100,000 (the "DPS-GA Loan"), as evidenced by a Promissory Note and Security Agreement dated January 20, 2009, made payable by DPS-GA to NFB in the original principal amount of $10,100,000. The DPS-GA Loan (and all other debts of DPS-GA to NFB and its successors and assigns) is secured by, among other thing, DPS-GA's accounts, equipment, feed, general intangibles, livestock, and milk sale proceeds.

3.      The DPS-MS Loans

On or about July 11, 2005, NFB made a loan to DPS-MS in the original principal amount of $3,250,000 (the "First DPS-MS Loan") as evidenced by a Promissory Note and Security Agreement dated July 11, 2005, made payable by DPS-MS to NFB in the original principal amount of $3,250,000, as modified by a Debt Modification Agreement dated August 19, 2008, and as further modified by a Debt Modification Agreement dated August 28, 2008. The First DPS-MS Loan (and all other debts of DPS-MS to NFB and its successors and assigns) is secured by the DPS-MS Dairy.

On or about May 22, 2006, NFB made a loan to DPS-MS in the original principal amount of $4,512,000 (the "Second DPS-MS Loan"; the First DPS-Mississippi Loan and the Second DPS-Mississippi Loan are collectively, the "DPS-Mississippi Loans") as evidenced by a Promissory Note and Security Agreement dated May 22, 2006, made payable by DPS-MS to NFB in the original principal amount of $4,512,000, as modified by a Commercial Debt Modification Agreement dated May 14, 2007, as further modified by a Debt Modification Agreement dated May 18, 2008, and as further amended by a Debt Modification Agreement dated December 23, 2008. The Second DPS-MS Loan (and all other debts of DPS-MS to NFB and its successors and assigns) is secured by, among other things, DPS-MS' accounts, crops, equipment, farm products, supplies, feed, inventory, and livestock.

4.      The Heifer Haven Loan

On or about June 21, 2007, NFB made a loan to Heifer Haven in the original principal amount of $5,012,000 (the "Heifer Haven Loan") evidenced by a Promissory Note and Security Agreement dated June 21, 2007 made payable by Heifer Haven to NFB in the original principal amount of $5,012,000, as modified by a Debt Modification Agreement dated June 25, 2008. The Heifer Haven Loan (and all other debts of Heifer Haven to NFB and its successors and assigns) is secured by Heifer Haven's livestock.

5.      The New Frontier Loans

On or about December 28, 2007, NFB made a loan to New Frontier in the original principal amount of $8,600,000 (the "First New Frontier Loan") as evidenced by a Promissory

- 13 -

Note dated December 28, 2007, made payable by New Frontier to NFB in the original principal amount of $8,600,000. The First New Frontier Loan (and all other debts of New Frontier to NFB and its successors and assigns) is secured by the New Frontier Farm.

On or about July 3, 2008, NFB made a loan to New Frontier in the original principal amount of $12,030,000 (the "Second New Frontier Loan"; the First New Frontier Loan and Second New Frontier Loan are collectively the "New Frontier Loans") evidenced by a Promissory Note dated July 3, 2008, made payable by New Frontier to NFB in the original principal amount of $12,030,000, as modified by a Debt Modification Agreement dated December 10, 2008, which Debt Modification Agreement reduced the credit limit under the Second New Frontier Loan from $12,030,000 to $9,030,000, as further modified by a Debt Modification Agreement dated December 29, 2008, as further modified by a Debt Modification Agreement dated March 20, 2009, and as further modified by a Debt Modification Agreement dated March 23, 2009. The Second New Frontier Loan is secured by certain personal property of New Frontier, including, but not limited to, all farm products and livestock of New Frontier.

Each of the above-referenced loans made by NFB to DPS, DPS-GA, DPS-MS, New Frontier and Heifer Haven (together, the "DPS Loans") is guaranteed by Sumrall.

The Federal Deposit Insurance Corporation ("FDIC") placed NFB's assets into receivership. In November, 2009, AFS purchased the DPS Loans from the FDIC at auction and became NFB's successor-in-interest with respect to all its rights under the DPS Loans and their corresponding collateral.

6.      The Peperzak Loans

On or about January 15, 2005, Marcus Peperzak, an individual resident of Florida ("Peperzak"), made a loan to DPS in the original principal amount of $900,000 (the "First DPS Peperzak Loan"). The First DPS Peperzak Loan is secured by a mortgage granted by Aurora Dairy-Florida, LLC dated January 15, 2005 and recorded under Clerk's Instrument No. 2005000416 of the Public Records of Gilchrist County, Florida.

On or about January 15, 2004, Peperzak made a loan to DPS in the original principal amount of $800,000 (the "Second DPS Peperzak Loan"). The Second DPS Peperzak Loan is secured by a mortgage granted by Aurora Dairy-Florida, LLC dated January 15, 2005 and recorded under Clerk's Instrument No. 2005000417 of the Public Records of Gilchrist County, Florida.

On or about December 4, 2008, Peperzak made a loan to New Frontier in the original principal amount of $3,000,000 (the "New Frontier Peperzak Loan", and together with the First DPS Peperzak Loan and the Second DPS Peperzak Loan, the "Peperzak Loans"). The New Frontier Peperzak Loan is secured by a Deed of Trust, Security Agreement and Financing Statement granted by New Frontier dated April 9, 2009, effective December 4, 2008, and filed and recorded on April 15, 2009 under Document No. 209-00947 in the Real Property Records of Erath County, Texas.

- 14 -

For good and valuable consideration, Peperzak assigned the Peperzak Loans and security therefor to AFS, which is the current holder of the Peperzak Loans and their corresponding collateral.

    C.    <u>Amounts Outstanding Under and Encumbered By the DPS Loans and Peperzak Loans</u>

The following table shows the amounts owed by each of the Debtors under the DPS Loans and Peperzak Loans as of the Petition Date, along with an estimate of the value of the property serving as collateral for the obligations under such loans to AFS:

| Debtor | Total Claim | Estimated Collateral Value[8] | Estimated Secured Claim | Estimated Unsecured Claim |
|---|---|---|---|---|
| DPS-FL | $25,732,257 | 16,582,618 | 16,582,618 | $9,149,639 |
| DPS-GA | $11,891,042 | $5,801,746 | $5,801,746 | $6,089,296 |
| DPS-MS | $8,812,162 | $5,388,226 | $5,388,226 | $3,423,936 |
| New Frontier | $24,758,517 | $9,153,085 | $9,153,085 | $15,605,432 |
| Heifer Haven | $5,972,980 | $1,855,510 | $1,855,510 | $4,117,470 |
| **Totals:** | **$77,166,958** | **$38,781,185** | **$38,781,185** | **$38,385,773** |

    D.    <u>Other Prepetition Obligations of the Debtors</u>

In addition to the obligations described above, the Debtors have other debts and liabilities, including trade payables and obligations under executory contracts and unexpired leases. A chart illustrating the Proponent's estimations of certain of these obligations based on the Debtors' Schedules can be found in Article IV.G.2.

    E.    <u>Events Leading to the Chapter 11 Cases</u>[9]

    1.    <u>Diminishing Milk Prices</u>

In 2008, there began a severe economic downturn in the U.S. dairy industry that continued through the Petition Date. From November, 2008 to February, 2009, the all-milk price fell precipitously from $17.10 per hundred weight ("CWT") to $11.60 per CWT. Prices remained below $12.00 per CWT until they began to rise in August, 2009.

There are a number of reasons for this precipitous decline. The global recession appears to be a major factor. In addition to reducing domestic demand, the global recession has had dramatic effects on overall U.S. agricultural exports, falling from a peak of $10.6 billion in October, 2008 to a low of $7.3 billion in September, 2009, before rebounding to $10.0 billion in December, 2009. On a ME (mature equivalent) skim-solids basis, U.S. dairy exports reached a high of 7.6 billion pounds in the second quarter of 2008 and then declined to a low of 5.1 billion

---

[8]    All estimates of collateral value provided in this Disclosure Statement are preliminary and do not represent AFS' valuation of such collateral.

[9] The source of certain data contained in this Section is the "Background" information provided in various of the Debtors' motions filed on or near the Petition Date. AFS cannot warrant to the accuracy or veracity of this information.

pounds in the first quarter of 2009, before rising to 6.3 billion pounds in the fourth quarter of 2009. The increase in milk production through 2008, sluggish domestic demand in 2008 and 2009, and falling export volumes in late 2008 and early 2009, created a milk surplus, driving down milk prices in early 2009.

<strong>2.      Increasing Feed Prices and Other Operational Costs</strong>

The sharp decline in milk prices occurred in conjunction with significant increases in feed prices and other operational costs. From September, 2007 until September, 2008, corn prices averaged $4.20 per bushel and, from October, 2007 until October, 2008, soybean meal prices averaged $335.94 per ton. These prices can be compared against expected average costs for corn and soybean meal for the September/October, 2009 to September/October, 2010 period of $3.35 to $3.95 per bushel and $270 to $320, respectively, which still are high by historic measures.

<strong>3.      The Debtors' Default under the DPS Loans</strong>

The Debtors were unable to service the DPS Loans after April of 2009. Accordingly, the Debtors defaulted.

During this period, the Debtors carried far more debt per cow and per head of milking capacity than was standard for similar dairies. The Debtors' higher than normal debt burden rendered them poorly suited to adapt to the decrease in margins that they experienced as a result of decreasing milk prices. The decrease in milk prices and the increase in feed costs collectively created a negative impact on the Debtors' respective net incomes, causing significant negative cash flow problems and compromising the Debtors' ability to service the DPS Loans, which, as stated above, significantly exceeded industry convention on a per-cow basis.

<strong>4.      AFS' Acquisition of the DPS Loans</strong>

On April 10, 2009, the FDIC placed NFB and its assets, including the DPS Loans, into receivership. In November of 2009, AFS purchased the DPS Loans from the FDIC at auction and became NFB's successor-in-interest thereto. Despite approximately ten (10) months of negotiations with AFS, the Debtors and AFS were unable to agree upon a restructuring of the DPS Loans. AFS ultimately decided to exercise the legal remedies available to it. In September and October of 2010, AFS commenced civil actions in Florida, Georgia and Mississippi, seeking to place the Debtors' assets into receivership and to collect on the DPS Loans.

Shortly after the filing of these receivership and collection actions, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, commencing these Bankruptcy Cases. Additional information prepared by the Debtors relating to the Debtors' businesses and the events leading up to the commencement of the Debtors' bankruptcy cases can be found in the Declaration of David P. Sumrall, President and CEO of the Debtors, in Support of Chapter 11 Petitions and First-Day Orders, which was filed on October 13, 2010 and is Docket No. 24 in these jointly-administered Bankruptcy Cases.

ATL 18,236,281 131498.010100

F.     <u>Pending Litigation Against the Debtors</u>

Prior to the filing of the Debtors' Bankruptcy Cases, AFS commenced actions against DPS, DPS-GA, DPS-MS and New Frontier in state courts for breach of their loan obligations and seeking, among other things, appointment of a receiver over their assets. In total, AFS filed four separate lawsuits in late September and early October of 2010. The captions of the four cases are as follows:

*Agricultural Funding Solutions, LLC v. Dairy Production Systems, LLC, et al.*, Case No. 21-2010-CA-0103, Circuit Court of the Eighth Judicial Circuit of the State of Florida, in and for Gilchrist County, Florida;

*Agricultural Funding Solutions, LLC v. Dairy Production Systems-Georgia, LLC*, Case No. 10CB633, Superior Court of Mitchell County, Georgia

*Agricultural Funding Solutions LLC v. Dairy Production Systems-Mississippi, et. al.*, Case No. G2010-125 O/3, Chancery Court for the Second Judicial District of Hinds County, Mississippi

*Agricultural Funding Solutions, LLC v. New Frontier Dairy, LLC*, Case No. CV-30796, 266th Judicial District Court, Erath County, Texas

In addition, in the ordinary course of their business, the Debtors are parties to various lawsuits, legal proceedings, and claims arising out of their respective businesses. The Proponent cannot predict with certainty the outcome of these lawsuits, legal proceedings and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the filing of the Chapter 11 Cases.

**ARTICLE IV**
**SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES**

A.     <u>The Debtors' Post-Petition Financial Performance</u>

Since the Petition Date, the Debtors have been operating their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Summaries of the Debtors' post-petition financial performance are filed on a monthly basis with the Bankruptcy Court pursuant to the Operating Guidelines and Reporting Requirements for Debtors In Possession and Chapter 11 Trustees for Region 21 (the "<u>Monthly Operating Reports</u>"). The Monthly Operating Reports are available from the Office of the Clerk of the U.S. Bankruptcy Court for the Middle District of Georgia and are online at https://ecf.gamb.uscourts.gov (please note that a PACER account is required to view and download documents).

- 17 -

B.    Filing and First Day Orders

The Debtors commenced the Chapter 11 Cases on October 7, 2010 by filing with the Bankruptcy Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Shortly after the Petition Date, the Bankruptcy Court entered certain orders designed to minimize disruption to the Debtors' business operations and to facilitate an orderly process in the Chapter 11 Cases. These motions and orders include:

*Joint Administration Order*: This order authorized and directed the joint administration of the Chapter 11 Cases. Please note that this order is procedural in nature only and did not substantively consolidate the estates or assets of the respective Debtors.

*Business Operations*: The Court entered various orders allowing the Debtors to (i) maintain existing bank accounts and business forms and continue to use existing cash management systems, (ii) provide adequate assurance to utility companies and establish procedures for determining additional adequate assurance, and (iii) continue to make payments on account of wages, compensation and employee benefits.

*Cash Collateral*: The Bankruptcy Court entered multiple interim orders granting the Debtors authority to use cash collateral to operate their businesses, which funds constituted the cash collateral of AFS. These orders are discussed in greater detail in Section IV.C. below.

C.    Cash Collateral Use

The Debtors' funds constitute AFS' cash collateral, which the Debtors may not use except with AFS' consent or by order of the Court. On October 12, 2010, the Debtors moved the Court for authorization to use such cash collateral pursuant to a budget filed with the Court. The Debtors also proposed to grant to AFS "replacement liens" on all of the Debtors' post-petition accounts receivable as adequate protection for the Debtors' use of such cash collateral.

The Court entered an order authorizing the Debtors' use of cash collateral on an interim basis and has continued such authorization **on an interim basis only** by orders to which AFS has consented. As adequate protection for use of cash collateral, the Court granted AFS a super-priority administrative claim in the Debtors' post-petition accounts receivable. Most recently, on August 30, 2011, the Court entered a consensual order authorizing the Debtors' use of cash collateral pursuant to a budget attached thereto through and including September 21, 2011 [Docket #447].

D.    Appointment of Creditors' Committee

On October 19, 2010, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the following members to the Committee, see Docket No. 49:

Wendelin Industries, LLC

Furst-McNess Company

Dairy Replacement Management, LLC

Century-Plus, LLC

Norvel Reed, Jr.

Kay Enterprises, Inc.

Bradley Wayne Mills

The Committee retained Stone & Baxter, LLP, Fickling & Company Building, 577 Mulberry Street, Suite 800, Macon, Georgia 31201, as Committee counsel.

E.     Adversary Proceeding

On January 31, 2011, the Debtors filed a complaint commencing Adversary Proceeding No. 11-05050 against AFS before the United States Bankruptcy Court for the Middle District of Georgia (the "Adversary Proceeding"). By the Adversary Proceeding, the Debtors brought suit against AFS alleging various theories of lender liability grounded in alleged acts that purportedly occurred both before and after AFS purchased the DPS Loans from the FDIC, and both before and after the Petition Date.

AFS denies each of the allegations made by the Debtors in the Adversary Proceeding, as reflected in AFS' answer, and asserts that AFS is not liable to the Debtors under any theory. AFS moved to dismiss the Debtors' counts for alleged breach of implied duty of good faith and fair dealing and for alleged tortious interference with business relations and was successful in obtaining dismissal of each such count.

The remaining counts allege that AFS is liable under theories of breach of oral contract, promissory estoppel, and fraud and seek to equitably subordinate AFS' liens and obtain litigation expenses and punitive damages from AFS. The Debtors additionally seek to set off and recoup AFS' claims against any liability for an alleged anticompetitive "tying arrangement" as defined under the federal securities laws that was purportedly formed between certain of the Debtors' principals and former principals and AFS' predecessor-in-interest. Further, the Debtors allege that certain of their debts to AFS and the corresponding liens are unenforceable if AFS is unable to locate the original instrument evidencing such debts. As stated above, AFS denies each of these allegations in full.

The Adversary Proceeding is currently in the discovery phase, with the discovery period currently set to expire on November 11, 2011. Dispositive motions are due to be filed on or before December 11, 2011.

F.     The Aurora Dairy - Georgia Lease

The DPS-GA Dairy is located on property that it leases from Aurora Dairy - Georgia, LLC ("Aurora") pursuant to a Ground Lease effective as of March 1, 2007 (the "Aurora Lease"). DPS-GA is in default under the Aurora Lease for failure to make required payments thereunder. Accordingly, Aurora moved the Bankruptcy Court for relief from the automatic stay,

to compel DPS-GA to assume or reject the Aurora Lease, or to compel DPS-GA to pay its post-petition obligations under the Aurora Lease until such time as it is assumed or rejected, alternatively.

DPS-GA contends that it owes Aurora approximately $709,000 under the Aurora Lease, plus continuing monthly lease payments, while Aurora contends that DPS-GA owes approximately $2,400,000 thereunder, plus continuing monthly lease payments. Resolution of this dispute has been continued by the Court on five occasions. On August 26, 2011, the Court entered an order continuing the resolution of this dispute through September 21, 2011 and extending DPS-GA's deadline to assume or reject the Aurora Lease through September 22, 2011 [Docket #440].

G.    Retention of Professionals

1.    The Debtors

The Debtors have retained a number of professionals in the Chapter 11 Cases, including:

Arnall Golden Gregory LLP, as bankruptcy counsel;

Morgan Joseph TriArtisan, LLC, as investment banker; and

James Moore & Co., P.L., as accountant.

2.    The Committee

The Committee retained the following professionals in the Chapter 11 Cases:

Stone & Baxter, LLP, as bankruptcy counsel; and

Odyssey Capital Group, LLC, as its financial advisor.

3.    The Lender

The Lender is represented by Greenberg Traurig LLP.

H.    Claims Process and Bar Date

1.    Schedules and Statements

On November 11, 2010, each of the Debtors filed with the Bankruptcy Court its Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules"). Each of the Debtors filed its Schedules on the docket in its own respective Chapter 11 Case.

Below is a summary of the assets and liabilities listed on the Schedules filed by each of the Debtors:[10]

| Debtor | Assets | Liabilities |
|---|---|---|
| DPS | $15,054,217.00 | $33,593,806.55 |
| DPS-GA | $6,178,324.00 | $19,182,907.03 |
| DPS-MS | $4,664,738.00 | $11,012,397.51 |
| New Frontier | $9,554,278.00 | $21,744,705.76 |
| Heifer Haven | $3,851,888.00 | $5,773,211.94 |

Additional detail on the Debtors' assets and liabilities can be found within the Debtors' Schedules filed with the Bankruptcy Court and are available online from the Office of the Clerk of the United States Bankruptcy Court for the Middle District of Georgia at https://ecf.gamb.uscourts.gov (please note that a PACER username and password are required).

2.      Proof of Claim Bar Date for Pre-Petition Claims Other Than Governmental Claims

In the Notice of Filing Chapter 11 Bankruptcy Case dated October 12, 2010, the Debtors set the deadline for all persons, other than Governmental Units (as that term is defined in section 101(27) of the Bankruptcy Code), to file proofs of claim in the Debtors' Bankruptcy Cases as November 14, 2011 [Docket #16]. This notice was sent to various entities via first class United States mail and electronic transmission [Docket #33]. Pursuant to section 502(b)(9) of the Bankruptcy Code, the deadline for Governmental Units to file proofs of Claim expired on April 8, 2011.

The total amount of Claims for which a proof of Claim was filed against each Debtor (both excluding and including proofs of Claim filed by AFS) and the total amount of Claims scheduled by each Debtor (all of which include Claims held by AFS) are set forth in the chart below:

| Debtor | Claims Filed Excluding AFS | Claims Filed Including AFS | Claims Scheduled |
|---|---|---|---|
| DPS | $4,647,198.03 | $30,285,885.18 | $2,220,778.59 |
| DPS-GA | $6,250,130.16 | $18,094,865.69 | $1,949,769.48 |
| DPS-MS | $1,240,242.95 | $10,052,404.93 | $1,696,605.08 |
| New Frontier | $1,238,129.61 | $25,996,646.16 | $386,938.85 |
| Heifer Haven | $9,600.71 | $5,982,580.95 | $90,229.25 |

This data encompasses purported claims that may be unsecured, secured, priority, unknown and administrative. Further, this data is raw data, and the claims scheduled and filed have not been reviewed for duplicity, accuracy, or veracity. Additionally, these amounts do not include potential claims that might be incurred as a result of the rejection or assumption of

---

[10]    The figures provided in this Section were provided by the Debtors in papers filed with the Bankruptcy Court. The Proponent makes no representation or warranty with respect to the accuracy or veracity of any such amounts.

executory contracts. Therefore, the actual amounts of the allowed claims that may be asserted against each Debtor may differ from the numbers provided in the chart above.

### 3. Administrative Expense Bar Date

The Proponent intends to file a motion requesting the Bankruptcy Court to establish a deadline for asserting Administrative Expense Claims that arose after the Petition Date and through and including the date of the entry of an order approving this Disclosure Statement. In addition, the Holders of Fee Claims will not be required to assert Fee Claims by such deadline, but will be required to file estimates of fees and expenses that they expect will be incurred through and including the Effective Date.

As part of the Plan, a separate bar date will be determined for Administrative Expense Claims arising after the date of the entry of an order confirming this Disclosure Statement.

On August 26, 2011, the Debtors filed their Motion to Establish Bar Date for Filing Motions Requesting Allowance or Payment of Administrative Expense Claims Pursuant to 11 U.S.C. § 503(b)(9) and to Approve the Form and Manner of Notice Thereof [Docket #441]. By this motion, the Debtors move the Court to set the deadline for creditors to file claims under Section 503(b)(9) of the Bankruptcy Code as October 21, 2011 at 4:00 p.m. Eastern Time. Proponent expects that this motion will be approved and the deadline will be set accordingly.

### I. Assumption and/or Rejection of Certain Executory Contracts and Unexpired Leases

#### 1. Leases of Non-Residential Real Estate

On April 8, 2011, the Court entered an order authorizing the Debtors to assume eight leases for non-residential real estate, each with a cure claim amount of $0.00. However, the Court did not approve DPS-GA's request to assume a certain lease with Aurora Dairy-Georgia, LLC (the "Aurora Dairy Lease"), instead extending the time period within which DPS-GA could assume or reject such lease. The Court has since extended this time period again, through and including September 22, 2011.

To date, DPS-GA's motion to assume the Aurora Dairy Lease remains pending, as the parties to such lease continue to negotiate the cure cost that would be associated with assumption of such Lease.

#### 2. Dairy Replacement Management, LLC

On April 23, 2011, the Court entered an order authorizing Heifer Haven to assume a certain Management Agreement (the "Management Agreement") with Dairy Replacement Management, LLC ("DRM"). By the Management Agreement, DRM agreed to manage and care for dairy cattle owned by the Debtors, including providing feed, hay, vaccines, medicine, worming, veterinary care and breeding to such cattle.

- 22 -

The Debtors and DRM agreed to a cure schedule by which the Debtors would make a total of $78,691.35 worth of payments in four approximately equal installments over a four month period. This cure amount and payment schedule were approved by the Court.

J.      Expiration of Debtors' Exclusivity

The Debtors' exclusive period to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code has been extended by the Bankruptcy Court on multiple occasions. The Debtors' exclusivity period expired on August 29, 2011, after which time the Proponent filed this Plan.

**ARTICLE V**
**SUMMARY OF THE PLAN OF REORGANIZATION**

The following sections summarize the salient provisions of the Plan. This summary refers to, and is qualified in its entirety by, reference to the Plan, a copy of which is attached hereto as Exhibit A. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.

Parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and its impact on Holders of Claims and Equity Interests.

The Court has not yet confirmed the Plan described in this Disclosure Statement. In other words, the terms of the Plan do not yet bind any person or entity. However, if the Bankruptcy Court confirms the Plan and the Plan becomes effective, the Plan will bind all Holders of Claims and Equity Interests.

**THE PROPONENT PROPOSES THE PLAN WITH RESPECT TO EACH DEBTOR INDIVIDUALLY. EACH HOLDER OF A CLAIM OR EQUITY INTEREST WILL RECEIVE A SEPARATE BALLOT FOR EACH CLAIM AGAINST EACH DEBTOR AND MAY VOTE SEPARATELY TO CONFIRM OR REJECT THE PLAN WITH RESPECT TO EACH DEBTOR.**

**PLEASE NOTE THAT THE PLAN DOES NOT SEEK TO SUBSTANTIVELY CONSOLIDATE THE DEBTORS.**

A.      Classification and Treatment of Claims and Equity Interests

For purposes of brevity and convenience, the classification of Claims and Equity Interests set forth below applies to each Debtor individually. Unclassified Claims are Unimpaired by the Plan. The following are the unclassified Claims: Administrative Expense Claims, Fee Claims, Priority Tax Claims and U.S. Trustee Fees.

1.      Unclassified Claims

Other than expressly provided in the Plan, as provided in section 1123(a)(1) of the Bankruptcy Code, certain Claims shall not be classified for purposes of voting or receiving

- 23 -

Distributions under the Plan. Rather, all such claims shall be treated separately as unclassified Claims pursuant to the Plan.

### a. *Administrative Expense Claims*

Administrative Expense Claims are any Claim (other than a Fee Claim) for payment of costs or expenses of administration specified in Sections 503(b) and 507(a)(7) of the Bankruptcy Code and include, without limitation, (a) any actual and necessary costs and expenses incurred on and after the Petition Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries or commissions for services rendered); and (b) any fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code.

Each Holder of an Allowed Administrative Expense Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim: (a) Cash equal to the amount of such Allowed Administrative Expense Claim; or (b) such other treatment as to which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Administrative Expense Claim will have agreed upon in writing.

### b. *Fee Claims*

Fee Claims are Claims for compensation or reimbursement of expenses, pursuant to sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) or 1103 of the Bankruptcy Code, incurred with respect to the Chapter 11 Cases.

Unless the Bankruptcy Court has entered a Final Order allowing a Fee Claim prior to the entry of the Confirmation Order, each Person who holds or asserts a Fee Claim incurred before the Effective Date will be required to file with the Bankruptcy Court and serve on all parties required to receive notice of filings in the Chapter 11 Cases a Fee Application within thirty (30) days after the Effective Date. The failure to file and serve such Fee Application timely and properly will result in the Fee Claim being forever barred and discharged. To the extent necessary to give effect to the Plan, entry of the Confirmation Order will amend and supersede any previously entered orders of the Bankruptcy Court regarding procedures for the payment of Fee Claims.

A Fee Claim, with respect to which a Fee Application has been timely and properly filed and served pursuant to the Plan, will become an Allowed Fee Claim only to the extent allowed by Final Order of the Bankruptcy Court, and will be paid in accordance with such Final Order. Each Holder of an Allowed Fee Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Fee Claim: (a) Cash equal to the amount of such Allowed Fee Claim; or (b) such other treatment as to which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Fee Claim will have agreed upon in writing.

### c. *Priority Tax Claims*

Priority Tax Claims are any Claims entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. All Priority Tax Claims shall be treated as follows:

- 24 -

Each Holder of an Allowed Priority Tax Claim will receive, at the sole option of the Proponent or the Liquidation Trustee, as applicable, in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter; (b) regular installment payments in Cash in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as to which the Proponent or the Liquidation Trustee, as appropriate, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing. Classified Claims and Equity Interests

        d.    *U.S. Trustee Fees*

U.S. Trustee Fees are fees required to be paid to the United States Trustee pursuant to the Bankruptcy Code and applicable guidelines of the Office of the United States Trustee for Region 21. All U.S. Trustee Fees shall be treated as follows:

All U.S. Trustee Fees payable on or before the Effective Date will be paid from Cash held by the Debtors on or before the Effective Date. From and after the Effective Date, the Liquidation Trust will be liable and will pay any U.S. Trustee Fees assessed against the Debtors' Estates until such time as a particular Debtor's Chapter 11 Case is closed, dismissed or converted.

        2.    <u>Classified Claims</u>

For purposes of brevity and convenience, the treatment of classified Claims and Equity Interests set forth in the Plan applies individually to each Debtor.

Unless the Holder of an Allowed Claim or Allowed Equity Interest and the Proponent or the Liquidation Trustee, as applicable, agree to a different treatment, each Holder of an Allowed Claim or Allowed Equity Interest will receive the following Distributions in accordance with the Plan:

        a.    *Class 1: Priority Non Tax Claims.*

(A)   <u>Description</u>: Priority Non Tax Claims are any Claims (other than an Administrative Expense Claim, a Fee Claim, or a Priority Tax Claim) that is entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

(B)   <u>Treatment</u>: Each Holder of an Allowed Priority Non Tax Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Non Tax Claim: (a) Cash equal to the amount of such Allowed Priority Non Tax Claim; or (b) such other treatment which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Priority Non Tax Claim have agreed upon in writing.

(C)   <u>Status</u>: Class 1 is Unimpaired. The Holders of Claims in Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

b.     *Class 2:  AFS Secured Claim.*

(A)     Description:  The AFS Secured Claim is an Allowed Secured Claim in the amount of approximately $39,000,000 held by AFS against the Debtors.  The AFS Secured Claims will be treated as an Allowed Class 2 Claim against each Debtor in the amounts set forth in the Disclosure Statement.

(B)     Treatment:  Each Holder of an Allowed AFS Secured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed AFS Secured  Claim, their Pro Rata Share of (a) the DairyCo Equity Interests and (b) the DairyCo Notes.

(C)     Status:  Class 2 is Impaired.  The Holders of Claims in Class 2 are entitled to vote to accept or reject the Plan.

c.     *Class 3:  Allowed Other Secured Claims.*

(A)     Description: Allowed Other Secured Claims are comprised of any Secured Claim against a Debtor, with the exception of the AFS Secured Claim.

(B)     Treatment:  Each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Other Secured  Claim (a) one of the treatments specified in section 1124 of the Bankruptcy Code; or (b) such other treatment which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing.

(C)     Status:  Class 3 is Unimpaired.  The Holders of Claims in Class 3 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

d.     *Class 4:  Allowed Unsecured Claims.*

(A)     Description:   Unsecured Claims are Claims (or a portion thereof), including, without limitation, any Rejection Claims, the AFS Deficiency Claims and Insider Claims, but specifically excluding any Secured Claim, Administrative Expense Claim, Fee Claim, Priority Non-Tax Claim or Priority Tax Claim.

(B)     Treatment:  Each Holder of an Allowed Unsecured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Unsecured Claims, their Pro Rata Share of the Liquidation Trust Proceeds.  Upon the Effective Date of the Plan, the Holders of the Allowed AFS Deficiency Claims and any Allowed Unsecured Claims of Sumrall, which are included in this Class 4, will be deemed to have waived any and rights to Distributions on account of their respective Allowed Class 4 Claims only with respect to the DairyCo Liquidation Trust Contribution, and they otherwise will be entitled to receive their Pro Rata Share of the Liquidation Trust Proceeds.

(C)     Status:  Class 4 is Impaired.  The Holders of the Claims in Class 4 are entitled to vote to accept or reject the Plan.

- 26 -

e. *Class 5: Allowed Convenience Class Claims.*

(A)    Description: Convenience Class Claims are (a) any Unsecured Claim that is Allowed in an amount equal to or less than $750.00 or (b) any Unsecured Claim that is Allowed in an amount greater $750.00 to the extent the Holder of such Allowed Unsecured Claim has elected on the Ballot to reduce the Allowed amount of its Claim to $750.00 in order to receive treatment as a Convenience Class Claim. In the event a Holder of an Allowed Unsecured Claim against a Debtor holds more than one Allowed Unsecured Claim against such Debtor, all such Claims will be aggregated against such Debtor for purposes of determining whether each such Claim is a Convenience Class Claim.

(B)    Treatment:  Each Holder of an Allowed Convenience Class Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Convenience Class Claim, 100% of their Allowed Convenience Class Claim, which amounts will be paid from the DairyCo Liquidation Trust Contribution.

(C)    Status:  Class 5 is Impaired.  The Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

f. *Class 6: Equity Interests.*

(A)    Description: Equity Interests are (a) any equity interest or security in any of the Debtors or of a Debtor, within the meaning of section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued, authorized or outstanding shares of stock together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, (b) partnership, limited liability company, membership or similar interest in a Debtor or of a Debtor and (c) Intercompany Interests.

(B)    Treatment:  All Class 6 Equity Interests will be extinguished on the Effective Date.

(C)    Status:  Class 6 is Impaired.  The Holders of Equity Interests in Class 6 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

3.    Reservation of Rights Regarding Claims and Equity Interests.

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

4.    Limitation to Full Recovery.

Notwithstanding anything herein or in the Plan to the contrary, no Holder of any Claim will be entitled to a distribution in excess of 100% of the amount of the Allowed Claim. Allowed Unsecured Claims will not be entitled to interest on account of their respective Allowed Unsecured Claims.

- 27 -

B.     Claims and Distribution

1.     Distribution Agent.

The Proponent or the Liquidation Trustee, as applicable, may employ or contract with other Persons or Entities to serve as the Distribution Agent and assist in or make the Distributions required under the Plan.

2.     Distributions Under the Plan.

Within the time periods provided in the Plan, the Proponent or Liquidation Trustee, as applicable, will make periodic and final Distributions under the Plan, including, without limitation, the Liquidation Trust Proceeds, except such amounts as are necessary to maintain the Disputed Claims Reserve, such amounts as are necessary to fund the Liquidation Trust Expenses and any such other amounts required to be withheld in accordance with the terms of the Plan or determined as necessary to withhold in the sole discretion of the Proponent or the Liquidation Trustee, as applicable. The Distribution Agent will withhold from amounts distributable to any Person any and all amounts, determined in the Distribution Agent's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement. The Distribution Agent will require any Person receiving a Distribution hereunder to furnish to the Distribution Agent in writing an employer identification number or taxpayer identification number as assigned by the Internal Revenue Service, and the Distribution Agent may condition any Distribution to any Person hereunder on receipt of such identification number.

3.     Timing of Distributions.

Distributions to Holders of Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claim, Allowed Priority Non Tax Claim, Allowed AFS Secured Claims, and Allowed Convenience Class Claims will be made on the later of:

(i)     the Effective Date of the Plan,

(ii)    as soon as practicable after the Claim becomes an Allowed Claim by Final Order, and

(iii)   such other date as may be agreed upon by the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Claim.

As soon as reasonably practicable, but not to exceed sixty (60) days after the establishment of the Disputed Claims Reserve, the Liquidation Trustee will make an initial Distribution of the available Liquidation Trust Proceeds in accordance with the provisions of the Plan and the Confirmation Order, to the extent practicable in the sole discretion of the Liquidation Trustee, to the Holders of Allowed Unsecured Claims. The Liquidation Trustee will make periodic Distributions thereafter to Holders of Allowed Unsecured Claims, as appropriate, in its discretion.

- 28 -

4.       Disputed Claims Reserve.

For each Class of Claims, the Proponent or Liquidation Trustee, as applicable, will estimate, on or before the Distribution Date, the anticipated aggregate amount of all Disputed Claims in such Class as of such date, and will establish a Disputed Claims Reserve for such Class in an amount sufficient to make the Distributions to Holders of such Disputed Claims (to the extent such Disputed Claims are eventually Allowed at, in the aggregate, the amount estimated by the Proponent or Liquidation Trustee) that would have been made to the Holders as of such date had the Claims been Allowed as of the Distribution Date. Notwithstanding the foregoing, nothing in the Plan, the Confirmation Order or any related document, agreement, instrument or order will prohibit the Liquidation Trustee from using Liquidation Trust Assets and other reserve amounts to fund Liquidation Trust Expenses. Once all Disputed Claims have been resolved, the Disputed Claims Reserve will be dissolved. Any Cash remaining in the Disputed Claims Reserve after all Disputed Claims have been resolved and paid, as appropriate, and the costs and expenses of the Liquidation Trust and Liquidation Trustee have been fully paid, will be available for Distribution to the other Holders of Allowed Claims in accordance with the Plan. After any and all Cash in the Disputed Claims Reserve have been disbursed in accordance with the Plan, such Disputed Claims Reserve will be deemed dissolved.

5.       Unclaimed Property.

a.       *Holding of Unclaimed Property.*

If a Distribution to any Holder of an Allowed Claim is Unclaimed Property, no additional Distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address in accordance with the Plan. Nothing contained in the Plan will required the Proponent, the Liquidation Trustee or the Distribution Agent to attempt to locate any Holder of an Allowed Claim. The Distribution Agent will hold all Unclaimed Property (and all interest, dividends, and other distributions thereon) for the benefit of the Holders of Claims entitled thereto under the terms of the Plan. The Distribution Agent will make all Distributions of Unclaimed Property on or after the Distribution Date as soon as reasonably practicable after such Unclaimed Property has become deliverable or has been claimed in accordance with the Plan.

b.       *Distribution of Unclaimed Property.*

At the end of one hundred and twenty (120) days following the date that any Cash or other property becomes Unclaimed Property, the Holder of the Allowed Claim theretofore entitled to such Unclaimed Property held pursuant to the Plan will be deemed to have forfeited such property, whereupon all right, title and interest in and to such Unclaimed Property and any further Distributions under the Plan will be available to fund the Liquidation Trust or Liquidation Trustee or will be available for Distribution to all other Holders of Allowed Claims unless the Holder of an Allowed Claim entitled to the Unclaimed Property makes a request in writing to the Distribution Agent for such Unclaimed Property (which request must set forth the Distribution Address for such Holder) prior to the expiration of such period. If there are any residual Liquidation Trust Proceeds or Unclaimed Property at the time of the dissolution of the Liquidation Trust, such residual Liquidation Trust Proceeds or Unclaimed Property will be

- 29 -

distributed to DairyCo, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

6.     Distributions to Holders of Claims Generally.

a.     *No Distribution in Excess of Allowed Claim.*

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim will receive, in respect of such Claim, Distributions under the Plan in excess of the amount of its Allowed Claim.

b.     *Disputed Payments.*

If any dispute arises as to the identity of a Holder of an Allowed Claim that is to receive any Distribution, the Distribution Agent may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account or otherwise hold such Distribution until the disposition thereof is determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute, which written agreement is reasonably acceptable to the Proponent or Liquidation Trustee, as applicable, and the Distribution Agent.

c.     *Withholding Taxes.*

Any federal or state withholding taxes or other amounts required to be withheld under any applicable law will be deducted and withheld from any Distributions made pursuant to the Plan.  All Persons holding Claims will be required to provide to the Distribution Agent any information necessary to effect the withholding of such taxes.  Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a Distribution hereunder will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such Distribution, including, without limitation, withholding tax obligations in respect of in-kind (non-cash) Distributions.  Any party issuing an instrument or making an in-kind (non-cash) Distribution under the Plan has the right, but not the obligation, to refrain from making such Distribution until the Person to which the Distribution is to be made has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligation.

d.     *Timing of Distributions under The Plan.*

Payments and Distributions in respect of Allowed Claims under the Plan will be made as provided in the Plan.

e.     *Distributions after the Effective Date.*

Distributions made after the Effective Date to Holders of Allowed Claims that are Disputed Claims as of the Effective Date will be deemed to have been made on the Effective Date.  No interest will accrue or be payable on such Claims or any Distributions.

- 30 -

f.    *Manner of Payments.*

Any payments to be made by the Distribution Agent pursuant to the Plan will be made by checks drawn on accounts maintained by the Distribution Agent or its professionals, or by wire transfer if circumstances justify, at the option of the Distribution Agent.

g.    *Delivery of Distribution.*

Distributions to Holders of Allowed Claims will be made to the Holder's Distribution Address.

h.    *Record Date for Distributions.*

The Distribution Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims hat are Holders of such Claims as of the close of business on the Distribution Record Date. The Distribution Agent will instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

i.    *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, no payments or Distributions by the Distribution Agent will be made with respect to all or any portion of a Disputed Claim unless and until all Objections to such Disputed Claim have been settled or withdrawn by agreement of the parties or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim; provided however, that the Proponent or the Liquidation Trustee, as applicable, may in their discretion, pay any undisputed portion of a Disputed Claim.

7.    Setoffs.

Except as otherwise provided in the Plan, the Confirmation Order, or in an agreement approved by a Final Order of the Bankruptcy Court, the Proponent or the Liquidation Trustee, as applicable, may, pursuant to applicable law (including, without limitation, section 553 of the Bankruptcy Code), set off against any Distribution amounts related to any Claim before any Distribution is made on account of such Claim, any and all of the Claims and Causes of Action of any nature that the Debtors or the Estates may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, any other act or omission of the Proponent, the Liquidation Trustee or the Distribution Agent, nor any provision of the Plan (other than Article X below) will constitute a waiver or release by the Debtors, the Proponent or the Liquidation Trustee of any such Claims and Causes of Action that the Debtors, the Proponent or the Liquidation Trustee may possess against such Holder.  To the extent the Proponent, the Liquidation Trustee or the Distribution Agent fail to set off against a Claim and seek to collect a Claim or Cause of Action from such Holder after a Distribution to such Holder has been made pursuant to the Plan, the Proponent or the Liquidation Trustee, as applicable, if successful in asserting such Claim or Cause of Action, will be entitled to full recovery on the Claim or Causes of Action against such Holder.

- 31 -

8.	Control of Claims Resolution Process by Liquidation Trust and Liquidation Trustee.

After the Effective Date, the Liquidation Trustee, on behalf of the Liquidation Trust, will have the sole power and authority to file and prosecute objections to, or negotiate, settle or otherwise resolve, any and all Disputed Claims in any Class in accordance with the objection procedures set forth in the Plan, and the sole power and authority to institute all Avoidance Actions, and to prosecute or defend all appeals relating to such objections to Claims and Avoidance Actions on behalf of the Debtors or the Estates.

9.	Distributions Under Twenty-Five Dollars.

No Distributions of less than twenty-five dollars ($25.00) will be made by the Distribution Agent to any Holder of an Allowed Claim unless a request therefor is made in writing to the Distribution Agent.  If no request is made as provided in the preceding sentence, all such Distributions will be treated as Unclaimed Property.

10.	Fractional Distributions.

Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars by the Distribution Agent will not be required.  Whenever any Distribution of a fraction of a dollar would be required, the Distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

11.	Final Distribution.

In accordance with the Plan and notwithstanding any other provision of the Plan to the contrary, in the event that: (a) in the sole discretion of the Liquidation Trustee, the Liquidation Trust (i) has insufficient funds to make any further distributions to the Liquidation Trust Beneficiaries, (ii) has no remaining potential sources of funds and (iii) has repaid the DairyCo Liquidation Trust Loan Obligations in full, in Cash; (b) all cure amounts relating to Assumed Contracts, Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims (if applicable) have been paid in full; and (c) it is impractical or impossible for the Liquidation Trustee to make further distributions under the Plan, the Liquidation Trustee will make a final distribution of all remaining Liquidation Trust Proceeds to DairyCo.

C.	Means for Implementation of the Plan

1.	Overview of Plan.

On the Effective Date, the Debtors will be deemed dissolved and each of the Debtors will be deemed to have transferred (a) to DairyCo, any and all Estate Assets, other than Liquidation Trust Assets and subject to the Plan, free and clear of any liens, Claims, interests and encumbrances, and (b) to the Liquidation Trust, any and all Liquidation Trust Assets. In addition, on the Effective Date, the DairyCo Liquidation Trust Contribution will be transferred to the Liquidation Trust, and the Liquidation Trustee will be authorized to request DairyCo Liquidation Trust Loan Advances under the DairyCo Liquidation Trust Loan.

From and after the Effective Date, DairyCo intends to conduct a going concern business using the Estate Assets acquired hereunder and additional cash and operating assets acquired by DairyCo. DairyCo may enter into consulting agreements with certain corporate employees of the Debtors in accordance with the Plan and to maintain vendor relationships with a large number of the Debtors' trade vendors (or other vendors offering similar products and services), in order to properly operate its business.

Separately, the Liquidation Trustee, on behalf of the Liquidation Trust, will assemble all Liquidation Trust Assets, prosecute and liquidate the Liquidation Trust Assets, make Distributions in accordance with the Plan and distribute the Liquidation Trust Proceeds in accordance with the Plan. The Liquidation Trustee will be responsible for administering the Liquidation Trust and making all Distributions under the Plan to Holders of Allowed Claims after the Effective Date.

      2.      <u>Effective Date Transactions.</u>

To effectuate the Plan, the following transactions will occur:

      a.      On the Effective Date, all of the Estate Assets, other than the Liquidation Trust Assets, will be transferred or assigned to DairyCo free and clear of all liens, claims, interests and encumbrances.

      b.      On the Effective Date, the DairyCo Equity Interests and DairyCo Notes will be issued to AFS or its designee in satisfaction of the AFS Secured Claims.

      c.      On the Effective Date, the Liquidation Trust will be formed and will be funded with the Liquidation Trust Assets, including, without limitation, the DairyCo Liquidation Trust Contribution and the proceeds of any DairyCo Liquidation Trust Loan Advance made pursuant to the DairyCo Liquidation Trust Loan.

      d.      On the Effective Date, the Liquidation Trustee, on behalf of the Liquidation Trust, will execute and deliver to DairyCo the DairyCo Liquidation Trust Loan Documents.

      e.      On the Effective Date, the Debtors will be deemed dissolved.

      f.      On and after the Effective Date, the Liquidation Trustee, on behalf of the Liquidation Trust, will commence to assemble, prosecute and liquidate all Liquidation Trust Assets and make Distributions to all Holders of Allowed Claims in accordance with the Plan, including, without limitation, distribution of the Liquidation Trust Proceeds.

3. Effective Date Funding.

On the Effective Date, the Plan and the transactions and Distributions contemplated therein will be funded by a contribution, referred to in the Plan as the DairyCo Liquidation Trust Contribution, and the proceeds of a loan, known as the DairyCo Liquidation Trust Loan.

The DairyCo Liquidation Trust Contribution is a $250,000 Cash contribution made by DairyCo to the Liquidation Trust. The DairyCo Liquidation Trust Contribution will be used to pay any Allowed Convenience Class Claims and expenses of the Liquidation Trust, and, after payment of such Allowed Convenience Class Claims and expenses, all other Holders of Allowed Unsecured Claims against all Debtors, other than Holders of the AFS Deficiency Claim and Allowed Claims of Sumrall, will be entitled to their Pro Rata Share of the balance of the DairyCo Liquidation Trust Contribution. If the Liquidation Trustee makes a Distribution from assets of the Liquidation Trust to Holders of Class 4 Claims other than from the DairyCo Liquidation Trust Contribution, then all Holders of Allowed Class 4 Claims, including Holders of the AFS Deficiency Claim and the Allowed Claims of Sumrall, will be entitled to their Pro Rata Share of such Distribution.

The DairyCo Liquidation Trust Loan is a revolving loan that will be made by DairyCo to the Liquidation Trust in a principal amount not to exceed $1,000,000, on or after the Effective Date, from time to time, as evidenced by and in accordance with the DairyCo Liquidation Trust Loan Documents. The DairyCo Liquidation Trust Loan will be used solely for the purposes of funding any and all cure amounts for Assumed Contracts, Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims.

Distributions to Holders of the Allowed AFS Secured Claims will be in the form of DairyCo Notes and DairyCo Equity Interests.

4. Post-Effective Date Funding.

From and after the Effective Date, the Liquidation Trustee will be authorized to make requests to DairyCo for DairyCo Liquidation Trust Loan Advances made pursuant to the DairyCo Liquidation Trust Loan, but only to the extent that: (a) the funds in the Liquidation Trust are insufficient to pay Holders of Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non Tax Claims or Allowed Other Secured Claims (if applicable) at any time that such Allowed Claims are due and owing under the Plan; and (b) such DairyCo Liquidation Trust Loan Advance is permissible under the terms of the DairyCo Liquidation Trust Loan Documents, including, without limitation, that the maximum principal amount outstanding under the DairyCo Liquidation Trust Loan shall not exceed $1,000,000.

5. Employees.

On the Effective Date, all of the Debtors' managers, officers, employees and consultants will be deemed terminated and, immediately thereafter, DairyCo will offer to hire substantially all the Debtors' former employees and consultants, on substantially the same terms

- 34 -

of employment as previously offered by the Debtors.  DairyCo may attempt to negotiate separate consulting agreements that may be entered into by and between DairyCo (or one of its Affiliates) and each of David P. Sumrall, Massoud Ghadiani, Michael Pedreiro, Jamie Sumrall, Kimberly Potts, Carrie Pedreiro, and A.J. Pedreiro (the "Consulting Agreements").

The Consulting Agreements will be separate agreements and would commence on the Confirmation Date. Under the Consulting Agreements, the consultant would work on behalf of one or more of the DairyCo entities to provide assistance regarding the Debtors' businesses and to actively facilitate the orderly transition of the Debtors' businesses to DairyCo, including, but not limited to, collection of accounts receivable. The consultant will serve in an advisory and consulting capacity only and shall not be any employee of any of the DairyCo entities.

6.         Estate Assets Transferred to DairyCo.

On the Effective Date, all Estate Assets, other than Liquidation Trust Assets, will be transferred or assigned to DairyCo free and clear of all liens, Claims, interests and encumbrances; provided that, at DairyCo's sole option, DairyCo may elect, on or after the Effective Date, to abandon or not acquire any Estate Asset, including, without limitation, any deposits, prepaid expenses or retainers, in which case such Estate Asset will become a Liquidation Trust Asset to be administered as part of the Liquidation Trust.

7.         Assumed Liabilities.

DairyCo is acquiring the Estate Assets, other than Liquidation Trust Assets, free and clear of all liens, Claims, interests and encumbrances except for the Assumed Liabilities. The Assumed Liabilities will be expressly identified in the Plan Supplement as Claims that will be assumed by DairyCo.

8.         Corporate (or Equivalent) Action.

On the Effective Date, all matters expressly provided for under the Plan that would otherwise require approval of the members, managers, shareholders, directors or other corporate officials of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, will be deemed to have occurred and will be in effect upon the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors are incorporated without any requirement of action by the members, managers, shareholders, directors or other corporate officials of the Debtors.  The entry of the Confirmation Order will constitute authorization and direction for the Debtors, or the Proponent on the Debtor's behalf, to take or cause to be taken all corporate, limited liability or other actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court.  On the Effective Date, the Debtors, or the Proponent on the Debtor's behalf, will be authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan in the name and on behalf of the Debtors and to take all necessary and appropriate actions to effectuate the transactions contemplated by the Plan.

- 35 -

9.      Other Documents and Actions.

        The Debtors, or the Proponent on the Debtor's behalf, are authorized and directed to execute such documents and take such other actions as may be necessary to effectuate the transactions provided for in the Plan.

10.     Operations Between the Confirmation Date and the Effective Date.

        The Debtors will be directed to operate their businesses and conduct their affairs in the ordinary course of business or as necessary to implement the Plan.  In addition, on or after the Confirmation Date, DairyCo will have the right, in its sole discretion, to designate one or more Persons to operate, manage and safeguard the Debtors' businesses and Estate Assets in order to ensure a timely and smooth transition of the Estate Assets to DairyCo or the Liquidation Trust, as applicable, on the Effective Date.

11.     Dissolution of Debtors.

        As of the Effective Date, the Debtors will be deemed to have been dissolved.  All of the Debtors' officers, directors, managers or members, as applicable, will be deemed to have resigned.

12.     Conditions Precedent to the Effective Date.

        On or before the Effective Date, the following actions will be undertaken and will be deemed to have occurred simultaneously (and no such action will be deemed to have occurred prior to the taking of any other such action), and all such actions will be conditions precedent to the effectiveness of the Plan:

        a.      Holders of the AFS Secured Claims will have accepted the Plan.

        b.      All Distributions, payments and transfers to be made on the Effective Date will be made or duly provided for.

        c.      The Bankruptcy Court will have entered the Disclosure Statement Order and the Confirmation Order, each in form and substance consistent with the Plan and acceptable to the Proponent in its sole discretion, and neither the Disclosure Statement Order nor the Confirmation Order will have been reversed, modified or amended in any material respect prior to the Effective Date.

        d.      All licenses, permits and regulatory approvals necessary for the ownership and operation of the Debtors' businesses, to the extent issued prior to the Effective Date, will have been assigned to, issued to, or obtained by DairyCo.

        e.      A mutual release between AFS and Sumrall will be executed, in a form reasonably acceptable to AFS and Sumrall.

- 36 -

f.    The Confirmation Order will:

(i)    expressly approve the terms and provisions of the Plan, and find that they comply with section 1129 of the Bankruptcy Code;

(ii)    find that all Holders of Claims and Equity Interests, and all other parties in interest, were duly given notice of, and an opportunity to be heard in connection with, the Chapter 11 Cases and the Plan, pursuant to and in satisfaction of the applicable provisions of the Bankruptcy Code;

(iii)    set forth and approve the identity of the Liquidation Trustee as trustee of the Liquidation Trust;

(iv)    set forth the Administrative Expense Bar Date and the Distribution Record Date;

(v)    provide for transfer of the Estate Assets (other than the Liquidation Trust Assets) to DairyCo, on the Effective Date, free and clear of all Claims, liens, interests, encumbrances and other liabilities including, without limitation, Claims against or Equity Interests in the Debtors, to the full extent allowed pursuant to sections 105, 363, 1123, 1129 and 1141 of the Bankruptcy Code, except as otherwise provided in the Plan;

(vi)    provide for the assumption on the Effective Date of the Assumed Contracts in accordance with the Plan;

(vii)    provide for the rejection of all executory contracts and unexpired leases, other than a contract or lease that (A) is expressly assumed and/or assigned by the Debtors pursuant to a Final Order of the Bankruptcy Court entered prior to such date or is subject to a separate motion to assume pending before the Bankruptcy Court on such date, (B) is specifically designated by the Proponent as an Assumed Contract, or (C) expires, terminates or otherwise becomes non-executory prior to such date;

(viii)    provide for the allowance of the AFS Claims as provided in the Plan;

(ix)    authorize and direct holders of Claims or Equity Interests in the Debtors to take or cause to be taken, on or prior to the Effective Date, all actions that are necessary to implement effectively the provisions of the Plan. Moreover, the Confirmation Order will empower, authorize and direct the

- 37 -

Debtors to consummate the transactions contemplated by the Plan on or after the Effective Date;

(x)     provide that the Estate Assets will be and remain free and clear of the liens, Claims, and Equity Interests of any Person other than as provided in the Plan, and no Person will be permitted to execute against or receive Distributions except in accordance with the terms of the Confirmation Order and the Plan;

(xi)    provide that all transfers of money or property by the Debtors or the Liquidation Trust, or the issuance, transfer, release or exchange of a security, or the making or delivery of any instrument of transfer, including, without limitation, the transfer of the Estate Assets of the Debtors to DairyCo or the Liquidation Trust, as applicable, and the issuance of DairyCo Equity Interests and DairyCo Notes, are an integral part of the Plan and will be deemed to be made under the Plan pursuant to section 1129 of the Bankruptcy Code, and that all appropriate taxing entities will not impose any tax under any law imposing a stamp tax or similar tax based on the issuance, transfer, or exchange of a security, or the making or delivery of any instrument of transfer or release, as contemplated by the Plan, to the full extent allowed by section 1146(a) of the Bankruptcy Code;

(xii)   provide that entry of the Confirmation Order will not have any res judicata or other preclusive effect with respect to any Causes of Action that are not specifically and expressly released by the terms of the Plan, the Confirmation Order or another Final Order of the Bankruptcy Court entered prior to the Confirmation Hearing, and that entry of the Confirmation Order will not be deemed a bar to asserting such Causes of Action;

(xiii)  approve the releases provided in Article X; and

g.      The Confirmation Order has become a Final Order.

13.     Waiver of Conditions to Effectiveness.

The requirement that a particular condition to the effectiveness of the Plan be satisfied may be waived in whole or part by the Proponent, without notice or a hearing. The failure of the Proponent to assert the non satisfaction of any such conditions will not be deemed a waiver of any other rights hereunder, and each such right will be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

- 38 -

14. Effect of Nonoccurrence of the Conditions to Effectiveness.

If each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied or duly waived on or before the date that is one hundred and eighty (180) days after the Confirmation Date, the Confirmation Order may be vacated by the Bankruptcy Court upon a motion filed by the Proponent. If the Confirmation Order is vacated pursuant to the Plan, the Plan will be null and void in all respects, and nothing contained in the Plan will: (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, or (b) prejudice in any manner the rights of the Proponent.

15. Further Authorization.

So long as not inconsistent with the terms of the Plan or the Confirmation Order, the Proponent will be entitled to seek such orders as each deems necessary to carry out and further the intentions and purposes, and to give full effect to the provisions, of the Plan.

16. No Substantive Consolidation.

Any Claim asserted against any of the Debtors or any of the Estates will be deemed to be a Claim asserted only against the applicable Debtor and Estate, or, if multiple Debtors are liable on the Claim, against the applicable Debtors and Estates. The voting and distribution provision of the Plan will be determined with respect to each Debtor. Nothing in the Plan will effect substantive consolidation of the Debtors or deemed consolidation of the Debtors.

17. Securities Registration Exemption.

The DairyCo Equity Interests to be issued and Distributed pursuant to the Plan are to be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or any similar federal, state, or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code. To the extent section 1145 of the Bankruptcy Code is inapplicable, these issuances of the DairyCo Equity Interests would otherwise be exempt from registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

18. Cancellation of Instruments and Equity Interests.

On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtors, except such instruments that are authorized or issued under the Plan, will be canceled and extinguished. Additionally, as of the Effective Date, all Equity Interests, and any and all warrants, options, rights, or interests with respect to Equity Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued, will be deemed canceled and extinguished without any further action of any party. The Holders of or parties to the canceled notes, share certificates and other agreements and instruments will have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

- 39 -

19. Operating Reports.

Prior to the Effective Date, the Debtors will timely file all reports, including without limitation, monthly operating reports required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules, or the Office of the United States Trustee. On and after the Effective Date, the Liquidation Trustee will timely file all reports, including without limitation, quarterly operating reports as required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules, or Office of the United States Trustee until entry of an order closing or converting the Chapter 11 Cases.

20. Disposition of Books and Records.

On the Effective Date, the Debtors will transfer all of the Debtors' books and records in their possession to DairyCo, in the format and medium requested by DairyCo, in its discretion. From and after the Effective Date, DairyCo will preserve and maintain all documents and electronic data transferred to it by the Debtors and will not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Court after a hearing upon thirty (30) days notice to parties-in-interest. DairyCo will provide the Liquidation Trustee and Liquidation Trustee Professionals with reasonable access to such books and records during normal business hours; provided that DairyCo will not incur any costs associated with such access.

D.   Liquidation Trust

1. Establishment of Liquidation Trust.

On the Effective Date, the Liquidation Trust will be established pursuant to the Liquidation Trust Agreement. The Liquidating Trust Agreement will be set forth in the Plan Supplement.

2. Appointment of Liquidation Trustee.

The appointment of the Liquidation Trustee will be approved in the Confirmation Order, and such appointment will be as of the Effective Date. In accordance with the Liquidation Trust Agreement, the Liquidation Trustee will serve in such capacity through the earlier of (a) the date that the Liquidation Trust and the Disputed Claims Reserve are dissolved in accordance with the Plan and (b) the date such Liquidation Trustee resigns, is terminated or is otherwise unable to serve, provided, however, that, in the event that the Liquidation Trustee resigns, is terminated or is unable to serve, then the Court, upon the motion of any party-in-interest, will approve a successor to serve as the Liquidation Trustee, and such successor Liquidation Trustee will serve in such capacity until the Liquidation Trust is dissolved.

The Liquidation Trustee will be Ronald L. Glass, a principal and co-founder of GlassRatner Advisory and Capital Group, LLC ("GlassRatner"). GlassRatner has been retained in significant matters to act as a trustee, receiver, and chief restructuring officer for businesses in many different industries. Mr. Glass himself has had a notable career in management of troubled companies. Mr. Glass spent the majority of his career in the senior management team of the Equity Group and its affiliates. For the past several years, Mr. Glass has primarily acted as a

Chapter 11 trustee and plan administrator in complex restructuring assignments. Under his leadership, GlassRatner has been involved in the restructuring of more than $20 billion of bank debt. Mr. Glass has also served as a court-appointed receiver and fiduciary in numerous matters and jurisdictions. For additional information on GlassRatner, please visit its website at http://www.glassratner.com.

3.     <u>Liquidation Trust Assets</u>.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors will be deemed to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such Liquidation Trust Assets will automatically vest in the Liquidation Trust free and clear of all Claims, liens, encumbrances and other liabilities, subject only to the DairyCo Liquidation Trust Loan Obligations, Claims of the Liquidation Trust Beneficiaries as set forth in the Plan and the expenses of the Liquidation Trust and the Liquidation Trustee as set forth herein and in the Liquidation Trust Agreement, with all proceeds of the Liquidation Trust to be distributed in accordance with the provisions of the Plan. Thereupon, the Debtors will have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

In connection with any Causes of Action that are included in the Liquidation Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications thereto (whether written or oral) will also exist for the benefit of the Liquidation Trust and will vest in the Liquidation Trustee and its representatives, and will also be preserved for and as to the Debtors. The Liquidation Trustee is authorized to take all necessary actions to benefit from such privileges.

The Liquidation Trust Assets will include Avoidance Actions, which are those Claims and Causes of Action asserted or that could be asserted by the Debtors or their Estates pursuant to sections 544 (or applicable state laws providing for avoidance of fraudulent transfers), 546, 547, 548, 549, 550 or 551 of the Bankruptcy Code, including any such Claims or Causes of Action already asserted by the Debtors or others. The Avoidance Actions may constitute a source of recovery for the Liquidation Trust Beneficiaries.

The Proponent has conducted no research into the existence or viability of any Avoidance Actions; however, subsequent to confirmation of the Plan, the Liquidating Trustee will analyze transfers that may be avoidable under chapter 5 of the Bankruptcy Code and will pursue such actions in his discretion.

There is no guaranty that the Liquidation Trustee's pursuit of Avoidance Actions will produce a net benefit to the Liquidation Trust or allow for an increased Distribution. Such uncertainty is due in part to the collectability of the defendants of potential Avoidance Actions and defenses to Avoidance Actions provided by the Bankruptcy Code and applicable state law.

According to disclosures made by the Debtors in their Schedules, the Liquidation Trustee may be able to pursue Avoidance Actions in approximately the amounts set forth in the

- 41 -

chart below, which amounts are based upon transfers made to creditors within ninety days of the Petition Date and transfers made to the Debtors' insiders within one year of the Petition Date. The names of these transferees will be provided in the Plan Supplement.

The amounts set forth below are an aggregation of amounts potentially subject to avoidance based on the transfers reported by the Debtors to have been made to third parties and insiders within the ninety days and one year prior to the Petition Date, respectively. The actual amounts recovered may be lower or higher depending on the accuracy of the Debtors' reporting, the collectability of the Avoidance Action defendant and the defenses provided by the Bankruptcy Code and applicable law, including, but not limited to, defenses related to new value and transfers in the ordinary course of business. Accordingly, the actual amounts recovered may be materially less than the amounts set forth in the chart below.

| Debtor | Estimated Aggregate Transfers to Third Parties | Estimated Aggregate Transfers to Insiders |
|---|---|---|
| DPS | $2,613,625.49 | $3,144,946.08 |
| DPS-GA | $2,766,738.83 | $3,600,434.08 |
| DPS-MS | $962,893.61 | $1,063,308.45 |
| New Frontier | $1,340,299.91 | $251,632.27 |
| Heifer Haven | $260,150.00 | $523,250.00 |

4.     Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor in-Interest.

The Liquidation Trust will be established for the primary purpose of liquidating the Liquidation Trust Assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration. The Liquidation Trust will not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) will treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such Liquidation Trust Assets by the Debtors to the Holders of Allowed Claims of the Liquidation Trust Beneficiaries entitled to distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries will be treated as the grantors and owners of a grantor trust for federal income tax purposes.

ATL 18,236,281 131498.010100

As soon as reasonably practicable after the Effective Date, the Liquidation Trustee (to the extent that the Liquidation Trustee deems it necessary or appropriate in his or her sole discretion) will value the Liquidation Trust Assets based on the good faith determination of the value of such Liquidation Trust Assets. The valuation will be used consistently by all parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all federal income tax purposes. The Bankruptcy Court will resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets transferred to the Liquidation Trust, the proceeds thereof, or any income earned by the Liquidation Trust, will be limited to the right and power to invest such Liquidation Trust Assets (pending distributions in accordance with the Plan), as set forth in the Plan; provided, however, that the scope of any such investments will be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service guidelines, whether set forth in Internal Revenue Service rulings, other Internal Revenue Service pronouncements, or otherwise.

5.   Investments of Cash.

Except as otherwise provided in the Plan, all Cash held by the Liquidation Trust will be invested by the Liquidation Trustee with sole and absolute discretion in only (a) direct obligations of, or obligations guaranteed by, the United States; (b) obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States, as an agency or instrumentality thereof; (c) AAA rated tax-free securities issued by municipalities or state governments or agencies; or (d) such other obligations or instruments as may from time to time be approved for such investments by Final Order of the Bankruptcy Court; provided, however, that the Liquidation Trustee may, to the extent it deems necessary, deposit moneys in demand deposits (including, without limitation, money market funds) at any commercial bank, trust company or other financial institution organized under the laws of the United States or any state thereof which has, at the time of such deposit, a capital stock and surplus aggregating at least $500,000,000. The investment powers of the Liquidation Trustee will be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings or financial institutions, or other temporary, liquid investments such as U.S. Treasury Bills. Such investments will mature in such amounts and at such times as may be deemed necessary by the Liquidation Trustee, with sole and absolute discretion, to provide funds when needed to make Distributions and payments as required by the Plan.

6.   Responsibilities of the Liquidation Trustee.

The responsibilities of the Liquidation Trustee will include, but will not be limited to:

a.      the making of Distributions as contemplated in the Plan;

b. requesting DairyCo Liquidation Trust Loan Advances under the DairyCo Liquidation Trust Loan and repaying amounts so borrowed;

c. establishing and maintaining the Disputed Claims Reserve in accordance with the terms of the Plan;

d. conducting an analysis of Administrative Expense Claims, Fee Claims, Priority Tax Claims, Priority Non Tax Claims, Other Secured Claims, Unsecured Claims, Insider Claims and Convenience Class Claims and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate in accordance with the Plan;

e. filing appropriate tax returns in the exercise of its fiduciary obligations;

f. retaining the Liquidation Trust Professionals;

g. taking such actions as are necessary to prosecute, resolve or compromise, as appropriate, all Avoidance Actions; and

h. taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust.

7. Liquidation Trust Expenses.

a. All Liquidation Trust Expenses will be charged against and paid from the proceeds of the Liquidation Trust Assets, and the Liquidation Trustee will pay the same as and when due and payable.

b. The Liquidation Trust Professionals retained by the Liquidation Trustee will submit periodic statements for services rendered and costs incurred to the Liquidation Trustee for review and approval. The Liquidation Trustee will have thirty (30) days to object to any such statement. In the event that any such objection is received by the relevant Liquidation Trust Professional and cannot be promptly resolved by such Liquidation Trust Professional and the Liquidation Trustee, the dispute will be submitted by the Liquidation Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate any such objection. In the event that no objection is raised to a statement within the thirty (30) day period, such statement will be promptly paid by the Liquidation Trustee, subject to the Plan. In no event shall the Liquidation Trustee make or be compelled to make payment to a Liquidation Trust Professional in an amount that

- 44 -

would require the principal amount outstanding under the Liquidation Trust Loan to exceed $1,000,000.

8.    Repayment of DairyCo Liquidation Trust Loan Obligations.

All Liquidation Trust Proceeds, other than allocated but unused DairyCo Liquidation Trust Loan Advances, the DairyCo Liquidation Trust Contribution and amounts necessary to fund the Liquidation Trust Expenses, will be paid to DairyCo for application against the DairyCo Liquidation Trust Loan Obligations until the DairyCo Liquidation Trust Loan Obligations are paid in full, in Cash.

9.    Bonding of Liquidation Trustee.

The Liquidation Trustee will not be obligated to obtain a bond but may do so, in its sole discretion, in which case the expense incurred by such bonding will be paid by the Liquidation Trust.

10.    Fiduciary Duties of the Liquidation Trustee.

Pursuant to the Plan and the Liquidation Trust Agreement, the Liquidation Trustee will act in a fiduciary capacity on behalf of the Liquidation Trust Beneficiaries.

11.    Dissolution of the Liquidation Trust.

The Liquidation Trust will be dissolved no later than four (4) years from the Effective Date unless the Bankruptcy Court, upon a motion filed prior to the fourth (4th) anniversary or the end of any extension period approved by the Bankruptcy Court (the filing of which will automatically extend the term of the Liquidation Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed two (2) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. After (a) the final Distribution of the Disputed Claims Reserve and the balance of the Liquidation Trust Proceeds pursuant to the Plan, and (b) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, the Liquidation Trust will be deemed dissolved for all purposes without the necessity for any other or further actions.

12.    Full and Final Satisfaction against Liquidation Trust.

On and after the Effective Date, the Liquidation Trust will have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Liquidation Trust Agreement. All payments and all Distributions made by the Liquidation Trustee under the Plan will be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Liquidation Trust.

- 45 -

13. **Limitation of Liability.**

    a.    No recourse will ever be had, directly or indirectly, against the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidation Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidation Trustee under the Plan for any purpose authorized by the Plan.  All such liabilities, covenants, and agreements of the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee, whether in writing or otherwise, under the Plan will be enforceable only against, and will be satisfied only out of, the Liquidation Trust Assets or such part thereof as will, under the terms of any such agreement, be liable therefor, or will be evidence only of a right of payment out of the income and Liquidation Trust Proceeds, as the case may be.  Every undertaking, contract, covenant or agreement entered into in writing by the Liquidation Trustee will provide expressly against the personal liability of the Liquidation Trustee.

    b.    Neither the Liquidation Trustee, the Liquidation Trust Professionals nor any other representatives, agents, employees, successors or assigns of the Liquidation Trustee will  be liable for any act or omission of one another, nor will the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee be liable for any act or omission taken or not taken in such capacity other than for specific acts or omissions resulting from Liquidation Trustee's, the Liquidation Trust Professionals' or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee willful misconduct or fraud.  The Liquidation Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with the Liquidation Trust Professionals, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such entities, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, the Liquidation Trustee will not be under any obligation to consult with the Liquidation Trust Professionals, and the determination not to do so will not result in the imposition of liability on the Liquidation Trustee, the Liquidation Trust Professionals or any other

- 46 -

representatives, agents, employees, successors or assigns of the Liquidation Trustee, unless such determination is based on willful misconduct or fraud. The Liquidation Trust will indemnify and hold harmless the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements, and related expenses), which such Persons may incur or to which such Persons may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Persons arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of their willful misconduct or fraud.

14.     Reliance on Documents.

The Liquidation Trustee may rely, and will be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper Person or Persons.

15.     Requirement of Undertaking.

The Liquidation Trustee may request any court of competent jurisdiction to require, and any such court may in its discretion require, in any suit for the enforcement of any right or remedy under the Plan, or in any suit against the Liquidation Trustee for any act taken or omitted by the Liquidation Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including, without limitation, reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

E.     The Releases and Exculpation

1.     Estate Release.

For good and valuable consideration, upon the Effective Date and except as otherwise provided in the Plan, the Debtors will release the AFS Released Parties from any and all Claims and Causes of Action, including, without limitation, Avoidance Actions, AFS Causes of Action and Sumrall Causes of Action, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place at any time on or before the Effective Date; *provided that* to the extent any Person received a payment or

- 47 -

transfer from Sumrall or is otherwise subject to an Avoidance Action as a result of receiving a payment or transfer from Sumrall, such Person will not receive the benefits of this release.

The above-described release includes, but is not limited to, a release by the Debtors and their Estates of any and all Causes of Action asserted by the Debtors against AFS in the Adversary Proceeding. As a consequence of this release, the Liquidation Trustee will dismiss the Adversary Proceeding with prejudice, with each side bearing its own costs.

In exchange for the release set forth in the Plan, AFS and its Affiliates have agreed, subject to the conditions precedent set forth in the Plan, to contribute funds to DairyCo, which will make contributions and loans to the Liquidating Trust to fund the administration of the Plan and the Debtors' Estates after the Confirmation Date. Absent the Plan and AFS' willingness to fund Distributions under the Plan, there would be no certain recovery to any Creditor.

In exchange for the release set forth in the Plan, Sumrall has played an important role in the Debtors' post-petition management and has agreed to support the Plan. Notwithstanding Sumrall's support, his Equity Interests in the Debtors will be extinguished by the Plan on its Effective Date.

## 2. Sumrall/AFS Release.

Upon the Effective Date, Sumrall and AFS will execute a mutual release, in a form reasonably acceptable to them, releasing, except as otherwise provided in the Plan, the other, including, without limitation, their respective former, current and future Affiliates, members, managers, officers, directors, employees, consultants, agents, advisors, attorneys, accountants, financial advisors, representatives, professionals, successors, executors, administrators, heirs and assigns, from any and all Claims and Causes of Action, that either Sumrall or AFS would have been legally entitled to assert in their own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place at any time on or before the Effective Date; provided, however, for the avoidance of doubt, Sumrall will only be entitled to receive a release from AFS if Sumrall executes and delivers a release of all such claims against AFS.

As consideration for the release set forth in the Plan, AFS has agreed to dismiss the actions pending in the various state courts against Sumrall on his guaranty obligations of the DPS Loans. Sumrall has agreed to dismiss any counterclaims he may assert in the pending state court actions and to cause the Debtors to dismiss the Adversary Proceeding against AFS.

## 3. Releases by Holders of Claims.

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action, or liability of any nature whatsoever, will be deemed to, completely and forever release, waive, void, extinguish, and discharge unconditionally the AFS Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies, and liabilities of any

nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are or may be based in whole or part on any act, omission, transaction, event, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan or the Disclosure Statement; *provided, however*, (a) that each Person that has submitted a ballot rejecting the Plan may elect, by checking the appropriate box on its ballot, not to grant the releases set forth in the Plan with respect to the AFS Released Parties and (b) that each Person that holds a Claim entitled to vote and who abstains from voting to either accept or reject the Plan will be bound to the releases set forth in the Plan with respect to the AFS Released Parties unless they return a ballot opting out of such releases; and *provided, further, however,* that nothing in the Plan will be construed to release the AFS Released Parties from willful misconduct as determined by a Final Order. Holders of Allowed Claims that voted in favor of the Plan, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims will be deemed to be bound to the releases in the Plan.

The releases set forth in this Article V.E.3 are in exchange for AFS' agreement to fund Distributions on account of Claims against the Debtors as provided in the Plan, through DairyCo.

4.      Exculpation.

The Released Parties will not have or incur any liability to any Person for any act taken or omission made in good faith in connection with or in any way related to the Chapter 11 Cases, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, including, without limitation, all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including, without limitation, any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases. The Released Parties will have no liability to any creditor for actions taken in good faith under the Plan, in connection therewith or with respect thereto, including, without limitation, failure to obtain consummation of the Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions precedent to Confirmation or to the occurrence of the Effective Date. The Released Parties will not have or incur any liability to any Holder of a Claim or party-in-interest herein or any other Person for any act or omission in connection with or arising out of: (a) administration of the Plan, (b) the implementation of any of the transactions provided for, or contemplated in, the Plan, or (c) any action taken in connection with either the enforcement of the Debtors' rights against any Person or the defense of Claims asserted against the Debtors with regard to the Chapter 11 Cases, except for willful misconduct as finally determined by a Final Order. The Released Parties are entitled to rely on, and act or refrain from acting on, all information provided by other Released Parties without any duty to investigate the veracity or accuracy of such information.

- 49 -

F.    Procedures for Resolving Disputed Claims

1.    Objections to Claims.

On and after the Effective Date, the Liquidation Trust will have the right to the exclusion of all others to make, file and prosecute objections to Disputed Claims.  The Liquidation Trust will conduct a review of the Schedules and all Proofs of Claim filed in the Chapter 11 Cases and, except as provided hereunder, will file objections to such Claims (if any) with the Clerk of the Bankruptcy Court on or before the Claim Objection Deadline.  The Liquidation Trust may compromise, settle or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court, and such compromise, settlement or other resolution will constitute a Final Order of the Bankruptcy Court with respect to the allowance of such Claim for all purposes under the Plan.

2.    Disputed Claims.

No Distribution will be made with respect to any Disputed Claim (or any portion of such Claim) unless and until a Final Order allowing such Claim has been entered.

3.    Subordination of Claims.

Under the Plan, any Claim (other than the AFS Claims) may be subordinated to other Claims pursuant to section 510 of the Bankruptcy Code.  No Distributions will be made in respect of a subordinated Claim until all Claims to which such Claim has been subordinated have been satisfied in full.  Any action to subordinate a Claim will be filed by the Liquidation Trust at any time after the Effective Date.

4.    Estimation of Claims.

The Liquidation Trust may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Liquidation Trust previously had objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time, including, without limitation, during litigation or another proceeding concerning any objection to such Disputed Claim.

5.    No Distribution in Respect of Disallowed Claims.

To the extent that a Disputed Claim is Disallowed in whole or in part, the Holder of such Claim will not receive any Distribution on account of the portion of such Claim (including, without limitation, the whole, if applicable) that is Disallowed.

ATL 18,236,281 131498.010100

G. **Effect of Confirmation**

    1.     Release of Liens and Cancellation of Instruments.

        a.     *Release of Liens on Estate Assets.*

Unless a particular Claim is reinstated or left unaltered: (a) each Holder of a Secured Claim or a Claim that is purportedly secured by any or all of the Estate Assets will, on or immediately prior to the Effective Date, (i) turn over and release to DairyCo or the Liquidation Trust, as applicable, any and all Estate Assets that secure or purportedly secure such Claim; and (ii) execute such documents and instruments as the DairyCo or the Liquidation Trust, as applicable, may require to evidence or record (with respect to any liens or security interests recorded in the public records) such Holder's release of such property and of all security interests and liens in and on such property; and (b) on the Effective Date, all Claims, right, title and interest in and to such property will revert to DairyCo or the Liquidation Trust, as applicable, free and clear of all Claims, including, without limitation, liens, charges, pledges, encumbrances and/or security interests of any kind. All liens, charges, pledges, encumbrances and/or security interests of any kind of the Holders of such Claims in or on the Estate Assets will be deemed to be canceled and released as of the Effective Date.

        b.     *Effect of Failure to Release Liens.*

No Distribution hereunder will be made to or on behalf of any Holder of a Claim unless and until such Holder executes and delivers to the Liquidation Trust such release and surrender of liens or other items described in this Article XII.A, or demonstrates the non availability of such items to the satisfaction of the Liquidation Trust, including, without limitation, requiring such Holder to post a lost instrument or other indemnity bond, among other things, to hold the Liquidation Trust harmless in respect of such lien, instrument or other item described in this Article XII.A and any Distributions made in respect thereof. The Liquidation Trust may reasonably require the Holder of such Claim to hold it harmless up to the amount of any Distribution made in respect of such unavailable note, instrument, document, certificate, subordinated note, agreement, certificated security or other item evidencing such Claim. Any such Holder that fails to execute and deliver such release of liens or other items described in this Article XII.A or satisfactorily explain their non-availability to the Liquidation Trust within one hundred and eighty (180) days after the Effective Date will be deemed to have no further Claim against the Liquidation Trust, and will not participate in any Distribution hereunder, and the Distributions that would otherwise have been made to such Holder will be treated as Unclaimed Property. To the extent any Holder of a Claim described in Article XII.A.1 above fails to release the relevant liens as described in such subsection and in this Article XII.A.2, the Distribution Agent may act as attorney-in-fact, on behalf of such Holder, to provide any releases as may be required.

    2.     Revesting and Vesting; Retention and Enforcement of Claims.

Except as otherwise provided in the Plan, on the Effective Date, all Estate Assets, other than the Liquidation Trust Assets, will vest in DairyCo, free and clear of all Claims, liens, charges, encumbrances and interests of Claim and Equity Interest Holders. Any and all

- 51 -

Liquidation Trust Assets accruing to the Debtors or assertable as accruing to the Debtors will remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date will be transferred to and vest in the Liquidation Trust.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidation Trust and the Liquidation Trustee will have the right to pursue or not to pursue, or, subject to the terms of the Plan and the Liquidation Trust Agreement, compromise or settle any Liquidation Trust Assets.  From and after the Effective Date, the Liquidation Trust and the Liquidation Trustee may commence, litigate and settle any Avoidance Actions or objections to Claims properly instituted by the Liquidation Trust and Liquidation Trustee after the Effective Date, except as otherwise expressly provided in the Plan and the Liquidation Trust Agreement.  Other than as set forth herein, no other Person may pursue such Liquidation Trust Assets after the Effective Date.  The Liquidation Trustee will be deemed hereby substituted as plaintiff, defendant, or in any other capacity for either the Committee or each Debtor in any Causes of Action pending before the Bankruptcy Court or any other court that constitutes a Liquidation Trust Asset without the need for Filing any motion for such relief.

3. <u>Injunction</u>.

Except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 524 and 1141 and provided that the Effective Date occurs, the entry of the Confirmation Order will permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is subject to the Plan from taking any of the following actions in respect of such Claim, debt or liability:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against either or both of the Debtors or DairyCo; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against either or both of the Debtors or DairyCo; (c) creating, perfecting or enforcing in any manner directly or indirectly, any lien or encumbrance of any kind against either or both of the Debtors or DairyCo; (d) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to either or both of the Debtors or DairyCo; and (e) proceeding in any manner in any place whatsoever, including, without limitation, employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

4. <u>Discharge of Claims and Equity Interests</u>.

Except as otherwise provided herein, to the fullest extent permitted by applicable law (a) on the Confirmation Date, the Confirmation Order will operate as a discharge under Bankruptcy Code section 1141(d)(1), and release of any and all Claims, debts (as such term is defined in Bankruptcy Code section 101(12)), liens, security interests and encumbrances of and against all property of each of the Debtors and their affiliates, and each of their former, current and future officers, directors, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and professionals, in their official and individual capacities (and such Persons will have all of the benefits and protections set forth in Bankruptcy Code section 1141(d)(1)) that arose before confirmation, including without limitation, any Claim of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i)

- 52 -

and all principal and interest, whether accrued before, on or after the Petition Date, regardless of whether (i) a Proof of Claim in respect of such Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to Bankruptcy Code section 502, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan; and (b) from and after the Confirmation Date, (x) all Holders of Claims will be barred and enjoined from asserting against the Persons entitled to such discharge pursuant to the Plan any Claims, debt (as defined in Bankruptcy Code section 101(12)), liens, security interests and encumbrances of and against all property of each of the Debtors and (y) the Debtors will be fully and finally discharged of any liability or obligation on a Disallowed Claim. Except as otherwise specifically provided herein, nothing in the Plan will be deemed to waive, limit or restrict in any manner the discharge granted upon confirmation of the Plan pursuant to Bankruptcy Code section 1141.

5.      Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

H.      Executory Contracts

1.      Assumption and Assignment of Certain Executory Contracts.

On the Effective Date, the Debtors will assume the Assumed Contracts and assign the Assumed Contracts to DairyCo. The Proponent will include in the Plan Supplement a schedule of all Assumed Contracts and, to the extent applicable, the proposed cure amounts with respect to each Assumed Contract. ANY NON-DEBTOR PARTY TO AN AGREEMENT LISTED ON THE SCHEDULE OF ASSUMED CONTRACTS THAT WISHES TO OBJECT TO THE ASSUMPTION AND (IF APPLICABLE) ASSIGNMENT OF SUCH AGREEMENT OR TO THE PROPOSED CURE AMOUNT WITH RESPECT TO SUCH AGREEMENT AS SET FORTH ON THE SCHEDULE OF ASSUMED CONTRACTS MUST FILE AN OBJECTION WITH THE BANKRUPTCY COURT NO LATER THAN FIFTEEN (15) DAYS PRIOR TO THE DATE OF COMMENCEMENT OF THE CONFIRMATION HEARING, AND MUST SERVE SUCH OBJECTION ON THE PROPONENT. IF SUCH NON-DEBTOR PARTY FAILS TO TIMELY FILE AND SERVE SUCH OBJECTION, SUCH PARTY WILL BE DEEMED TO CONSENT TO THE ASSUMPTION AND ASSIGNMENT OF SUCH AGREEMENT AND THE PROPOSED CURE AMOUNT (IF ANY) WITH RESPECT TO SUCH AGREEMENT, AND SUCH OBJECTION AND ANY ASSERTED RIGHT TO RECEIVE A CURE PAYMENT OTHER THAN THAT SET FORTH ON THE SCHEDULE OF ASSUMED CONTRACTS (IF ANY) WILL BE WAIVED. THE PROPONENT MAY RESPOND TO ANY TIMELY FILED AND SERVED OBJECTION (IN WHICH CASE THE BANKRUPTCY COURT WILL DECIDE SUCH OBJECTION AT THE CONFIRMATION HEARING OR SUCH OTHER TIME AS DETERMINED BY THE BANKRUPTCY COURT), OR THE PROPONENT MAY REMOVE THE PARTICULAR AGREEMENT FROM THE SCHEDULE OF ASSUMED CONTRACTS (IN WHICH CASE THE AGREEMENT WILL NO LONGER BE AN ASSUMED CONTRACT). Cure amounts for Assumed Contracts

determined in accordance with the Plan will be satisfied by DairyCo Liquidation Trust Loan Advances.

### 2. Assumption and Assignment Conditioned upon Consummation of the Plan

The Plan seeks to cause the applicable Debtors to assume the Assumed Contracts and assign such Assumed Contracts to DairyCo to the extent, and only to the extent, that such contracts or leases constitute executory contracts or unexpired leases. Additionally, unless the assumption and assignment of an Assumed Contract is expressly approved by a Final Order of the Bankruptcy Court that provides otherwise, the assumption and assignment of each Assumed Contract is expressly conditioned upon the occurrence of the Effective Date. If the Effective Date does not occur, assumption and assignment of the Assumed Contracts as provided in the Plan will not be effective, and the Debtors will retain all of their rights under section 365 of the Bankruptcy Code with respect to such contracts and leases.

### 3. Rejection of Remaining Contracts and Leases.

Any and all of the Debtors' executory contracts and unexpired leases will be deemed rejected as of the Effective Date (unless such deadline is extended by Final Order of the Bankruptcy Court), other than contracts and leases that (a) are expressly assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court entered prior to such date or are subject to a separate motion to assume and assign to DairyCo pending before the Bankruptcy Court on such date, (b) are specifically designated by the Proponent as an Assumed Contract pursuant to the Plan, or (c) expire, terminate or otherwise become non-executory prior to such date. Proofs of Claim with respect to any Claim for damages arising from the rejection of any executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served on the Liquidation Trustee on or before the Rejection Bar Date.

### 4. Treatment of Rejection Damages Claims.

Any Claim for damages based upon the rejection of any executory contract or unexpired lease will be treated as an Unsecured Claim and will be classified in Class 4 or Class 5, as appropriate, and may be objected to in accordance with the provisions of the Plan, and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules. The failure to file a Proof of Claim with respect to a Claim for damages based upon the rejection of an executory contract or unexpired lease as provided in the Plan or a Final Order of the Bankruptcy Court specifically relating to such Claim will forever bar and discharge such Claim.

## I. Administrative Provisions

### 1. Retention of Jurisdiction.

The Bankruptcy Court will retain post-confirmation jurisdiction over these Chapter 11 Cases including, without limitation, for the following purposes:

a. To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases, including, without limitation, disputes that arise between or

among the Debtors, the Proponent, DairyCo, the Liquidation Trust, the Liquidation Trustee, Holders of Claims or Equity Interests or other parties in interest.

b. To adjudicate all claims or controversies arising out of any purchases, sales, contracts or undertakings by the Debtors during the pendency of the Chapter 11 Cases.

c. To adjudicate any and all claims filed by any Person, including, without limitation, any of the current or former officers, directors, employees, agents, Holders of Equity Interests or controlling Persons of the Debtors, or other parties in interest, against the Debtors, the Estates, the Liquidation Trust, the Committee, the Proponent or any of their respective representatives and agents, raised in connection with any and all post-petition Claims or Causes of Action arising from or related to the Chapter 11 Cases, or against the Proponent or any of its respective agents or representatives with respect to the Plan.

d. To adjudicate all controversies and issues arising out of or relating to any adversary proceedings on the Bankruptcy Court's docket as of the Confirmation Date, or which are commenced after the Confirmation Date pursuant to the provisions of the Bankruptcy Code and the Plan, and including, without limitation, adversary proceedings with respect to any Claims or Equity Interests, or any Causes of Action.

e. To recover all assets and properties of the Debtors and the Estates, whether title is presently held in the name of the Debtors or a third party.

f. To determine the allowability, classification, or priority of Claims upon objection by the Liquidation Trust (including, without limitation, the resolution of disputes regarding any Disputed Claims and claims for disputed Distributions), and the validity, extent, priority and avoidability of consensual and nonconsensual liens and other encumbrances, and to estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code.

g. To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order or any order of the Bankruptcy Court, including, without limitation, the Bar Date Order and the injunctions contained therein, to issue such orders as may be necessary for the implementation, execution, performance and

- 55 -

consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person.

h.  To protect the property of the Estates, the Debtors, the Liquidation Trust or DairyCo from claims against, or interference with, such property, including, without limitation, actions to quiet or otherwise clear title to such property or to resolve any dispute concerning liens, security interest or encumbrances in or on any property of the Estates.

i.  To determine any and all applications for allowance of Fee Claims.

j.  To determine any Priority Tax Claims, Priority Non Tax Claims, Administrative Expense Claims or any other request for payment of Claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code.

k.  To determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases, to determine any motion to assume and assign an executory contract or unexpired lease pursuant to Article XIII above or to resolve any disputes relating to the appropriate cure amount or other issues related to the assumption and assignment of executory contracts or unexpired leases in the Chapter 11 Cases.

l.  To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including, without limitation, any remands.

m.  To enter a Final Order or orders closing the Chapter 11 Cases.

n.  To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes.

o.  To issue such orders in aid of consummation of the Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person, to the fullest extent authorized by the Bankruptcy Code.

p.  To determine any tax liability pursuant to section 505 of the Bankruptcy Code.

q.	To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated.

r.	To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, any applicable Claims bar date (including, without limitation, the Bar Date, the Administrative Expense Bar Date, and any other Claims bar date provided in the Plan, the Confirmation Order, or any other Final Order of the Bankruptcy Court), the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing, or for any other purpose.

s.	To authorize sales or transfers of assets, or issuances or transfers of securities, as necessary or desirable and to resolve objections, if any, to such sales, transfers or issuances.

t.	To resolve any disputes concerning any release of a non-Debtor hereunder or the injunction against acts, employment of process or actions against such non-Debtor arising hereunder.

u.	To approve any Distributions, or resolve objections thereto, under the Plan.

v.	To assist with the collection of any accounts receivable or other amounts owed by any co-op.

w.	To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order, or as may be authorized under the Bankruptcy Code.

2.	Failure of the Bankruptcy Court to Exercise Jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, then Article XIV.A above will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

3.	Governing Law.

Except to the extent the Bankruptcy Code, Bankruptcy Rules, Local Rules or other federal laws apply, the rights and obligations arising under the Plan will be governed by the laws of the State of Georgia, without giving effect to principles of conflicts of law.

4. Amendments.

   a. *Preconfirmation Amendment.*

   The Proponent, may modify the Plan at any time prior to the Confirmation Date; provided, however, that the Plan, as modified, and the Disclosure Statement pertaining thereto will meet applicable Bankruptcy Code requirements.

   b. *Post-Confirmation Amendment Not Requiring Resolicitation.*

   After the Confirmation Date, with the approval of the Bankruptcy Court, the Proponent may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and effects of the Plan, or in a manner that does not materially adversely affect the interests, rights, treatment or Distributions of any Class of Claims or Equity Interests. Any waiver under Article VIII.M above will not be considered to be a modification or amendment of the Plan.

   c. *Post-Confirmation, Pre-Consummation Amendment Requiring Resolicitation.*

   After the Confirmation Date and before substantial consummation of the Plan, the Proponent may modify the Plan in a manner that materially and adversely affects the interests, rights or treatment of, or Distributions to, one or more Classes of Claims or Equity Interests, provided, however, that (a) the Plan, as modified, will satisfy all applicable Bankruptcy Code requirements; (b) the Proponent will obtain Bankruptcy Court approval for such modification; (c) such modification will be accepted by each Class of Claims or Equity Interests adversely affected by such modification pursuant to the standards for acceptance set forth in Article VI above; and (d) the Proponent will comply with section 1125 of the Bankruptcy Code with respect to the Plan as modified.

5. Modification, Revocation or Withdrawal of The Plan.

   The Proponent, may modify, revoke or withdraw the Plan as the plan of reorganization for any Debtor (in which case the Proponent may proceed with confirmation and/or consummation of the Plan with respect to the other Debtors) or all of the Debtors at any time prior to the Confirmation Date or, if the Proponent is for any reason unable to consummate the Plan after the Confirmation Date, at any time prior to the Effective Date.

6. Exemption from Certain Transfer Taxes.

   Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other lien, mortgage, deed of trust or other security interest, or (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale or transfer of any assets of the Debtors or the Estates (including, without limitation, the sale or transfer by the Debtors to DairyCo of any assets that, prior to the Effective Date, constituted Estate Assets), and any deeds,

- 58 -

bills of sale or assignments executed in connection with the Plan or the Confirmation Order, will not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the full extent provided for or allowed under section 1146(a) of the Bankruptcy Code.

7.     Compromise of Controversies.

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtors, the Proponent, the Holders of Claims who vote to accept the Plan and various other Holders of Claims, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors, to the extent provided in the Plan. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the foregoing compromises and settlements and all other compromises and settlements provided for in the Plan and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, and all parties in interest, and are fair, equitable and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non severable.

8.     Insurance Preservation and Proceeds.

Nothing in the Plan will diminish or impair the enforceability of any policies of insurance that may cover Claims against or Equity Interests in the Estates, the Debtors or any related Person. Holders of Claims that are eligible to be satisfied, in whole or in part, through any such policy will be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery or assist the Liquidation Trustee in seeking recovery under such policies with regard to such Claims.

9.     Successors and Assigns.

The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

10.     Confirmation Order and Plan Control.

To the extent that the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Proponent and any party, the Plan controls the Disclosure Statement and any such agreement, and the Confirmation Order (and any other Final Orders entered by the Bankruptcy Court after the date of the Plan) controls the Plan.

11.     Dissolution of the Committee.

As of the Effective Date, the duties of the Committee will terminate. Any post-Effective Date powers and duties that would otherwise be powers and duties of the Committee will be powers and duties of the Liquidation Trust. The Committee will be discharged and disbanded as of the Effective Date.

12.     Severability.

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Proponent, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.     Headings.

Headings used in the Plan are for convenience and reference only, and will not constitute a part of the Plan for any other purpose.

14.     Notices.

All notices or requests in connection with the Plan will be made in writing and will be addressed to:

David B. Kurzweil
John J. Dyer
Greenberg Traurig, LLP
3290 Northside Parkway
Suite 400
Atlanta, Georgia 30327

15.     No Admissions.

Notwithstanding anything herein to the contrary, nothing contained in the Plan will be deemed an admission by the Proponent, DairyCo or any other Person with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of a Claim's classification.

- 60 -

# ARTICLE VI
## VOTING ON AND CONFIRMATION OF THE PLAN

A.     General

      The Proponent submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to all known Holders of Claims whose Claims are Impaired for the purpose of disclosing that information which the Bankruptcy Court has determined is material, important and necessary for such Holders of Impaired Claims to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan.

      In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code, (iii) the Proponent has proposed the Plan in good faith, and (iv) the Proponent's disclosures as required by Chapter 11 of the Bankruptcy Code have been adequate and have included information concerning all payments made or promised by the Debtors or the Proponent in connection with the Plan. The Proponent believes that all of these requirements will have been met by the date of the Confirmation Hearing and will seek rulings of the Bankruptcy Court to such effect at that hearing.

B.     Acceptances Necessary for Confirmation

      The Bankruptcy Code also requires that the Plan shall have been accepted by the requisite votes of the Holders of Impaired Claims (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code); that the Plan be feasible (that is, confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization); and that the Plan be in the "best interests" of all Holders of Impaired Claims that do not vote to accept the Plan (that is, those that do not vote to accept the Plan will receive pursuant to the Plan value at least equal to the value they would receive in a liquidation of the Debtors under Chapter 7). To confirm the Plan, the Bankruptcy Court must find that all of these requirements are met. Thus, even if the Holders of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it is in the best interests of the Impaired dissenting Claim Holders before it may confirm the Plan. These statutory conditions to confirmation are discussed below.

C.     Voting Under the Plan

      Each Impaired Class of Claims that is receiving a Distribution under the Plan is entitled to vote separately to accept or reject the Plan. Accordingly, except as otherwise provided in the Plan, each Holder of Claims in Classes 2, 4, and 5 will receive a ballot which will be used to cast its vote to accept or reject the Plan. Holders of Claims in Classes 1 and 3 are deemed to accept the Plan and will not be entitled to vote to accept or reject the Plan. Holders of Interests in Class 6 are deemed to reject the Plan and will not be entitled to vote to accept or reject the Plan.

      The amount of each Claim for voting purposes is determined as of the Voting Record Date as follows:

- The Claim listed in a Debtor's Schedules, provided that (i) such Claim is not scheduled as Contingent, unliquidated, undetermined or Disputed and (ii) no proof of Claim has been timely filed (or otherwise deemed timely filed by the Court under applicable law).

- The noncontingent and liquidated amount specified in a proof of Claim timely filed with the Court (or otherwise deemed timely filed by the Court under applicable law) to the extent the proof of Claim is not the subject of an objection filed no later than _____, 2011 (the **"Vote Objection Deadline"**) (or, if such Claim has been resolved pursuant to a stipulation or order entered by the Court, or otherwise resolved by the Court, the amount set forth in such stipulation or order).

- The amount temporarily allowed by the Court for voting purposes, pursuant to Bankruptcy Rule 3018(a), provided that a motion is brought, notice is provided and a hearing is held prior to the Confirmation Hearing (as defined in the Disclosure Statement Order), in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order.

- Except as otherwise provided above, with respect to Ballots cast by alleged creditors who have timely filed proofs of Claim in wholly unliquidated, unknown or uncertain amounts that are not the subject of an objection filed before the Vote Objection Deadline, such Ballots shall be counted in determining whether the numerosity requirement of section 1126(c) of the Bankruptcy Code has been met, but shall not be counted in determining whether the aggregate Claim amount requirement has been met.

The Disclosure Statement Order contains additional details regarding the counting of Ballots. Holders of Claims entitled to vote on the Plan should review the Disclosure Statement Order for such additional details.

D.     Acceptance by Impaired Creditors

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (2) cures any default, reinstates the original terms of such obligation, compensates the holder for any damages incurred as a result of non-performance of the contract, and otherwise does not alter the legal, equitable or contractual rights to which the holder of the claim might otherwise be entitled.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than

one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the those Classes entitled to vote must accept the Plan in order for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.

Holders of Claims in Classes 2, 4 and 5 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. Classes 1 and 3 are Unimpaired under the Plan and are conclusively deemed to have voted to accept the Plan. Class 6 is Impaired, will not be receiving Distributions under the Plan and is, therefore, conclusively deemed to have voted to reject the Plan. The Proponent reserves the right to seek non-consensual confirmation of the Plan with respect to any Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan.

E.    Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits the Bankruptcy Court to confirm a Chapter 11 plan over the rejection or deemed rejection of the plan by any class of claims or interests as long as the standards in section 1129(b) of the Bankruptcy Code are met. This power to confirm a plan over dissenting classes—often referred to as "cramdown"—is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case. Because Holders of Equity Interests in Class 6 are deemed to reject the Plan, the Proponent will seek to have the Plan approved and confirmed by the Bankruptcy Court pursuant to section 1129(b) of the Bankruptcy Code. In addition, it is possible that any other Impaired Class may vote to reject the Plan, in which case the Proponent will request a ruling that the Plan meets the requirements of the Bankruptcy Code with respect to such Class.

In the event one or more Impaired Classes of Claims votes to reject the Plan, and the Plan is not withdrawn as provided in the Plan, the Proponent may modify the terms of the Plan in order to reallocate value from all Classes at and below the level of the objecting Class(es) of Claims to all Impaired senior Classes and/or the objecting Class(es) of Claims to the extent they deem necessary to make the Plan satisfy the absolute priority rule set forth in section 1129(b) of the Bankruptcy Code, and may make such other modifications or amendments to the Plan as the Proponent deems necessary or desirable. Any such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice of the Confirmation Hearing at least three (3) days prior to such hearing.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all other impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the

Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The Plan, as proposed, does not unfairly discriminate given that classes of claims or equity interests of equal priority are similarly treated thereunder. While Allowed Convenience Class Claims are being paid 100%, such treatment is for the purposes of convenience only and does not cause the Plan to unfairly discriminate.

### 2. Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (A)(i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; (B) for a sale under section 363 of the Bankruptcy Code, the liens securing such claims attach to the proceeds of such sale; or (C) the holders of such secured claims realize the indubitable equivalent of such claims.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain, on account of such claim, property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan, on account of such junior claim or junior equity interest, any property.

- 64 -

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Proponent believes that the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 6 is deemed to reject the Plan. No class that is junior to Class 6 will receive or retain any property on account of Equity Interests in such Class. Moreover, to the extent that Class 4 or 5 rejects the Plan, the Plan also will satisfy the "fair and equitable" requirements given that no class junior to Class 4 or 5 is receiving a Distribution under the Plan.

F.   Feasibility

The Bankruptcy Code requires that the Proponent demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization, unless provided for in the plan.

This Plan is a liquidation plan whereby all of the Estate Assets are being transferred to DairyCo free and clear of any liens, Claims, interests and encumbrances, except for certain specific, enumerated assets that are being transferred to the Liquidation Trust. DairyCo is then issuing all of the DairyCo Equity Interests and DairyCo Notes to the Holders of the AFS Secured Claims in full and final satisfaction of the AFS Secured Claims.

A Liquidation Trust is being established on the Effective Date to administer the Plan, including, without limitation, making all Distributions under the Plan and liquidating the remaining Estate Assets. The Liquidation Trust will be funded by DairyCo with $250,000, to be used to make distributions to Holders of Allowed Convenience Class Claims and fund the expenses of the Liquidation Trust, with any remaining amounts available for Distribution to the Holders of Allowed Unsecured Claims (other than the Allowed AFS Deficiency Claims and Allowed Sumrall Claims) and the DairyCo Liquidation Trust Loan Advances, which will be used to fund any Distributions due to the Holders of Allowed Administrative Expense Claims (including U.S. Trustee Fees), Allowed Priority Tax Claims, Allowed Fee Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims.

The funding provided by DairyCo to support the Distributions under the Plan is sufficient to satisfy the feasibility requirements of the Bankruptcy Code with respect to the Liquidation Trust. As to DairyCo's ability to meet these funding needs, DairyCo will be an operating business and otherwise adequately funded as described below.

1.   DairyCo

DairyCo will be an operating business comprised of those of the Debtors' assets acquired under the Plan, and additional assets acquired after the Effective Date. DairyCo will be managed by a seasoned team of executives and employees. In addition, as described herein,

- 65 -

DairyCo will be funded by its equity holders with adequate capital to support its operations and its funding obligations under the Plan.

a. <i><u>DairyCo Team Members.</u></i>

DairyCo will be led by a seasoned team of executives and other professionals with extensive experience in agriculture, dairy management, operations and finance.

(i) Executive Team Members

*Mark Wong, Chief Executive Officer*

Mark Wong has over 30 years of experience in agribusiness. He is the Chief Executive Officer of Agrivida, an agriculture biotechnology company. He has led several highly successful agricultural loan workouts and restructurings, including the recovery of 100% of his bank client's principal, interest and fees from a $75 million seed company, the restructuring and operational consolidation of a $150 million apple growing and processing company, and the recapitalization of an agricultural company based outside Los Angeles.

Mr. Wong was formerly the founder and CEO of Emergent Genetics, Inc., a seed and biotechnology company, and a partner of Big Stone Partners, a private investment and management advisory firm that specializes in the agricultural and biotechnology sectors.

*Nathan Drake, Chief Operating Officer*

Nathan Drake has substantial experience negotiating financing and purchase transactions, as well as restructuring companies' operations and balance sheets. Most recently, Mr. Drake was turnaround CEO of Platte Valley Woodworks, a manufacturer of luxury doors and millwork located in Fort Collins, Colorado, where he improved on-time delivery and product quality, negotiated a forbearance arrangement with the senior lender, minimized all operating expenses and ran an investment banking process.

Mr. Drake was previously a principal of Kachi Partners, a private equity firm based in Colorado, where he was responsible for deal origination, transaction execution, fundraising and portfolio company supervision. He was also worked as a corporate attorney at the law offices of Holme, Roberts & Owen, and a compliance officer in the commodity trading division of Goldman Sachs. Mr. Drake is a graduate of Harvard Law School and MIT's Sloan School of Management.

*John Ball, VP of Finance*

John Ball has over 25 years' experience in the food and agribusiness industry. Mr. Ball has provided financial services, including capital market services, to a diverse group of US companies, such as Leprino, Dean Foods, HP Hood, DFA, Tyson Foods, Perdue Farms, JBS Swift, Smithfield Foods, C&S Wholesale Grocers, Wegman Food Markets, Constellation Brands, Seneca Foods, and Stanislaus Food Products.

- 66 -

Mr. Ball is a graduate of Cornell University, with a B.S. degree in Agriculture Economics and Business Management. He earned a M.S. from New Mexico State University in Accounting and Agricultural Economics. He has taught courses in economics, farm finance and taxation at Iowa State University and the Iowa Ag Bankers School. Mr. Ball grew up on a dairy and egg farm in New York State and earned the status of "Empire Farmer" as a member of the FFA.

Messrs. Wong, Drake and Ball are principals of CFH Management, LLC, the servicer for AFS.

(ii)     Former DPS Executives

DairyCo is negotiating with David Sumrall, Massoud Ghadiani, Michael Pedreiro and other former DPS executives to potentially retain them as consultants during the transition period.

(iii)     Dairy Farm Advisers

*Alan Vander Horst, Texas Farm Adviser*

Alan Vander Horst will advise DairyCo regarding DairyCo's Texas operations. Mr. Vander Horst owns and operates multiple dairy operations throughout Central Texas, including 20,000 head of dairy cattle, 8,000 acres of cropland, and 110 employees. He is the owner and chief operator of 360 Ag Management, a dairy industry consulting and management company, and has 20 years' experience in production agriculture of primarily dairy and cropping operations.

In his early professional career, Mr. Vander Horst worked as a dairy nutrition and management consultant for Dairyman's Cooperative Creamery Association (DCCA) in Tulare, CA. Thereafter, he partnered with his colleague from DCCA to form Valley Nutrition which soon came be a prominent dairy consulting firm in the San Joaquin Valley to some of the largest and progressive dairies in the US.

Mr. Vander Horst is a graduate of Cal Poly State University, San Luis Obispo, with a B.S. degree in Agri-business Management, and a minor in Dairy Science. He is also a graduate of the Texas Executive Program for Agricultural Producers, and is regularly involved in its continuing education alumni program, the Association of Agricultural Producer Executives.

*Ron St. John, Southeast Farm Adviser*

Ron St. John will advise DairyCo regarding DairyCo's Florida, Georgia, and Mississippi operations. Mr. St. John has over 40 years of experience as a dairy farmer and currently manages five dairy farms in the Southeast with 30,000 head of cattle and young stock and 10,000 acres of land.

In 2011, Mr. St. John was named Swisher Sweets/Sunbelt Ag Expo Florida Farmer of the Year in recognition of his efficient, sustainable and low-cost operations. He is partner in Chiefland Farm Supply, where his wife, Marcia, is chief financial officer. Mr. St. John

- 67 -

is also the Managing Partner of Suwannee Valley Feeds, which mixes, buys, and sells commodity feeds in Trenton, Florida.

Mr. St. John is the Vice President and member of the Board of Directors of Farm Credit of North Carolina. He is also a member of the Board of Directors and of the Executive Committee for Southeast Milk Cooperative.

DairyCo may retain other advisers in addition to or in lieu of the advisers listed.

(iv)    Former DPS Employees

DairyCo expects that its team will be further bolstered by the former DPS employees who choose to join DairyCo in the reorganization. These individuals' specific experience in the reorganized operations will help DairyCo in the transition period and into the future.

2.    DairyCo Ownership

Under the Plan, the DairyCo Equity Interests are distributed to AFS or its designee. AFS is majority owned by investment funds managed by TPG Credit Management, L.P. ("TPG"), and it is intended that DairyCo will be majority owned by TPG as well.

TPG was founded in August 2005 by Rory O'Neill and as of June 30, 2011 participates in the management of over $2 billion in assets through six private funds.

3.    Equity Contribution

As of the Effective Date, the DairyCo Equity Interests will be distributed to AFS or its designee under the Plan, and will be valued at $2 million. The holders of the DairyCo Equity Interests intend to invest between an additional $3 million to $8 million in equity into DairyCo to provide sufficient funding for DairyCo to meet its obligations under the Plan and to increase the productivity of its assets. These funds may be used to buy additional cows to maximize milk production, to renovate and improve dairy facilities, to undertake deferred maintenance and to fund working capital and other day-to-day operational needs of DairyCo. The holders of the Equity Interests will also be subject to additional capital calls under the agreements governing the DairyCo Equity Interests.

4.    Debt Structure

Under the Plan, the DairyCo Notes will be issued to AFS or its designee. Presently, the DairyCo Notes are intended to evidence three separate loans in the aggregate principal amount of $37 million. The first of the DairyCo Notes will be a $20 million term note with a five year term based on a twenty year amortization and accruing interest at 8.00% per year, and it will be secured by all of DairyCo's real estate. The second of the DairyCo Notes will be a $15 million term note with a five year term based on a five year amortization and accruing interest at 8.00% per year, and it will be secured by all of DairyCo's cattle and equipment. The third of the DairyCo Notes will be a $2 million revolving note with a five year

- 68 -

term and accruing interest at 8.00% per year, and it will be secured by all of DairyCo's personal property, other than cattle and equipment. The terms of the DairyCo Notes are subject to change.

5.  The Plan is Feasible

Based upon the foregoing, the Plan is feasible. The Liquidation Trust will have adequate funding to make all Distributions required under the Plan with the (a) $250,000 DairyCo Liquidation Trust Contribution to be used to fund distributions to the Allowed Convenience Class Claims, fund the Liquidation Trust Expenses and fund Distributions to Holders of Allowed Unsecured Claims (other than the AFS Deficiency Claims and Sumrall Unsecured Claims) and (b) the DairyCo Liquidation Trust Loan, which will be a revolving loan in the maximum principal amount of $1,000,000, to be used to fund amounts due on Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Fee Claims and Allowed Other Secured Claims (to the extent applicable). The Liquidation Trustee will also pursue Avoidance Actions and liquidate any other assets of the Liquidation Trust in attempt to enhance the recovery of Holders of Claims (although no such enhancement is guaranteed).

As set forth above, DairyCo will be owned and funded by an entity with sufficient assets to provide such funding to the Liquidation Trust.  Moreover, DairyCo will continue as a going concern with an established customer base and supply network and will be managed by professionals with substantial industry and finance experience. DairyCo will have adequate funds to meet its obligations under the Plan.

G.  Best Interests Test

With respect to each impaired class of claims and interests, confirmation of the plan requires that each holder of a claim or interest either (i) accept the plan, or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test." To determine what Holders of Claims and Interests of each Impaired Class would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a Chapter 7 liquidation case.

The Proponent conducted a liquidation analysis to determine what Holders of Claims and Equity Interests would receive if the Debtors' Estates were liquidated under Chapter 7 (the "Liquidation Analysis"), which is attached hereto as Exhibit B.  In undertaking the Liquidation Analysis, the Proponent determined an estimated liquidation value of the assets of each Debtor, including estimating the net realizable proceeds of the Debtors' current assets, such as their accounts receivable, supplies, feed inventory and crops, Debtors' livestock, and Debtors' fixed assets such as real estate and equipment.  Substantially all of the Debtors' assets are encumbered by liens held by AFS and Holders of Other Secured Claims and serve as collateral for the AFS Secured Claims and Other Secured Claims.

- 69 -

As set forth in the Liquidation Analysis, the amounts of the AFS Secured Claim and of the Other Secured Claims with respect to each Debtor far exceed the value of that Debtors' assets. Therefore, the only proceeds available to distribute to Holders of Claims, including AFS on account of the AFS Unsecured Deficiency Claim and Holders of Administrative Expense Claims, would be proceeds of Avoidance Actions. However, such amounts would be net of any Allowed Chapter 7 administrative expense claims, which would include (a) amounts paid to a Chapter 7 trustee for administration of the liquidation, including any fees due and owing to the Chapter 7 trustee and (b) any litigation and recovery costs, including, without limitation, any attorneys' fees and expenses.

By contrast, the Plan provides for payment in full, in cash, as early as the Effective Date, to Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Fee Claims. Holders of Allowed Other Secured Claims are Unimpaired. Holders of Allowed Convenience Claims will receive a distribution equal to 100% of the Allowed amount of their Claims, without interest. Holders of Allowed Unsecured Claims will receive some recovery as a result of the $250,000 DairyCo Liquidation Trust Contribution. Additionally, the Liquidation Trustee will pursue Avoidance Actions under the Plan, just as a Chapter 7 Trustee would, and such proceeds will be distributed to Holders of Allowed Unsecured Claims in accordance with the Plan.

Based on the Liquidation Analysis, the size of the AFS Secured Claims and Other Secured Claims relative to the estimated liquidation values of each Debtors' Estate Assets, and the Distributions proposed by the Plan, the Proponent believes that each Holder of a Claim or Interest will receive under the Plan at least the value, as of the Plan's Effective Date, of what it would receive under Chapter 7 of the Bankruptcy Code.

H.    Confirmation and Consummation Procedure

1.    Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in each of Classes 2, 4 and 5 are Impaired, and the holders of Claims in each of such Classes are entitled to vote to accept or reject the Plan in the manner and to the extent set forth in the Voting Procedures. Pursuant to the procedures established in the Disclosure Statement Order, any holder of a Claim in an Impaired Class under the Plan may vote on the Plan so long as such Claim has not been Disallowed and is not the subject of an objection pending prior to the Voting Deadline Date. Nevertheless, if a Claim is the subject of such an objection, the Holder thereof may vote if, on or prior to the Voting Deadline Date, such Holder obtains an order of the Bankruptcy Court, or the Bankruptcy Court approves a stipulation between the Proponent and such Holder fully or partially allowing such Claim, whether for all purposes or for voting purposes only in accordance with the Disclosure Statement Order.

Claims in each of Class 1 and 3 are Unimpaired. The Holders of Allowed Claims in each of such Classes are conclusively presumed to have accepted the Plan, and the solicitation of acceptances with respect to each such Class is not required under section 1126(f) of the Bankruptcy Code. Equity Interests in Class 6 are Impaired and will not be receiving Distributions under the Plan. The Holders of Equity Interests in this Class 6 are conclusively

presumed to have rejected the Plan, and the solicitation of acceptances with respect to each such Class is not required under section 1126(g) of the Bankruptcy Code. If you hold an Equity Interest in Class 6, you will not be receiving a Ballot.

The Holder of any Claim that, as of the Voting Record Date, (a) has been Disallowed, (b) is the subject of a pending objection, or (c) was listed on the Schedules as unliquidated in amount, Contingent or Disputed (if no contrary Proof of Claim with respect to such Claim has been timely filed) or a Proof of Claim with respect to which was filed on or before the Bar Date pursuant to the provisions of the Bar Date Order and such Proof of Claim asserts such Claim as unliquidated in amount, Contingent or Disputed, shall not be entitled to vote on the Plan, unless on or prior to the Voting Record Date, the Bankruptcy Court enters a Final Order directing otherwise; provided, however, that if only a portion of such Claim has been Disallowed, objected to or listed or asserted (as applicable) as unliquidated, Contingent or Disputed, such Holder shall be entitled to vote the remainder of such Claim in an amount determined pursuant to the Disclosure Statement Order.

As to classes of claims entitled to vote on a plan, the Bankruptcy Code defines acceptance of a plan by a class of claimholders as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that have timely voted to accept or reject a plan. Detailed voting instructions will be provided with the Ballot and will be set forth in the Disclosure Statement Order.

2.   Contents of Solicitation Package

Each Holder of a Claim entitled to vote on the Plan will receive the following materials (collectively, the "Solicitation Package"):

(i)      the Confirmation Hearing Notice;

(ii)     the Plan;

(iii)    this Disclosure Statement;

(iv)    the Disclosure Statement Order;

(v)     the Ballot and return envelope; and

(vi)    such other information as the Bankruptcy Court may direct or approve.

3.   Temporary Allowance of Claims for Voting Purposes

Holders of Claims that are the subject of an objection filed no later than the Vote Deadline Date will not be entitled to vote unless such claim is temporarily allowed by the Court for voting purposes only pursuant to Bankruptcy Rule 3018(a), after a Claims Estimation Motion is brought by such Holder no later than _____, 2011, notice is provided and a hearing is held prior to the Confirmation Hearing. If an objection to a Claim requests that such Claim be

reclassified and/or allowed in a fixed, reduced amount, the Holder of such Claim's Ballot shall be counted in such reduced amount and/or as the reclassified category.

4.    Voting

As referred to herein, the "Balloting Agent" is counsel to AFS, which is Greenberg Traurig, LLP. The Balloting Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. The Balloting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

BALLOTS CAST BY HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER OR PERSONAL DELIVERY. THE BALLOTS WILL INDICATE THAT THE BALLOT MUST BE RETURNED TO THE BALLOTING AGENT. THE ADDRESS FOR BALLOTS RETURNABLE TO THE BALLOTING AGENT IS:

John J. Dyer
Greenberg Traurig, LLP
The Forum, Suite 400
3290 Northside Parkway
Atlanta, Georgia 30327

FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL A REPRESENTATIVE OF THE BALLOTING AGENT, JOHN J. DYER, at (678) 553-2100.

Additional copies of the Plan, this Disclosure Statement, the Plan Supplement or other Solicitation Package materials (except Ballots) are available from the Clerk's Office of the United States Bankruptcy Court for the Middle District of Georgia. Additional copies of Ballots may be obtained by contacting the Balloting Agent.

Votes shall be filed and served in accordance with the procedure set forth in the Disclosure Statement Order. All votes must be received by the Balloting Agent on or before 5:00 p.m. Eastern Time on _____, 2011 (the "Voting Deadline Date").

5.    The Confirmation Hearing

Section 1128 of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a confirmation hearing. As discussed above, the Confirmation Hearing in respect of the Plan has been scheduled to commence on _____2011 at _____ [a.m.] [p.m.], before the Honorable Judge James D. Walker, United States Bankruptcy Court, at _____, Georgia. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds of the objection and the amount and class of the Claim or Equity Interest. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the Proponent on or before _____, 2011 at _____ [a.m.][p.m.], prevailing Eastern time. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

6.     <u>Consummation</u>

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the Effective Date and the impact of the failure to meet such conditions, *see* Sections V.G and V.I of this Disclosure Statement.

**ARTICLE VII**
**SECURITIES REGISTRATION EXEMPTION**

A.     <u>Securities Registration Exemption</u>

Except as set forth below, the securities to be issued pursuant to the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

To the extent section 1145 of the Bankruptcy Code is inapplicable, the issuance of securities pursuant to the Plan would otherwise be exempt from registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

B.     <u>Section 1145 of the Bankruptcy Code</u>

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering. Therefore, the securities issued pursuant to the exemption under section 1145(a)(1) of the Bankruptcy Code may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is

- 73 -

made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(a)(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that a person that is deemed an "underwriter" receives securities under the Plan, resales of such securities by such person would not be freely transferable unless such person complies with the safe harbor provided by Rule 144 (other than the holding period), another exemption from registration for resale is available or such resale is registered under the Securities Act; provided, however, that any such resale will be subject to the restrictions on transfer and assignment contained in the operating agreement of DairyCo.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES PURSUANT TO THE PLAN MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ISSUER OF SUCH SECURITIES, THE PROPONENT MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER THE SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE PROPONENT RECOMMENDS THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES.

## ARTICLE VIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain significant U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Allowed Claims. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial decisions and published rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Due to the unsettled nature of several of the tax issues presented by the Plan, the differences among creditors in the nature of their Claims, and the possibility that future events, including amendments to the Tax Code, the Treasury regulations promulgated thereunder or court decisions, could change the U.S. federal income tax consequences of the implementation of the Plan, the tax consequences described below are only general descriptions that are subject to

- 74 -

significant uncertainties.

This discussion does not address the tax treatment of certain persons that may be subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, government authorities or agencies, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, including qualified plans, and investors in pass-through entities), or any aspect of state, local or foreign taxation. In addition, this discussion does not address the U.S. federal income tax consequences to Holders whose Claims are entitled to reinstatement or are otherwise Unimpaired under the Plan. No opinion has been requested, and the Proponent has not sought, nor does it intend to seek, a ruling from the IRS regarding the tax consequences of the Plan. Consequently, there can be no assurance that the treatment set forth below will be accepted by the IRS.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to each Holder of an Allowed Claim. All Holders of Allowed Claims are urged to consult their own tax advisors for the federal, state, local, foreign and other tax consequences applicable to them under the Plan.

IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, the Debtors and Holders of Allowed Claims are hereby notified that: (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by the Debtors or the Holders of Allowed Claims for the purpose of avoiding penalties that may be imposed on them under federal, state or local tax laws, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) the Debtors and the Holders of Allowed Claims should seek advice based on their particular circumstances from an independent tax advisor.

A.      Tax Consequences to the Debtors

Each Holder of an AFS Secured Claim will receive, in exchange for such AFS Secured Claim, a pro rata share of (a) the DairyCo Equity Interests and (b) the DairyCo Notes. For U.S. tax purposes, the DairyCo Equity Interests and the DairyCo Notes should be treated as separate instruments. The DairyCo Equity Interests and the DairyCo Notes should not be treated for U.S. federal income tax purposes as an investment unit. The IRS, however, may disagree with this analysis and treat the DairyCo Equity Interests and the DairyCo Notes as an investment unit. The relevant U.S. federal income tax consequences of such an alternative treatment by the IRS are discussed below.

As a result of the exchange of the AFS Secured Claims for the DairyCo Equity Interests and the DairyCo Notes, Sumrall, as the sole member of the Debtors, may realize cancellation of debt ("COD") income. In general, COD income is the amount by which the face amount of the discharged indebtedness (reduced by any unamortized discount and increased for unamortized premium with respect to the indebtedness) exceeds any consideration given in exchange therefor. The taxpayer would realize COD income equal to the excess of the "adjusted

- 75 -

issue price" of the debt retired over the fair market value of the property given in consideration for the debt. In the case of a solely debt-for-debt exchange, generally, the amount of COD income to be recognized is the excess of the adjusted issue price of the discharged debt over the issue price of the new debt. Alternatively, if the discharged debt is exchanged solely for equity in a partnership or a disregarded entity for U.S. tax purposes, the amount of COD income is generally the excess of the adjusted issue price of the discharged debt over the fair market value of the equity. There is no direct authority on the amount of COD income to be recognized in the case of exchanging debt for a combination of debt and equity.

While it is not clear from doubt, it appears that the amount of the consideration given in satisfaction of the AFS Secured Claim should be treated for U.S. federal income tax purposes as the sum of the fair market value of the DairyCo Equity Interests and the issue price DairyCo Notes.

It is expected that the sum of the fair market value of the DairyCo Equity Interests and the issue price of the DairyCo Notes will equal the outstanding balance of the AFS Secured Claims at the time of exchange. In such a case, there should be no COD income to be recognized by Sumrall as the sole member of the Debtors. However, if the IRS would treat the DairyCo Equity Interests and the DairyCo Notes as an investment unit for U.S. federal income tax purposes, the issue price of such an investment unit would be lower than the sum of the fair market value of the DairyCo Equity Interests and the issue price DairyCo Notes (in fact, the issue price of such an investment unit should be the issue price of the DairyCo Notes minus the value of the DairyCo Equity Interests), in which case Sumrall, as the sole member of the Debtors, should be treated as having COD income.

In addition, to the extend that the Debtors' discharged liabilities include accrued and unpaid interest that has been deducted by Sumrall, any accrued interest that was deducted by Sumrall as the sole member of the Debtors would have to be recognized by Sumrall at the time of exchange as ordinary income.

Under two relevant exceptions, a taxpayer is not required to include COD income in gross income to the extent that the taxpayer is either insolvent or under the jurisdiction of a court in a Title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to such proceeding. If the discharge occurs both when the taxpayer is insolvent and in a Title 11 bankruptcy proceeding, the Title 11 rule controls so that the exclusion is not limited to the amount of the insolvency. Instead, the Tax Code provides that a taxpayer in a bankruptcy proceeding with COD income must, subject to certain limitations and ordering rules, reduce its tax attributes (including, but not limited to, net operating loss ("NOL") carryforwards, current year NOLs, tax credits, passive activity losses and tax basis in assets) by the amount of the COD income, and will not have to recognize the COD income. To the extent the amount of COD income exceeds the tax attributes available for reduction, any remaining COD income is discharged with no further tax liability to the taxpayer.

In the case of a partnership (or a disregarded entity for U.S. federal income tax purposes), the COD income exclusion under the bankruptcy and insolvency exceptions as well as the attribute reduction rules are applied at the member, rather than entity, level. Thus, any COD

income recognized by a Debtor that is treated as a disregarded entity for U.S. federal income tax purposes will be allocated to Sumrall, its sole member, who generally must include its share of the COD income in determining his own taxable income, except to the extent that Sumrall is able to exclude the COD income because he himself is insolvent or under the jurisdiction of a court in a bankruptcy proceeding.

### B. Tax Consequences to Certain Holders of Allowed Claims

#### 1. General Tax Consequences to Holders of Allowed Claims

The U.S. federal income tax consequences to Holders of Allowed Claims arising from the various types of distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (i) the manner in which a Holder acquired an Allowed Claim; (ii) the type of consideration received by the Holder of an Allowed Claim in exchange for the interest it holds; (iii) the nature of the indebtedness owed to it; (iv) whether the Holder previously claimed a bad debt or worthless securities deduction in respect of the Allowed Claim; (v) whether the Holder of the Allowed Claim is a citizen or a resident of the U.S. for tax purposes; (vi) whether the Holder of the Allowed Claim reports income on the accrual or cash basis; and (vii) whether the Holder receives distributions in more than one taxable year. In addition, where gain or loss is recognized by a Holder of an Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, will be determined by a number of factors, including the tax status of the Holder of an Allowed Claim, whether the Allowed Claim constitutes a capital asset in the hands of the Holder, and how long it has been held or is treated as having been held. Due to the variety of considerations, relevant facts and circumstances and resulting possible tax consequences to Holders of Allowed Claims, we strongly urge each Holder of an Allowed Claim to consult with its own tax advisor regarding the U.S. federal income consequences pertaining to receiving, holding and disposing of Allowed Claims.

#### 2. Accrued Interest and OID

If and to the extent a Holder of Allowed Claim receives consideration in satisfaction of such an Allowed Claim and a portion of such consideration is attributable to accrued and unpaid interest or original issue discount ("OID"), such amount generally will be taxable to the Holder as ordinary interest income (if not previously included in the Holder's gross income). While a Holder of an Allowed Claim generally may recognize a deductible loss (subject to limitations) to the extent of any accrued interest and OID that was previously included in the Holder's gross income and is not paid in full, it is unclear whether such a loss would be a capital loss, rather than an ordinary loss, with respect to any previously included interest and OID that is not paid in full. All Holders of Allowed Claims should consult their tax advisors as to the tax consequences of the receipt of consideration after the Effective Date in satisfaction of accrued interest or OID, the allocation of consideration between principal and interest and the deductibility of unpaid interest and OID for U.S. federal income tax purposes.

#### 3. Receipt of Beneficial Interests in the Liquidation Trust

As set forth above, pursuant to Treasury Regulation Section 301.7701-4(d) and

- 77 -

related authorities, the Liquidation Trust should be treated as a grantor trust set up for the benefit of the Holders of Allowed Claims, as beneficiaries of such Trust. Holders of Allowed Claims that receive a beneficial interest in the Liquidation Trust will be treated for U.S. federal income tax purposes as receiving their Pro Rata Shares of the assets of the Liquidation Trust from the Debtors in a taxable exchange and then depositing them in the Liquidation Trust in exchange for beneficial interests in the Liquidation Trust. The Debtors will realize gain or loss on the difference between a Debtor's basis in the property and its fair market value. Holders of Allowed Claims that receive a beneficial interest in the Liquidation Trust will be required to report on their United States federal income tax returns their share of the Liquidation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Liquidation Trust. This requirement may result in such Holders of Allowed Claims being subject to tax on their allocable share of the Liquidation Trust's taxable income prior to receiving any cash distributions from the Liquidation Trust. Holders of Allowed Claims that receive a beneficial interest in the Liquidation Trust are urged to consult their tax advisors regarding the tax consequences of holding a beneficial interest in the Liquidation Trust, the right to receive, and of the receipt (if any) of property from the Liquidation Trust.

### 4. The Exchange of the AFS Secured Claims

Assuming that the exchange of the AFS Secured Claims for the DairyCo Equity Interests and the DairyCo Notes will not qualify as a tax-free reorganization, the Holders of the AFS Secured Claims may have to recognize gain or loss from the exchange, equal to the difference between (i) the sum of the fair market value of the Dairy Equity Interest and the issue price of the DairyCo Notes and (ii) the outstanding balance of the AFS Secured Claim.

As set forth above, it is expected that the sum of the fair market value of the Dairy Equity Interest and the issue price of the DairyCo Notes will equal the outstanding balance of the AFS Secured Claim. Thus, there should be no gain or loss to be recognized by the Holders of the AFS Secured Claim. However, if the IRS would treat the Dairy Equity Interest and the DairyCo Notes as an investment unit, as set forth above, the issue price of such an investment unit would be lower than the sum of the fair market value of the Dairy Equity Interest and the issue price of the DairyCo Notes, in which case the Holders of the AFS Secured Claim will have a recognizable loss.

### 5. The Treatment of the DairyCo Equity Interests as Partnership Interests.

A Holder of an AFS Secured Claim that receives the DairyCo Equity Interests will become a member of DairyCo. It is intended that DairyCo will elect to be treated as a partnership for federal income tax purposes and to that end, the operating agreement of DairyCo will allow DairyCo to take all reasonable action to prevent DairyCo from being treated as a "publicly traded partnership" taxed as a corporation for U.S. federal income tax purposes. Accordingly, Holders of the DairyCo Equity Interests will receive an allocation of income, gain, loss, deduction, credit and items thereof and will be responsible for any tax liability associated with any such allocation. To the extent that any of such AFS Secured Claims have built-in gain or loss at the time of the exchange, such built-in gain or loss shall be governed by Section 704(c)

- 78 -

of the Tax Code. DairyCo may not have sufficient cash to make a distribution such that the Holders of the DairyCo Equity Interests, as members of DairyCo, can satisfy their tax liability with respect to such allocations.

In general, DairyCo will be treated as a "publicly traded partnership" if either the New Equity or any other equity issued by DairyCo is "publicly traded" within the meaning of Section 7704(b) of the Tax Code and Treasury Regulations promulgated thereunder. The Treasury Regulations set forth safe harbors for partnerships that either (i) have no more than one hundred (100) partners and whose partnership interests have been issued in a transaction that is not required to be registered under the Securities Act or (ii) earn types of income that satisfy the "passive income" guidelines. Although DairyCo will take such actions as it deems necessary to prevent DairyCo from being taxable as a corporation for federal income tax purposes, there can be no assurance that DairyCo will not become a "publicly traded partnership." If DairyCo is treated as publicly traded partnership, income and deductions of DairyCo would be reported on its tax return separately from its members, and DairyCo would be required to pay income tax at corporate rates on its net income. The imposition of any such tax would reduce the amount of cash available to be distributed to the Holders that own the DairyCo Equity Interests .

**6. Holders of Administrative Expense Claims, Fee Claims and Priority Tax Claims.**

Under the Plan, Holders of Administrative Expense Claims, Fee Claims and Priority Tax Claims generally will be paid any Cash Distribution either on the Effective Date or over a period of time. Accordingly, a Holder of Administrative Expense Claims, Fee Claim or Priority Tax Claim generally should realize gain or loss in an amount equal to the difference between (i) the amount realized by the Holder of Administrative Expense Claims, Fee Claims and Priority Tax Claims in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest and OID, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such consideration), and (ii) the Holder's adjusted tax basis in its Claim (excluding any portion attributable to an Claim for accrued but unpaid interest and OID). The amount realized by a Holder of Administrative Expense Claims, Fee Claims and Priority Tax Claims should equal the sum of the amount of any cash and the fair market value of any other property received by the Holder of Administrative Expense Claims, Fee Claims and Priority Tax Claims. It is possible that any loss or a portion of any gain realized by such a Holder of Administrative Expense Claims, Fee Claims and Priority Tax Claims may be deferred until the Holder of Administrative Expense Claims, Fee Claims and Priority Tax Claims has received its final Distribution. A Holder's tax basis in any property received in satisfaction of Administrative Expense Claims, Fee Claims and Priority Tax Claims generally should equal the fair market value of such property, and the Holder's holding period for the property generally should begin the day following the acquisition of the property. Furthermore, the Holders' gain or loss, the character of such gain or loss, the application of the market discount rules, and the treatment of accrued but unpaid interest generally should be determined in the same manner as described above.

- 79 -

### C. Information Reporting and Withholding

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding obligations. Under U.S. federal income tax law, certain interest, dividends and other reportable payments may be subject to "backup withholding" at the then-applicable rate (28% as of the tax year 2011). Backup withholding generally applies if the Holder: (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance tax payment which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions (referred to as "Reportable Transactions") in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims and Interests are urged to consult their tax advisors regarding these Treasury regulations and whether the transactions contemplated by the Plan would be subject to these Treasury regulations as Reportable Transactions and require disclosure on a Holder's tax returns.

### D. Non-United States Claimholders

**This Disclosure Statement does not cover any of the U.S. federal income tax consequences of the Plan to Non-United States Holders of Claims. Each such Non-United States Holder should consult its own tax advisor as to the United States tax consequences of holding interests in DairyCo including, without limitation, (i) whether such Non-United States Holder will be subject to United States tax and required to file a United States tax return, (ii) the tax consequences of a sale of its interest in DairyCo, and (iii) the withholding obligations imposed on distributions from DairyCo to such Non-United States Holder.**

THE PRECEDING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. THE PROPER TAX TREATMENT OF THE DEBTORS AND HOLDERS OF AN ALLOWED CLAIM IS UNCERTAIN IN VARIOUS RESPECTS. ACCORDINGLY, EACH DEBTOR AND HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR AS TO PARTICULAR TAX CONSEQUENCES TO IT OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY PROPOSED CHANGES IN APPLICABLE LAWS.

## ARTICLE IX
## RISK FACTORS

Holders of Claims against the Debtors and Interests in the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or referred to herein by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

A.    <u>Bankruptcy Considerations</u>

Although the Proponent believes that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

The Plan contemplates occurrence of the Effective Date within 15 days after entry of the Confirmation Order. However, the Effective Date of the Plan is based upon the occurrence of certain conditions precedent enumerated in the Plan, the occurrence of which are not a certainty. Further, although the Proponent intends at present to support the Plan, Proponent may, at its discretion, withdraw from the Plan at any time before entry of the Confirmation Order.

B.    <u>Proponent Cannot State with any Degree of Certainty the Number or Amount of Claims that will be Allowed.</u>

The Proponent cannot know with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed in each of the voting Classes. Since the Distribution made to the Holders of Claims in Class 4 will be *pro rata* based on the available assets to distribute and the aggregate amount of Allowed Class 4 Claims, the Distribution that any Holder of an Allowed Class 4 Claim will receive on account of any Claim is not certain.

C.    <u>Risk That Proceeds From Causes of Action Will be Less than Projected.</u>

The Plan provides that Holders of Class 4 Claims will recover, in part, from any proceeds of Avoidance Actions. Although the Proponent anticipates that the Avoidance Actions will, in time, be resolved in a manner that provides a net benefit, there can be no guarantee that the result will be favorable or that any recoveries for allowed Class 4 Claims will be generated by such Avoidance Actions.

D.    <u>Risk that, if the Plan is Not Confirmed, then the Debtors' Bankruptcy Cases May Be Converted To Liquidations Under Chapter 7.</u>

There is a risk that, if the Plan is not confirmed, the Debtors' cases may be converted to a Chapter 7 liquidation pursuant to section 1112 of the Bankruptcy Code. Whether such conversion may occur will be at the discretion of the Bankruptcy Court and may turn on the

existence of factors that Proponent does not now know, such as the cost of attempting to confirm the Plan and the Debtors' continuing financial performance.

E.    Alternative/Competing Plans

There is a risk that other parties in interest may propose competing plans of reorganization or liquidation.  If the process of attempting to confirm a plan becomes too costly and/or lengthy, these Chapter 11 Cases may convert to Chapter 7 liquidation cases.  If the Chapter 11 cases are converted to Chapter 7 liquidation cases, the creditors likely will receive a lower (or possibly no) recovery.

F.    Relief from the Automatic Stay

There is a risk that Holders of Secured Claims may move for relief from the automatic stay imposed by Section 362 of the Bankruptcy Code in order to assert their rights against the Debtors' encumbered property. The entities that may seek such relief are the Proponent, the Holder of the AFS Secured Claims, and any Holder of any Other Secured Claims. On November 11, 2010, Proponent filed a Motion for Relief from Stay against certain of the Debtors' assets [Docket #102], which the Court has continued on various occasions and most recently through and including September 21, 2011.

At the present, Proponent does not intend to file additional motions for relief from stay, nor does Proponent anticipate that any Holders of Other Secured Claims will so move. However, depending on the complexity, duration and expense of the Plan confirmation process and other external factors, there is a risk that such motions may be filed.[11]

**ARTICLE X**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN**

A.    General

If the Plan is not confirmed, the potential alternatives include (i) alternative plans of reorganization under Chapter 11, (ii) dismissal of the Chapter 11 Cases, or (iii) conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Proponent may attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of its assets.

---

[11] Nothing in this Disclosure Statement should be considered a waiver of Proponent's rights or remedies under applicable law or equity or the Proponent's right to pursue its pending automatic stay motion. Proponent expressly reserves any and all such rights.

ATL 18,236,281 131498.010100

C.    Sale of Assets Under Section 363 With Follow-On Plan

If the Plan is not confirmed, a section 363 sale may be pursued whereby substantially all of the Debtors' assets will be sold. The Lender has the right to credit bid at any such 363 sale. After such 363 sale is consummated, a Chapter 11 plan may be filed with the Bankruptcy Court with respect to any remaining assets.

D.    Liquidation Under Chapter 7

If no Chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code in which case a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of holders of Claims is set forth in Section VI.D.3.d of this Disclosure Statement. The Proponent believes that liquidation under Chapter 7 would result in lower, more uncertain distributions made to creditors than those provided for in the Plan.

**The Proponent has concluded that this Plan enables creditors and equity holders to realize the most value under the circumstances and that Holders of Claims would receive greater recoveries under this Plan than under a different business reorganization scenario or in a Chapter 7 liquidation.**

**ARTICLE XI**
**MISCELLANEOUS**

A.    Disclaimers

The statements contained in this Disclosure Statement are generally made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the information set forth herein since the date of this Disclosure Statement or the date of the materials relied upon in preparation of this Disclosure Statement.

This Disclosure Statement is not necessarily in accordance with Federal or State securities laws or similar laws and may not be relied upon for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Proponent or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan on Holders of Claims.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself. All Holders of Claims, who are entitled to vote, are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan, prior to submitting a ballot pursuant to any solicitation of votes with respect to the Plan. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling.

**This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in**

the Debtors' Chapter 11 Cases and certain financial information. Although the Proponent believes that these summaries are fair and accurate, the summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions. In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement, including other documents or financial information incorporated into the Disclosure Statement by reference, and the terms and provisions of the Plan, the terms of the Plan shall govern for all purposes. In the event of any inconsistency between the Disclosure Statement and any documents or financial information incorporated into the Disclosure Statement, such other documents or other financial information, as the case may be, shall govern for all purposes.

No one is authorized to give any information with respect to the Plan other than that which is contained in this Disclosure Statement. No representations concerning the Debtors or the value of their property have been authorized by the Proponent other than as set forth in this Disclosure Statement and the documents attached to this Disclosure Statement. Any information, representations or inducements made to obtain an acceptance of the Plan that are other than as set forth, or inconsistent with, the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, the Plan or the Plan Supplement, should not be relied upon by any Holder of a Claim or Interest.

With respect to contested matters, adversary proceedings and other pending, threatened, potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver, but rather as a statement made in the context of settlement negotiations pursuant to Rule 408 of the Federal Rules of Evidence.

The securities described in this Disclosure Statement will be issued without registration under the Securities Act or any similar federal, state, or local law, pursuant to section 1145 of the Bankruptcy Code. There is currently no public market for the securities described in this Disclosure Statement nor does the Proponent anticipate that there will be such a public market. Such securities will not be listed on any securities exchange. Any Holders of Claim receiving securities under the Plan should consult their own legal counsel concerning the securities laws and the laws governing the ownership and transferability of any such securities.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission or any state securities commission, nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement or upon the merits of the Plan.

Although the Proponent believes that the Plan complies with all applicable provisions of the Bankruptcy Code, the Proponent cannot assure such compliance or that the Bankruptcy Court will confirm the Plan.

Although the Proponent has used its best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, the financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, unless specifically indicated otherwise. Historical financial information that may have been used to

prepare this Disclosure Statement was prepared by the Debtors and have not been verified by the Proponent.

The Proponent cautions that some of assumptions made in this Disclosure Statement inevitably will not materialize; therefore, future events and projections may be different from those assumed or, alternatively, may have been unanticipated, and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Therefore, any projections or representations of future events made herein may not be relied upon as a guaranty or other assurance of the actual results that will occur.

B.    Information Contained Herein Is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

C.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interests. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

D.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity nor (b) be deemed evidence of the tax or other legal effects of the Plan on Reorganized Debtors or any other parties in interest.

E.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Proponent may seek to object to Claims and Interests before or after the confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

F.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Proponent, the Debtors or the Liquidation Trust (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any Claims or Causes of Action are specifically or generally identified herein.

- 85 -

G.  Potential Exists for Inaccuracies, and the Proponent has No Duty to Update

The statements contained in this Disclosure Statement are made by the Proponent as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Proponent has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Proponent nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Proponent may subsequently update the information in this Disclosure Statement, it has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

H.  No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, these Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Proponent and the United States Trustee.

I.  Rules of Interpretation

For purposes of this Disclosure Statement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented; (d) any reference to any entity as a Holder of a Claim or Equity Interest includes that entity's successors and assigns; (e) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement; (f) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in the Plan Supplement; (g) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (j) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in

capitalized form in this Disclosure Statement that is not otherwise defined in the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Proponent in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

J.      <u>Computation of Time</u>

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply. If the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

K.      <u>References to Monetary Figures</u>

All references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE XII
## SUMMARY, RECOMMENDATION AND CONCLUSION

In the opinion of the Proponent, the treatment of the Claims and Interests under the Plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors. Accordingly, the Proponent believes that confirmation of the Plan is in the best interests of Holders of Claims and Interests and recommends that you vote to accept the Plan.

Respectfully submitted, this 8th day of September, 2011.


**GREENBERG TRAURIG, LLP**

 /s/ David B. Kurzweil
David B. Kurzweil (Georgia Bar No. 430492)
John J. Dyer (Georgia Bar No. 236844)
3290 Northside Parkway, NW, Suite 400
Atlanta, Georgia 30327
Telephone: (678) 553-2100
Facsimile: (678) 553-2212

*Attorneys for Proponent Agricultural Funding Solutions, LLC*

- 87 -

**Exhibit A**

**The Plan**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

--------------------------------------------------------------------------------------------------------x

IN RE:                                                          :

DAIRY PRODUCTION SYSTEMS - GEORGIA, LLC,                        :
DAIRY PRODUCTION SYSTEMS, LLC,                                  :
DAIRY PRODUCTION SYSTEMS - MISSISSIPPI, LLC,
NEW FRONTIER DAIRY, LLC, and                                   :
HEIFER HAVEN, LLC                                               :

                                      Debtors               :

Chapter 11

Case No. 10-11752

(Jointly Administered)

--------------------------------------------------------------------------------------------------------x

## JOINT CHAPTER 11 PLANS OF REORGANIZATION FOR DAIRY PRODUCTION SYSTEMS - GEORGIA, LLC, DAIRY PRODUCTION SYSTEMS, LLC, DAIRY PRODUCTION SYSTEMS - MISSISSIPPI, LLC, NEW FRONTIER DAIRY, LLC, AND HEIFER HAVEN, LLC PROPOSED BY AGRICULTURAL FUNDING SOLUTIONS, LLC

Dated:  September 8, 2011

GREENBERG TRAURIG, LLP
David B. Kurzweil
John J. Dyer
3290 Northside Parkway
Suite 400
Atlanta, Georgia 30327
Telephone:  (678) 553-2100
Facsimile:   (678) 553-2400


Attorneys for Agricultural Funding Solutions,
LLC, as Proponent

# TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS

A. Defined Terms ................................................................................................................ 1
B. Rules of Construction .................................................................................................... 11
C. Exhibits; Plan Supplement ........................................................................................... 12

ARTICLE II
CLASSIFICATION OF CLAIMS
AND EQUITY INTERESTS AND GENERAL PROVISIONS

A. Claims and Equity Interests Classified ........................................................................ 12
B. Administrative Expense Claims, Fee Claims and Priority Tax Claims .......................... 12
C. Classification of Claims and Equity Interests .............................................................. 13

ARTICLE III
IMPAIRMENT OF
CLASSES OF CLAIMS AND EQUITY INTERESTS

A. Unimpaired Classes of Claims ..................................................................................... 13
B. Impaired Classes of Claims and Equity Interests ........................................................ 13

ARTICLE IV
PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS

A. Administrative Expense Claims .................................................................................... 13
B. Fee Claims .................................................................................................................... 14
C. Priority Tax Claims ....................................................................................................... 14
D. U.S. Trustee Fees ......................................................................................................... 14

ARTICLE V
PROVISIONS FOR TREATMENT OF CLAIMS
AND EQUITY INTERESTS CLASSIFIED IN THE PLAN

A. Class 1: Priority Non Tax Claims ................................................................................. 15
B. Class 2: AFS Secured Claims ....................................................................................... 15
C. Class 3: Allowed Other Secured Claims. ..................................................................... 15
D. Class 4: Allowed Unsecured Claims. ........................................................................... 15
E. Class 5: Allowed Convenience Class Claims. .............................................................. 16
F. Class 6: Equity Interests. .............................................................................................. 16
I. Reservation of Rights Regarding Claims and Equity Interests ..................................... 16
J. Limitation to Full Recovery .......................................................................................... 16

ARTICLE VI
ACCEPTANCE OR REJECTION OF THE PLAN

A. Each Impaired Class Entitled to Vote Separately ........................................................ 16

| B. | Acceptance by a Class of Claims | 16 |
| C. | Claims and Equity Interests Not Entitled to Vote | 16 |
| D. | Cramdown | 17 |
| E. | Controversy Concerning Impairment | 17 |
| F. | Elimination of Vacant Classes | 17 |
| G. | Removal of Debtors | 17 |

## ARTICLE VII
## CLAIMS AND DISTRIBUTIONS

| A. | Distribution Agent | 17 |
| B. | Distributions Under the Plan | 18 |
| C. | Timing of Distributions | 18 |
| D. | Disputed Claims Reserve | 18 |
| E. | Unclaimed Property | 19 |
| F. | Distributions to Holders of Claims Generally | 19 |
| G. | Setoffs | 21 |
| H. | Control of Claims Resolution Process by Liquidation Trust and Liquidation Trustee | 21 |
| I. | Distributions Under Twenty-Five Dollars | 21 |
| J. | Fractional Distributions | 21 |

## ARTICLE VIII
## MEANS FOR IMPLEMENTATION OF THE PLAN

| A. | Overview of Plan | 22 |
| B. | Effective Date Transactions | 22 |
| C. | Effective Date Funding | 23 |
| D. | Post-Effective Date Funding | 23 |
| E. | Employees | 23 |
| F. | Estate Assets Transferred to DairyCo | 23 |
| G. | Assumed Liabilities | 23 |
| H. | Corporate (or Equivalent) Action | 23 |
| I. | Other Documents and Actions | 24 |
| J. | Operations Between the Confirmation Date and the Effective Date | 24 |
| K. | Dissolution of Debtors | 24 |
| L. | Conditions Precedent to the Effective Date | 24 |
| M. | Waiver of Conditions to Effectiveness | 26 |
| N. | Effect of Nonoccurrence of the Conditions to Effectiveness | 26 |
| O. | Further Authorization | 26 |
| P. | No Substantive Consolidation | 27 |
| Q. | Securities Registration Exemption. | 27 |
| R. | Cancellation of Instruments and Equity Interests | 27 |
| S. | Operating Reports | 27 |

T.    Disposition of Books and Records ................................................................... 27

## ARTICLE IX
## LIQUIDATION TRUST

A.    Establishment of Liquidation Trust................................................................. 28
B.    Appointment of Liquidation Trustee................................................................ 28
C.    Liquidation Trust Assets .................................................................................. 28
D.    Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor in-Interest................................................................................................................... 28
E.    Investments of Cash ........................................................................................ 29
F.    Responsibilities of the Liquidation Trustee.................................................... 30
G.    Liquidation Trust Expenses ............................................................................ 30
H.    Repayment of DairyCo Liquidation Trust Loan Obligations......................... 31
I.    Bonding of Liquidation Trustee ...................................................................... 31
J.    Fiduciary Duties of the Liquidation Trustee .................................................. 31
K.    Dissolution of the Liquidation  Trust ............................................................. 31
L.    Full and Final Satisfaction against Liquidation Trust .................................... 31
M.    Limitation of Liability..................................................................................... 31
N.    Reliance on Documents ................................................................................... 32
O.    Requirement of Undertaking ........................................................................... 32

## ARTICLE X
## THE RELEASES AND EXCULPATION

A.    Estate Release.................................................................................................. 33
B.    Sumrall/AFS Release ...................................................................................... 33
C.    Releases by Holders of Claims........................................................................ 33
D.    Exculpation...................................................................................................... 34

## ARTICLE XI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.    Objections to Claims ....................................................................................... 34
B.    Disputed Claims .............................................................................................. 35
C.    Subordination of Claims.................................................................................. 35
D.    Estimation of Claims ....................................................................................... 35
E.    No Distribution in Respect of Disallowed Claims .......................................... 35

## ARTICLE XII
## EFFECT OF CONFIRMATION

A.    Release of Liens and Cancellation of Instruments .......................................... 35
B.    Revesting and Vesting; Retention and Enforcement of Claims ...................... 36

| | | |
|---|---|---|
| C. | Injunction | 36 |
| D. | Discharge of Claims and Equity Interests | 37 |
| E. | Term of Injunctions or Stays | 37 |

ARTICLE XIII
EXECUTORY CONTRACTS

| | | |
|---|---|---|
| A. | Assumption and Assignment of Certain Executory Contracts | 37 |
| B. | Assumption and Assignment Conditioned upon Consummation of This Plan | 38 |
| C. | Rejection of Remaining Contracts and Leases | 38 |
| D. | Treatment of Rejection Damages Claims | 38 |

ARTICLE XIV
ADMINISTRATIVE PROVISIONS

| | | |
|---|---|---|
| A. | Retention of Jurisdiction | 39 |
| B. | Failure of the Bankruptcy Court to Exercise Jurisdiction | 41 |
| C. | Governing Law | 41 |
| D. | Amendments | 41 |
| E. | Modification, Revocation or Withdrawal of This Plan | 42 |
| F. | Exemption from Certain Transfer Taxes | 42 |
| G. | Compromise of Controversies | 42 |
| H. | Insurance Preservation and Proceeds | 42 |
| I. | Successors and Assigns | 42 |
| J. | Confirmation Order and Plan Control | 43 |
| K. | Dissolution of the Committee | 43 |
| L. | Severability | 43 |
| M. | Headings | 43 |
| N. | Notices | 43 |
| O. | No Admissions | 43 |

ATL 18,237,319 131498.010100

Agricultural Funding Solutions, LLC hereby proposes this Plan pursuant to the provisions of chapter 11 of the Bankruptcy Code. All capitalized terms used in this Plan are either defined in section 101 of the Bankruptcy Code or in Article I below.

For a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of the Plan and certain related matters, reference is made to the Disclosure Statement that is distributed herewith. In the event of any inconsistencies between the Plan and Disclosure Statement, the terms and provisions of the Plan will control.

# ARTICLE I
# DEFINITIONS

A. <u>Defined Terms</u>. Unless otherwise provided in this Plan, all terms used herein will have the meanings assigned to such terms in the Bankruptcy Code. For the purposes of this Plan, the following terms will have the meanings set forth below:

(1) "<u>Administrative Expense Bar Date</u>" means the date, as established by the Disclosure Statement Order, the Confirmation Order or any other order of the Bankruptcy Court, as the deadline for filing any motions or proofs of claim (if allowed pursuant to such order) asserting Administrative Expense Claims arising under section 503(b)(9) of the Bankruptcy Code or asserting Administrative Expense Claims arising on or after the Petition Date and to and including the Effective Date.

(2) "<u>Administrative Expense Claim</u>" means any Claim (other than a Fee Claim) for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation: (a) any actual and necessary costs and expenses incurred on and after the Petition Date of preserving the Estates and operating the business of the Debtors (such as wages, salaries or commissions for services rendered); and (b) any fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code.

(3) "<u>Administrative Expense Objection Deadline</u>" means the first Business Day that is one hundred and eighty (180) days after the Effective Date, as such date may be extended from time to time by the Bankruptcy Court.

(4) "<u>Affiliate</u>" will have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

(5) "<u>AFS</u>" means Agricultural Funding Solutions, LLC.

(6) "<u>AFS Causes of Action</u>" mean any and all Causes of Action held by the Debtors or their Estates against AFS, including without limitation all claims that have been or could have been asserted and that certain Adversary Proceeding filed by the Debtors against AFS in the Bankruptcy Court (Adversary Proceeding No. 11-01008).

(7) "<u>AFS Claims</u>" means the AFS Secured Claims and the AFS Deficiency Claims in the aggregate amount of at least $77,168,958 as of the Petition Date.

(8)	"<u>AFS Deficiency Claim</u>" means the Allowed Unsecured Claim held by AFS against each of the Debtors in an amount equal to (a) any and all amounts due and owing by a specific Debtor to AFS as of the Effective Date, *less* (b) the amount of the AFS Secured Claim relating to such Debtor. The AFS Deficiency Claims will be treated as an Allowed Class 4 Claim against each Debtor, in the amount set forth in the preceding sentence, under this Plan.

(9)	"<u>AFS Released Parties</u>" means AFS, Aurora Dairy, Colorado Financial Holdings, LLC, TPG Credit Management, LP, and each of their respective former, current and future Affiliates, partners, members, managers, officers, directors, employees, consultants, advisors, attorneys, accountants, financial advisors, representatives, professionals, agents, successors, executors, administrators, heirs or assigns.

(10)	"<u>AFS Secured Claims</u>" means the Secured Claims in the aggregate amount of approximately $39,000,000 held by AFS against the Debtors. The AFS Secured Claims will be treated as an Allowed Class 2 Claim against each Debtor in the amounts set forth in the Disclosure Statement.

(11)	"<u>Allowed</u>" means, with respect to any Claim: (a) any Claim that is allowed pursuant to or as provided in this Plan, the Confirmation Order or a Final Order of the Bankruptcy Court, (b) any Claim set forth in the Schedules as liquidated in amount and not Contingent or Disputed (if no contrary Proof of Claim with respect to such Claim was timely filed and if no objection to the allowance of such Claim has been filed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or a Final Order of the Bankruptcy Court), or (c) any Claim with respect to which a Proof of Claim was properly and timely filed as provided in this Plan or the Bar Date Order, as applicable, and such Proof of Claim asserts such Claim as liquidated in amount and not Contingent or Disputed, and for which no objection to the allowance of such Claim has been interposed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or a Final Order of the Bankruptcy Court.

(12)	"<u>Assumed Contract</u>" means an executory contract or unexpired lease of the Debtors, if any, that is assumed on the Effective Date pursuant to section 365 of the Bankruptcy Code, and assigned to DairyCo in accordance with Article XIII.A below.

(13)	"<u>Assumed Liabilities</u>" means any and all Claims expressly identified in the Plan Supplement as Claims to be assumed by DairyCo.

(14)	"<u>Avoidance Actions</u>" means any and all Claims and Causes of Action asserted or that could be asserted by or on behalf of the Debtors or the Estates pursuant to sections 544 (including under applicable state laws through which transfers may be avoided), 546, 547, 548, 549, 550 or 551 of the Bankruptcy Code, including any such Claims or Causes of Action already asserted by the Debtors or others. The Proponent intends to include in the Plan Supplement a non-exclusive list of potential Avoidance Actions.

(15)	"<u>Aurora Dairy</u>" means Aurora Dairy - Georgia, LLC.

(16)    "Ballot" means the form or forms distributed to Holders of Impaired Claims entitled to vote on the Plan and on which such Holders are to indicate their acceptance or rejection of the Plan.

(17)    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

(18)    "Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of Georgia.

(19)    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended and as applicable to the Chapter 11 Cases.

(20)    "Bar Date" means February 14, 2011, the deadline for filing Proofs of Claim with respect certain Claims.

(21)    "Bar Date Order" means that certain Order Pursuant to Bankruptcy Rules 2002(a)(7), (f), (l) and 3003(e) and Section 502(b)(9) of the Bankruptcy Code Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof, entered by the Bankruptcy Court in the Chapter 11 Cases on October 12, 2010 [Docket No. 16].

(22)    "Business Day" means any day except a Saturday, Sunday or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

(23)    "Cash" means cash, deposits, retainers, prepaid expenses and cash equivalents, including, without limitation, bank deposits, checks and other similar items.

(24)    "Causes of Action" means any and all actions, claims, rights, defenses, third-party claims, damages, executions, demands, crossclaims, counterclaims, suits, causes of action, choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, Contingent, matured, unmatured, Disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, accruing to the Debtors, which causes of action exist as of the Effective Date, whether or not those causes of action arose before or after the Petition Date; provided, however, that "Causes of Action" will not include Causes of Action that are released or waived by the Debtors through the Plan or a Final Order of the Bankruptcy Court.

(25)    "Chapter 11 Cases" means each of the cases commenced under Chapter 11 of the Bankruptcy Code by the Debtors, which are pending before the Bankruptcy Court and jointly administered under Chapter 11 Case No. 10-11752 (JDW).

(26)    "Claim" or "Claims" means a claim or claims against any of the Debtors, as defined in section 101(5) of the Bankruptcy Code.

(27)    "Claims Objection Deadline" means one hundred and eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court, provided

<u>however</u>, that the Liquidation Trustee may seek extensions of this date from the Bankruptcy Court.

(28)   "<u>Class</u>" means any group of Claims or Equity Interests classified by this Plan, as described in Article II below, pursuant to section 1122(a) of the Bankruptcy Code.

(29)   "<u>Committee</u>" means the statutory committee of unsecured creditors appointed by the Office of the United States Trustee on October 19, 2010.

(30)   "<u>Confirmation Date</u>" means the date on which the Confirmation Order is entered by the Clerk of the Bankruptcy Court.

(31)   "<u>Confirmation Hearing</u>" means the hearing pursuant to which the Bankruptcy Court considers confirmation of this Plan.

(32)   "<u>Contingent</u>" means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

(33)   "<u>Confirmation Order</u>" means the Final Order or Orders of the Bankruptcy Court, among other things, confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order or orders will be in form and substance acceptable to the Proponent.

(34)   "<u>Convenience Class Claim</u>" means (a) any Unsecured Claim that is Allowed in an amount equal to or less than $750.00 or (b) any Unsecured Claim that is Allowed in the amount greater $750.00 to the extent the Holder of such Allowed Unsecured Claim has elected on the Ballot to reduce the Allowed amount of its claim to $750.00 in order to receive treatment as a Convenience Class Claim.  In the event a Holder of an Allowed Unsecured Claim against a Debtor holds more than one Allowed Unsecured Claim against such Debtor, all such Claims will be aggregated for purposes of determining whether each such Claim is a Convenience Class Claim against such Debtor.

(35)   "<u>Convenience Class Election</u>" means the election on the Ballot, pursuant to which the Holder of an Unsecured Claim elects to have its Claim treated as a Convenience Class Claim.

(36)   "<u>Debtors</u>" means DPS-GA, DPS, DPS-MS, New Frontier and Heifer Haven.

(37)   "<u>DairyCo</u>" means the entity or entities formed on or before the Effective Date to receive the Estate Assets, other than the Liquidation Trust Assets and subject to Article XIII.F, free and clear of any and all liens, claims, interests and encumbrances.

(38)   "<u>DairyCo Equity Interests</u>" means Equity Interests in DairyCo.

(39)   "<u>DairyCo Liquidation Trust Contribution</u>" means the $250,000 Cash contributed by DairyCo to the Liquidation Trust.  The DairyCo Liquidation Trust Contribution will be used to pay any Liquidation Trust Expenses and Allowed Convenience Class Claims and

after payment of such Liquidation Trust Expenses and Allowed Convenience Class Claims, all other Holders of Allowed Unsecured Claims against all Debtors, other than the Holders of the AFS Deficiency Claims and the Allowed Claims of Sumrall, will be entitled to their Pro Rata Share of the balance of the DairyCo Liquidation Trust Contribution.

(40) "DairyCo Liquidation Trust Loan" means that certain revolving loan made by DairyCo to the Liquidation Trust, on or after the Effective Date, from time to time, as evidenced by and in accordance with the DairyCo Liquidation Trust Loan Documents, solely for purposes of funding any and all cure amounts for Assumed Contracts, Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims (if applicable), which loan will be in a principal amount not to exceed $1,000,000.

(41) "DairyCo Liquidation Trust Loan Advance(s)" mean any funds distributed by DairyCo to the Liquidation Trust pursuant to the DairyCo Liquidation Trust Loan Documents.

(42) "DairyCo Liquidation Trust Loan Documents" means the that certain promissory note executed by the Liquidation Trust in favor of DairyCo and dated as of the Effective Date and any and all other documents evidencing the DairyCo Liquidation Trust Loan, each in form and substance acceptable to DairyCo in DairyCo's sole discretion.

(43) "DairyCo Liquidation Trust Loan Obligations" means the obligations owed by the Liquidation Trust to DairyCo pursuant to the DairyCo Liquidation Trust Loan Documents.

(44) "DairyCo Liquidation Trust Loan Payments" means any payments made by the Liquidation Trust to DairyCo for application against the DairyCo Liquidation Trust Loan Obligations.

(45) "DairyCo Notes" means the promissory notes issued by DairyCo to AFS on account of the AFS Secured Claims under this Plan.

(46) "Disallowed" means with respect to any Claim or portion thereof, any Claim against the Debtor which: (a) has been disallowed, in whole or part, by a Final Order; (b) has been withdrawn by agreement of the Holder thereof and the Proponent or Liquidation Trustee, in whole or in part; (c) has been withdrawn, in whole or in part, by the Holder thereof; (d) if listed in the Schedules as zero or as Disputed, Contingent or unliquidated and in respect of which a proof of Claim has not been timely filed or deemed timely filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of Claim; (f) is evidenced by a proof of Claim which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of Claim was not timely or properly filed; (g) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; (h) where the Holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h),

544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code; or (i) is for reimbursement or contribution that is Contingent as of the time of allowance or disallowance of such Claim. In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

(47) "Disclosure Statement" means a disclosure statement that relates to this Plan and has been approved by the Disclosure Statement Order, as such disclosure statement may be revised, amended, modified or supplemented (and all exhibits and schedules annexed thereto or referred to therein).

(48) "Disclosure Statement Order" means the Final Order (I) Approving the Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan, Including (A) Approving the Form and Manner of Solicitation Packages; (B) Approving the Form and Manner of Notice of the Confirmation Hearing; (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages; (D) Approving Forms of Ballots; (E) Establishing Deadline for Receipt of Ballots; (F) Approving Procedures for Vote Tabulations; and (G) Approving Procedures Associated with the Rights Offering; and (III) Establishing Deadline and Procedures for Filing Objections to (A) Confirmation of the Plan and (B) Proposed Cure Amounts Related to Contracts and Leases Assumed Under the Plan; and (IV) Granting Related Relief entered by the Bankruptcy Court. [Docket No. ___]

(49) "Disputed" means any Claim: (a) which is listed in the Schedules as disputed, Contingent or unliquidated and for which a proof of Claim has been timely filed pursuant to this Plan, the Bankruptcy Code, or any Final Order of the Bankruptcy Court; (b) which is objected to in whole or in part on or before the Claims Objection Deadline or for which a request for estimation has been filed in accordance with the Bankruptcy Code and the Bankruptcy Rules and as to which no Final Order allowing or disallowing such Claim has been entered; or (c) for which a motion to approve a settlement of such Claim has been filed in accordance with the Bankruptcy Code and the Bankruptcy Rules and as to which no Final Order approving or disapproving such settlement has been entered. To the extent an objection relates to the allowance of only part of a Claim, such Claim will be Disputed only to the extent of the objection.

(50) "Disputed Claims Reserve" means, with respect to each Class of Claims, the reserve established by the Distribution Agent with respect to such Class to hold Distributions on account of Disputed Claims in such Class, as provided in Article VII.D below.

(51) "Distribution" means Cash, property, interests in property or other value distributed under this Plan to the Holders of Allowed Claims. Except as otherwise provided in this Plan, all Distributions made on account of an Allowed Claim will be made by the Distribution Agent to the Holder of such Claim, as of the Distribution Record Date, on the Distribution Date, unless the Distribution Agent consents to making Distributions on account of such Claim to a different Person.

(52)    "<u>Distribution Address</u>" means, for each Holder of a Claim, its address as set forth in the Proof of Claim with respect to such Claim or, if no Proof of Claim is filed in respect to a particular Claim, its address as set forth in the Schedules.

(53)    "<u>Distribution Agent</u>" means the Proponent, on the Effective Date, and the Liquidation Trustee, after the Effective Date, or such Person, as selected by the Proponent or Liquidation Trustee, as applicable, in their sole discretion, to make Distributions under the Plan.

(54)    "<u>Distribution Date</u>" means the date on which a Distribution is made pursuant to this Plan.

(55)    "<u>Distribution Record Date</u>" means a date established by the Confirmation Order that will be the date of determination as to the Holder of a Claim for purposes of Distributions under this Plan.

(56)    "<u>DPS</u>" means Dairy Production Systems, LLC.

(57)    "<u>DPS-GA</u>" means Dairy Production Systems - Georgia, LLC.

(58)    "<u>DPS-MS</u>" means Dairy Production Systems - Mississippi, LLC.

(59)    "<u>Effective Date</u>" means the first Business Day after the later of (a) the date on which all of the conditions precedent to the effectiveness of this Plan specified in Article VIII.L below have been satisfied or waived, and (b) if the Confirmation Order is stayed, the date of expiration, dissolution or lifting of such stay.

(60)    "<u>Estates</u>" means the Debtors' estates created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

(61)    "<u>Estate Assets</u>" means all property and other interests of the Debtors included in the Estates pursuant to section 541 of the Bankruptcy Code, including, without limitation, the Causes of Action, Cash and all other property and interests of the Debtors, wherever located or of whatever type or nature, existing as of the Effective Date (but excluding assets distributed, expended or otherwise disposed of by the Debtors prior to the Effective Date that are not otherwise subject to recovery by the Debtors), including, without limitation, any executory contracts and unexpired leases assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or this Plan and assigned to DairyCo and any rights of the Debtors pursuant to section 505 of the Bankruptcy Code, and all proceeds of the foregoing.

(62)    "<u>Equity Interests</u>" means (a) any equity interest or security in any of the Debtors or of a Debtor, within the meaning of section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued, authorized or outstanding shares of stock together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, (b) partnership, limited liability company, membership or similar interest in a Debtor or of a Debtor and (c) Intercompany Interests.

(63) "<u>Fee Application</u>" means an application for payment of a Fee Claim that conforms with the requirements of this Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable orders of the Bankruptcy Court.

(64) "<u>Fee Claim</u>" means a Claim for compensation or reimbursement of expenses, pursuant to sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) or 1103 of the Bankruptcy Code, incurred with respect to the Chapter 11 Cases.

(65) "<u>Final Order</u>" means an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing will then be pending or as to which any right to appeal, petition for *certiorari*, reargue or rehear will have been waived in writing in form and substance satisfactory to the Proponent, as applicable, or, in the event that an appeal, writ of *certiorari* or reargument or rehearing thereof has been sought, such order has been affirmed by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing has been denied by the highest court from which *certiorari*, reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing has expired; <u>provided</u>, <u>however</u>, that the possibility of a timely motion under Bankruptcy Rule 9024 or any applicable analogous rule being filed with respect to such order will not prevent the order from being a Final Order.

(66) "<u>Heifer Haven</u>" means Heifer Haven, LLC.

(67) "<u>Holder</u>" means the legal or beneficial Holder(s) of a Claim or Equity Interest (and, when used in conjunction with a Class or type of Claim or Equity Interest, means a Holder of a Claim or Equity Interest in such Class or of such type).

(68) "<u>Impaired</u>" means, with respect to any Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is impaired as provided in section 1124 of the Bankruptcy Code.

(69) "<u>Insider Claims</u>" means any Claim held by an "insider", within the meaning of section 101(31) of the Bankruptcy Code, of any of the Debtors.

(70) "<u>Intercompany Interest</u>" means any Equity Interest in any of the Debtors held by another Debtor.

(71) "<u>Liquidation Trust</u>" means the trust established pursuant to Article IX of the Plan.

(72) "<u>Liquidation Trust Agreement</u>" means the agreement governing the formation and conduct of the Liquidation Trust as set forth in the Plan Supplement.

(73) "<u>Liquidation Trust Assets</u>" means the Avoidance Actions, all proceeds from the DairyCo Liquidation Trust Loan Advances, the DairyCo Liquidation Trust Contribution and any other assets of the Debtors that are not transferred to DairyCo on the Effective Date as determined by DairyCo in its sole discretion.

(74) "<u>Liquidation Trust Beneficiaries</u>" means the Holders of Allowed Administrative Expense Claims, Fee Claims, Priority Tax Claims, Priority Non Tax Claims, Other Secured Claims, Unsecured Claims and Convenience Class Claims under this Plan.

(75) "<u>Liquidation Trust Expenses</u>" means all any and all costs, expenses and obligations incurred by (a) the Liquidation Trust, (b) the Liquidation Trustee and its agents, employees, representatives, successors and assigns and (c) the Liquidation Trust Professionals in administering the Liquidation Trust or in any manner connected, incidental or related thereto, including, but not limited to, the fees and expenses of professionals retained by the Liquidation Trust to assist in carrying out its post-Effective Date duties pursuant to this Plan and the Liquidation Trust Agreement.

(76) "<u>Liquidation Trust Proceeds</u>" means the proceeds of any Liquidation Trust Assets available for distribution to the Holders of Allowed Unsecured Claims, including, without limitation, the proceeds of any judgment, settlement or compromise of any of the Avoidance Actions, net of the following: (a) the Liquidation Trust Expenses, (b) Distributions made or to be made to Holders of Administrative Expense Claims, Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims and Convenience Class Claims and (c) the amounts due and owing on account of the DairyCo Liquidation Trust Loan Obligations.

(77) "<u>Liquidation Trust Professionals</u>" means any and all attorneys, accountants, tax advisors, financial advisors or other professionals or consultants retained by the Liquidation Trust or Liquidation Trustee, including, without limitation, Greenberg Traurig, LLP who will act as counsel to the Liquidation Trustee, to advise and assist the Liquidation Trust and/or Liquidation Trustee in carrying out its post-Effective Date duties pursuant to this Plan and the Liquidation Trust Agreement.

(78) "<u>Liquidation Trustee</u>" means Ronald L. Glass of GlassRatner Advisory and Capital Group, LLC, the Person selected to act as trustee for the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement, as set forth in the Plan Supplement, and whose appointment would be approved upon entry by the Bankruptcy Court of the Confirmation Order.

(79) "<u>Local Rules</u>" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Middle District of Georgia, as amended, as applicable to the Chapter 11 Cases.

(80) "<u>New Frontier</u>" means New Frontier Dairy, LLC.

(81) "<u>Other Secured Claim</u>" means any Secured Claim against a Debtor except the AFS Secured Claims.

(82) "<u>Person</u>" means a person, as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, partnership, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof.

(83) "<u>Petition Date</u>" means October 7, 2010, the date on which each of the petitions commencing the Chapter 11 Cases were filed by the Debtors with the Bankruptcy Court.

(84) "<u>Plan</u>" means this joint chapter 11 plan relating to each of the Debtors, either in its present form or as it may be altered, amended or modified from time to time, and the Plan Supplement.

(85) "<u>Plan Supplement</u>" means the compilation of documents and forms of documents specified in this Plan that will be filed with the Clerk of the Bankruptcy Court as provided in Article I.C below, and which will be considered a part of this Plan for all purposes.

(86) "<u>Priority Non-Tax Claim</u>" means any Claim (other than an Administrative Expense Claim, a Fee Claim, or a Priority Tax Claim) that is entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

(87) "<u>Priority Tax Claim</u>" means any Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

(88) "<u>Proof of Claim</u>" means a written statement describing the basis and amount of a Claim or Equity Interest, together with all supporting evidence for such Claim or Equity Interest (if any), which complies with the provisions of this Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bar Date Order or any other Final Order of the Bankruptcy Court, as applicable.

(89) "<u>Proponent</u>" means AFS.

(90) "<u>Pro Rata Share</u>" means, with respect to any Claim in a given Class, on any date, the quotient of (a) the amount of the Allowed Claim as of such date, over (b) the sum of (i) the aggregate amount of all Allowed Claims in such Class as of such date plus (ii) the Disputed Claims Reserve, if any, for such Class as of such date.

(91) "<u>Rejection Bar Date</u>" will mean the deadline by which a counterparty to a rejected executory contract or an unexpired lease of the Debtors must file a Proof of Claim for damages resulting from the rejection of such executory contract or unexpired lease by the Debtors, and will be the later of: (a) the Bar Date; (b) thirty (30) days after the entry of an order by the Court authorizing such rejection; or (c) such other date, if any, as the Court may fix in the order authorizing such rejection.

(92) "<u>Rejection Claim</u>" will mean any Claim for amounts due as a result of the rejection by the Debtors of any executory contract or unexpired lease under section 365 of the Bankruptcy Code.

(93) "<u>Released Parties</u>" means the Sumrall, Proponent, AFS, Aurora Dairy, Colorado Financial Holdings, LLC, TPG Credit Management, LP, DairyCo, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Professionals, the Distribution Agent and, as applicable, each of their respective former, current and future Affiliates, partners, members, managers, officers, directors, employees, consultants, advisors, attorneys, accountants, financial

advisors, representatives, professionals, agents, successors, executors, administrators, heirs or assigns.

(94) "Schedules" means the schedules of the Debtors' assets and liabilities and the statements of the Debtors' financial affairs filed with the Bankruptcy Court on or about November 11, 2010, and any other schedules and statements filed pursuant to sections 521(a) or 1106(a)(2) of the Bankruptcy Code, in each case as such schedules and statements have been and may be amended and supplemented from time to time in accordance with Bankruptcy Rule 1009. [Case No. 10-11752, Docket No. 103; Case No. 10-11754, Docket No. 22; Case No. 10-11755, Docket No. 20; Case No. 10-11756, Docket No. 20; Case No. 10-11757, Docket No. 20].

(95) "Secured Claim" means, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or on any Estate Assets or other property or interests in property of the Debtors, but only to the extent of the value of the Holder of such Claim's interest in the Estates' interest in such property, or (b) Allowed as such pursuant to the terms of this Plan (subject to the Confirmation Order becoming a Final Order).

(96) "Sumrall" means David P. Sumrall.

(97) "Sumrall Causes of Action" mean any and all Causes of Action held by the Debtors or their Estates against Sumrall or his heirs, successors or assigns.

(98) "Unclaimed Property" means any Cash or other property unclaimed on or after the Distribution Date in respect of the applicable Allowed Claim. Unclaimed Property will include, without express or implied limitation, (a) checks (and the funds represented thereby) and other property mailed to a Distribution Address and returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; and (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available on the applicable Distribution Date.

(99) "Unimpaired" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

(100) "Unsecured Claim" means any Claim (or portion thereof), including, without limitation, any Rejection Claim, AFS Deficiency Claim and Insider Claim, but specifically excluding any Secured Claim, Administrative Expense Claim, Fee Claim, Priority Non-Tax Claim or Priority Tax Claim.

(101) "U.S. Trustee Fees" will mean fees payable pursuant to 28 U.S.C. § 1930.

(102) "Voting Record Date" means such date established in the Disclosure Statement Order that determines the right of any Person to vote to accept or reject this Plan.

B. **Rules of Construction.** (a) The words "herein," "hereof," "hereunder," and other words of similar import refer to this Plan as a whole, not to any particular Article, section,

subsection or clause, unless the context requires otherwise; (b) whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) captions and headings to Articles and sections (and subsections, where applicable) of this Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (d) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan unless superseded herein or in the Confirmation Order; (e) any reference in this Plan to an existing document or exhibit means such document or exhibit as it may have been amended, restated, revised, supplemented or otherwise modified as of the Effective Date; (f) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006 will apply; and (g) whenever this Plan provides that a payment or other Distribution will occur on any date, it will mean on or as soon as reasonably practicable after such date.

C.    Exhibits; Plan Supplement.  All exhibits to this Plan will be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court fifteen (15) days prior to the deadline for filing objections to confirmation of this Plan, or in accordance with such other deadline as may be established in the Disclosure Statement Order or another Final Order of the Bankruptcy Court.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement, once filed, by making a written request or telephone call to the following:

John J. Dyer
Greenberg Traurig, LLP
3290 Northside Parkway, Suite 400
Atlanta, Georgia  30327
Telephone: (678) 553-2235
Email: dyerj@gtlaw.com

## ARTICLE II
## CLASSIFICATION OF CLAIMS
## AND EQUITY INTERESTS AND GENERAL PROVISIONS

A.    Claims and Equity Interests Classified.  All Claims (other than Administrative Expense Claims, Priority Tax Claims and Fee Claims) and all Equity Interests will be classified as set forth in Article II.C.  A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  A Claim or Equity Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released or otherwise settled prior to the Effective Date.  For purposes of brevity and convenience, the classification of Claims and Equity Interests set forth in Article II.C applies to each Debtor individually.

B.    Administrative Expense Claims, Fee Claims and Priority Tax Claims.  As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims and Priority Tax Claims are not classified for purposes of voting or receiving

Distributions under this Plan. Rather, all such Claims will be treated separately as unclassified Claims pursuant to Article IV below.

C.     <u>Classification of Claims and Equity Interests</u>.  This Plan classifies the following Claims against and Equity Interests in each of the Debtors for all purposes as follows:

     (1)     <u>Class 1</u>:  Priority Non Tax Claims

     (2)     <u>Class 2</u>:  AFS Secured Claims

     (3)     <u>Class 3</u>:  Allowed Other Secured Claims

     (4)     <u>Class 4</u>:  Allowed Unsecured Claims

     (5)     <u>Class 5</u>:  Allowed Convenience Class Claims

     (6)     <u>Class 6</u>:  Equity Interests

## ARTICLE III
## IMPAIRMENT OF
## CLASSES OF CLAIMS AND EQUITY INTERESTS

A.     <u>Unimpaired Classes of Claims</u>.  Claims in Class 1 and Class 3 are not Impaired under this Plan.  Holders of Claims in Class 1 and Class 3 will not receive Ballots and will be deemed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

B.     <u>Impaired Classes of Claims and Equity Interests</u>.  Claims in Class 2, Class 4, and Class 5 and Equity Interests in Class 6 are Impaired under this Plan.  Holders of Claims in Class 2, Class 4 and Class 5 will receive Ballots to accept or reject the Plan.  Holders of Equity Interests in Class 6 will not receive Ballots and will be deemed to have rejected the Plan in accordance with section 1126(g) of the Bankruptcy Code.

## ARTICLE IV
## PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS

For purposes of brevity and convenience, the treatment of unclassified Claims set forth in this Article IV applies to each Debtor individually.  Unless the Holder of an Allowed Claim and the Proponent or the Liquidation Trustee, as applicable, agree to a different treatment, each Holder of an Allowed Claim will receive the following Distributions in accordance with Article VII of the Plan:

A.     <u>Administrative Expense Claims</u>.  Each Holder of an Allowed Administrative Expense Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Expense Claim: (a) Cash equal to the amount of such Allowed Administrative Expense Claim; or (b) such other treatment as to which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Administrative Expense Claim will have agreed upon in writing.

B.      Fee Claims.  All Fee Claims will be treated as follows:

(1)      Time for Filing Fee Claims.  Unless the Bankruptcy Court has entered a Final Order allowing a Fee Claim prior to the entry of the Confirmation Order, each Person who holds or asserts a Fee Claim incurred before the Effective Date will be required to file with the Bankruptcy Court and serve on all parties required to receive notice of filings in the Chapter 11 Cases a Fee Application within thirty (30) days after the Effective Date.  The failure to file and serve such Fee Application timely and properly will result in the Fee Claim being forever barred and discharged.  To the extent necessary to give effect to this Article IV.B.1, entry of the Confirmation Order will amend and supersede any previously entered orders of the Bankruptcy Court regarding procedures for the payment of Fee Claims.

(2)      Allowance of Fee Claims.  A Fee Claim, with respect to which a Fee Application has been timely and properly filed and served pursuant to Article IV.B.1 above, will become an Allowed Fee Claim only to the extent allowed by Final Order of the Bankruptcy Court, and will be paid in accordance with such Final Order.  Each Holder of an Allowed Fee Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Fee Claim: (a) Cash equal to the amount of such Allowed Fee Claim; or (b) such other treatment as to which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Fee Claim will have agreed upon in writing.

C.      Priority Tax Claims.  Each Holder of an Allowed Priority Tax Claim will receive, at the sole option of the Proponent or the Liquidation Trustee, as applicable, in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (a) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter; (b) regular installment payments in Cash in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as to which the Proponent or the Liquidation Trustee, as appropriate, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing.

D.      U.S. Trustee Fees.  All U.S. Trustee Fees payable on or before the Effective Date will be paid from Cash held by the Debtors on or before the Effective Date.  From and after the Effective Date, the Liquidation Trust will be liable and will pay any U.S. Trustee Fees assessed against the Debtors' Estates until such time as a particular Debtor's Chapter 11 Case is closed, dismissed or converted.

# ARTICLE V
# PROVISIONS FOR TREATMENT OF CLAIMS
# AND EQUITY INTERESTS CLASSIFIED IN THE PLAN

For purposes of brevity and convenience, the treatment of classified Claims and Equity Interests set forth in this Article V applies individually to each Debtor.

Unless the Holder of an Allowed Claim or Allowed Equity Interest and the Proponent or the Liquidation Trustee, as applicable, agree to a different treatment, each Holder of an Allowed Claim or Allowed Equity Interest will receive the following Distributions in accordance with Article VII of the Plan:

A.    <u>Class 1: Priority Non Tax Claims.</u>

(1)    <u>Treatment</u>: Each Holder of an Allowed Priority Non Tax Claim will receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Non Tax Claim: (a) Cash equal to the amount of such Allowed Priority Non Tax Claim; or (b) such other treatment which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Priority Non Tax Claim have agreed upon in writing.

(2)    <u>Status</u>: Class 1 is Unimpaired. The Holders of Claims in Class 1 are deemed to accept this Plan and, accordingly, are not entitled to vote to accept or reject this Plan.

B.    <u>Class 2: AFS Secured Claims.</u>

(1)    <u>Treatment</u>: Each Holder of an Allowed AFS Secured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed AFS Secured Claim, their Pro Rata Share of (a) the DairyCo Equity Interests and (b) the DairyCo Notes.

(2)    <u>Status</u>: Class 2 is Impaired. The Holders of Claims in Class 2 are entitled to vote to accept or reject this Plan.

C.    <u>Class 3: Allowed Other Secured Claims.</u>

(1)    <u>Treatment</u>: Each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Other Secured Claim (a) one of the treatments specified in section 1124 of the Bankruptcy Code; or (b) such other treatment which the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing.

(2)    <u>Status</u>: Class 3 is Unimpaired. The Holders of Claims in Class 3 are deemed to accept this Plan and, accordingly, are not entitled to vote to accept or reject this Plan.

D.    <u>Class 4: Allowed Unsecured Claims.</u>

(1)    <u>Treatment</u>: Each Holder of an Allowed Unsecured Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Unsecured Claim, their Pro Rata Share of the Liquidation Trust Proceeds. Upon the Effective Date of this Plan, the Holders of the Allowed AFS Deficiency Claims and any Allowed Unsecured Claims of Sumrall, which are included in this Class 4, will be deemed to have waived any and rights to Distributions on account of their respective Allowed Class 4 Claims only with respect to the DairyCo Liquidation Trust Contribution, and they otherwise will be entitled to receive their Pro Rata Share of the Liquidation Trust Proceeds.

(2)    <u>Status</u>: Class 4 is Impaired. The Holders of the Claims in Class 4 are entitled to vote to accept or reject this Plan.

E.    Class 5:  Allowed Convenience Class Claims.

(1)    Treatment:  Each Holder of an Allowed Convenience Class Claim will receive, in full and final satisfaction, settlement and release of and in exchange for such Allowed Convenience Class Claim, 100% of their Allowed Convenience Class Claim, which amounts will be paid from the DairyCo Liquidation Trust Contribution.

(2)    Status:  Class 5 is Impaired.  The Holders of Claims in Class 5 are entitled to vote to accept or reject this Plan.

F.    Class 6:  Equity Interests.

(1)    Treatment:   All Class 6 Equity Interests will be extinguished on the Effective Date.

(2)    Status:  Class 6 is Impaired.  The Holders of Equity Interests in Class 6 are deemed to reject this Plan and, accordingly, are not entitled to vote to accept or reject this Plan.

I.    Reservation of Rights Regarding Claims and Equity Interests.   Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Equity Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

J.    Limitation to Full Recovery.  Notwithstanding anything herein to the contrary, no Holder of any Claim will be entitled to a distribution in excess of 100% of the amount of the Allowed Claim.  Allowed Unsecured Claims will not be entitled to interest on account of their respective Allowed Unsecured Claims.

## ARTICLE VI
## ACCEPTANCE OR REJECTION OF THE PLAN

A.    Each Impaired Class Entitled to Vote Separately.  Each Impaired Class of Claims that is to receive a Distribution under this Plan will be entitled to vote separately to accept or reject this Plan.  Except as provided in Article VI.C below, each Person that, as of the Voting Record Date, holds a Claim in an Impaired Class will receive a Ballot which will be used to cast its vote to accept or reject this Plan.

B.    Acceptance by a Class of Claims.  An Impaired Class of Claims will be deemed to accept this Plan if this Plan is accepted by Holders of Claims in such Class that hold at least two thirds (⅔) in amount and more than one-half (½) in number of the Claims of such Class that have voted to accept or reject this Plan.

C.    Claims and Equity Interests Not Entitled to Vote.  The Holder of any Claim that, as of the Voting Record Date: (a) has been Disallowed, (b) is the subject of a pending objection, or (c) was listed on the Schedules as unliquidated in amount, Contingent or Disputed (if no contrary Proof of Claim with respect to such Claim has been timely filed) or a Proof of Claim with respect to which was filed on or before the Bar Date pursuant to the provisions of the Bar

Date Order and such Proof of Claim asserts such Claim as unliquidated in amount, Contingent or Disputed, will not be entitled to vote on this Plan, unless on or prior to the Voting Record Date the Bankruptcy Court enters a Final Order directing otherwise; provided, however, that if only a portion of such Claim has been Disallowed, objected to or listed or asserted (as applicable) as unliquidated, Contingent or Disputed, such Holder will be entitled to vote the remainder of such Claim in an amount determined pursuant to the Disclosure Statement Order. Other Holders of Claims may not be entitled to vote on the Plan pursuant to the terms of the Disclosure Statement Order. As provided in Article V.F.2 above and section 1126(g) of the Bankruptcy Code, Holders of Equity Interests are not entitled to vote on this Plan.

D.    Cramdown. Because, as provided in V.F.2 and V.G.2 above, Class 6 is deemed to reject this Plan, the Proponent will seek to have this Plan approved and confirmed by the Bankruptcy Court pursuant to section 1129(b) of the Bankruptcy Code. In the event one or more Impaired Classes of Claims votes not to accept this Plan, and this Plan is not withdrawn as provided in Article XIV.E below, the Proponent may modify the terms of this Plan in order to reallocate value from all Classes at and below the level of the objecting Class(es) of Claims to all Impaired senior Classes and/or the objecting Class(es) of Claims to the extent they deem necessary to make this Plan satisfy the absolute priority rule set forth in section 1129(b) of the Bankruptcy Code, and may make such other modifications or amendments to this Plan as the Proponent deems necessary or desirable. Any such modifications or amendments will be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice of the Confirmation Hearing at least three (3) days prior to such hearing.

E.    Controversy Concerning Impairment. If a controversy arises as to whether any Claim or Equity Interest is Impaired under the Plan, the Bankruptcy Court will, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F.    Elimination of Vacant Classes. Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, will be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

G.    Removal of Debtors. If this Plan cannot be confirmed with respect to one or more of the Debtors or for any other reason, the Proponent, at its sole option, may remove such Debtor(s) from this Plan. In such event, the Classes pertaining to such Debtor(s) will be removed from this Plan, and the Plan will omit any treatment of the assets and liabilities of such Debtor(s). The removal of any Debtor from this Plan will not affect this Plan with respect to any other Debtor.

## ARTICLE VII
## CLAIMS AND DISTRIBUTIONS

A.    Distribution Agent. The Proponent or the Liquidation Trustee, as applicable, may employ or contract with other Persons or Entities to serve as the Distribution Agent and assist in or make the Distributions required under the Plan.

B.  **Distributions Under the Plan.**  Within the time periods provided in Article VII.C of this Plan, the Proponent or Liquidation Trustee, as applicable, will make periodic and final Distributions under this Plan, including, without limitation, the Liquidation Trust Proceeds, except such amounts as are necessary to maintain the Disputed Claims Reserve, such amounts as are necessary to fund the Liquidation Trust Expenses and any such other amounts required to be withheld in accordance with the terms of this Plan or determined as necessary to withhold in the sole discretion of the Proponent or the Liquidation Trustee, as applicable.  The Distribution Agent will  withhold from amounts distributable to any Person any and all amounts, determined in the Distribution Agent's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.  The Distribution Agent  will require any Person receiving a Distribution hereunder to furnish to the Distribution Agent in writing an employer identification number or taxpayer identification number as assigned by the Internal Revenue Service, and the Distribution Agent may condition any Distribution to any Person hereunder on receipt of such identification number.

C.  **Timing of Distributions.**

(a)  Distributions to Holders of Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claim, Allowed Priority Non Tax Claim, Allowed AFS Secured Claims, and Allowed Convenience Class Claims will be made on the later of:

   (i)  the Effective Date of this Plan,

   (ii)  as soon as practicable after the Claim becomes an Allowed Claim by Final Order, and

   (iii)  such other date as may be agreed upon by the Proponent or the Liquidation Trustee, as applicable, and the Holder of such Allowed Claim.

(b)  As soon as reasonably practicable, but not to exceed sixty (60) days after the establishment of the Disputed Claims Reserve, the Liquidation Trustee will make an initial Distribution of the available Liquidation Trust Proceeds in accordance with the provisions of this Plan and the Confirmation Order, to the extent practicable in the sole discretion of the Liquidation Trustee, to the Holders of Allowed Unsecured Claims.  The Liquidation Trustee will make periodic Distributions thereafter to Holders of Allowed Unsecured Claims, as appropriate, in its discretion.

D.  **Disputed Claims Reserve.**  For each Class of Claims, the Proponent or Liquidation Trustee, as applicable, will estimate, on or before the Distribution Date, the anticipated aggregate amount of all Disputed Claims in such Class as of such date, and will establish a Disputed Claims Reserve for such Class in an amount sufficient to make the Distributions to Holders of such Disputed Claims (to the extent such Disputed Claims are eventually Allowed at, in the aggregate, the amount estimated by the Proponent or Liquidation Trustee) that would have been made to the Holders as of such date had the Claims been Allowed as of the Distribution Date.  Notwithstanding the foregoing, nothing in this Plan, the Confirmation Order or any related document, agreement, instrument or order will prohibit the

Liquidation Trustee from using Liquidation Trust Assets and other reserve amounts to fund Liquidation Trust Expenses. Once all Disputed Claims have been resolved, the Disputed Claims Reserve will be dissolved. Any Cash remaining in the Disputed Claims Reserve after all Disputed Claims, have been resolved and paid, as appropriate, and the costs and expenses of the Liquidation Trust and Liquidation Trustee have been fully paid, will be available for Distribution to the other Holders of Allowed Claims in accordance with the Plan. After any and all Cash in the Disputed Claims Reserve have been disbursed in accordance with the Plan, such Disputed Claims Reserve will be deemed dissolved

E.    Unclaimed Property.

(1)    Holding of Unclaimed Property. If a Distribution to any Holder of an Allowed Claim is Unclaimed Property, no additional Distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address in accordance with the Plan. Nothing contained in this Plan will required the Proponent, the Liquidation Trustee or the Distribution Agent to attempt to locate any Holder of an Allowed Claim. The Distribution Agent will hold all Unclaimed Property (and all interest, dividends, and other distributions thereon) for the benefit of the Holders of Claims entitled thereto under the terms of this Plan. The Distribution Agent will make all Distributions of Unclaimed Property on or after the Distribution Date as soon as reasonably practicable after such Unclaimed Property has become deliverable or has been retained in accordance with the Plan.

(2)    Distribution of Unclaimed Property. At the end of one hundred and twenty (120) days following the date that any Cash or other property becomes Unclaimed Property, the Holder of the Allowed Claim theretofore entitled to such Unclaimed Property held pursuant to Article VII.E.1 above will be deemed to have forfeited such property, whereupon all right, title and interest in and to such Unclaimed Property and any further Distributions under this Plan will be available to fund the Liquidation Trust or Liquidation Trustee or will be available for Distribution to all other Holders of Allowed Claims unless the Holder of an Allowed Claim entitled to the Unclaimed Property makes a request in writing to the Distribution Agent for such Unclaimed Property (which request must set forth the Distribution Address for such Holder) prior to the expiration of such period. If there are any residual Liquidation Trust Proceeds or Unclaimed Property at the time of the dissolution of the Liquidation Trust, such residual Liquidation Trust Proceeds or Unclaimed Property will be distributed to DairyCo, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.

F.    Distributions to Holders of Claims Generally.

(1)    No Distribution in Excess of Allowed Claim. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim will receive, in respect of such Claim, Distributions under this Plan in excess of the amount of its Allowed Claim.

(2)    Disputed Payments. If any dispute arises as to the identity of a Holder of an Allowed Claim that is to receive any Distribution, the Distribution Agent may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account or otherwise hold such Distribution until the disposition thereof is determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute, which

written agreement is reasonably acceptable to the Proponent or Liquidation Trustee, as applicable, and the Distribution Agent.

(3) <u>Withholding Taxes</u>.  Any federal or state withholding taxes or other amounts required to be withheld under any applicable law will be deducted and withheld from any Distributions made pursuant to this Plan.  All Persons holding Claims will be required to provide to the Distribution Agent any information necessary to effect the withholding of such taxes.  Notwithstanding the foregoing, each Holder of an Allowed Claim that is to receive a Distribution hereunder will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such Distribution, including, without limitation, withholding tax obligations in respect of in-kind (non-cash) Distributions.  Any party issuing an instrument or making an in-kind (non-cash) Distribution under this Plan has the right, but not the obligation, to refrain from making such Distribution until the Person to which the Distribution is to be made has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligation.

(4) <u>Timing of Distributions under This Plan</u>.  Payments and Distributions in respect of Allowed Claims under this Plan will be made as provided in this Plan.

(5) <u>Distributions after the Effective Date</u>. Distributions made after the Effective Date to Holders of Allowed Claims that are Disputed Claims as of the Effective Date will be deemed to have been made on the Effective Date.  No interest will accrue or be payable on such Claims or any Distributions.

(6) <u>Manner of Payments</u>.  Any payments to be made by the Distribution Agent pursuant to this Plan will be made by checks drawn on accounts maintained by the Distribution Agent or its professionals, or by wire transfer if circumstances justify, at the option of the Distribution Agent.

(7) <u>Delivery of Distribution</u>.  Distributions to Holders of Allowed Claims will be made to the Holder's Distribution Address.

(8) <u>Record Date for Distributions</u>.  The Distribution Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims hat are Holders of such Claims as of the close of business on the Distribution Record Date.  The Distribution Agent will instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

(9) <u>No Distributions Pending Allowance</u>.  Notwithstanding any other provision of this Plan, no payments or Distributions by the Distribution Agent will be made with respect to all or any portion of a Disputed Claim unless and until all Objections to such Disputed Claim have been settled or withdrawn by agreement of the parties or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim;

provided however, that the Proponent or the Liquidation Trustee, as applicable, may in their discretion, pay any undisputed portion of a Disputed Claim.

G.  Setoffs.  Except as otherwise provided in this Plan, the Confirmation Order, or in an agreement approved by a Final Order of the Bankruptcy Court, the Proponent or the Liquidation Trustee, as applicable, may, pursuant to applicable law (including, without limitation, section 553 of the Bankruptcy Code), set off against any Distribution amounts related to any Claim before any Distribution is made on account of such Claim, any and all of the Claims and Causes of Action of any nature that the Debtors or the Estates may hold against the Holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, any other act or omission of the Proponent, the Liquidation Trustee or the Distribution Agent, nor any provision of this Plan (other than Article X below) will constitute a waiver or release by the Debtors, the Proponent or the Liquidation Trustee of any such Claims and Causes of Action that the Debtors, the Proponent or the Liquidation Trustee may possess against such Holder.  To the extent the Proponent, the Liquidation Trustee or the Distribution Agent fail to set off against a Claim and seek to collect a Claim or Cause of Action from such Holder after a Distribution to such Holder has been made pursuant to this Plan, the Proponent or the Liquidation Trustee, as applicable, if successful in asserting such Claim or Cause of Action, will be entitled to full recovery on the Claim or Causes of Action against such Holder.

H.  Control of Claims Resolution Process by Liquidation Trust and Liquidation Trustee.  After the Effective Date, the Liquidation Trustee, on behalf of the Liquidation Trust, will have the sole power and authority to file and prosecute objections to, or negotiate, settle or otherwise resolve, any and all Disputed Claims in any Class in accordance with the objection procedures set forth in Article XI below, and the sole power and authority to institute all Avoidance Actions, and to prosecute or defend all appeals relating to such objections to Claims and Avoidance Actions on behalf of the Debtors or the Estates.

I.  Distributions Under Twenty-Five Dollars.  No Distributions of less than twenty-five dollars ($25.00) will be made by the Distribution Agent to any Holder of an Allowed Claim unless a request therefor is made in writing to the Distribution Agent.  If no request is made as provided in the preceding sentence, all such Distributions will be treated as Unclaimed Property.

J.  Fractional Distributions.  Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars by the Distribution Agent will not be required. Whenever any Distribution of a fraction of a dollar would be required, the Distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

K.  Final Distribution.  In accordance with Article VII.E.2 of the Plan and notwithstanding any other provision of the Plan to the contrary, in the event that: (a) in the sole discretion of the Liquidation Trustee, the Liquidation Trust (i) has insufficient funds to make any further distributions to the Liquidation Trust Beneficiaries, (ii) has no remaining potential sources of funds and (iii) has repaid the DairyCo Liquidation Trust Loan Obligations in full, in Cash; (b) all cure amounts relating to Assumed Contracts, Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and

Allowed Other Secured Claims (if applicable) have been paid in full; and (c) it is impractical or impossible for the Liquidation Trustee to make further distributions under the Plan, the Liquidation Trustee will make a final distribution of all remaining Liquidation Trust Proceeds to DairyCo.

## ARTICLE VIII
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     Overview of Plan.  On the Effective Date, the Debtors will be deemed dissolved and each of the Debtors will be deemed to have transferred (a) to DairyCo, any and all Estate Assets, other than Liquidation Trust Assets and subject to Article VIII.F, free and clear of any liens, Claims, interests and encumbrances and (b) to the Liquidation Trust, any and all Liquidation Trust Assets.  In addition, on the Effective Date, the DairyCo Liquidation Trust Contribution will be transferred to the Liquidation Trust, and the Liquidation Trustee will be authorized to request DairyCo Liquidation Trust Loan Advances under the DairyCo Liquidation Trust Loan.

From and after the Effective Date, DairyCo intends to conduct a going concern business using the Estate Assets acquired hereunder and additional Cash and operating assets acquired by DairyCo.  DairyCo plans to offer employment to substantially all non-corporate employees of the Debtors, as set forth in Article VIII.E herein, to enter into consulting agreements with certain corporate employees of the Debtors in accordance with Article VIII.E and to maintain vendor relationships with a large number of the Debtors' trade vendors (or other vendors offering similar products and services), in order to properly operate its business.

Separately, the Liquidation Trustee, on behalf of the Liquidation Trust, will assemble all Liquidation Trust Assets, prosecute and liquidate the Liquidation Trust Assets, make Distributions in accordance with the Plan and distribute the Liquidation Trust Proceeds in accordance with this Plan.  The Liquidation Trustee will be responsible for administering the Liquidation Trust and making all Distributions under the Plan to Holders of Allowed Claims after the Effective Date.

B.     Effective Date Transactions.  To effectuate the Plan, the following transactions will occur:

(a)     On the Effective Date, all of the Estate Assets, other than the Liquidation Trust Assets, will be transferred or assigned to DairyCo free and clear of all liens, claims, interests and encumbrances.

(b)     On the Effective Date, the DairyCo Equity Interests and DairyCo Notes will be issued to AFS or its designee(s) in satisfaction of the AFS Secured Claims.

(c)     On the Effective Date, the Liquidation Trust will be formed and will be funded with the Liquidation Trust Assets, including, without limitation, the DairyCo Liquidation Trust Contribution and the proceeds of any DairyCo Liquidation Trust Loan Advance.

(d)     On the Effective Date, the Liquidation Trustee, on behalf of the Liquidation Trust, will execute and deliver to DairyCo the DairyCo Liquidation Trust Loan Documents.

(e)     On the Effective Date, the Debtors will be deemed dissolved.

(f)     On and after the Effective Date, the Liquidation Trustee, on behalf of the Liquidation Trust, will commence to assemble, prosecute and liquidate all Liquidation Trust Assets and make Distributions to all Holders of Allowed Claims in accordance with the Plan, including, without limitation, distribution of the Liquidation Trust Proceeds.

C.     <u>Effective Date Funding</u>.  On the Effective Date, this Plan and the transactions and Distributions contemplated hereunder will be funded by the DairyCo Liquidation Trust Contribution and the proceeds of the DairyCo Liquidation Trust Loan Advances under the DairyCo Liquidation Trust Loan, which is a revolving loan in the maximum principal amount not to exceed $1,000,000.  Distributions to Holders of the Allowed AFS Secured Claims will be in the form of DairyCo Notes and DairyCo Equity Interests.

D.     <u>Post-Effective Date Funding</u>.  From and after the Effective Date, the Liquidation Trustee will be authorized to make requests to DairyCo for DairyCo Liquidation Trust Loan Advances, but only to the extent that: (a) the funds in the Liquidation Trust are insufficient to pay Holders of Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non Tax Claims or Allowed Other Secured Claims (if applicable) at any time that such Allowed Claims are due and owing under the Plan; and (b) such DairyCo Liquidation Trust Loan Advance is permissible under the terms of the DairyCo Liquidation Trust Loan Documents, including, without limitation, that the maximum principal amount outstanding under the DairyCo Liquidation Trust Loan shall not exceed $1,000,000.

E.     <u>Employees</u>.  On the Effective Date, all of the Debtors' managers, officers, employees and consultants will be deemed terminated and, immediately thereafter, DairyCo will offer to hire substantially all the Debtors' former employees and consultants, on substantially the same terms of employment as previously offered by the Debtors.  DairyCo may attempt to negotiate separate consulting agreements that may be entered into by and between DairyCo (or one of its Affiliates) and each of David P. Sumrall, Massoud Ghadiani, Michael Pedreiro, Jamie Sumrall, Kimberly Potts, Carrie Pedreiro, and A.J. Pedreiro, which consulting agreements would commence on the Confirmation Date and contain terms, conditions and compensation acceptable to DairyCo or its Affiliate(s).

F.     <u>Estate Assets Transferred to DairyCo</u>.  On the Effective Date, all Estate Assets, other than Liquidation Trust Assets, will be transferred or assigned to DairyCo free and clear of all liens, Claims, interests and encumbrances; provided that, at DairyCo's sole option, DairyCo may elect, on or after the Effective Date, to abandon or not acquire any Estate Asset, including, without limitation, any deposits, prepaid expenses or retainers, in which case such Estate Asset will become a Liquidation Trust Asset to be administered as part of the Liquidation Trust.

G.     <u>Assumed Liabilities</u>.  DairyCo is acquiring the Estate Assets, other than Liquidation Trust Assets, free and clear of all liens, Claims, interests and encumbrances except for the Assumed Liabilities.

H.     <u>Corporate (or Equivalent) Action</u>.  On the Effective Date, all matters expressly provided for under this Plan that would otherwise require approval of the members, managers,

shareholders, directors or other corporate officials of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, will be deemed to have occurred and will be in effect upon the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors are incorporated without any requirement of action by the members, managers, shareholders, directors or other corporate officials of the Debtors. The entry of the Confirmation Order will constitute authorization and direction for the Debtors, or the Proponent on the Debtor's behalf, to take or cause to be taken all corporate, limited liability or other actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court. On the Effective Date, the Debtors, or the Proponent on the Debtor's behalf, will be authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan in the name and on behalf of the Debtors and to take all necessary and appropriate actions to effectuate the transactions contemplated by the Plan.

I. <u>Other Documents and Actions</u>. The Debtors, or the Proponent on the Debtor's behalf, is authorized and directed to execute such documents and take such other actions as may be necessary to effectuate the transactions provided for in the Plan.

J. <u>Operations Between the Confirmation Date and the Effective Date</u>. The Debtors will be directed to operate their businesses and conduct their affairs in the ordinary course of business or as necessary to implement the Plan. In addition, on or after the Confirmation Date, DairyCo will have the right, in its sole discretion, to designate one or more Persons to operate, manage and safeguard the Debtors' businesses and Estate Assets in order to ensure a timely and smooth transition of the Estate Assets to DairyCo or the Liquidation Trust, as applicable, on the Effective Date.

K. <u>Dissolution of Debtors</u>. As of the Effective Date, the Debtors will be deemed to have been dissolved. All of the Debtors' officers, directors, managers or members, as applicable, will be deemed to have resigned.

L. <u>Conditions Precedent to the Effective Date</u>. On or before the Effective Date, the following actions will be undertaken and will be deemed to have occurred simultaneously (and no such action will be deemed to have occurred prior to the taking of any other such action), and all such actions will be conditions precedent to the effectiveness of this Plan:

(a) Holders of the AFS Secured Claims will have accepted this Plan.

(b) All Distributions, payments and transfers to be made on the Effective Date will be made or duly provided for.

(c) The Bankruptcy Court will have entered the Disclosure Statement Order and the Confirmation Order, each in form and substance consistent with this Plan and acceptable to the Proponent in its sole discretion, and neither the Disclosure Statement Order nor the Confirmation Order will have been reversed, modified or amended in any material respect prior to the Effective Date.

(d)     All licenses, permits and regulatory approvals necessary for the ownership and operation of the Debtors' businesses, to the extent issued prior to the Effective Date, will have been assigned to, issued to, or obtained by DairyCo.

(e)     A mutual release between AFS and Sumrall will be executed, in a form reasonably acceptable to AFS and Sumrall.

(f)     The Confirmation Order will:

(i)     expressly approve the terms and provisions of this Plan, and find that they comply with section 1129 of the Bankruptcy Code;

(ii)     find that all Holders of Claims and Equity Interests, and all other parties in interest, were duly given notice of, and an opportunity to be heard in connection with, the Chapter 11 Cases and this Plan, pursuant to and in satisfaction of the applicable provisions of the Bankruptcy Code;

(iii)     set forth and approve the identity of the Liquidation Trustee as trustee of the Liquidation Trust;

(iv)     set forth the Administrative Expense Bar Date and the Distribution Record Date;

(v)     provide for transfer of the Estate Assets (other than the Liquidation Trust Assets) to DairyCo, on the Effective Date, free and clear of all Claims, liens, interests, encumbrances and other liabilities including, without limitation, Claims against or Equity Interests in the Debtors, to the full extent allowed pursuant to sections 105, 363, 1123, 1129 and 1141 of the Bankruptcy Code, except as otherwise provided in this Plan;

(vi)     provide for the assumption on the Effective Date of the Assumed Contracts in accordance with Article XIII.A.

(vii)     provide for the rejection of all executory contracts and unexpired leases, other than a contract or lease that (A) is expressly assumed and/or assigned by the Debtors pursuant to a Final Order of the Bankruptcy Court entered prior to such date or is subject to a separate motion to assume pending before the Bankruptcy Court on such date, (B) is specifically designated by the Proponent as an Assumed Contract, or (C) expires, terminates or otherwise becomes non-executory prior to such date;

(viii)     provide for the allowance of the AFS Claims as provided herein;

(ix)     authorize and direct holders of Claims or Equity Interests in the Debtors to take or cause to be taken, on or prior to the Effective Date, all actions that are necessary to implement effectively the provisions of this Plan.  Moreover, the Confirmation Order will empower, authorize and direct the Debtors to consummate the transactions contemplated by this Plan on or after the Effective Date;

(x)      provide that the Estate Assets will be and remain free and clear of the liens, Claims, and Equity Interests of any Person other than as provided in this Plan, and no Person will be permitted to execute against or receive Distributions except in accordance with the terms of the Confirmation Order and this Plan;

(xi)     provide that all transfers of money or property by the Debtors or the Liquidation Trust, or the issuance, transfer, release or exchange of a security, or the making or delivery of any instrument of transfer, including, without limitation, the transfer of the Estate Assets of the Debtors to DairyCo or the Liquidation Trust, as applicable, and the issuance of DairyCo Equity Interests and DairyCo Notes, are an integral part of this Plan and will be deemed to be made under this Plan pursuant to section 1129 of the Bankruptcy Code, and that all appropriate taxing entities will not impose any tax under any law imposing a stamp tax or similar tax based on the issuance, transfer, or exchange of a security, or the making or delivery of any instrument of transfer or release, as contemplated by this Plan, to the full extent allowed by section 1146(a) of the Bankruptcy Code;

(xii)    provide that entry of the Confirmation Order will not have any res judicata or other preclusive effect with respect to any Causes of Action that are not specifically and expressly released by the terms of this Plan, the Confirmation Order or another Final Order of the Bankruptcy Court entered prior to the Confirmation Hearing, and that entry of the Confirmation Order will not be deemed a bar to asserting such Causes of Action;

(xiii)   approve the releases provided in Article X; and

(g)      The Confirmation Order has become a Final Order.

M.      <u>Waiver of Conditions to Effectiveness</u>.   The requirement that a particular condition to the effectiveness of the Plan be satisfied may be waived in whole or part by the Proponent, without notice or a hearing.   The failure of the Proponent to assert the non satisfaction of any such conditions will not be deemed a waiver of any other rights hereunder, and each such right will be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

N.      <u>Effect of Nonoccurrence of the Conditions to Effectiveness</u>.   If each of the conditions to consummation and the occurrence of the Effective Date has not been satisfied or duly waived on or before the date that is one hundred and eighty (180) days after the Confirmation Date, the Confirmation Order may be vacated by the Bankruptcy Court upon a motion filed by the Proponent.   If the Confirmation Order is vacated pursuant to this Article VIII.N, this Plan will be null and void in all respects, and nothing contained in this Plan will:   (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, or (b) prejudice in any manner the rights of the Proponent.

O.      <u>Further Authorization</u>.   So long as not inconsistent with the terms of the Plan or the Confirmation Order, the Proponent will be entitled to seek such orders as each deems necessary to carry out and further the intentions and purposes, and to give full effect to the provisions, of this Plan.

P.    No Substantive Consolidation.  Any Claim asserted against any of the Debtors or any of the Estates will be deemed to be a Claim asserted only against the applicable Debtor and Estate, or, if multiple Debtors are liable on the Claim, against the applicable Debtors and Estates. The voting  and distribution provision of this Plan will be determined with respect to each Debtor.  Nothing in this Plan will effect substantive consolidation of the Debtors or deemed consolidation of the Debtors.

Q.    Securities Registration Exemption.  The DairyCo Equity Interests to be issued and Distributed pursuant to this Plan are to be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code. To the extent section 1145 of the Bankruptcy Code is inapplicable, these issuances are exempt from registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

R.    Cancellation of Instruments and Equity Interests.  On the Effective Date, all instruments evidencing or creating any indebtedness or obligation of the Debtors, except such instruments that are authorized or issued under this Plan, will be canceled and extinguished. Additionally, as of the Effective Date, all Equity Interests, and any and all warrants, options, rights, or interests with respect to Equity Interests that have been issued, could be issued, or that have been authorized to be issued but that have not been issued, will be deemed canceled and extinguished without any further action of any party.  The Holders of or parties to the canceled notes, share certificates and other agreements and instruments will have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

S.    Operating Reports.  Prior to the Effective Date, the Debtors will timely file all reports, including without limitation, monthly operating reports required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules., or the Office of the United States Trustee.  On and after the Effective Date, the Liquidation Trustee will timely file all reports, including without limitation, quarterly operating reports as required by the Bankruptcy Court, Bankruptcy Code, Bankruptcy Rules, or Office of the United States Trustee until entry of an order closing or converting the Chapter 11 Cases.

T.    Disposition of Books and Records.  On the Effective Date, the Debtors will transfer all of the Debtors' books and records in their possession to DairyCo, in the format and medium requested by DairyCo, in its discretion.  From and after the Effective Date, DairyCo will preserve and maintain all documents and electronic data transferred to it by the Debtors and will not destroy or otherwise abandon any such documents and records (in electronic or paper format) absent further order of the Court after a hearing upon thirty (30) days notice to parties-in-interest. DairyCo will provide the Liquidation Trustee and Liquidation Trustee Professionals with reasonable access to such books and records during normal business hours; provided that DairyCo will not incur any costs associated with such access.

# ARTICLE IX
# LIQUIDATION TRUST

A.      Establishment of Liquidation Trust.  On the Effective Date, the Liquidation Trust will be established pursuant to the Liquidation Trust Agreement.

B.      Appointment of Liquidation Trustee.  Ronald L. Glass of GlassRatner Advisory and Capital Group, LLC will  serve as the Liquidation Trustee.  The appointment of the Liquidation Trustee will be approved in the Confirmation Order, and such appointment will  be as of the Effective Date.  In accordance with the Liquidation Trust Agreement, the Liquidation Trustee will serve in such capacity through the earlier of (a) the date that the Liquidation Trust and the Disputed Claims Reserve are dissolved in accordance with Articles VII.D and IX.K of the Plan and (b) the date such Liquidation Trustee resigns, is terminated or is otherwise unable to serve, provided, however, that, in the event that the Liquidation Trustee resigns, is terminated or is unable to serve, then the Court, upon the motion of any party-in-interest, will approve a successor to serve as the Liquidation Trustee, and such successor Liquidation Trustee will serve in such capacity until the Liquidation Trust is dissolved.

C.      Liquidation Trust Assets.  Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors will be deemed to have automatically transferred to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such Liquidation Trust Assets will automatically vest in the Liquidation Trust free and clear of all Claims, liens, encumbrances and other liabilities, subject only to the DairyCo Liquidation Trust Loan Obligations, Claims of the Liquidation Trust Beneficiaries as set forth in the Plan and the expenses of the Liquidation Trust and the Liquidation Trustee as set forth herein and in the Liquidation Trust Agreement, with all proceeds of the Liquidation Trust to be distributed in accordance with the provisions of this Plan.  Thereupon, the Debtors will have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

In connection with any Causes of Action that are included in the Liquidation Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications thereto (whether written or oral) will also exist for the benefit of the Liquidation Trust and will vest in the Liquidation Trustee and its representatives, and will also be preserved for and as to the Debtors.  The Liquidation Trustee is authorized to take all necessary actions to benefit from such privileges.

D.      Treatment of Liquidation Trust for Federal Income Tax Purposes; No Successor in-Interest.  The Liquidation Trust will be established for the primary purpose of liquidating the Liquidation Trust Assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.  Accordingly, the Liquidation Trustee will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration.  The Liquidation Trust will not be deemed a successor-in-

interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.

The Liquidation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust. For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) will treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such Liquidation Trust Assets by the Debtors to the Holders of Allowed Claims of the Liquidation Trust Beneficiaries entitled to distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries will be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as reasonably practicable after the Effective Date, the Liquidation Trustee (to the extent that the Liquidation Trustee deems it necessary or appropriate in his or her sole discretion) will value the Liquidation Trust Assets based on the good faith determination of the value of such Liquidation Trust Assets. The valuation will be used consistently by all parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all federal income tax purposes. The Bankruptcy Court will resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets transferred to the Liquidation Trust, the proceeds thereof, or any income earned by the Liquidation Trust, will be limited to the right and power to invest such Liquidation Trust Assets (pending distributions in accordance with the Plan), as set forth in Article IX.E herein; provided, however, that the scope of any such investments will be limited to include only those investments that a liquidating trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service guidelines, whether set forth in Internal Revenue Service rulings, other Internal Revenue Service pronouncements, or otherwise.

E.    Investments of Cash. Except as otherwise provided in this Plan, all Cash held by the Liquidation Trust will be invested by the Liquidation Trustee with sole and absolute discretion in only (a) direct obligations of, or obligations guaranteed by, the United States; (b) obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States, as an agency or instrumentality thereof; (c) AAA rated tax-free securities issued by municipalities or state governments or agencies; or (d) such other obligations or instruments as may from time to time be approved for such investments by Final Order of the Bankruptcy Court; provided, however, that the Liquidation Trustee may, to the extent it deems necessary, deposit moneys in demand deposits (including, without limitation, money market funds) at any commercial bank, trust company or other financial institution organized under the laws of the United States or any state thereof which has, at the time of such deposit, a capital stock and surplus aggregating at least $500,000,000. The investment powers of the Liquidation Trustee will be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings or financial institutions, or other temporary, liquid investments such as U.S. Treasury Bills. Such investments will mature in such

amounts and at such times as may be deemed necessary by the Liquidation Trustee, with sole and absolute discretion, to provide funds when needed to make Distributions and payments as required by this Plan.

F.    Responsibilities of the Liquidation Trustee.    The responsibilities of the Liquidation Trustee will include, but will not be limited to:

(1)    the making of Distributions as contemplated herein;

(2)    requesting DairyCo Liquidation Trust Loan Advances under the DairyCo Liquidation Trust Loan and repaying amounts so borrowed;

(3)    establishing and maintaining the Disputed Claims Reserve in accordance with the terms of this Plan;

(4)    conducting an analysis of Administrative Expense Claims, Fee Claims, Priority Tax Claims, Priority Non Tax Claims, Other Secured Claims, Unsecured Claims, Insider Claims and Convenience Class Claims and prosecuting objections thereto or settling or otherwise compromising such Claims if necessary and appropriate in accordance with Article XI.A;

(5)    filing appropriate tax returns in the exercise of its fiduciary obligations;

(6)    retaining the Liquidation Trust Professionals;

(7)    taking such actions as are necessary to prosecute, resolve or compromise, as appropriate, all Avoidance Actions; and

(8)    taking such actions as are necessary and reasonable to carry out the purposes of the Liquidation Trust.

G.    Liquidation Trust Expenses.

(1)    All Liquidation Trust Expenses will be charged against and paid from the proceeds of the Liquidation Trust Assets, and the Liquidation Trustee will pay the same as and when due and payable.

(2)    The Liquidation Trust Professionals retained by the Liquidation Trustee will submit periodic statements for services rendered and costs incurred to the Liquidation Trustee for review and approval.  The Liquidation Trustee will have thirty (30) days to object to any such statement.  In the event that any such objection is received by the relevant Liquidation Trust Professional and cannot be promptly resolved by such Liquidation Trust Professional and the Liquidation Trustee, the dispute will be submitted by the Liquidation Trustee to the Bankruptcy Court for adjudication.  The Bankruptcy Court will retain jurisdiction to adjudicate any such objection.  In the event that no objection is raised to a statement within the thirty (30) day period, such statement will be promptly paid by the Liquidation Trustee, subject to Article IX.G.1 above.

H. Repayment of DairyCo Liquidation Trust Loan Obligations. All Liquidation Trust Proceeds, other than allocated but unused DairyCo Liquidation Trust Loan Advances, the DairyCo Liquidation Trust Contribution and amounts necessary to fund the Liquidation Trust Expenses, will be paid to DairyCo for application against the DairyCo Liquidation Trust Loan Obligations until the DairyCo Liquidation Trust Loan Obligations are paid in full, in Cash.

I. Bonding of Liquidation Trustee. The Liquidation Trustee will not be obligated to obtain a bond but may do so, in its sole discretion, in which case the expense incurred by such bonding will be paid by the Liquidation Trust.

J. Fiduciary Duties of the Liquidation Trustee. Pursuant to this Plan and the Liquidation Trust Agreement, the Liquidation Trustee will act in a fiduciary capacity on behalf of the Liquidation Trust Beneficiaries.

K. Dissolution of the Liquidation Trust. The Liquidation Trust will be dissolved no later than four (4) years from the Effective Date unless the Bankruptcy Court, upon a motion filed prior to the fourth (4th) anniversary or the end of any extension period approved by the Bankruptcy Court (the filing of which will automatically extend the term of the Liquidation Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed two (2) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. After (a) the final Distribution of the Disputed Claims Reserve and the balance of the Liquidation Trust Proceeds pursuant to this Plan, and (b) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court in accordance with this Plan, the Liquidation Trust will be deemed dissolved for all purposes without the necessity for any other or further actions.

L. Full and Final Satisfaction against Liquidation Trust. On and after the Effective Date, the Liquidation Trust will have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Liquidation Trust Agreement. All payments and all Distributions made by the Liquidation Trustee under the Plan will be in full and final satisfaction, settlement, and release of and in exchange for all Claims or Equity Interests against the Liquidation Trust.

M. Limitation of Liability.

(1) No recourse will ever be had, directly or indirectly, against the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidation Trustee under this Plan or by reason of the creation of any indebtedness by the Liquidation Trustee under this Plan for any purpose authorized by this Plan. All such liabilities, covenants, and agreements of the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee,

whether in writing or otherwise, under this Plan will be enforceable only against, and will be satisfied only out of, the Liquidation Trust Assets or such part thereof as will, under the terms of any such agreement, be liable therefor, or will be evidence only of a right of payment out of the income and Liquidation Trust Proceeds, as the case may be. Every undertaking, contract, covenant or agreement entered into in writing by the Liquidation Trustee will provide expressly against the personal liability of the Liquidation Trustee.

(2) Neither the Liquidation Trustee, the Liquidation Trust Professionals nor any other representatives, agents, employees, successors or assigns of the Liquidation Trustee will be liable for any act or omission of one another, nor will the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee be liable for any act or omission taken or not taken in such capacity other than for specific acts or omissions resulting from Liquidation Trustee's, the Liquidation Trust Professionals' or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee willful misconduct or fraud. The Liquidation Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with the Liquidation Trust Professionals, and will not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such entities, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Liquidation Trustee will not be under any obligation to consult with the Liquidation Trust Professionals, and the determination not to do so will not result in the imposition of liability on the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee, unless such determination is based on willful misconduct or fraud. The Liquidation Trust will indemnify and hold harmless the Liquidation Trustee, the Liquidation Trust Professionals or any other representatives, agents, employees, successors or assigns of the Liquidation Trustee from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including, without limitation, reasonable attorney's fees, disbursements, and related expenses), which such Persons may incur or to which such Persons may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Persons arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidation Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of their willful misconduct or fraud.

N. Reliance on Documents. The Liquidation Trustee may rely, and will be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper Person or Persons.

O. Requirement of Undertaking. The Liquidation Trustee may request any court of competent jurisdiction to require, and any such court may in its discretion require, in any suit for the enforcement of any right or remedy under this Plan, or in any suit against the Liquidation Trustee for any act taken or omitted by the Liquidation Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including, without limitation, reasonable attorneys' fees, against any party

litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

## ARTICLE X
## THE RELEASES AND EXCULPATION

A.     Estate Release.  For good and valuable consideration, upon the Effective Date and except as otherwise provided herein, the Debtors will release the Released Parties from any and all Claims and Causes of Action, including, without limitation, Avoidance Actions, AFS Causes of Action and Sumrall Causes of Action, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place at any time on or before the Effective Date; *provided that* to the extent any Person received a payment or transfer from Sumrall or is otherwise subject to an Avoidance Action as a result of receiving a payment or transfer from Sumrall, such Person will not receive the benefits of this release.

The above-described release includes, but is not limited to, a release by the Debtors and their Estates of any and all Causes of Action asserted by the Debtors against AFS in the Adversary Proceeding. As a consequence of this release, the Liquidation Trustee will dismiss the Adversary Proceeding with prejudice, with each side bearing its own costs.

B.     Sumrall/AFS Release.  Upon the Effective Date, Sumrall and AFS will execute a mutual release, in a form reasonably acceptable to them, releasing, except as otherwise provided herein, each other, including, without limitation, their respective former, current and future Affiliates, members, managers, officers, directors, employees, consultants, agents, advisors, attorneys, accountants, financial advisors, representatives, professionals, successors, executors, administrators, heirs and assigns, from any and all Claims and Causes of Action, that either Sumrall or AFS would have been legally entitled to assert in their own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place at any time on or before the Effective Date. Sumrall and AFS will execute a mutual release, in a form reasonably acceptable to them, on the Effective Date; provided, however, for the avoidance of doubt Sumrall will only be entitled to receive a release from AFS if Sumrall executes and delivers a release of all such claims against AFS.

C.     Releases by Holders of Claims.  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action, or liability of any nature whatsoever, will be deemed to, completely and forever release, waive, void, extinguish, and discharge unconditionally the AFS Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies, and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are or may be based in whole or part on any act, omission,

transaction, event, or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan or the Disclosure Statement; *provided, however*, (a) that each Person that has submitted a ballot rejecting the Plan may elect, by checking the appropriate box on its ballot, not to grant the releases set forth in this Article X.C with respect to the AFS Released Parties and (b) that each Person that holds a Claim entitled to vote and who abstains from voting to either accept or reject the Plan will be bound to the releases set forth in this Article X.C. with respect to the AFS Released Parties unless they return a ballot opting out of such releases; and *provided, further, however,* that nothing in this Article X.C. will be construed to release the AFS Released Parties from willful misconduct as determined by a Final Order. Holders of Allowed Claims that vote in favor of the Plan, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims will be deemed to be bound to the releases in this Article X.C.

D.    Exculpation.  The Released Parties will not have or incur any liability to any Person for any act taken or omission made in good faith in connection with or in any way related to the Chapter 11 Cases, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, including, without limitation, all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including, without limitation, any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases.  The Released Parties will have no liability to any creditor for actions taken in good faith under the Plan, in connection therewith or with respect thereto, including, without limitation, failure to obtain consummation of the Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions precedent to Confirmation or to the occurrence of the Effective Date.  The Released Parties will not have or incur any liability to any Holder of a Claim or party-in-interest herein or any other Person for any act or omission in connection with or arising out of: (a) administration of the Plan, (b) the implementation of any of the transactions provided for, or contemplated in, the Plan, or (c) any action taken in connection with either the enforcement of the Debtors' rights against any Person or the defense of Claims asserted against the Debtors with regard to the Chapter 11 Cases, except for willful misconduct as finally determined by a Final Order.  The Released Parties are entitled to rely on, and act or refrain from acting on, all information provided by other Released Parties without any duty to investigate the veracity or accuracy of such information.

## ARTICLE XI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.    Objections to Claims.  On and after the Effective Date, the Liquidation Trust will have the right to the exclusion of all others to make, file and prosecute objections to Disputed Claims.  The Liquidation Trust will conduct a review of the Schedules and all Proofs of Claim filed in the Chapter 11 Cases and, except as provided hereunder, will file objections to such Claims (if any) with the Clerk of the Bankruptcy Court on or before the Claim Objection Deadline.  The Liquidation Trust may compromise, settle or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court, and such compromise, settlement or other

resolution will constitute a Final Order of the Bankruptcy Court with respect to the allowance of such Claim for all purposes under this Plan.

B. <u>Disputed Claims</u>. No Distribution will be made with respect to any Disputed Claim (or any portion of such Claim) unless and until a Final Order allowing such Claim has been entered.

C. <u>Subordination of Claims</u>. Under this Plan, any Claim (other than the AFS Claims) may be subordinated to other Claims pursuant to section 510 of the Bankruptcy Code. No Distributions will be made in respect of a subordinated Claim until all Claims to which such Claim has been subordinated have been satisfied in full. Any action to subordinate a Claim will be filed by the Liquidation Trust at any time after the Effective Date.

D. <u>Estimation of Claims</u>. The Liquidation Trust may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Liquidation Trust previously had objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time, including, without limitation, during litigation or another proceeding concerning any objection to such Disputed Claim.

E. <u>No Distribution in Respect of Disallowed Claims</u>. To the extent that a Disputed Claim is Disallowed in whole or in part, the Holder of such Claim will not receive any Distribution on account of the portion of such Claim (including, without limitation, the whole, if applicable) that is Disallowed.

# ARTICLE XII
# EFFECT OF CONFIRMATION

A. <u>Release of Liens and Cancellation of Instruments</u>.

(1) <u>Release of Liens on Estate Assets</u>. Unless a particular Claim is reinstated or left unaltered: (a) each Holder of a Secured Claim or a Claim that is purportedly secured by any or all of the Estate Assets will, on or immediately prior to the Effective Date, (i) turn over and release to DairyCo or the Liquidation Trust, as applicable, any and all Estate Assets that secure or purportedly secure such Claim; and (ii) execute such documents and instruments as the DairyCo or the Liquidation Trust, as applicable, may require to evidence or record (with respect to any liens or security interests recorded in the public records) such Holder's release of such property and of all security interests and liens in and on such property; and (b) on the Effective Date, all Claims, right, title and interest in and to such property will revert to DairyCo or the Liquidation Trust, as applicable, free and clear of all Claims, including, without limitation, liens, charges, pledges, encumbrances and/or security interests of any kind. All liens, charges, pledges, encumbrances and/or security interests of any kind of the Holders of such Claims in or on the Estate Assets will be deemed to be canceled and released as of the Effective Date.

(2) <u>Effect of Failure to Release Liens</u>. No Distribution hereunder will be made to or on behalf of any Holder of a Claim unless and until such Holder executes and delivers to the Liquidation Trust such release and surrender of liens or other items described in this Article XII.A, or demonstrates the non availability of such items to the satisfaction of the

Liquidation Trust, including, without limitation, requiring such Holder to post a lost instrument or other indemnity bond, among other things, to hold the Liquidation Trust harmless in respect of such lien, instrument or other item described in this Article XII.A and any Distributions made in respect thereof. The Liquidation Trust may reasonably require the Holder of such Claim to hold it harmless up to the amount of any Distribution made in respect of such unavailable note, instrument, document, certificate, subordinated note, agreement, certificated security or other item evidencing such Claim. Any such Holder that fails to execute and deliver such release of liens or other items described in this Article XII.A or satisfactorily explain their non-availability to the Liquidation Trust within one hundred and eighty (180) days after the Effective Date will be deemed to have no further Claim against the Liquidation Trust, and will not participate in any Distribution hereunder, and the Distributions that would otherwise have been made to such Holder will be treated as Unclaimed Property. To the extent any Holder of a Claim described in Article XII.A.1 above fails to release the relevant liens as described in such subsection and in this Article XII.A.2, the Distribution Agent may act as attorney-in-fact, on behalf of such Holder, to provide any releases as may be required.

B.     <u>Revesting and Vesting; Retention and Enforcement of Claims</u>.  Except as otherwise provided in this Plan, on the Effective Date, all Estate Assets, other than the Liquidation Trust Assets, will vest in DairyCo, free and clear of all Claims, liens, charges, encumbrances and interests of Claim and Equity Interest Holders. Any and all Liquidation Trust Assets accruing to the Debtors or assertable as accruing to the Debtors will remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date will be transferred to and vest in the Liquidation Trust. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Liquidation Trust and the Liquidation Trustee will have the right to pursue or not to pursue, or, subject to the terms of this Plan and the Liquidation Trust Agreement, compromise or settle any Liquidation Trust Assets. From and after the Effective Date, the Liquidation Trust and the Liquidation Trustee may commence, litigate and settle any Avoidance Actions or objections to Claims properly instituted by the Liquidation Trust and Liquidation Trustee after the Effective Date, except as otherwise expressly provided in this Plan and the Liquidation Trust Agreement. Other than as set forth herein, no other Person may pursue such Liquidation Trust Assets after the Effective Date. The Liquidation Trustee will be deemed hereby substituted as plaintiff, defendant, or in any other capacity for either the Committee or each Debtor in any Causes of Action pending before the Bankruptcy Court or any other court that constitutes a Liquidation Trust Asset without the need for Filing any motion for such relief.

C.     <u>Injunction</u>.  Except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 524 and 1141 and provided that the Effective Date occurs, the entry of the Confirmation Order will permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is subject to the Plan from taking any of the following actions in respect of such Claim, debt or liability: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against either or both of the Debtors or DairyCo; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against either or both of the Debtors or DairyCo; (c) creating, perfecting or enforcing in any manner directly or indirectly, any lien or encumbrance of any kind against either or both of the Debtors or DairyCo; (d) asserting any

setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to either or both of the Debtors or DairyCo; and (e) proceeding in any manner in any place whatsoever, including, without limitation, employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

D. <u>Discharge of Claims and Equity Interests</u>.  Except as otherwise provided herein, to the fullest extent permitted by applicable law (a) on the Confirmation Date, the Confirmation Order will operate as a discharge under Bankruptcy Code section 1141(d)(1), and release of any and all Claims, debts (as such term is defined in Bankruptcy Code section 101(12)), liens, security interests and encumbrances of and against all property of each of the Debtors and their affiliates, and each of their former, current and future officers, directors, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and professionals, in their official and individual capacities (and such Persons will have all of the benefits and protections set forth in Bankruptcy Code section 1141(d)(1)) that arose before confirmation, including without limitation, any Claim of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i) and all principal and interest, whether accrued before, on or after the Petition Date, regardless of whether (i) a Proof of Claim in respect of such Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to Bankruptcy Code section 502, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan; and (b) from and after the Confirmation Date, (x) all Holders of Claims will be barred and enjoined from asserting against the Persons entitled to such discharge pursuant to this Article XII.D any Claims, debt (as defined in Bankruptcy Code section 101(12)), liens, security interests and encumbrances of and against all property of each of the Debtors and (y) the Debtors will be fully and finally discharged of any liability or obligation on a Disallowed Claim.  Except as otherwise specifically provided herein, nothing in the Plan will be deemed to waive, limit or restrict in any manner the discharge granted upon confirmation of the Plan pursuant to Bankruptcy Code section 1141.

E. <u>Term of Injunctions or Stays</u>.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105(a) or 362, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

**ARTICLE XIII**
**EXECUTORY CONTRACTS**

A. <u>Assumption and Assignment of Certain Executory Contracts</u>.  On the Effective Date, the Debtors will assume the Assumed Contracts and assign the Assumed Contracts to DairyCo.  The Proponent will include in the Plan Supplement a schedule of all Assumed Contracts and, to the extent applicable, the proposed cure amounts with respect to each Assumed Contract.  ANY NON-DEBTOR PARTY TO AN AGREEMENT LISTED ON THE SCHEDULE OF ASSUMED CONTRACTS THAT WISHES TO OBJECT TO THE ASSUMPTION AND (IF APPLICABLE) ASSIGNMENT OF SUCH AGREEMENT OR TO THE PROPOSED CURE AMOUNT WITH RESPECT TO SUCH AGREEMENT AS SET FORTH ON THE SCHEDULE OF ASSUMED CONTRACTS MUST FILE AN OBJECTION WITH THE BANKRUPTCY COURT NO LATER THAN FIFTEEN (15) DAYS PRIOR TO THE DATE OF COMMENCEMENT OF THE CONFIRMATION HEARING, AND MUST

SERVE SUCH OBJECTION ON THE PROPONENT. IF SUCH NON-DEBTOR PARTY FAILS TO TIMELY FILE AND SERVE SUCH OBJECTION, SUCH PARTY WILL BE DEEMED TO CONSENT TO THE ASSUMPTION AND ASSIGNMENT OF SUCH AGREEMENT AND THE PROPOSED CURE AMOUNT (IF ANY) WITH RESPECT TO SUCH AGREEMENT, AND SUCH OBJECTION AND ANY ASSERTED RIGHT TO RECEIVE A CURE PAYMENT OTHER THAN THAT SET FORTH ON THE SCHEDULE OF ASSUMED CONTRACTS (IF ANY) WILL BE WAIVED. THE PROPONENT MAY RESPOND TO ANY TIMELY FILED AND SERVED OBJECTION (IN WHICH CASE THE BANKRUPTCY COURT WILL DECIDE SUCH OBJECTION AT THE CONFIRMATION HEARING OR SUCH OTHER TIME AS DETERMINED BY THE BANKRUPTCY COURT), OR THE PROPONENT MAY REMOVE THE PARTICULAR AGREEMENT FROM THE SCHEDULE OF ASSUMED CONTRACTS (IN WHICH CASE THE AGREEMENT WILL NO LONGER BE AN ASSUMED CONTRACT). Cure amounts for Assumed Contracts determined in accordance with this Article XIII.A will be satisfied by DairyCo Liquidation Trust Loan Advances.

B. <u>Assumption and Assignment Conditioned upon Consummation of This Plan</u>. This Plan seeks to cause the applicable Debtors to assume the Assumed Contracts and assign such Assumed Contracts to DairyCo to the extent, and only to the extent, that such contracts or leases constitute executory contracts or unexpired leases. Additionally, unless the assumption and assignment of an Assumed Contract is expressly approved by a Final Order of the Bankruptcy Court that provides otherwise, the assumption and assignment of each Assumed Contract is expressly conditioned upon the occurrence of the Effective Date. If the Effective Date does not occur, assumption and assignment of the Assumed Contracts as provided in this Plan will not be effective, and the Debtors will retain all of their rights under section 365 of the Bankruptcy Code with respect to such contracts and leases.

C. <u>Rejection of Remaining Contracts and Leases</u>. Any and all of the Debtors' executory contracts and unexpired leases will be deemed rejected as of the Effective Date (unless such deadline is extended by Final Order of the Bankruptcy Court), other than contracts and leases that (a) are expressly assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court entered prior to such date or are subject to a separate motion to assume and assign to DairyCo pending before the Bankruptcy Court on such date, (b) are specifically designated by the Proponent as an Assumed Contract pursuant to Article XIII.A above, or (c) expire, terminate or otherwise become non-executory prior to such date. Proofs of Claim with respect to any Claim for damages arising from the rejection of any executory contract or unexpired lease pursuant to this Article XIII.C must be filed with the Bankruptcy Court and served on the Liquidation Trustee on or before the Rejection Bar Date.

D. <u>Treatment of Rejection Damages Claims</u>. Any Claim for damages based upon the rejection of any executory contract or unexpired lease will be treated as an Unsecured Claim and will be classified in Class 4 or Class 5, as appropriate, and may be objected to in accordance with the provisions of Article XI above, and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules. The failure to file a Proof of Claim with respect to a Claim for damages based upon the rejection of an executory contract or unexpired lease as provided in Article XIII.C above or a Final Order of the Bankruptcy Court specifically relating to such Claim will forever bar and discharge such Claim.

# ARTICLE XIV
## ADMINISTRATIVE PROVISIONS

A.    <u>Retention of Jurisdiction</u>.    The Bankruptcy Court will retain post-confirmation jurisdiction over these Chapter 11 Cases including, without limitation, for the following purposes:

(1)    To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases, including, without limitation, disputes that arise between or among the Debtors, the Proponent, DairyCo, the Liquidation Trust, the Liquidation Trustee, Holders of Claims or Equity Interests or other parties in interest.

(2)    To adjudicate all claims or controversies arising out of any purchases, sales, contracts or undertakings by the Debtors during the pendency of the Chapter 11 Cases.

(3)    To adjudicate any and all claims filed by any Person, including, without limitation, any of the current or former officers, directors, employees, agents, Holders of Equity Interests or controlling Persons of the Debtors, or other parties in interest, against the Debtors, the Estates, the Liquidation Trust, the Committee, the Proponent or any of their respective representatives and agents, raised in connection with any and all post-petition Claims or Causes of Action arising from or related to the Chapter 11 Cases, or against the Proponent or any of its respective agents or representatives with respect to this Plan.

(4)    To adjudicate all controversies and issues arising out of or relating to any adversary proceedings on the Bankruptcy Court's docket as of the Confirmation Date, or which are commenced after the Confirmation Date pursuant to the provisions of the Bankruptcy Code and this Plan, and including, without limitation, adversary proceedings with respect to any Claims or Equity Interests, or any Causes of Action.

(5)    To recover all assets and properties of the Debtors and the Estates, whether title is presently held in the name of the Debtors or a third party.

(6)    To determine the allowability, classification, or priority of Claims upon objection by the Liquidation Trust (including, without limitation, the resolution of disputes regarding any Disputed Claims and claims for disputed Distributions), and the validity, extent, priority and avoidability of consensual and nonconsensual liens and other encumbrances, and to estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code.

(7)    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order or any order of the Bankruptcy Court, including, without limitation, the Bar Date Order and the injunctions contained therein, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person.

(8) To protect the property of the Estates, the Debtors, the Liquidation Trust or DairyCo from claims against, or interference with, such property, including, without limitation, actions to quiet or otherwise clear title to such property or to resolve any dispute concerning liens, security interest or encumbrances in or on any property of the Estates.

(i) To determine any and all applications for allowance of Fee Claims.

(ii) To determine any Priority Tax Claims, Priority Non Tax Claims, Administrative Expense Claims or any other request for payment of Claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code.

(9) To determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases, to determine any motion to assume and assign an executory contract or unexpired lease pursuant to Article XIII above or to resolve any disputes relating to the appropriate cure amount or other issues related to the assumption and assignment of executory contracts or unexpired leases in the Chapter 11 Cases.

(10) To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including, without limitation, any remands.

(11) To enter a Final Order or orders closing the Chapter 11 Cases.

(12) To modify this Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes.

(13) To issue such orders in aid of consummation of this Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person, to the fullest extent authorized by the Bankruptcy Code.

(14) To determine any tax liability pursuant to section 505 of the Bankruptcy Code.

(15) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated.

(16) To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, any applicable Claims bar date (including, without limitation, the Bar Date, the Administrative Expense Bar Date, and any other Claims bar date provided in this Plan, the Confirmation Order, or any other Final Order of the Bankruptcy Court), the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing, or for any other purpose.

(17) To authorize sales or transfers of assets, or issuances or transfers of securities, as necessary or desirable and to resolve objections, if any, to such sales, transfers or issuances.

(18)     To resolve any disputes concerning any release of a non-Debtor hereunder or the injunction against acts, employment of process or actions against such non-Debtor arising hereunder.

(19)     To approve any Distributions, or resolve objections thereto, under this Plan.

(20)     To assist with the collection of any accounts receivable or other amounts owed by any co-op.

(21)     To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order, or as may be authorized under the Bankruptcy Code.

B.     Failure of the Bankruptcy Court to Exercise Jurisdiction.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, then Article XIV.A above will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

C.     Governing Law.  Except to the extent the Bankruptcy Code, Bankruptcy Rules, Local Rules or other federal laws apply, the rights and obligations arising under this Plan will be governed by the laws of the State of Georgia, without giving effect to principles of conflicts of law.

D.     Amendments.

(1)     Preconfirmation Amendment.  The Proponent, may modify this Plan at any time prior to the Confirmation Date; provided, however, that this Plan, as modified, and the Disclosure Statement pertaining thereto will meet applicable Bankruptcy Code requirements.

(2)     Post-Confirmation Amendment Not Requiring Resolicitation.  After the Confirmation Date, with the approval of the Bankruptcy Court, the Proponent may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order as may be necessary to carry out the purposes and effects of this Plan, or in a manner that does not materially adversely affect the interests, rights, treatment or Distributions of any Class of Claims or Equity Interests.  Any waiver under Article VIII.M above will not be considered to be a modification or amendment of this Plan.

(3)     Post-Confirmation, Pre-Consummation Amendment Requiring Resolicitation.  After the Confirmation Date and before substantial consummation of this Plan, the Proponent may modify this Plan in a manner that materially and adversely affects the interests, rights or treatment of, or Distributions to, one or more Classes of Claims or Equity Interests, provided, however, that (a) this Plan, as modified, will satisfy all applicable Bankruptcy Code requirements; (b) the Proponent will obtain Bankruptcy Court approval for such modification; (c) such modification will be accepted by each Class of Claims or Equity Interests adversely affected by such modification pursuant to the standards for acceptance set forth in Article VI above; and (d) the Proponent will comply with section 1125 of the Bankruptcy Code with respect to the Plan as modified.

E.     <u>Modification, Revocation or Withdrawal of This Plan</u>. The Proponent, may modify, revoke or withdraw this Plan as the plan of reorganization for any Debtor (in which case the Proponent may proceed with confirmation and/or consummation of the Plan with respect to the other Debtors) or all of the Debtors at any time prior to the Confirmation Date or, if the Proponent is for any reason unable to consummate this Plan after the Confirmation Date, at any time prior to the Effective Date.

F.     <u>Exemption from Certain Transfer Taxes</u>. Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other lien, mortgage, deed of trust or other security interest, or (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with this Plan or the sale or transfer of any assets of the Debtors or the Estates (including, without limitation, the sale or transfer by the Debtors to DairyCo of any assets that, prior to the Effective Date, constituted Estate Assets), and any deeds, bills of sale or assignments executed in connection with this Plan or the Confirmation Order, will not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the full extent provided for or allowed under section 1146(a) of the Bankruptcy Code.

G.     <u>Compromise of Controversies</u>. Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to this Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against the Debtors, the Proponent, the Holders of Claims who vote to accept this Plan and various other Holders of Claims, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors, to the extent provided in this Plan. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the foregoing compromises and settlements and all other compromises and settlements provided for in this Plan and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, and all parties in interest, and are fair, equitable and within the range of reasonableness. The provisions of this Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non severable.

H.     <u>Insurance Preservation and Proceeds</u>. Nothing in this Plan will diminish or impair the enforceability of any policies of insurance that may cover Claims against or Equity Interests in the Estates, the Debtors or any related Person. Holders of Claims that are eligible to be satisfied, in whole or in part, through any such policy will be obligated, as a condition to receiving any Distributions under this Plan, to seek recovery or assist the Liquidation Trustee in seeking recovery under such policies with regard to such Claims.

I.     <u>Successors and Assigns</u>. The rights, benefits, and obligations of any Person named or referred to in this Plan will be binding upon, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

J.    Confirmation Order and Plan Control.  To the extent that the Confirmation Order or this Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Proponent and any party, this Plan controls the Disclosure Statement and any such agreement, and the Confirmation Order (and any other Final Orders entered by the Bankruptcy Court after the date of this Plan) controls this Plan.

K.    Dissolution of the Committee.  As of the Effective Date, the duties of the Committee will terminate.  Any post-Effective Date powers and duties that would otherwise be powers and duties of the Committee will be powers and duties of the Liquidation Trust.  The Committee will be discharged and disbanded as of the Effective Date.

L.    Severability.  If, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Proponent, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

M.    Headings.  Headings used in the Plan are for convenience and reference only, and will not constitute a part of the Plan for any other purpose.

N.    Notices.  All notices or requests in connection with this Plan will be made in writing and will be addressed to:

David B. Kurzweil
John J. Dyer
Greenberg Traurig, LLP
3290 Northside Parkway
Suite 400
Atlanta, Georgia 30327

O.    No Admissions.  Notwithstanding anything herein to the contrary, nothing contained in this Plan will be deemed an admission by the Proponent, DairyCo or any other Person with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of a Claim's classification.

**GREENBERG TRAURIG, LLP**

/s/ David B. Kurzweil
David B. Kurzweil (Georgia Bar No. 430492)
John J. Dyer (Georgia Bar No. 236844)
3290 Northside Parkway, N.W., Suite 400
Atlanta, Georgia 30327
Telephone: (678) 553-2100
Facsimile: (678) 553-2212

*Attorneys for Proponent Agricultural Funding
Solutions, LLC*

**Exhibit B**

**Liquidation Analysis**

| | DPS | DPS-GA | DPS-MS | NFD | HH | Total | Assumptions, Adjustments and Comments |
|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | |
| Cash & Cash Equivalent | $ 241,030.17 | $ 66,243.63 | $ 136,725.69 | $ 44,909.50 | $ 17,057.00 | $ 505,965.99 | Zero shrinkage relative to forecast assumed |
| AR - Milk | $ 289,031.42 | $ 335,538.46 | $ 95,220.30 | $ 64,842.97 | $ - | $ 784,633.16 | Discounted by 30% due to collectability |
| AR-Other | $ - | $ - | $ - | $ - | $ - | $ - | Substantially all intercompany accounts eliminated in consolidation |
| AR- Cattle Sales | $ - | $ - | $ - | $ - | $ - | $ - | Substantially all intercompany accounts eliminated in consolidation |
| Feed Inventory & Crops Growing | $ 837,130.32 | $ 549,570.84 | $ 265,345.08 | $ 74,512.36 | $ - | 1,726,558.60 | Liquidation scenario discounts due to transaction and shipping costs: 25% to commodity feed ; 50% to silage in FL, GA and TX; 75% to silage in MS. As applied to 7/24/11 feed inventories, this resulted in a 48% weighted average discount, which will increase as silage's % of feed inventory increases. |
| Supplies Inventory | $ 27,003.00 | $ 14,123.50 | $ 24,301.50 | $ 28,085.50 | $ - | 93,513.50 | Discounted 50% due to saleability |
| Prepaid Expenses | $ 61,812.20 | $ 200,449.60 | $ 16,755.80 | $ 33,078.80 | $ - | 312,096.40 | Discounted 80% in liquidation scenario due to collectability |
| **Total Current Assets** | $ 1,456,007.12 | $ 1,165,926.02 | $ 538,348.37 | $ 245,429.13 | $ 17,057.00 | $ 3,422,767.64 | |
| **Livestock and Related** | | | | | | | |
| Cattle | $ 3,727,649.29 | $ 4,428,669.13 | $ 1,572,612.95 | $ 1,719,518.43 | $ 2,256,888.00 | $ 13,705,337.79 | 25% of milking herd culled, remaining 75% sold at FMV and all calves sold at FMV. Liquidation scenario proceeds reduced by 5% for holding and transaction costs. |
| Less Acc Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | |
| Milk Quota/Base & Coop Retains | $ 110,056.40 | $ 88,003.00 | $ 124,797.80 | $ 107,138.20 | $ - | 429,995.40 | Discounted by 50% due to collectability and creditworthiness issues |
| **Total Livestock and Related** | $ 3,837,705.69 | $ 4,516,672.13 | $ 1,697,410.75 | $ 1,826,656.63 | $ 2,256,888.00 | $ 14,135,333.19 | |
| **Property, Plant and Equipment** | | | | | | | |
| Real Estate and Improvements | $ 8,080,000.00 | $ - | $ 2,440,000.00 | $ 5,560,000.00 | $ - | 16,080,000.00 | Equipment removed. FMV discounted by 20% as a result of sale in 6-12 month time frame as non-going concern |
| Less Acc Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | |
| Equipment | $ 654,616.21 | $ 271,802.17 | $ 142,486.91 | $ 412,913.22 | $ - | 1,481,818.51 | NBV discounted by 30% to account for sale costs |
| Less Acc Depreciation | $ - | $ - | $ - | $ - | $ - | $ - | |
| Construction in Progress | $ - | $ - | $ - | $ - | $ - | $ - | |
| **Total Property, Plant and Equipment** | $ 8,734,616.21 | $ 271,802.17 | $ 2,582,486.91 | $ 5,972,913.22 | $ - | 17,561,818.51 | |
| **Other** | | | | | | | |
| Loan Fees & Organizational Costs | $ - | $ - | $ - | $ - | $ - | $ - | |
| Less Accumulated Depreciation on Loan Fees | $ - | $ - | $ - | $ - | $ - | $ - | |
| Deposits & Other Assets | $ 26,574.20 | $ 4,096.20 | $ 6,713.00 | $ 5,820.80 | $ - | 43,204.20 | Discounted 80% in liquidation scenario due to collectability |
| **Total Other Assets** | $ 26,574.20 | $ 4,096.20 | $ 6,713.00 | $ 5,820.80 | $ - | 43,204.20 | |
| **Total Assets** | $ 14,054,903.21 | $ 5,958,496.53 | $ 4,824,959.03 | $ 8,050,819.78 | $ 2,273,945.00 | $ 35,163,123.55 | |
| **Debt Owed to Agricultural Funding Solutions, LLC ("AFS")** | $25,732,257 | $11,891,042 | $8,812,162 | $24,758,517 | $5,972,980 | $77,166,958 | Debts to AFS are secured by all assets of each of the Debtors. Additionally, certain creditors may hold interests in a Debtor's property senior to AFS, such as holders of purchase money security interests and lessors of property. |
| **Amounts Available for Distrubution** | $ - | $ - | $ - | $ - | $ - | $ - | This projected distribution does not take into account the proceeds of Avoidance Actions or expenses of administering a Chapter 7 liquidation, including, but not limited to, trustee fees and trustee distribution fees. |