# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

| | | |
|---|---|---|
| In re | : | |
| | : | |
| **DAIRY PRODUCTION SYSTEMS-** | : | **Chapter 11** |
| **GEORGIA, LLC, DAIRY PRODUCTION** | : | |
| **SYSTEMS, LLC, DAIRY PRODUCTION** | : | **Case No. 10-11752-JDW** |
| **SYSTEMS-MISSISSIPPI, LLC, NEW** | : | |
| **FRONTIER DAIRY, LLC and HEIFER** | : | **Jointly Administered** |
| **HAVEN, LLC,** | : | |
| | : | |
| **Debtors.** | : | |
| | : | |

## DISCLOSURE STATEMENT FOR
## JOINT COMMITTEE PLAN OF REORGANIZATION OF THE DEBTORS
## OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## DATED SEPTEMBER 20, 2011

Ward Stone, Jr.
Jerome L. Kaplan
David L. Bury, Jr.
Matthew S. Cathey
Stone & Baxter, LLP
Suite 800, 577 Mulberry Street
Macon, Georgia 31201
Counsel to Official Committee of Unsecured Creditors

## TABLE OF CONTENTS

**Page**

I.    Introduction ............................................................................................................2

II.   Voting Procedures and Requirements .....................................................................5

III.  The Dairies ...............................................................................................................8

IV.   The Dairies' Chapter 11 Cases ..............................................................................14

V.    Summary of the Committee Plan ...........................................................................18

VI.   Financial Information .............................................................................................49

VII.  Acceptance and Confirmation ...............................................................................49

VIII. Feasibility of the Committee Plan .........................................................................53

IX.   Certain Tax Consequences .....................................................................................53

X.    Alternatives to Confirmation and Consummation of the Committee Plan ............59

XI.   Solicitation .............................................................................................................60

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

| | | |
|---|---|---|
| In re | : | |
| | : | |
| **DAIRY PRODUCTION SYSTEMS-** | : | **Chapter 11** |
| **GEORGIA, LLC, DAIRY PRODUCTION** | : | |
| **SYSTEMS, LLC, DAIRY PRODUCTION** | : | **Case No. 10-11752-JDW** |
| **SYSTEMS-MISSISSIPPI, LLC, NEW** | : | |
| **FRONTIER DAIRY, LLC and HEIFER** | : | **Jointly Administered** |
| **HAVEN, LLC,** | : | |
| | : | |
| **Debtors.** | : | |
| | : | |

**DISCLOSURE STATEMENT FOR**
**JOINT COMMITTEE PLAN OF REORGANIZATION OF THE DEBTORS**
**OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**DATED SEPTEMBER 20, 2011**

Ward Stone, Jr.
Jerome L. Kaplan
David L. Bury, Jr.
Matthew S. Cathey
Stone & Baxter, LLP
Suite 800, 577 Mulberry Street
Macon, Georgia 31201
Counsel to the Official Committee of Unsecured Creditors

<u>**NOTICE**</u>

THIS DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>") IS THE ONLY DOCUMENT AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE JOINT COMMITTEE PLAN OF REORGANIZATION OF THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "<u>COMMITTEE</u>"), A COPY OF WHICH PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT (AS IT MAY BE AMENDED, THE "<u>COMMITTEE PLAN</u>"). NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE COURT CONCERNING THE COMMITTEE PLAN, EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE COMMITTEE PLAN, AND IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE COMMITTEE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE COMMITTEE PLAN (WHICH IS INCLUDED AS **EXHIBIT A** TO THIS DISCLOSURE STATEMENT). **ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANING ASSINGED IN THE ACCOMPANYING COMMITTEE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE COMMITTEE PLAN AND DISCLOSURE STATEMENT, THE PROVISIONS OF THE COMMITTEE PLAN WILL GOVERN.** ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE COMMITTEE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMMITTEE PLAN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE COMMITTEE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMMITTEE PLAN, EVENTS IN THE DAIRIES' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE COMMITTEE BELIEVES THAT THE COMMITTEE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY OR IS BASED UPON INFORMATION SUPPLIED BY MANAGEMENT OR SOURCES DEEMED RELIABLE BY THE COMMITTEE, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE COMMITTEE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, EXCEPT TO THE EXTENT AN EARLIER DATE IS SPECIFIED WITH RESPECT TO ANY INFORMATION, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR THEREOF.

NO PERSON WILL CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH PERSON SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL OR TAX ADVISORS AS TO ANY SUCH MATTERS.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON OR IS THE SECURITIES AND EXCHANGE COMMISSION REQUIRED TO PASS UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, NOR SHALL IT BE CONSTRUED AS A WAIVER OF ANY LEGAL OR FACTUAL CONTENTION OF THE DEBTORS, THE ESTATE, OR OF THE COMMITTEE WITH RESPECT TO ANY CAUSE OF ACTION.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A FINDING BY THE COURT THAT THE REPRESENTATIONS CONTAINED HEREIN ARE FACTUAL, NOR DOES SUCH APPROVAL CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THIS DISCLOSURE STATEMENT OR IN THE ATTACHED COMMITTEE PLAN. THE COMMITTEE PLAN WILL NOT BE BINDING ON CREDITORS UNLESS IT IS CONFIRMED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING TO BE HELD ON THE DATE AND AT THE TIME SPECIFIIED IN THE ACCOMPANYING NOTICE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF GEORGIA, ALBANY DIVISION, LOCATED IN THE C. B. KING U.S. COURTHOUSE, 201 WEST BROAD AVENUE, 2ND FLOOR, ALBANY, GEORGIA 31701.

# I.    <u>INTRODUCTION</u>

On October 7, 2010, Dairy Production Systems – Georgia, LLC, Dairy Production Systems, LLC, Dairy Production Systems – Mississippi, LLC, New Frontier Dairy, LLC and Heifer Haven, LLC (collectively, "<u>Dairies</u>" or the "<u>Debtors</u>") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code. The above-captioned bankruptcy cases are

sometimes collectively referred to in this Disclosure Statement as the "Case" or the "Cases." This Disclosure Statement provides a history of the Dairies, the reasons for filing the Cases, key developments during the Cases, and an explanation of the Dairies' Committee Plan.

On October 19, 2010, pursuant to Section 1102 of the Bankruptcy Code, the United States Trustee appointed seven creditors to serve on the Committee in connection with this Chapter 11 case. The Committee has been active in discussions with the Debtors, its lenders, and others regarding the Debtors' financial prospects and operational issues, as well as the prospects for reorganization of the Debtors' businesses. As a result of such efforts, the Committee has determined that the best prospect for a meaningful repayment of a portion of the claims of unsecured creditors is by following the course of action outlined in the Committee Plan.

Under the Committee Plan, the Allowed Secured Claim of AFS, the Debtors' senior lender, is valued at $30,100,000, which will receive payments of interest only for 60 months following the Effective Date of the Plan, following which it will be amortized in full over a 240-month term, with interest at the floating rate of Prime plus 2%. Various secured equipment loans of the Debtors will be paid in full over a period of time not to exceed 60 months. A Liquidation Trust (the "Trust") is created for the benefit of holders of Allowed Unsecured Claims, except for small claims which will be paid in full as soon as permitted following the Confirmation of the Plan. . The Plan provides that the massive deficiency claim of AFS, the Debtors' senior lender may either participate Pro-rata with other unsecured claims in the treatment provided under the Plan, or may elect to receive 100% of the voting stock of the new corporation in full satisfaction of its deficiency claim (the "Stock Option"). If AFS does not elect to receive 100% of the common shares of the Reorganized Debtors in full satisfaction of its Allowed Deficiency Claim, the Plan provides that Holders of Allowed Unsecured Claims will receive Pro-rata, in addition to the payments to be made through the Trust, 100% of the common voting stock of a new corporation which will be created to receive the Assets of the Debtors The Liquidation Trust and the Reorganized Debtors will be administered by a liquidation trustee (the "Trustee") for a period of sixty (60) months following the Effective Date of the Committee Plan (the "Participation Period") during which the Liquidation Trust will be paid 3.0% of the gross operating revenues of the Reorganized Debtors and will be paid all Litigation Proceeds, whenever received. If AFS elects the Stock Option, resulting in the waiver of its deficiency claim, the Participation Period decreases to thirty-six (36) months. Distribution to holders of Allowed Unsecured Claims participating in the Trust will be made quarterly, beginning after and following payment of all Administrative and other Claims specified to be paid in full before the beginning of the Participation Period. The date that such Administrative and other Claims are paid in full by the Trustee signals the beginning of the Participation Period and is the Effective Date of the Committee Plan.

The Participation Period will last for sixty (60) months following the Effective Date, but will terminate if the Dairies are sold during that time. In the event of a sale of the Dairies, the Trustee will accept a discounted payment in satisfaction of the Trust's revenue participation in the Dairies provided under the Committee Plan. The discount schedule is attached to the Plan.

During the Participation Period the Trustee will run the Dairies in the Ordinary Course of Business, liquidate Heifer Haven (with the net proceeds to be used to purchase producing cows on the market), pursue Causes of Action which might yield a positive recovery for the Trust ("Net Litigation Proceeds"), pay AFS interest-only on its Allowed Secured Claim (the "AFS Allowed Secured Claim"), and pay 3.0% of the gross receipts from operation of the Dairies, any discounted proceeds from the sale of the Dairies ("Net Dairy Sales Discount Proceeds"), and Net Litigation Proceeds into the Trust for distribution to holders of Allowed Unsecured Claims participating in the Trust (see discussion below).

The Committee Plan provides for the substantive consolidation (merger) of the Debtors into a single entity, which will be a new corporation, which will be a Statutory Close Corporation created under the Laws of the State of Georgia, unless AFS elects the Stock Option, in which case, AFS may elect the state of incorporation of the entity which will constitute the successor by merger of the Debtors. During the Participation Period, the common stock issued in accordance with the Plan will be subject to a voting proxy to be held by the Trustee, which will limit shareholder control during the participation period to matters concerning corporate governance, and to considerations relating to the expansion or sales of the Dairies. The Trustee will retain operating control of the Reorganized Debtors until the Participation Period ends or is terminated by the sale of the Dairies. The Committee Plan could generate up to $12,692,520 for payment to holders of Allowed Unsecured Claims participating in the Trust. If the Holders of Allowed Unsecured Claims in Class 5 (AFS) exercise the optional Stock Option provided under the Plan, the total estimated amount paid to the Trust for the benefit of unsecured creditors would drop to approximately $6,500,000. The liquidation of the Dairies at this time would not generate material funds for payment of unsecured claims. The Committee requests all creditors to vote for its Plan.

The Committee submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Committee Plan, a copy of which is annexed hereto as **Exhibit A**.

A.     **The Disclosure Statement.**

The purpose of this Disclosure Statement is to set forth information that (i) outlines the history of the Dairies, their business, and the reasons the Dairies were forced to file the Case, (ii) summarizes the Committee Plan, and (iii) is intended to assist each holder of any Claim against, or Equity Interest in, the Dairies entitled to vote for acceptance or rejection of the Committee Plan to make an informed decision of whether to vote to accept or reject the Committee Plan. No solicitation for votes on the Committee Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any other information concerning the Dairies or its businesses for such purpose.

This Disclosure Statement does not purport to be a complete description of the Committee Plan, the financial status of the Dairies, the applicable provisions of the Bankruptcy Code, or of other matters that may be deemed significant by Creditors, interest-holders or other parties-in-interest. The Disclosure Statement necessarily involves a series of compromises

between extensive "raw data" and the legal language in documents or statutes on the one hand and considerations of readability and usefulness on the other. For further information, you should examine the Committee Plan directly and consult your legal, financial, and tax advisors.

## B. Bankruptcy Court Approval of this Disclosure Statement.

After notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable each Holder of a Claim against or Interest in the Dairies to make an informed judgment as to whether to vote to accept or reject the Committee Plan.

## II. VOTING PROCEDURES AND REQUIREMENTS

### A. Eligibility to Vote

The Committee is soliciting acceptances of the Committee Plan from each Class of Creditors identified in the Committee Plan as an impaired class that is not deemed to have rejected the Committee Plan. "Unclassified Claims," identified below, are unimpaired, and are therefore deemed to have accepted the Committee Plan. Such parties will not vote. Each Class of Creditors or Interest holders that will not receive any distribution under the Committee Plan is deemed under section 1126(g) of the Bankruptcy Code to have rejected the Committee Plan. The Committee will not solicit acceptances from those Creditors or Interest holders.

Specifically, only the holders of Allowed Claims in those classes specified below and further specified in the Committee Plan (the "Voting Classes") are eligible to vote to accept or reject the Committee Plan.

This Disclosure Statement and the accompanying Committee Plan are being sent to all holders of Unclassified Claims, Creditors, and Interest holders, whether or not entitled to vote. Under section 1141 of the Bankruptcy Code, the Committee Plan, if approved ("confirmed") by the Bankruptcy Court, will bind all parties, whether or not such parties are entitled to vote for or against the Committee Plan.

### B. Ballots and Voting Deadlines.

#### 1. Ballots.

Holders of Claims entitled to vote on the Committee Plan will receive a Ballot accompanying this Disclosure Statement. All votes to accept or reject the Committee Plan must be cast by using the Ballot enclosed with this Disclosure Statement (or manually executed copies thereof). No other votes will be counted.

Please fill out the Ballot and return it to the Bankruptcy Court at the address listed below:

Clerk, United States Bankruptcy Court

Middle District of Georgia
P.O. Box 1957
Macon, GA 31202-1957

DO NOT RETURN ANY SECURITIES, NOTES OR PROOFS OF CLAIM WITH YOUR BALLOT.

If delivery is by mail, enough time should be allowed to ensure timely delivery to and actual receipt by the Bankruptcy Court by the Voting Deadline.

**AS PROVIDED IN THE ATTACHED ORDER OF THE BANKRUPTCY COURT APPROVING THE FORM AND CONTENT OF THIS DISCLOSURE STATEMENT, IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND ACTUALLY RECEIVED IN PROPER FORM BY THE BANKRUPTCY COURT AT THE ABOVE ADDRESS ON OR BEFORE MIDNIGHT (EASTERN TIME) ON THE DATE SPECIFIED IN THE NOTICE (THE "VOTING DEADLINE"), OR SUCH LATER DATE TO WHICH THIS SOLICITATION IS EXTENDED BY THE COMMITTEE OR THE COURT. BALLOTS RECEIVED AFTER THIS TIME MAY NOT BE COUNTED IN THE VOTING UNLESS THE COURT SO ORDERS. IF YOU HAVE ANY QUESTIONS ABOUT PROCEDURES FOR VOTING, OR IF YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR HAVE ANY QUESTIONS ABOUT THE COMMITTEE PLAN OR DISCLOSURE STATEMENT, PLEASE CALL COUNSEL FOR THE COMMITTEE AS SET FORTH ON THE COVER PAGE OF THIS DOCUMENT.**

The Committee in its sole discretion may waive objections to Ballots filed after the Voting Deadline, or related to Disputed Claims (e.g., those listed in the Dairies' Schedules as disputed, unliquidated, or contingent, or for which a Proof of Claim has been filed to which the Committee or any party-in-interest has objected). Otherwise such ballots will not be counted unless ordered otherwise by the Bankruptcy Court.

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, such persons should indicate such capacity when signing.

### 2. Revocation of Ballots.

Ballots to accept or reject the Committee Plan may be revoked or changed at any time prior to the Voting Deadline by notifying the Bankruptcy Court in a writing received by the Bankruptcy Court prior to the Voting Deadline. Thereafter, Ballots may be revoked or changed only with the approval of the Bankruptcy Court.

### 3. Voting Multiple Claims.

Persons holding Claims in more than one Class will vote such Claims in each Class.

### 4. **Incomplete Ballots.**

Any Ballot received which is unsigned or does not indicate either an acceptance or a rejection of the Committee Plan will not be counted. Incomplete ballots may be amended by the holder of the Claim on account of which the Ballot is cast to cure the deficiency, provided the amendment is filed before the beginning of the hearing on confirmation of the Committee Plan.

### 5. **Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, change, or withdrawal of Ballots will be determined by the Bankruptcy Court, which determination will be final and binding. The Committee reserves the absolute right to contest the validity of any change, revocation or withdrawal. The Committee also reserves the right to request the Bankruptcy Court to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Committee or its counsel, be unlawful. The Committee further reserves the right to request the Bankruptcy Court to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The Bankruptcy Court's interpretation (including its interpretation of the Ballot and the respective instructions thereto), unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Bankruptcy Court determines. Neither the Committee nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. The Committee will provide copies of any contested ballots to the Debtors, to the proponent of any competing plan, and to the United States Trustee contemporaneously with the filing of the Balloting Report with the Court.

### C. **Confirmation Hearing.**

The Confirmation Hearing will be held on the date and time specified in the accompanying Notice before the Honorable James D. Walker, Jr., United States Bankruptcy Judge, in the Courtroom of the United States Bankruptcy Court for the Middle District of Georgia, Albany Division, in The C. B. King U.S. Courthouse, 201 West Broad Avenue, 3rd Floor, Albany, Georgia 31701, as stated above. Such Confirmation Hearing, held pursuant to section 1128 of the Bankruptcy Code, may be adjourned from time to time by additional notice prior the hearing or by announcement in Bankruptcy Court on the scheduled date of such hearing, with notice of such continued hearing being given to only such parties as directed by the Bankruptcy Court. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for the Voting Classes, (ii) hear and determine objections, if any, to the Committee Plan and to confirmation of the Committee Plan that have not been previously disposed of, and (iii) determine whether to confirm the Committee Plan.

In the Order Approving the form of this Disclosure Statement, attached hereto, the

Bankruptcy Court has directed that all objections, if any, to confirmation of the Committee Plan must be Filed with the Bankruptcy Court and served in a manner so as to be actually received by counsel to the Committee, Stone & Baxter, LLP, Suite 800, Fickling and Company Building, 577 Mulberry Street, Macon, Georgia 31201-8256 (fax number 478-750-9899), to the Attention of Ward Stone, and by the Office of the United States Trustee, Middle District of Georgia, Attn: Elizabeth Hardy, 440 Martin Luther King, Jr., Blvd. Suite 302 Macon, Georgia, 31201, on or before 12:00 midnight on the objection deadline specified in the Order and Notice.

.

### D. Recommendations.

***THE COMMITTEE BELIEVES THAT THE COMMITTEE PLAN PROVIDES THE BEST AND MOST EFFICIENT APPROACH TO THE PAYMENT OF CLAIMS IN THESE CASES THROUGH THE CONTINUING OPERATION DAIRIES AND MAXIMIZES THE VALUE OF THE DAIRIES' ASSETS FOR THE BENEFIT OF THE DAIRIES' CREDITORS AND EQUITY INTEREST HOLDERS. THE COMMITTEE URGES CREDITORS TO VOTE TO ACCEPT THE COMMITTEE PLAN.***

## III. THE DAIRIES

### A. General Information

### Debtors' Corporate Structure and Businesses

Each of the Debtors, Dairy Production Systems – Georgia, LLC ("DPS-Georgia"), Dairy Production Systems, LLC ("DPS"), Dairy Production Systems – Mississippi, LLC ("DPS-Mississippi"), New Frontier Dairy, LLC ("New Frontier Dairy") and Heifer Haven, LLC ("HH") are single-member Colorado limited liability companies that are currently wholly-owned and solely-managed by David P. Sumrall ("Mr. Sumrall"). By virtue of their common ownership, the Debtors are affiliates of one another as that term is defined in the Bankruptcy Code. The Debtors own and/or operate five (5) dairy farms located in Florida, Georgia, Mississippi, and Texas. The Debtors' gross revenue on a consolidated basis was approximately $57,248,119 and $47,967,685 in 2008 and 2009, respectively.

Mr. Sumrall acquired his interests in the Dairy Farms comprising DPS during a series of transactions with Marcus Peperzak ("Mr. Peperzak"). The Dairies had been founded or previously operated by Mr. Peperzak through a number of limited liability companies controlled by him. The Dairies are "traditional" dairies, i.e. they do not produce milk to the standards set by the U.S.D.A. for "organic" milk products. Prior to 2004, Mr. Peperzak entered the "organic" dairy business. Thereafter, he made the strategic decision to get out of the "traditional" dairy business, and operate exclusively "organic" dairies.

Mr. Peperzak had hired Mr. Sumrall as the Manager of his "traditional" dairy operations. Upon deciding to exit the "traditional" dairy market, Mr. Peperzak offered the Dairies to Mr. Sumrall, under terms which required both the refinancing of the Dairies, with owner financing

for a portion of the purchase price. Mr. Sumrall agreed, and in 2004, Mr. Peperzak began the process of transferring the Dairies to Mr. Sumrall.

The first Dairies transferred were the Florida operations, through a purchase of equity, followed by the Mississippi Dairy, through an asset sale, followed by the Georgia Dairy, through a combination of an asset sale and an arrangement denominated as a "ground lease" between Mr. Peperzak's limited liability company known as "Aurora Dairy – Georgia, LLC" and Mr. Sumrall, individually. The characterization of the "ground lease" will be discussed in more detail below Mr. Sumrall subsequently acquired New Frontier Dairy in Texas. At the conclusion of the transfers and acquisitions, Mr. Sumrall emerged as the sole owner of DPS and Mr. Peperzak, at least on paper, exited the "traditional" dairy business.

DPS was formed in October of 2004, and is headquartered in High Springs, Florida. DPS operates two separate dairy operations in Florida - the Branford Farm and the Bell Farm. According to the Debtors' pleadings, these farms were acquired through the merger of Aurora Dairy Florida, LLC simultaneously with the purchase of all of the membership interests of that entity. Currently, DPS owns an aggregate of approximately 3,192 head of cattle. At capacity, the two farms could accommodate approximately 4,500 head of cattle, with a permitted milking herd capacity of 3,750 head. The two DPS farms are approximately 15 miles apart in Gilchrist County, Florida. DPS owns a total of 1,049 acres, approximately 560 acres of which are irrigated and yield crops that account for approximately 40% of the two herds forage needs. The balance of forage needs is produced by surrounding local area farmers and supplemented with necessary grains and protein. DPS also has dairy parlors, newly-constructed freestall housing for the milking herds, and various other customary dairy improvements on the farm premises.

DPS-Mississippi was formed in May of 2005 and owns assets contributed from Aurora Dairy Mississippi, LLC, an LLC formerly owned by Mr. Sumrall and now dissolved. Currently, DPS-Mississippi owns approximately 1,464 head of cattle. At capacity it could accommodate approximately 1,800 head of cattle. DPS-Mississippi also owns a 240 acre farm located near Jackson, Mississippi (the "Edwards Farm"). DPS-Mississippi purchases its forage needs locally, and imports its grain and protein needs.

DPS-Georgia was formed in November of 2008 and owns the operating assets acquired from Aurora Dairy - Georgia, LLC ("Aurora-Georgia"), exclusive of the real property owned by Aurora-Georgia. DPS-Georgia owns approximately 3,826 head of cattle. At capacity, it could accommodate approximately 4,200 head of cattle. It also owns equipment and dairy improvements that are located on a 1,065-acre farm (the "Aurora-Georgia Farm"). The Aurora-Georgia Farm includes 500 irrigated acres which account for approximately 50% of the herd's forage needs.

Mr. Sumrall, individually, purchased the Aurora-Georgia Farm from Aurora Dairy – Georgia, LLC under an Asset Purchase Agreement, dated as of March 20, 2007 (the "Aurora Dairy APA"), and a "Ground Lease" dated March 1, 2007 (the "Ground Lease"). The impetus for the acquisition may have been demand from New Frontier Bank (see discussion below), with

which Mr. Sumrall was engaged in negotiations for the financing outlined below, that the loan-to-value ratio of the overall assets intended to be pledged as collateral by Mr. Sumrall for the financing sought from New Frontier Bank be improved.  In effect, Mr. Peperzak agreed to sell the assets covered by the Aurora Dairy APA to Mr. Sumrall for a total purchase price of $8,481,579.03 (the "Aurora Georgia Asset Purchase Price", or "AGAPP"), plus the obligations related to the Ground Lease.  The AGAPP was paid through assumption or refinance of existing debt.  The Aurora Dairy APA conveyed to Mr. Sumrall all assets of the Dairies other than the actual real estate and certain fixtures (the "Dirt"), including all improvements on the Dirt, including without limitation all structures, buildings, livestock, supplies, equipment, and inventories.  According to Mr. Peperzak, the Dirt was not included to allow Mr. Peperzak to avoid adverse tax consequences he would have incurred (and subsequently did incur) upon a sale of substantially all assets of Aurora Dairy – Georgia, LLC or its equity interests – which tax liability could have exceeded $2,000,000.  The Ground Lease obligates the Tenant to cover all "debt service" associated with the Dirt, plus pay $8,000 per month during the term of the Ground Lease.   The debt service component of the Ground Lease consists of making payments due to Farm Credit Services of Mountain Plains, FLCA on a first mortgage covering the Dirt with an original principal balance of $5,000,000.00  (the "Farm Credit Note"), with a balloon date of September 1, 2015, and the "debt service" due to New Frontier Bank on a junior mortgage on the Dirt in the original principal amount of $2,381,000.00 (the "NFB Aurora Loan").  The terms of the note to be secured by the second mortgage to New Frontier Bank had not been finalized when the Ground Lease was entered into between Aurora Dairy - Georgia, LLC and Mr. Sumrall on March 1, 2007, but was ultimately agreed to balloon on September 6, 2010.  The initial term of the Ground Lease runs until September 1, 2015.  The Ground Lease provides that the Tennant is not liable for the debts of Aurora Dairy - Georgia, LLC with respect to which it is required to pay "debt service" as a component of the rent under the Ground Lease.

The Ground Lease contains a purchase option (the "Purchase Option") which matures on September 1, 2015.  Under the Purchase Option, the Tenant has the option to purchase the Dirt on September 1, 2015 for the balance of all outstanding debt due at that on the Dirt plus a grossed up amount equal to any taxes owed by the Lessor due to the exercise of the Option by the Tenant (estimated to approximate $2,000,000 if the Landlord had been Mr. Peperzak on September 1, 2015).

Following the failure of New Frontier Bank on December 10, 2009 (see discussion below) the First DPS Loan was acquired by AFS.  On or about July 8, 2010, AFS, through a designee Agricultural Funding Solutions III, LLC (the "AFS Designee"), acquired the membership interests of Mr. Peperzak in Aurora Dairy - Georgia, LLC.  The AFS Designee was the mere straw man for AFS.  Accordingly, as of July 8, 2010, AFS held both the junior lien on the Dirt, by virtue of its acquisition of the NFB Aurora Loan, and the fee simple interest in the Dirt, by virtue of its acquisition through a straw man of 100% of Mr. Peperzak's the membership interests in Aurora Dairy - Georgia, LLC, the record owner of the Dirt, thereby resulting in a merger of its junior lien with the fee simple title, extinguishing the junior lien in the Dirt and the corresponding debt of Aurora Dairy - Georgia, LLC.

Accordingly, the assumption of the Ground Lease as provided under the Plan requires the Reorganized Debtor to cure the arrearage under such lease by the Effective Date of the Plan by bringing all past due payments under the Ground Lease current within a reasonable period, and maintain payments under the Farm Credit Note plus pay $8,000.00 per month to the AFS Designee until September 1, 2015, when the Purchase Option matures.

New Frontier Dairy was formed in December of 2007 and owns three milking parlors located on approximately 1,000 acres in Dublin, Texas (the "New Frontier Farm"). Milk from New Frontier Dairy is marketed through the Lone Star Milk Producers cooperative. Currently, New Frontier Dairy owns approximately 2,359 head of cattle. At capacity, the farm could accommodate approximately 4,500 head of cattle. It also owns the real property and equipment necessary for operating the New Frontier Farm.

HH was formed in May of 2007 and raises the heifer calves which are born in the DPS and DPS-Georgia operations. HH contracts with independent contractors who carry these animals through maturation to calving-age, at which point the heifers are purchased by the appropriate operation and become a part of that production facility. HH does not own any real estate or equipment. HH capitalizes the costs of heifer raising monthly and then discharges those costs at the time of purchase. Heifers are sold at cost and booked into the appropriate entity's cattle inventory at that same cost. The HH operation has resulted in the production of high quality dairy cattle, but its business structure requires substantial cash outlays by the Debtors. The Committee Plan provides that this operation will be discontinued and the Reorganized Debtors will purchase replacement cows from the market. The Committee projects that the Reorganized Debtors will lose very little margin on milk sales as a result of the change, and that cash flow will be significantly improved, aiding funding of the payments due to the Trust under the Committee Plan.

**Debtors' Senior Secured Debt**

On or about September 6, 2007, New Frontier Bank of Greeley, Colorado ("NFB") made a loan to DPS in the original principal amount of $2.825 million (the "First DPS Loan"). The First DPS Loan is secured by a deed to secure debt on the Aurora-Georgia Farm owned Aurora-Georgia Farm, and all furniture, fixtures, and equipment owned by DPS and Aurora-Georgia. On or about October 19, 2007, NFB made a loan to DPS in the original principal amount of $6.8 million (the "Second DPS Loan"). The Second DPS Loan (and all other debts of DPS to NFB and its successors and assigns up to the original principal amount of the Second DPS Note) is secured by Branford Farm. In addition to serving as collateral for the Second DPS Loan, Branford Farm is also encumbered by a second mortgage securing an $800,000 promissory note from Mr. Sumrall, personally, to Mr. Peperzak. According to the Debtors' pleadings, Mr. Peperzak transferred and assigned this note to AFS (as defined herein and below) or to one of its affiliates pursuant to a settlement agreement by and between Mr. Peperzak and AFS.

On or about January 15, 2009, NFB made a loan to DPS in the original principal amount of $2,978,129.00 (the "Third DPS Loan"). The Third DPS Loan (and all other debts of DPS to

NFB and its successors and assigns) is secured by Bell Farm.  In addition to serving as collateral for the Third DPS Loan, the Bell Farm is also encumbered by a second mortgage securing a $900,000 promissory note from Sumrall, personally, to Mr. Peperzak. According to the Debtors' pleadings, Mr. Peperzak transferred and assigned this note to AFS or one of its affiliates pursuant to a settlement agreement by and between Mr. Peperzak and AFS.  On or about March 19, 2009, NFB made a loan to DPS in the original principal amount of $8.6 million (the "Fourth DPS Loan"; together with the First DPS Loan, the Second DPS Loan, and the Third DPS Loan, the "DPS Loans").  The Fourth DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by, among other things, DPS's accounts, crops, equipment, farm products, general intangibles, inventory, livestock, and milk sale proceeds.

On or about January 20, 2009, NFB made a loan to DPS-Georgia in the original principal amount of $10.1 million (the "DPS-Georgia Loan").  The DPS-Georgia Loan (and all other debts of DPS-Georgia to NFB and its successors and assigns) is secured by, among other thing, DPS-Georgia's accounts, equipment, feed, general intangibles, livestock, and milk sale proceeds.  On or about July 11, 2005, NFB made a loan to DPS-Mississippi in the original principal amount of $3.25 million (the "First DPS- Mississippi Loan"), as modified from time to time.  The First DPS-Mississippi Loan (and all other debts of DPS- Mississippi to NFB and its successors and assigns) is secured by the Edwards Farm.

On or about May 22, 2006, NFB made a loan to DPS-Mississippi in the original principal amount of $4.512 million (the "Second DPS-Mississippi Loan"; together with the First DPS-Mississippi Loan and the Second DPS-Mississippi Loan, the "DPS Mississippi Loans") as modified from time to time.  The Second DPS-Mississippi Loan (and all other debts of DPS-Mississippi to NFB and its successors and assigns) is secured by, among other things, DPS-Mississippi's accounts, crops, equipment, farm products and supplies, feed, inventory, and livestock.

On or about June 21, 2007, NFB made a loan to HH in the original principal amount of $5.012 million (the "HH Loan"), as modified from time to time.  The HH Loan (and all other debts of HH to NFB and its successors and assigns) is secured by HH's livestock.

On or about December 28, 2007, NFB made a loan to New Frontier Dairy in the original principal amount of $8.6 million, as modified from time to time (the "First New Frontier Dairy Loan").  The First New Frontier Dairy Loan (and all other debts of New Frontier Dairy to NFB and its successors and assigns) is secured by the New Frontier Farm.  On or about July 3, 2008, NFB made a loan to New Frontier Dairy in the original principal amount of $12.03 million (the "Second New Frontier Dairy Loan"; together with the First New Frontier Dairy Loan, the New Frontier Dairy Loans, the DPS Loans, the DPS-Georgia Loan, the DPS-Mississippi Loans, the HH Loan, and the New Frontier Dairy Loans, the "NFB Loans").

The aggregate original principal amount of the NFB Loans was $64,707,129.00.  As of the Petition Date, the principal and accrued interest under the NFB Loans was approximately $76,189,872.63.  The NFB Loans are each personally guaranteed by Mr. Sumrall.  According to

the Debtors' pleadings, to the extent that Mr. Peperzak was a guarantor on some of the NFB Loans, he was released from such loans by AFS pursuant to a settlement agreement between Mr. Peperzak and AFS.

Section 506 of the Bankruptcy Code separates ("bifurcates") claims secured by property of a Debtor into a "secured" portion equal to the value of the lender's collateral on the effective date of a plan, and an "unsecured portion for any deficiency. The Committee values the secured portion of the AFS claim at $27,500,000 (the "<u>AFS Allowed Secured Claim</u>"). This valuation leaves AFS an unsecured deficiency claim of approximately $44,700,000 (the "<u>AFS Allowed Unsecured Deficiency Claim</u>"). The treatment of those two claims under the Committee Plan is discussed below.

**Events Leading up to Bankruptcy**

On April 10, 2009, the Colorado Division of Banking closed NFB, and the Federal Deposit Insurance Corporation ("<u>FDIC</u>") was named the receiver for NFB. The FDIC subsequently auctioned the NFB Loans. According to the Debtors' pleading, Agricultural Funding Solutions, LLC ("<u>AFS</u>") acquired the NFB Loans with an outstanding balance (principal and interest) on the date of auction of approximately $70 million for approximately $22 million. The failure of NFB coincided with a severe downturn in the U.S. dairy industry that has occurred over the past 36 to 48 months and continued into 2010. From November of 2008 to February of 2009, the all-milk price fell from $17.10 per hundred-weight (CWT) to $11.60 per CWT. Prices remained below $12.00 per CWT until they began to rise in August of 2009.

The Debtors claim that there were a number of reasons for this decline. The global recession was a major factor. In addition to reducing domestic demand, the global recession had and continues to have dramatic effects on over-all U.S. agricultural exports, falling from a peak of $10.6 billion in October of 2008 to a low of $7.3 billion in September of 2009, before rebounding to $10.0 billion in December of 2009. On an ME (mature equivalent) skim-solids basis, U.S. dairy exports reached a high of 7.6 billion pounds in the second quarter of 2008 and then declined to a low of 5.1 billion pounds in the first quarter of 2009, before rising to 6.3 billion pounds in the fourth quarter of 2009. The increase in milk production through 2008, sluggish domestic demand in 2008 and 2009, and falling export volumes in late 2008 and early 2009, created a milk surplus, driving down milk prices in early 2009.

The sharp decline in milk prices occurred in conjunction with significant increases in feed prices and other operational costs. From September of 2007 until September of 2008, corn prices averaged $4.20 per bushel and from October of 2007 until October of 2008, soybean meal prices averaged $335.94 per ton. These prices can be compared against expected average costs for corn and soybean meal for the September/October of 2009 to September/October of 2010 period of $3.35 to $3.95 per bushel and $270.00 to $320.00, respectively.

According to the Debtors' pleadings, the decrease in milk prices and the increase in feed costs, collectively, created a negative impact on the Debtors' respective revenues, causing severe

negative cash flow problems and compromising the Debtors' ability to service the NFB Loans. These cash flow problems were exacerbated by the failure of NFB that left the Debtors without a banking relationship during one of the tightest credit markets in history. The Debtors indicate that they pursued and exhausted all possible refinancing sources. All attempts to refinance the NFB Loans, both while the NFB loans were held by the FDIC and after AFS purchased the NFB loans, failed. The Debtors and AFS were unable to restructure the NFB Loans or settle on terms for additional capital financing.

On or about September 15, 2010, AFS filed a lawsuit (Circuit Civil Case No. 2010-CA-0103) against DPS, Mr. Sumrall, and several other defendants in the Circuit Court of the Eighth Judicial Circuit, Gilchrist County, Florida (the "<u>Florida Action</u>") seeking, among other things, foreclosure, the appointment of a receiver, and the collection of the NFB Loans. AFS filed similar lawsuits on or about October 6, 2010 against DPS-Georgia in the Superior Court of Mitchell County, Georgia, against DPS-Mississippi in the Chancery Court for the Second Judicial District of Hinds County, Mississippi, and against New Frontier Dairy in the 266th Judicial District Court, Erath County, Texas.

The Debtors allege in their pleadings that, as a result of (i) the decrease in milk prices and (ii) the Debtors' inability to find financing to enable them to purchase the dairy cows needed to fill the dairies to capacity (at that time they are at approximately 60 to 65% of capacity) and to complete the construction on the Bell Farm, the Debtors gross revenue on a consolidated basis dropped from $57,248,119 in 2008 to $47,967,685 in 2009.

Given the Debtors' negative cash flow problems, inability to obtain additional financing, inability to refinance or restructure the NFB Loans, and inability to prevent AFS's foreclosure and receivership actions, the Debtors filed these Chapter 11 cases.


## IV.    THE DAIRIES' CHAPTER 11 CASES

The Dairies' bankruptcy cases are reorganization cases under Chapter 11 of Title 11, United States Code. The Dairies have continued to operate the business and manage the Dairies as Debtors and Debtors-in-possession as authorized under sections 1107(a) and 1108 of the Bankruptcy Code. Significant developments during the Dairies' Chapter 11 Case are described below.

### A.    Significant "First Day" Bankruptcy Orders.

At the outset of the Chapter 11 case, the Dairies filed motions with the Bankruptcy Court seeking both procedural and substantive relief. Those motions are described below.

1. **Cash Collateral.**

After interim and final hearings, on October 13, 2010 the Bankruptcy Court entered the Consent Order on Motion for Use of Cash Collateral (as amended, the "Cash Collateral Order"). Under the Cash Collateral Order, the Bankruptcy Court authorized the Dairies to use their "cash collateral" for operations and other expenditures reflected on the budget attached thereto. The Cash Collateral Order was been extended and otherwise amended by agreement of the Debtors, AFS and the Committee several times during the case. There have also been various modifications of the budgets governing usage of cash collateral via consent of the Debtors and AFS as allowed in the Cash Collateral Order.

2. **Retention of Professionals.**

Both Dairies and the Committee filed several motions to employ professionals. The Bankruptcy Court entered orders authorizing the Dairies to retain Arnall, Golden, & Gregory, LLP as its bankruptcy counsel, and Morgan Joseph, LLP, as its financial advisers. The Bankruptcy Court authorized the Committee to retain Stone & Baxter, LLP, as its bankruptcy counsel and Odyssey Capital Group, LLC as its financial advisers. The Bankruptcy Court entered an order establishing compensation procedures for professionals whereby the fees and expenses of the professionals could be provisionally paid on a monthly basis, subject to objection by creditors and final approval by the Bankruptcy Court.

B. **Significant Events During the Chapter 11 Case**

Since the Petition Date, the Debtors have operated the Dairies profitably, and have paid all of their Post-petition obligations, with the exception of amounts due to professionals which are in arrears as of the date of this Disclosure Statement. The Debtors contend this arrearage is due to the seasonality of its business, and that revenues generally decline during summer months. The Debtors project that they should be current with all administrative expenses by the Confirmation Date of this Plan.

1. **Assumption of Pre-petition grain supply contracts.**

During the Case the Debtors assumed, with approval of the Bankruptcy Court, various grain and silage contracts, the assumption of which guarantees sufficient feed for the Dairies during the remainder of 2011. Because of the inability of the Debtor to obtain trade terms from vendors, they have been forced to pay in advance for feed, thereby pressuring cash flow. The Committee anticipates an increase in trade terms following the exit of the Reorganized Debtors from bankruptcy.

2. **Litigation During the Bankruptcy Case.**

The only material litigation commenced in the Bankruptcy Court during the Case is designated as Adversary Proceeding No. 11-01008, which was initiated by the Debtor against AFS, seeking various relief, including, but not limited to equitable subordination of the claim of

AFS due to its conduct prior to the filing of the bankruptcy cases which the Debtors consider to have amounted to inequitable inducements to the trade creditors to extend trade credit to the Debtors based upon AFS's representations that it would provide additional operating loans to the Debtors. The Debtors contend AFS had no intent to actually provide such additional operating loans. The adversary proceeding remains pending as of the date of this Disclosure Statement.

### 3. The Official Committee of Unsecured Creditors.

The Creditor's Committee was appointed in the Case on October 19, 2010, and organized. The Committee hired Stone & Baxter, LLP as its counsel and Odyssey Capital Group, LLC. The Committee has participated actively in the Case. As a result of its study of the Debtors' operations, the Committee has been able to project various alternative approaches to future operations to allow it to conclude whether the Debtors had the ability to reorganize. This Plan is the result of such analysis.

### 4. Filing of Schedules of Assets and Liabilities and Statement of Financial Affairs.

The Dairies filed their Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs ("SOFA"). The Schedules and SOFA are of record in the office of the Clerk of the Bankruptcy Court and are available for inspection on line and at the Clerk's Office.

The Schedules, filed under oath, list all known assets and liabilities of the Dairies as of the Petition Date. The manner in which Claims against the Dairies are listed in the Schedules is important. Under section 1111(a) of the Bankruptcy Code, a Proof of Claim or Interest is deemed filed for any claim or interest that appears in the Schedules, except a claim or interest that is scheduled as disputed, contingent, or unliquidated. Parties satisfied with the manner in which their claim or interest is listed in the Schedules need not file a Proof of Claim in the Bankruptcy Case, but if there is disagreement with the amount so scheduled, unless a Proof of Claim is filed, the amount of the claim or interest shown in the Schedules establishes the amount of the claim or interest for all purposes in the Bankruptcy Case. A Proof of Claim filed in the Case automatically supersedes the Schedules, unless objected to by the Dairies or the Reorganized Debtor under the Committee Plan. The Committee Plan provides that all parties in interest will have 120 days following the Effective Date within which to object to Proofs of Claim or claims that are deemed filed under section 1111(a), or within 90 days after the Filing of such Proof of Claims, whichever is later. Creditors have the burden of checking the Dairies Schedules to determine if their Claims are accurately scheduled.

### 4. Bar Date for Filing Proofs of Claim and Requests for Allowance of Administrative Expense Claims.

The Bankruptcy Court set the Bar Date for filing Proofs of Claim for any person or entity other than Governmental Units as February 14, 2011. A Bar Date for claims by Governmental Units has not been set. Any person who was required to but failed to file a Proof of Claim on

account of a Pre-petition Claim on or before the Bar Date is forever barred, estopped and enjoined from voting on, or receiving a distribution under the Committee Plan and is forever barred, estopped and enjoined from asserting a Pre-petition Claim against the Dairies, its Estate or any successors or assigns.

To date, many alleged general unsecured Claims, and many alleged secured Claims, have been filed with the Bankruptcy Court. Many of these claims could be disputed by the Dairies or by the Trustee. The Committee has been reviewing, and continues to review, such Claims with respect to amount, classification and validity.

The Dairies or the Trustee will file Claims objections, as appropriate, based on their continuing reconciliation of the Claims, including with respect to amount, classification, and validity. As further set forth in the Committee Plan and Disclosure Statement, the Confirmation Order will also serve as a Bar Date Order for certain Claims, including Administrative Claims and any Executory Contract Rejection Claims not governed by another Bar Date.

### 5. <u>Avoidance of Preferential Transfers.</u>

The Committee has not yet completed its investigation with regard to potential preferential payments under section 547 of the Bankruptcy Code. However, the SOFA's filed in the Cases reflect potential preferential payments. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Bankruptcy Code, such transfer may be subject to avoidance under sections 547 and 550 of the Bankruptcy Code. Under the Committee Plan, the Trustee will pursue collection of transfers that are avoidable under the Bankruptcy Code and will deposit the proceeds into the Trust. The Litigation Costs for such recoveries will be paid out of the Trust.

### 6. <u>Potential Claims Against Affiliates.</u>

Under Chapter 11 of the Bankruptcy Code, for reasons which are patently obvious, a debtor-in-possession is not charged with the responsibility of examining claims or possible causes of action against Insiders, such as Affiliates, shareholders, officers or directors. Rather, that duty is placed upon the creditors' committee.[1]

Notwithstanding the Debtors' lack of duty to "investigate themselves," in keeping with their responsibilities to make full disclosures to interest parties and to the Court, in their

---

[1] The rights, powers and duties of a debtor-in-possession are specified in section 1107 of the Bankruptcy Code. Those duties include the powers and functions of a chapter 11 trustee except the duties specified in sections 1106(a)(2), (3) and (4) (the "<u>Excluded Duties</u>"). Section 1106(3) includes the duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or the formulation of a Committee Plan. Conversely, section 1103(2) of the Bankruptcy Code provides that a committee may "investigate the acts, conduct, assets, liabilities an financial condition of the debtor, the operation of the debtor's business, and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a Committee Plan."

Schedules and SOFA's the Debtors have identified multiple transactions between them and their Affiliates which occurred during the two years prior to the Petition Date. The Committee, having reached its conclusions concerning the ability of the Debtors to reorganize, are now shifting their focus on identification and pursuit of Insider Claims. If identified, such claims may be pursued by either the Committee or by the Trustee.

## V.  SUMMARY OF THE COMMITTEE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF THE COMMITTEE PLAN. HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO READ THE COMMITTEE PLAN IN FULL. HOLDERS OF CLAIMS AND INTERESTS ARE ALSO URGED TO AND SHOULD CONSULT WITH COUNSEL IN ORDER TO UNDERSTAND AND ANALYZE THE COMMITTEE PLAN FULLY. IF CONFIRMED, THE COMMITTEE PLAN WILL BECOME A LEGALLY BINDING AGREEMENT AMONG THE COMMITTEE, THE DEBTORS, AND ALL CREDITORS AND PARTIES IN INTEREST.

### A.  Introduction.

Through the Committee Plan, the Dairies will continue operations, and payments to Allowed Claims in the Case will be made out of the operating revenues of the Reorganized Debtors pursuant to the terms of the Committee Plan. The Committee Plan provides that the Trustee will liquidate HH following confirmation and use the proceeds to purchase producing cows on the market, with such replacements to remain subject to any lien of AFS. The Committee Plan provides that the Trustee will manage the Dairies' assets during the Participation Period. The Committee believes that confirmation of the Committee Plan will be provide vastly greater payments to creditors than effecting a liquidation under Chapter 7 of the Bankruptcy Code because, among other things, of the requirement that substantially all proceeds of such a liquidation be paid to AFS as the holder of the senior liens, and the highly discounted price that would be obtained for the Dairies if sold in a quick sale by a Chapter 7 trustee and the increased costs and expenses of a liquidation under Chapter 7 of the Bankruptcy Code resulting from the fees and commissions payable to, and expenses incurred by, a trustee in bankruptcy and such trustee's professional advisors.

The Committee Plan provides for the treatment of Allowed Claims and Equity Interests. A Claim is generally defined by the Committee Plan and the Bankruptcy Code to be a right to payment from the Dairies, or from the property of the Dairies, or a right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment. The Committee Plan defines an Allowed Claim as follows: (a) a Claim that has been listed by the Dairies on its Schedules as other than disputed, contingent, or unliquidated, to the extent that it is not otherwise a Disputed Claim; (b) a Claim for which a Proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, to the extent that it is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) in any Stipulation of Amount and Nature of Claim executed by the Dairies or the Reorganized Debtor, as applicable, and Creditor; (ii) in any contract, instrument, or other agreement entered into in connection with the

Committee Plan; (iii) in a Final Order; or (iv) pursuant to the terms of the Committee Plan.

The categories of Claims and Equity Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Committee Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Committee Plan designates five Classes of Claims and one Class of Equity Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. A Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. All Claims within a class are substantially similar to all other Claims in that class. However, all Claims which could be argued to be substantially similar to Claims in a particular class are not necessarily classified in such class, as authorized by the Bankruptcy Code, Section 1122(a). Creditors should consult this Disclosure Statement and the accompanying Plan to determine in which Class their claims are classified. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. To the extent that the holders of any Allowed Claims or Interests object to the Dairies' classification scheme, such objections will be considered at the Confirmation Hearing, and if sustained, the classifications outlined below will be deemed modified in accordance with any order sustaining such objections. Generally, the Dairies' remaining assets will be liquidated and distributed to holders of Allowed Claims in accordance with its respective priorities as set forth under the Bankruptcy Code, the Confirmation Order or any other Final Order.

Any Class of Claims that, as of the date of the commencement of the Confirmation Hearing, contains no Allowed Claims will be deemed deleted from the Committee Plan for purposes of determining acceptance or rejection of the Committee Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

The classification of Claims against and Equity Interests in the Dairies, and their respective voting rights pursuant to the Committee Plan are as follows:

| Class | Impairment | Treatment |
|-------|------------|-----------|
| **Class 1A** – The Allowed Secured Claims of Governmental Units | Impaired | There are no known claims in this class. All Pre-petition ad valorem taxes are believed to have been paid. Any unpaid Pre-petition ad valorem taxes will be paid as provided under section 1129(a)(9)(C) of the Bankruptcy Code. |
|  |  |  |

| | | |
|---|---|---|
| **Class 1B** – The AFS Allowed Secured Claim. | Impaired | The Allowed Secured Claims of the Holders of Class 1B Claims (the "<u>AFS Allowed Secured Claim</u>"), anticipated to total $30,100,000.00, will be paid in full as follows:  (a) during the Trustee Operating Period - interest only on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs, at the fixed rate of 6% per annum; and (b) commencing on the Trustee Termination Date the AFS Allowed Secured Claim will be paid in full together with interest at the floating rate of Wall Street Prime plus 2% (200 basis points), determined as of the Trustee Termination Date, and adjusted annually thereafter, but not less than 6% per annum, in 240 monthly installments of not less than $215,645.75, each. Provided, however, that if and only if 11 U.S.C. §1111(b)(2) applies with respect to Class 1B, then the AFS Secured Claim will be amortized in full together with interest at the floating rate of Wall Street Prime plus 2% (200 basis points), but not less than 8.52% per annum, set as of the Trustee Termination Date, and adjustable thereafter annually on each anniversary date, in 360 monthly installments of not less than $231,869.74, each, and the AFS Allowed Unsecured Deficiency Claim shall be deemed extinguished. Holders of Allowed Secured Claims in Class 1B shall retain any lien securing such Allowed Secured Claim until such Claims are paid in full. |
| | | |

| Class 1C – The Allowed Secured Claims of FCC Equipment Financing, a Division of Caterpillar Financial Services Corporation, providing equipment financing for the Debtors (Approximately $326,022.22). | Impaired | Holders of Allowed Secured Claims in Class 1C will be paid in full, together with interest at the rate of 6% per annum in 59 equal monthly installments of $6,302.92 each, commencing on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs, with one last and final installment on the Trustee Termination Date for any remaining balance due under this Plan. Allowed Secured Claims in Class 1C shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. |
|---|---|---|
| Class 1D – The Allowed Secured Claims of Cal-Maine Foods, Inc. secured by a purchase-money security interest in corn silage stored for use by Dairy Production Systems – Mississippi, LLC. (Approximately $142,229.40).*<br><br>*assuming that $280,000.00 of the Court-ordered payments have been made to date on the total balance of $422,229.40. | Impaired | Holders of Allowed Secured Claims in Class 1D will be paid in full, as provided in a certain Order of the Bankruptcy Court entered on March 10, 2011, in the Bankruptcy Case (Docket #229), the term of which Order respecting the purchase money security interest of Cal-Maine Foods, Inc. is incorporated herein by this reference. Allowed Secured Claims in Class 1D shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. |
| Class 1E– The Allowed Secured Claims of John Deere Credit Corporation, providing equipment financing for the Debtors (Approximately $131,024.20 principal, as of the Petition Date). | Impaired | Holders of Allowed Secured Claims in Class 1E will be paid in full, together with interest at the rate of 6% per annum in 59 equal monthly installments of $2,533.06 each, commencing on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs, with one last and final installment on the Trustee Termination |

| | | |
|---|---|---|
| | | Date for any remaining balance due under this Plan. Allowed Secured Claims in Class 1E shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. |
| **Class 1F** – The Allowed Secured Claims of Dairy Co-ops holding rights of set-off or recoupment on the Effective Date of the Plan | Impaired | Holders of Allowed Secured Claims in Class 1F will be paid in full, together with interest at the rate of 6% per annum at a rate equal to one-half of one percent (.05%) of proceeds of milk sales due to the Reorganized Debtors commencing on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs. Allowed Secured Claims in Class 1F shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. |
| **Class 1G** – Other Allowed Secured Claims (if any). | Impaired | Holders of Allowed Secured Claims in Class 1G, if any, will be paid in full, together with interest at the rate of 6% per annum in 59 equal monthly installments on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs, with one last and final installment in the 60th month following the Effective Date for any remaining balance due under this Plan. Allowed Secured Claims in Class 1G shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. |
| | | |

| | | |
|---|---|---|
| **Class 2** – Non-Tax Priority Claims | Impaired | There are no known claims in this Class.  If such claims are Allowed by the Bankruptcy Court, except to the extent the holder of an Allowed Class 2 Claim agrees to other, lesser treatment, any  holder of an Allowed Class 2 Claim shall be paid in respect of such Allowed Claim (a) two (2) annual deferred cash payments on or before each December 31 following the Effective Date, together with Plan Interest, equal to the amount of such Allowed Claim; or (b) such other treatment as is in accordance with the Bankruptcy Code. |
| **Class 3** – Allowed Convenience Class Claims of $2,500.00 or less and claims voluntarily reduced to $2,500.00. Allowed Claims in Class 3 are estimated to total approximately $173,421.46, exclusive of inclusion elections. | Impaired | Allowed Claims in Class 3 will be paid 100% of the Allowed Amount of such claims, without interest – approximately $173,421.46, on the Effective Date in full satisfaction of such claims. |
| **Class 4** – Allowed Unsecured Claims other than Allowed Unsecured Claims included in Classes 3 or 5. | Impaired | Allowed Unsecured Claims in Class 4, anticipated to total approximately $16,575,000 will be paid out of the Trust, Pro Rata, along with any Allowed Unsecured Claims in Class 5 participating in the Trust, the Net Distributable Assets that have been finally Paid to the Liquidation Trustee on hand on the last day of each calendar quarter during the Participation Period, commencing on the last day of the first calendar quarter occurring following the Effective Date, with one last and final installment on the Final Distribution Date.   Additionally, unless AFS elects the Stock Option, triggering the provisions of Section 3.2.7 of this Plan, on the Effective Date holders of |

| | | |
|---|---|---|
| | | Allowed Unsecured Claims in Class 4 will receive Pro Rata with the holders of Allowed Unsecured Claims in Class 5, the New Stock. |
| **Class 5** – AFS Allowed Unsecured Deficiency Claim. | Impaired | Unless such Claims are extinguished as provided under Section 3.2.2(b),or elect the treatment provided in Section 3.2.7 of this Plan, Allowed Unsecured Claims in Class 5, which will total approximately $49,646,118.96, will be paid out of the Trust, Pro Rata, along with any Allowed Unsecured Claims in Class 4, the Net Distributable Assets that have been finally Paid to the Liquidation Trustee on hand on the last day of each calendar quarter during the Participation Period, commencing on the last day of the first calendar quarter occurring following the Effective Date, with one last and final installment on the Final Distribution Date.   Additionally, unless the provisions of Section 3.2.7 of this Plan apply, on the Effective Date holders of Allowed Unsecured Claims in Class 4 will receive Pro Rata with the Holders of Allowed Unsecured Claims in Class 5, the New Stock. |
| **Class 6** - Equity Interest Holders of the Debtors. | Impaired | The Equity Interests of the Equity Interest Holders of the Debtors will be extinguished on the Effective Date, and such Holders will receive or retain no property under this Plan. |

**B. Unclassified Claims**

**1. General Administrative Claims.**

The Committee Plan provides that, except to the extent the holder of an Allowed Administrative Claim agrees to other, lesser treatment, each holder of an Allowed Administrative Claim will be paid in respect of such Allowed Claim the full amount thereof, in Cash, by the later of (i) the Effective Date, or (ii) the date on which such Claim becomes an Allowed Claim. The Effective Date under this Plan occurs when the Trustee collects sufficient funds from the operating revenues of the Reorganized Debtors to make all payments due on the Effective Date.

**2. Statutory Fees.**

The Committee Plan provides that Allowed Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid in Cash as such fees are due in an amount equal to the amount of such Statutory Fees.

**3. Fee Claims.**

The Committee Plan provides that Professionals having Allowed Fee Claims will be paid in full, in Cash, by the Trustee in the amounts allowed by the Bankruptcy Court, by the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court order allowing such Fee Claim becomes a Final Order. After the Effective Date, Professionals of the Reorganized Debtors be compensated as set forth in the Committee Plan.

The Bankruptcy Court must rule on all Professional fees and expenses incurred from the Petition Date through and including the Effective Date as required under the Administrative Order, unless the order approving such Professionals' retention provides otherwise. For all Fee Claims (unless the order approving such Professionals' retention provides otherwise) except the statutory Clerk's Office costs of Court and U.S. Trustee's fees treated above, the Professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application. Only the amount of fees allowed by the Bankruptcy Court will be payable under the Committee Plan.

**Bar Dates for Fee Claims for Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date**. Such Professionals and Entities must File and serve on the United States Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 60 days after service of the notice of entry of the Confirmation Order. **Failure to File timely and serve such application will result in the Fee Claim being forever barred and discharged.** Objections to any Fee Claim must be Filed and served on the parties that were served with such application and the requesting party by the later of (a) 30 days after the Confirmation Date; (b) 30 days after the filing of the applicable request for payment of the Fee Claim; or (c) such later date as provided for by order

of the Bankruptcy Court.

### 4. Bar Dates for General Administrative Claims.

The holder of an Administrative Claim (other than (1) a Fee Claim, (2) a post-petition liability incurred and payable in the ordinary course of business by a Debtor (and not past due), (3) an Administrative Claim that has been Allowed on or before the Effective Date, and (4) Statutory Fees) must file with the Bankruptcy Court and serve on the Dairies, the Committee, and the Office of the United States Trustee, a request for payment of such Administrative Claim within thirty (30) days after service of notice of entry of the Confirmation Order. Such request must include at a minimum (a) the name of the holder of the Claim, (b) the amount of the Claim, and (c) the basis of the claim. **Failure to File and serve such request timely and properly will result in the Administrative Claim being forever barred and discharged.** The holders of the Administrative Claims enumerated in (1)–(4) above will not be required to file a request for payment of its Administrative Claims, and will be paid as further specified in this Article. Objections to general Administrative Claims must be Filed and served on the parties that were served with such Claims or requests and the requesting party by the later of (a) 30 days after the Effective Date; (b) 30 days after the Filing of the applicable request for payment of Administrative Claims; or (c) such later date as provided for by order of the Bankruptcy Court, which order may be entered without further notice or hearing.

### 5. Priority Tax Claims.

Priority Tax claims consist of any Claim of a governmental unit of a kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. These unsecured Claims are given a statutory priority in right of payment. The Committee Plan provides that each holder of an Allowed Priority Tax Claim will be paid in respect of such Allowed Claim (including with respect to any interest that is determined to be part of its Allowed Claim), at the option of the Trustee, (a) the full amount thereof, in Cash, by the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim; or (b) payment in Cash installments with statutory interest thereon on each anniversary of the Effective Date, until the fifth anniversary of the Petition Date (provided that the Trustee may prepay the balance of any such Allowed Priority Tax Claim, including accrued Post-confirmation Interest through the payment date, and shall do so prior to the Final Distribution Date); or (c) shall receive such lesser amount or other treatment as the holder of an Allowed Priority Tax Claim and the Trustee might otherwise agree.

### C. Classification and Treatment of Claims and Interests.

### 1. Secured Claims.

Class l consists of Secured Claims. Class 1 Claims are impaired. Class 1 Claims are divided into subclasses by creditor or category. The holders of Claims in this Class are entitled to vote to accept or reject the Committee Plan. The Committee Plan provides that the holders of Allowed Secured Claims in Classes 1A-1G will receive the following treatment under the Committee Plan:

1.     Class 1A.  There are no known claims in this class.  All Pre-petition ad valorem taxes are believed to have been paid.  Any unpaid Pre-petition ad valorem taxes will be paid as provided under section 1129(a)(9)(C) of the Bankruptcy Code.

2.     Class 1B.  AFS, the holder of all Allowed Secured Claims in Class 1B will be paid as follows: (a) during the Trustee Operating Period the Liquidation Trustee will pay interest only upon the Allowed Amount of such Allowed Secured Claim on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs, at the fixed rate of 6% per annum; and (b) commencing on the Trustee Termination Date the AFS Secured Claim will be amortized in full together with interest at the floating rate of Wall Street Prime plus 2% (200 basis points), but not less than 6% per annum, set as of the Trustee Termination Date, and adjustable thereafter annually on each anniversary date, in 240 monthly installments of not less than  $215,645.75, each. Provided, however, that if and only if 11 U.S.C. §1111(b)(2) applies with respect to Class 1B, then the AFS Secured Claim will be amortized in full together with interest at the floating rate of Wall Street Prime plus 2% (200 basis points), but not less than 8.52% per annum, set as of the Trustee Termination Date, and adjustable thereafter annually on each anniversary date, in 360 monthly installments of not less than  $231,869.74, each, and the AFS Allowed Unsecured Deficiency Claim shall be deemed extinguished.  Holders of Allowed Secured Claims in Class 1B shall retain any lien securing such Allowed Secured Claim until such Claims are paid in full.  If any AFS Collateral, other than Collateral contemplated to be sold via the HH liquidation, is sold by the Liquidation Trustee prior to the Trustee Termination Date, the proceeds of all AFS resulting liens from such sales will be applied to reduce the principal balance of the AFS Allowed Secured Claim, with a corresponding adjustment to the payments provided hereunder for such Allowed Secured Claim.  The Holder of the AFS Allowed Secured Claim will receive an amended and restated promissory note(s) and security agreement(s) executed by the Liquidation Trustee on behalf of the Reorganized Debtors evidencing the right to receive the payments provided under this plan (respectively the "Restructured Note(s)" and the "Restructured Security Agreement(s)").  The Restructured Notes and Restructured Security Agreements shall be in a form and content acceptable to the Liquidation Trustee and the Holder of the AFS Allowed Secured Claim, but such agreements shall not vary the terms of this Plan (which incorporates the Liquidation Trust and the Voting Proxy).  If the parties are unable to agree upon the form of the Restructured Notes and Restructured Security Agreements on or before the Effective Date, either party may submit the issue to the Bankruptcy

Court for final determination as to the form of the instruments. Nothing contained in this paragraph of this Plan shall obligate the Liquidation Trustee to agree to a form of instrument meeting all requirements for enabling securitization of the Restructured Notes or the Restructured Security Agreements.

3.      Class 1C.  FCC Equipment Financing, the Holder of the Allowed Secured Claims in Class 1C will be paid in full, together with interest at the rate of 6% per annum in 59 equal monthly installments of $6,302.92 each, commencing on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs, with one last and final installment on the Trustee Termination Date for any remaining balance due under this Plan. Allowed Secured Claims in Class 1C shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. The Holders of Allowed Secured Claims in Class 1C will receive a form of amendment to its promissory notes and security agreements executed by the Liquidation Trustee on behalf of the Reorganized Debtors reflecting the terms of the repayment required under this Plan (the "Class 1C Amended Note"). The Class 1C Amended Note shall be in a form and content acceptable to the Liquidation Trustee and the Holder of the Allowed Secured Claim in Class 1C, but such agreements shall not vary the terms of this Plan (which incorporates the Liquidation Trust and the Voting Proxy). If the parties are unable to agree upon the form of the Class 1C Amended Note on or before the Effective Date, either party may submit the issue to the Bankruptcy Court for final determination as to the form of the instruments. Nothing contained in this paragraph of this Plan shall obligate the Liquidation Trustee to agree to a form of instrument meeting all requirements for enabling securitization of the Class 1C Amended Note.

4.      Class 1D.  Cal-Maine Foods, Inc., the Holder of Allowed Secured Claims in Class 1D will be paid in full, as provided in a certain Order of the Bankruptcy Court entered on March 10, 2011, in the Bankruptcy Case (Docket #229), the term of which Order respecting the purchase money security interest of Cal-Maine Foods, Inc. is incorporated herein by this reference. Allowed Secured Claims in Class 1D shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full.

5.      Class 1E.  John Deere Credit Corporation, the Holder of the Allowed Secured Claims in Class 1E will be paid in full, together with interest at the rate of 6% per annum in 59 equal monthly installments in the amount of $2,533.06, each commencing on or before the last day of each calendar month commencing in the calendar month following the

calendar month in which the Effective Date occurs, with one last and final installment on the Trustee Termination Date for any remaining balance due under this Plan. Allowed Secured Claims in Class 1E shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. The Holders of Allowed Secured Claims in Class 1E will receive a form of amendment to its promissory notes and security agreements executed by the Liquidation Trustee on behalf of the Reorganized Debtors reflecting the terms of the repayment required under this Plan (the "Class 1E Amended Note"). The Class 1E Amended Note shall be in a form and content acceptable to the Liquidation Trustee and the Holder of the Allowed Secured Claim in Class 1E, but such agreements shall not vary the terms of this Plan (which incorporates the Liquidation Trust and the Voting Proxy). If the parties are unable to agree upon the form of the Class 1E Amended Note on or before the Effective Date, either party may submit the issue to the Bankruptcy Court for final determination as to the form of the instruments. Nothing contained in this paragraph of this Plan shall obligate the Liquidation Trustee to agree to a form of instrument meeting all requirements for enabling securitization of the Class 1E Amended Note.

6.    Class 1F.    Various Dairy Co-ops, the Holders of Allowed Secured Claims in Class 1F, will be paid in full, together with interest at the rate of 6% per annum at a rate equal to one-half of one percent (.05%) of proceeds of milk sales through each respective holder of an Allowed Secured Claim in Class 1F due to the Reorganized Debtors. The payments shall be effected through set-offs against the balance due the Reorganized Debtors commencing in the calendar month following the calendar month in which the Effective Date occurs. Allowed Secured Claims in Class 1F shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. The Holders of Allowed Secured Claims in Class 1F will receive a form of NON-NEGOTIABLE promissory note executed by the Liquidation Trustee on behalf of the Reorganized Debtors reflecting the terms of the repayment required under this Plan (the "Class 1F Note"). The Class 1F Note shall be in a form and content acceptable to the Liquidation Trustee and the Holders of Allowed Secured Claims in Class 1F, but such note shall not vary the terms of this Plan (which incorporates the Liquidation Trust and the Voting Proxy). If the parties are unable to agree upon the form of the Class 1F Note on or before the Effective Date, either party may submit the issue to the Bankruptcy Court for final determination as to the form of the instruments. Nothing contained in this paragraph of this Plan shall obligate the Liquidation Trustee to agree to a form of instrument meeting all requirements for enabling securitization of the Class 1F Note.

7. <u>Class 1G.</u> Holders of Allowed Secured Claims in Class 1G, if any, will be paid in full, together with interest at the rate of 6% per annum in 59 equal monthly installments on or before the last day of each calendar month commencing in the calendar month following the calendar month in which the Effective Date occurs, with one last and final installment in the 60th month following the Effective Date for any remaining balance due under this Plan. Allowed Secured Claims in Class 1G shall retain any lien securing such Allowed Secured Claim until the Claims are paid in full. Each Holder of an Allowed Secured Claim in Class 1G will receive a form of promissory note and security agreement executed by the Liquidation Trustee on behalf of the Reorganized Debtors reflecting the terms of the repayment required under this Plan (the "<u>Class 1G Amended Note</u>"). The Class 1G Amended Note shall be in a form and content acceptable to the Liquidation Trustee and the Holders of each Allowed Secured Claim in Class 1G, but such agreement shall not vary the terms of this Plan (which incorporates the Liquidation Trust and the Voting Proxy). If the parties are unable to agree upon the form of any Class 1G Amended Note on or before the Effective Date, either party may submit the issue to the Bankruptcy Court for final determination as to the form of the instruments. Nothing contained in this paragraph of this Plan shall obligate the Liquidation Trustee to agree to a form of instrument meeting all requirements for enabling securitization of the Class 1G Amended Note.

8. <u>Due upon Sale.</u> Notwithstanding any other provision of this Plan, unless otherwise agreed by the holders of each of such Claims, all balances owed to holders of Allowed Secured Claims in Classes 1A – 1G shall be due and payable in full at the Closing of the sale of all or substantially all of the Collateral of such Holder under this Plan, with the liens of such Holder attaching to the proceeds of such sale until paid to such Holder.

## 2. **Non-Tax Priority Claims.**

Class 2 consists of all Non-Tax Priority Claims - any Claim that is entitled to priority in payment pursuant to sections 507(a)(3), (4), (5) or (6) of the Bankruptcy Code and that is not a Priority Tax Claim, Administrative Claim or a Secured Claim. There are no known Claims in this Class. Class 2 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject the Committee Plan.

The Committee Plan provides that except to the extent the holder of an Allowed Class 2 Claim agrees to other, lesser treatment, any holder of an Allowed Class 2 Claim shall be paid in respect of such Allowed Claim (a) two (2) annual deferred cash payments on or before each December 31 following the Effective Date, together with Post-confirmation Interest, equal

to the amount of such Allowed Claim; or (b) such other treatment as is in accordance with the Bankruptcy Code.

### 3. Convenience Class Claims.

Class 3 consists of all Convenience Class Claims against the Dairies. Convenience Class Claims are defined as those Unsecured Claims against the Dairies, however arising, allowed in, or voluntarily reduced to, the amount of $2,500.00 or less.   Any holder of a Class 4 Unsecured Claim that desires treatment of such claim as a Convenience Class Claim may make such election on its Committee Plan ballot.  The Committee Plan provides that each holder of an Allowed Convenience Class Claim shall be paid 100% of its Allowed Claim, without interest, on the Effective Date, in full satisfaction of such claims.  Allowed Unsecured Claims in Class 3 are expected to total approximately $173,421.46.  Class 3 is impaired, and the holders of Claims in this Class are entitled to vote to accept or reject the Committee Plan.

### 4. General Unsecured Claims.

Treatment of Claims in Class 4 (General Unsecured Claims).  Allowed Unsecured Claims in Class 4, anticipated to total up to $16,575,000 will be paid out of the Trust, Pro Rata, along with Allowed Unsecured Claims in Class 5 participating in the Trust, the Net Distributable Assets that have been Finally Paid to the Liquidation Trustee on hand on the last day of each calendar quarter during the Participating Period (each a Distribution Date), commencing on the last day of the first calendar quarter occuring following the Effective Date, with one last and final installment on the Final Distribution Date.  Additionally, unless the provisions of Section 3.2.7 of the Plan apply (i.e. Class 5 exercises the Stock Option), on the Effective Date holders of Allowed Unsecured Claims in Class 4 will receive Pro-rata with the holders of Allowed Unsecured Claims in Class 5, the New Stock.  Class 4 is impaired and are entitled to vote to accept or reject the Plan.

### 5. The AFS Allowed Unsecured Deficiency Claim.

Treatment of Claims in Class 5 (The AFS Allowed Unsecured Deficiency Claim). Unless the AFS Allowed Unsecured Claim is extinguished through the election of the application of Section 1111(b)(2) of the Bankruptcy Code by holders of the AFS Allowed Secured Claim in Class 1B, of this Plan, or AFS elects the alternative treatment described below, then the Holder of the AFS Allowed Unsecured Claim  in Class 5, which will total approximately $49,646,118.96, will be paid out of the Trust, Pro-rata, along with Allowed Unsecured Claims in Class 4, the Net Distributable Assets that have been Finally Paid to the Liquidation Trustee on hand on the last day of each calendar quarter during the Participation Period (each a Distribution Date), commencing on the last day of the first calendar quarter occuring following the Effective Date, with one last and final installment on the Final Distribution Date.  Additionally, unless the AFS elects to exercise the Stock Option, on the Effective Date holders of Allowed Unsecured Claims in Class 5 will receive Pro-rata with the holders of Allowed Unsecured Claims in Class 4, the New Stock.  In lieu of the treatment outlined above, the Holders of Allowed Unsecurd

Claims in Class 5 may elect the Stock Option, by so inticating in writing delivered to the Committee before the end of the hearing on the the Disclosure Statement, which shall entitle such holders to receive on the Effective Date, 100% of the New Stock (subject to the Voting Proxy) in full satisfaction of all such Allowed Unsecured Claims in Class 5. Class 5 is impaired and are entitled to vote to accept or reject the Plan.

### 6. Equity Interests

Treatment of Class 6 (Equity Interests). Equity Interests in Class 6 will be cancelled on the Confirmation Date, and the Holders of such Interests will receive or retain no property under this Plan on account of such interests. Holders of interest in Class 6 are deemed to reject the Plan and are not entitled to vote.

### D. Means of Implementation of the Committee Plan.

### 1. Reorganized Debtors and Powers And Duties.

The Committee Plan will be administered by the Trustee, who will be vested with power and authority over all Assets of the Dairies and the Estate and with the obligation to make distributions in accordance with the Committee Plan. The Trustee will be deemed as of the Confirmation of the Committee Plan to be the general representative of the Estate as authorized under and pursuant to the Bankruptcy Code, specifically including, without limitation, section 1123(b)(3) and the Committee Plan. He may file any papers or take actions he deems appropriate for the Dairies under this Committee Plan. The Trustee will also have the standing of a Chapter 11 Trustee appointed during the Bankruptcy Case to pursue Causes of Action as provided under section 544 of the Bankruptcy Code or otherwise to pursue claims for the benefit of the Debtor, including, but not limited to, the aforementioned claims against AFS and other Bankruptcy Causes of Action.

Under the Committee Plan, the Trustee is vested with and will have all rights, powers, and duties (a) that the Dairies had immediately prior to Confirmation under sections 1106, 1107, 1108 and otherwise of the Bankruptcy Code, including, without limitation, with respect to the Causes of Action (whether or not commenced as of Confirmation), (b) that would be vested in a chapter 11 Trustee appointed prior to Confirmation under Bankruptcy Code section 1104, and (c) otherwise set forth in the Committee Plan. The Trustee will have exclusive control of the Assets, including, without limitation, the Causes of Action, subject to the jurisdiction of the Bankruptcy Court, as further set forth in the Committee Plan. The Reorganized Debtors (acting through its Board of Directors) will have authority to authorize the sale of Assets, other than HH, not in the Ordinary Course of Business as further set forth in the Committee Plan.

The Committee Plan provides that the Trustee, *inter alia*, will be empowered to and will make all distributions required to be made under the Committee Plan, and the Trustee will be authorized and empowered to fully act to (a) prosecute, settle or release all Causes of

Action in accordance with the best interest of and for the benefit of the Creditors entitled to receive distributions under the Committee Plan; (b) prosecute objections to Claims; (c) resolve Disputed Claims; (d) make distributions to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and holders of other Allowed Claims (as its respective interests may appear in accordance with the Committee Plan) in as prompt, efficient and orderly fashion as possible in accordance with the Committee Plan; (e) perform administrative services related to the implementation of the Committee Plan; (f) employ attorneys and other professionals, as further set forth in the Committee Plan, to assist in fulfilling the Reorganized Debtors' obligations under the Committee Plan; and (g) otherwise act in accordance with the Committee Plan and orders of the Bankruptcy Court.

Professionals employed by the Trustee following the Effective Date of the Committee Plan will not be required to file fee applications in connection with services rendered after the Effective Date, but will be compensated in accordance with the procedure set forth under the Committee Plan.

The Committee Plan provides that the Trustee will perform the duties and obligations imposed on the Reorganized Debtors with reasonable diligence and care under the circumstances. The Trustee will not be personally liable to the Creditors or to Persons entitled to receive distributions of Assets under the Committee Plan, except for such of its own acts as will constitute fraud, bad faith, willful misconduct, gross negligence or willful disregard of its duties. Except as aforesaid, the Trustee will be entitled to be exonerated and indemnified from time to time from the Assets against any and all losses, claims, costs, expenses (including the cost of defense), and liabilities arising out of or in connection with the Assets or the implementation of the Committee Plan. The foregoing will also extend to the employees, professionals and agents of the Reorganized Debtors, as the case may be. For additional information about the Trustee, please refer to the full text of the Committee Plan.

## 2. Substantive Consolidation.

Summary. The Committee Plan contemplates substantive consolidation of the Debtors for all purposes. The Committee Plan shall serve as a motion seeking entry of an order by the Bankruptcy Court substantively consolidating the Estates of the Debtors, and the Confirmation Order authorizing substantive consolidation shall constitute an order of the Bankruptcy Court approving the substantive consolidation of the Debtors. On the Confirmation Date the Estate of each of the Debtors shall be substantively consolidated into the Estate of DPS for all purposes associated with confirmation and consummation of the Committee Plan. The Trustee will cause the incorporation of a new corporate entity which will be organized under the laws of the State of Georgia as a Statutory Close Corporation, unless AFS has exercised the Stock Option, in which event the choice of venue for the incorporation shall pass to the holders of such shares (the "New Stock"). The New Stock will be distributed on the Effective Date as provided in the Plan.

Effect of Substantive Consolidation.  On and after the Effective Date, (a) all assets and liabilities of the Debtors shall be treated as though they were merged into the DPS Estate, (b) the Intercompany Claims will be discharged, (c) for all purposes associated with Confirmation (including, without limitation, for purposes of tallying acceptances and rejections of the Committee Plan) and distributions under the Committee Plan, the Estates of the Debtors shall be deemed to be one consolidated Estate for DPS, (d) any guarantees of any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liablity of any Debtor shall be one obligation of the Reoganized Debtors, and (e) each and every Claim filed or to be filed in the Cases shall be deemed filed against the Debtors, and shall be Claims against and obligations of the Reorganized Debtors.

Reasons for Substantive Consolidation.  In the Debtors' view, substantive consolidation of the Estates is appropriate for the following reasons:

      i.      the Debtors have generally operated as a single economic enterprise, with a high degree of integration;

      ii.      the Debtors share common ownership and common officers;

      iii.      the Debtors' Assets other than Causes of Action substantially cross-collateralize the AFS Allowed Secured Claim, to the end that liquidation of all assets would produce no material dividend for the Holder of any Allowed Unsecured Claim in any case;

      iv.      it would be difficult or impossible to determine the appropriate Debtor entitled to any Net Litigation Proceeds from pursuit of Insider Claims, because of the comingling of funds and management withdrawals and compensation arrangements;

      v.      with respect to non-Insider Bankruptcy Causes of Action, but for the treatment afforded the AFS Allowed Unsecured Deficiency Claim, the diluting effect upon distributions to Holders of other Allowed Unsecured Claims of such Claim would make the percentage of recovery from such Causes of Action to holders of unsecured claims among the various Debtors immaterial.

No harm will result to creditors if the Estates are substantively consolidated. Instead, Holders of Allowed Unsecured Claims of all Estates will benefit by such consolidation. Further, substantive consolidation under the Committee Plan will allow Debtors to avoid unnecessary duplicative costs of preparing individual Plans and seeking acceptance of such individual Plans, and it would eliminate claim objections by the Debtors based on a creditor's filing a proof of claim in the wrong case due to confusion among the separate Debtors.

As currently structured, intercompany receivables have been created. By consolidating Debtors, such intercompany receivables are eliminated by discharge through merger.

The due process rights of all creditors, equity security holders and other interested parties will be protected. All such interested parties will receive notice of the hearing on the Disclosure Statement and will receive notice of the conformation hearing on the Committee Plan, and will be afforded the opportunity to review such documents and to object, if so desired. Additionally, Debtors' creditors holding Allowed Claims will receive substantial benefits if the Committee Plan is confirmed, since they will likely receive more in a consolidation than if the Debtors' cases were either converted or if Debtors filed individual Chapter 11 Plans.

In sum, in the view of the Debtors, substantive consolidation provides substantial benefits to the creditors and is in the best interests of the Estates. Moreover, the Debtors believe that the prejudice to creditors resulting from substantive consolidation, if any, is substantially outweighed by the benefit to the Estates.

Effect if Subsantial Consolidation is Denied. In the event that the Bankruptcy Court does not order substantive consolidation of the Debtors, the Committe will modify the Committee Plan in order to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code for each of the Debtors. In addition, the event that the Bankruptcy Court does not order substantive consolidation, then except as specifically set forth in the Committee Plan, nothing in the Committee Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor.

**3.**         **Closing of Case; Dairies' Business Records.**

The Committee Plan provides that contemporaneously with the substantial consummation of the Committee Plan, the Trustee will seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Code and the Bankruptcy Rules. The Trustee will arrange for subsequent maintenance and storage, for any period required by law, or other custody and control of the business records of the Dairies, unless the Bankruptcy Court orders otherwise.

### 4. Vesting of Assets in the Reorganized Debtors.

The Committee Plan provides that, on the Effective Date, title to all property of the Dairies will vest in the Reorganized Debtors, as successor by merger to the Debtors, as provided in sections 1141 and 524 of the Bankruptcy Code.

### 5. Executory Contracts.

#### (a) Assumed Contracts

Except as provided in Section 5(b), below, all Executory Contracts and unexpired leases, including without limitation the Insurance Contracts and the John Deere Lease, are deemed assumed, in accordance with the provisions of sections 365 and 1123, and any other relevant provisions of the Bankruptcy Code. Any Cure Costs associated with the assumed contracts, in the amounts determined by the Bankruptcy Court at the Confirmation Hearing, will be paid as Allowed Administrative Expense Claims, as appropriate, unless otherwise agreed with the other party to such Executory Contract.

#### (b) Rejected Contracts.

On the Confirmation Date, all Employee Benefit Plans of the Debtor are rejected and shall be terminated in accordance with applicable law.

#### (c) Bar Date for Rejection Claims.

The Committee Plan provides that by not later than 30 days after service of notice of entry of the Confirmation Order, any Person who is a party to an Executory Contract or unexpired lease rejected by the Dairies must File a Proof of Claim for damages alleged to arise from the rejection of such Executory Contract or unexpired lease, or be forever barred. A copy of such Proof of Claim will be Filed with the Bankruptcy Court and served on the Trustee in accordance with the notice provisions of the Committee Plan not later than 30 days after service of notice of entry of the Confirmation Order. If the Claim becomes an Allowed Claim, then such Claim will be classified as an Unsecured Claim and distributions will be made in accordance with the provisions of the Committee Plan. Objections to Executory Contract Claims must be Filed and served on the parties that were served with such Claims or requests and the requesting party by the later of (a) 90 days after the Effective Date; (b) 90 days after the Filing of the applicable Proof of Claim for such Executory Contract Claim; or (c) such later date as provided for by order of the Bankruptcy Court, which order may be entered without further notice or hearing.

### E. Provisions Governing Payment and Distributions.

### 1. Manner of Payment.

Under the Committee Plan, any payment in Cash to be made by the Reorganized

Debtors will be made at the election of the Reorganized Debtors, as applicable, by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 2. Funds and Accounts for Distributions and Committee Plan Implementation.

The Committee Plan provides that Trustee will establish the Disputed Claims Reserve under the Trust as further provided in the Committee Plan, and any other funds or accounts that the Reorganized Debtors deem necessary or desirable to implement the Committee Plan.

The Trustee may establish out of the operating revenues of the Reorganized Debtors an Administrative Expense Reserve and a Committee Plan Expense Reserve for the purpose of funding and implementing the Administrative Expenses which will be paid on the Effective Date.

On the Effective Date, or as soon thereafter as reasonably practicable, the Trustee may create a reserve out of the monies paid into the Trust for Committee Plan expenses, including Litigation Costs necessary to adequately fund litigation which the Reorganized Debtors in their business judgment determine is likely to produce a recovery in excess of the costs of pursuing the Cause of Action, which will be called the Committee Plan Expense Reserve. The Trustee may transfer an appropriate amount of Cash into such Committee Plan accounts as the Reorganized Debtors deem necessary and desirable to fund the Committee Plan Expense Reserve and pay Committee Plan Expenses efficiently and promptly.

### 3. Distributions on Allowed Claims and Interests.

Distributions on Claims will be made in accordance with Article VI of the Committee Plan. The Trustee will make no distribution to holders of Claims that are not Allowed Claims as defined in the Committee Plan. Notwithstanding any other provision of the Committee Plan, the Trustee will have discretion to make the distributions called for under the Committee Plan at the times specified in the Committee Plan, or earlier if the Trustee deems such earlier distribution to be necessary or beneficial. Please refer to Article VI of the Committee Plan for more specific detail on payment and distributions with respect to particular Classes of Claims, including Allowed Claims as of the Effective Date, Disputed Claims and Subsequently Allowed Claims.

### 4. Distributions on Unclassified, Non-Tax Priority, Convenience Class, and Secured Claims.

The Committee Plan generally provides that on the Effective Date, the Trustee will pay, out of the available cash on hand and operating revenues of the Debtors and Reorganized Debtors, to each of the holders of Allowed Administrative Claims, Allowed Priority Tax Claims (subject to the right to make deferred cash payments to such claimants in accordance with section 1129(a)(9)(C) of the Bankruptcy Code), Non-Tax Priority Claims, and Convenience

Class Claims the amount provided in Article III of the Committee Plan, unless such holder and the Dairies or the Reorganized Debtors, as the case may be, agree upon other, lesser terms for the treatment of such Claim. The Committee estimates that all such claims should be paid in full.

The Committee Plan provides, as more specifically set forth therein, that at the times of distribution to Allowed Claims out of the Trust, the Trustee will cause a transfer to the Disputed Claims Reserve of the amount of Cash necessary to pay the amount due at such distribution to Disputed Claims related to the above, to be paid by the Reorganized Debtors from the Disputed Claim Reserve if and when such claim becomes an Allowed Claim.

Under the Committee Plan, the Trustee will pay all Allowed Secured Claims in Class 1 (including all subclasses 1A – 1G) out of the operating revenues of the Reorganized Debtor in the manner specified in Article III of the Committee Plan. With respect to Class 1 Secured Claims that are Disputed Claims, the Trustee will cause a transfer of the designated amount of payment which would be owing on any such Claim were it Allowed to the Disputed Claims Reserve to be paid when it has become an Allowed Claim as provided in the Committee Plan.

For the purpose of setting aside the Disputed Claims Reserve for all other Classes except for Classes 3, 4, and 5, the Trustee will, on account of such Disputed Claim, deposit into the Disputed Claims Reserve an amount equal to the distribution due to the holder of the disputed claim based upon the face amount of any Proof of Claim or request for payment of Administrative Claim filed by the holder of a Disputed Claim or, if no Proof of Claim or Request for Payment has been filed, the amount shown by any pleading asserting the claim, if no such pleading has been filed, the amount shown by the Dairies' Schedules.

## 5.    Distributions with respect to Classes 4 and 5.

The Committee Plan provides generally that, unless Class 5 opts out of such treatment as provided under the Plan, Allowed Claims in Classes 4 and 5, anticipated to total approximately $16,575,000 for Class 4, and approximately $49,646,118.96 for Class 5, will be paid Pro-rata the Net Distributable Assets that have been Finally Paid to the Liquidation Trustee on hand in the Trust on the last day of each calendar quarter during the Trustee Operating Period (each a Distribution Date), commencing on the last day of the first calendar quarter occuring following the Effective Date, with one last and final installment on the Final Distribution Date. The Trustee may enter into voluntary compromises with the holders of Allowed Claims in Class 4 or 5 for the payment of less than the full amount of the claims in full and complete satisfaction of such claims. The Trustee also may make such interim distributions to Class 4 and 5 Claims out of the Trust as he deems necessary or desirable on such earlier date(s) and in such amounts as the Trustee determines in his discretion, subject to the priority scheme set forth in the Committee Plan for payment of Claims senior to Classes 4 and 5 and subject to reservation for Committee Plan expenses.

The Trustee will deposit into the Disputed Claims Reserve the distribution which would have been due to all holders of Disputed Claims in Classes 4 or 5 if they were Allowed Claims, as calculated in the foregoing paragraph.

For the purpose of calculating the distribution to holders of Allowed Claims in Classes 4 and 5 the Reorganized Debtors shall add to the total of all Allowed Claims in such Class the face amount of any Proof of Claim filed by the holder of a Disputed Claim or, if no Proof of Claim has been filed, the amount shown by the Debtors' Schedules. The resulting gross total of claims in such Class shall be used as a denominator of a fraction, the numerator of which shall be a dollar amount equal to the amount determined by the Reorganized Debtors to be available for distribution to such Class at such time. The amount of each Allowed Claim shall then be multiplied by the resulting fraction, and the product rounded to the nearest dollar shall equal the amount of the distribution to each holder of an Allowed Claim in such Class.

## 6. Previously Disputed Claims that Are Subsequently Allowed.

The Committee Plan provides that within fifteen (15) days from the date of which any order of the Bankruptcy Court allowing a previously Disputed Claim becomes a Final Order, with no appeal pending, or if an appeal is filed, the date on which all orders affirming allowance of such claims becomes non-appealable, the Reorganized Debtors will withdraw from the Disputed Claims Reserve an amount equal to the amount deposited into the Disputed Claims Reserve on account of each previously Disputed Claim and will then pay the holder of such previously Disputed Claim the amount due on such Claim as of the date of such distribution to its Class. No interest will be payable on account of any delayed distribution unless such interest is a distribution of Post-confirmation Interest specifically set forth in the Committee Plan and payable for that Class.

In the event a Disputed Claim in Class 3, 4, or 5 is finally Allowed in an amount less than the face amount of any Proof of Claim filed by the holder of such Disputed Claim or is Subordinated, the Reorganized Debtors will recalculate the accumulated distribution to all holders of Allowed Claims in the affected Class using the formula specified in the Committee Plan (described in the foregoing paragraph) and will likewise recalculate the accumulated distribution due to the holder of the previously Disputed Claim. The dividend thus calculated to the holder of the previously Disputed Claim will thereupon be paid to the holder of such Claim. For purposes of all subsequent distributions, the previously Disputed Claim will be treated as an Allowed Claim and included in the appropriate Class and will be paid accordingly with the rest of its Class.

In the event a Disputed Claim is finally allowed as a Subordinated Claim, the Reorganized Debtors will withdraw any amount deposited into the Disputed Claims Reserve on account of such Claim for distribution in accordance with the priority of payment scheme established by the Committee Plan.

### 7. Unclaimed Distributions.

Under the Committee Plan, payment will be stopped on checks disbursed by the Trustee to holders of Allowed Claims if such checks remain not cashed ninety (90) days after the date of disbursement. The Cash represented by such checks shall be redistributed Pro Rata to holders of the remaining Allowed Claims, as provided under this Committee Plan at the time of the next scheduled distribution to Allowed Claims hereunder. No further distribution shall be made under this Committee Plan to the holder of any Allowed Claim who fails to negotiate a check issued by the Reorganized Debtors on account of a claim for payment within the ninety (90) days after the date such check was mailed to the holder, and any unclaimed distribution on account of such Allowed Claim shall thereby be deemed waived. If the amount of unclaimed Net Distributable Assets following the Final Distribution by the Trustee under this Plan is less than $7,500.00, in lieu of redistributing such unclaimed funds among holders of Allowed Claims in Class 4, the Trustee may pay such funds to the Reorganized Debtors, upon which payment such funds shall become property of the Reorganized Debtors pursuant to section 347(b) of the Bankruptcy Code.

### 8. Rounding of Dividend Amounts.

The Committee Plan provides that notwithstanding any other provision of the Committee Plan, the Reorganized Debtors will not be required to make any distribution of less than $10.00 to the holder of any Allowed Claim, and may round all distributions to the nearest $1.00.

### 9. No Interest or Attorneys' Fees.

Except as expressly stated in the Committee Plan or as allowed by the Bankruptcy Court pursuant to 11 U.S.C. §506(b), no interest, penalty or late charge arising after the Petition Date, and no award or reimbursement of attorneys' fees or related expenses or disbursements arising after the Petition Date will be allowed on, or in connection with, any Claim. This provision will apply whether the distribution on such Claim is made on the Effective Date or thereafter.

### 10. Distributions to the Last Known Address.

Distributions to holders of Allowed Claims will be sent to the last known address set forth on such holder's Proof of Claim Filed with the Bankruptcy Court, or on the Schedules, if no proof of Claim has been filed. Holders of Claims may change the address to which distributions, if any, will be sent by furnishing written notice to the Reorganized Debtor, in accordance with the notice provisions of the Committee Plan. A proper notice of change of address will be effective for a distribution if received at least 30 days in advance of such distribution date.

### 11. Withholding or Other Taxes.

The Committee Plan provides that any federal, state, or local withholding or other

taxes or other amounts required to be withheld under applicable law will be deducted from distributions under the Committee Plan. All Persons holding Claims will be required to provide any information necessary to effect the withholding of such taxes.

### 12. **Subordination Rights**.

All subordination rights, claims, and defenses of the Dairies and Reorganized Debtors will remain valid, enforceable, and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise, except as otherwise specifically provided in the Committee Plan.

### F. **Provisions Governing Objections to Claims.**

### 1. **Allowance of Claims.**

Except as expressly provided in the Committee Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim will be deemed allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code or agreed to be Allowed by the Dairies, by the Reorganized Debtors in accordance with the Committee Plan, or so ordered by Final Order of the Bankruptcy Court. Except as expressly provided in the Committee Plan, the Trustee after Confirmation will have and retain any and all rights and defenses the Dairies had with respect to any Claims as of the Petition Date, including the Causes of Action referenced in the Committee Plan and the Disclosure Statement and the Filing of any motions or other pleadings for estimation of the amount of Disputed Claims. All Claims of any Person or Entity that owes money to the Dairies will be disallowed unless and until such Person or Entity pays the full amount it owes the Dairies.

### 2. **Examination and Objections to Claims.**

The Committee Plan provides that the Committee and the Trustee will examine all claims and will have the responsibility of filing objections to the allowance of claims. However, nothing in the Plan shall be construed to prohibit any party in interest with standing to object to any claim.

Except as otherwise specified in the Committee Plan (including, without limitation, with respect to Administrative Claims, Fee Claims, and Executory Contract Claims), objections to Claims will be Filed with the Bankruptcy Court and served upon Creditors by the Claims Objection Bar Date, which will be no later than 120 days after the Effective Date or 90 days after such Claim is Filed, which ever date is later; provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Trustee, without notice or a hearing. Distributions with respect to and on account of all Claims to which objections have been filed will be made as soon as practicable after an order, judgment, decree or settlement agreement with respect to such Claim becomes a Final Order.

### 3. Claim Resolution.

Objections to Claims may be litigated to judgment, settled or withdrawn by the Trustee or Committee. The Committee Plan provides that any proposed settlement of a Disputed Claim where the original face amount of the Claim is more than $100,000 will be subject to the approval of the Bankruptcy Court after 21-days' notice and an opportunity for a hearing has been served on the Special Notice Parties described in the Committee Plan. The Trustee may settle Claims where the original face amount of such Claim is between $50,000 and $100,000 without Bankruptcy Court approval, provided that the Special Notice Parties will have had 15-days' notice of any such proposed settlement prior to consummating the settlement. If an objection to the proposed settlement is served on the Trustee and not resolved consensually within 10 additional days after expiration of the 15-day notice period, the Bankruptcy Court will determine whether such proposed settlement should be approved. If the original face amount of the Disputed Claim is less than $50,000, the Trustee can settle such Claim without any notice or approval of any other party.

### 4. No Distributions to Holders of Disputed Claims.

The Committee Plan provides that notwithstanding any other provision of the Committee Plan, no Cash or other Property will be distributed under the Committee Plan on account of any Disputed Claim.

### 5. Estimation of Claims.

Under the Committee Plan, the Committee (or following the Confirmation Date, the Trustee) may, at any time, request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code, as applicable, regardless of whether the Committee or the Trustee previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the litigation concerning any objection to any Claims, including without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated will constitute the Allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Dairies or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### G. Provisions Regarding Effects of Confirmation

#### 1. Discharge of Reorganized Debtor.

Under the Committee Plan, the effects of Confirmation will be as provided under Bankruptcy Code sections 1141(a), (b), (c), and (d) and 524(a). The applicable Code sections provide, in relevant part:

### § 1141. Effect of confirmation

**(a)** Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed Committee Plan bind the debtor, any entity issuing securities under the Committee Plan, any entity acquiring property under the Committee Plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the Committee Plan and whether or not such creditor, equity security holder, or general partner has accepted the Committee Plan.

**(b)** Except as otherwise provided in the Committee Plan or the order confirming the Committee Plan, the confirmation of a Committee Plan vests all of the property of the estate in the debtor.

**(c)** Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the Committee Plan or in the order confirming the Committee Plan, after confirmation of a Committee Plan, the property dealt with by the Committee Plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

**(d)**

**(1)** Except as otherwise provided in this subsection, in the Committee Plan, or in the order confirming the Committee Plan, the confirmation of a Committee Plan—

**(A)** discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502 (g), 502 (h), or 502 (i) of this title, whether or not—

**(i)** a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

**(ii)** such claim is allowed under section 502 of this title; or

**(iii)** the holder of such claim has accepted the Committee Plan; and

**(B)** terminates all rights and interests of equity security holders and general partners provided for by the Committee Plan. . . .

**(6)** Notwithstanding paragraph (1), the confirmation of a Committee Plan does not discharge a debtor that is a corporation from any debt—

**(A)** of a kind specified in paragraph (2)(A) or (2)(B) of section 523 (a) that is owed to a domestic governmental unit, or owed to a person as the result of an action filed under subchapter III of chapter 37 of title 31 or any similar State statute; or

**(B)** for a tax or customs duty with respect to which the debtor—

**(i)** made a fraudulent return; or
**(ii)** willfully attempted in any manner to evade or to defeat such tax or such customs duty.

**11 U.S.C. §524 Effect of discharge**
(a) A discharge in a case under this title--

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case . . . .

## 2.      Post-confirmation Effects of Evidences of Claims or Interests.

On the Effective Date, except as otherwise provided in the Committee Plan, all promissory notes, share certificates, warrants, membership interests, instruments, indentures, agreements, or other documents evidencing, giving rise to, or governing any Claim or Interest in the Dairies will represent only the right, if any, to participate in the distributions contemplated by the Committee Plan.

## 3.      Preservation of Causes of Action.

The Committee Plan provides that upon the occurrence of the Effective Date, all Causes of Action of the Debtor and the Estate will be retained and preserved for enforcement by the Reorganized Debtors. The Trustee will have the power and right to commence or continue and otherwise enforce any Causes of Action of the Dairies and/or the Estate, all of which will be retained and preserved hereby, notwithstanding Confirmation or consummation of the Committee Plan.

As set forth in the Committee Plan, the Committee is currently investigating whether to pursue potential Causes of Action against certain Persons or Entities. The investigation has not been completed to date but is still ongoing. The Committee and the Trustee have or will be deemed to have all rights on behalf of the Dairies and/or the Estate to commence and pursue any and all Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case) discovered in such an investigation, to the extent the Reorganized Debtors deems pursuit of such Cause of Action appropriate. Potential

Causes of Action currently being investigated by the Dairies, which may, but need not be, pursued by the Dairies prior to the Effective Date and by the Trustee after the Effective Date as warranted but which will be retained after Confirmation include, without limitation, the following:

(a)     Specified Causes of Action.  The aforemention claim against AFS, all Claims for recharacterization of the Aurora Dairy Obligation and/or the Aurora Dairy Lease, and all other Causes of Action, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation, the following: possible claims against vendors, suppliers, general contractors, or subcontractors for warranty, indemnity, back charge/set-off issues, overpayment or duplicate payment issues and collections/account receivables matters; deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, or other Person or Entity; employee, management or operational matters; financial reporting; environmental, and product liability matters; actions against insurance carriers relating to coverage, indemnity or other matters; actions against current or former officers, directors, employees, parents, subsidiaries, Affiliates, or tax or pension or other control group members; counterclaims and defenses relating to notes or other obligations; and contract or tort claims which may exist or subsequently arise;

(b)     Avoidance Actions.  Any and all avoidance actions pursuant to any applicable section of the Bankruptcy Code, including, without limitation, sections 544 (including, but not limited to, all Causes of Action arising under State law and maintainable under section 544 of the Bankruptcy Code), 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, and other similar state laws such as fraudulent conveyance and preference statutes, arising from any transaction involving or concerning the Dairies; and

(c)     Any and all other Claims and Causes of Action of the Dairies.  In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth in the Committee Plan or Disclosure Statement because the facts upon which such Causes of Action are based are not currently or fully known by the Dairies and, as a result, can not be raised during the pendency of the Chapter 11 Case (collectively, the "Unknown Causes of Action").  The failure to list any such Unknown Cause of Action herein or in other Committee Plan documents is not intended to and will not limit the rights of the Reorganized Debtors to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action subsequently become fully known to the Dairies or the Reorganized Debtors or other parties in interest.

The Committee Plan provides that unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled in the Committee Plan or by any Final Order, the Dairies and Trustee, on behalf of themselves and holders of

Allowed Claims and in accordance with Bankruptcy Code section 1123(b)(3)(B), expressly reserve and will retain for enforcement post-Confirmation and post-consummation all Causes of Action and Unknown Causes of Action, including, without limitation, the Causes of Action described in the Committee Plan and Disclosure Statement, as well as any other Causes of Action or Unknown Causes of Action that the Dairies or the Estate had or had the power to assert immediately before Confirmation, for adjudication or later adjudication, and, therefore, no waiver or preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation or consummation of the Committee Plan, solely due to such Confirmation or Consummation of the Committee Plan.

In addition, under the Committee Plan, the Dairies and the Trustee expressly reserve and retain the right to pursue or adopt or otherwise enforce (and the right of the Reorganized Debtors to do so) any claims alleged in any lawsuit in which the Dairies is a defendant or an interested party, including, without limitation, the lawsuits described in the Disclosure Statement, against any Person, including, without limitation, the plaintiffs and co-defendants in such lawsuits. Nothing contained in the Committee Plan or Disclosure Statement or any related document will constitute a waiver of the rights, if any, of the Dairies or Reorganized Debtor or the Estate, through the Reorganized Debtor, to a jury trial with respect to any Cause of Action or objection to any Claim or Interest.

### 4. Representative of the Estate.

The Committee Plan provides that, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that the Debtors, Reorganized Debtors, or Estate may hold or have the power to commence at any time against any Person or Entity will be preserved and retained and enforced by the Trustee on behalf of the Reorganized Debtors, and the Trustee will have the right to continue or commence or otherwise enforce, as the authorized representative of the Dairies and the respective Estate and Reorganized Debtor, any and all such Claims, rights, or Causes of Action. The Reorganized Debtors may pursue any and all such Claims, rights, or Causes of Action, as appropriate, in accordance with the best interests of the holders of Allowed Claims. Subject to the provisions of the Committee Plan, the Reorganized Debtors will have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and Causes of Action.

### 5. Exculpation and Limitation of Liability.

The Committee Plan provides that, the Trustee, the Committee and their respective members, officers, directors, agents, attorneys, and employees (including professionals) (collectively, the "Exculpated Persons") will neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken by any Exculpated Person in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, Confirmation or consummation of this Committee Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with this Committee Plan (except for any obligations of the Post-confirmation

Debtor, the Estate, or the Reorganized Debtor arising in the Ordinary Course of Business). The Exculpated Persons will have no liability to any Debtor, holder of a Claim, holder of an interest, other party in interest in the Bankruptcy Case or any other Person for actions taken or not taken under this Committee Plan, in connection herewith or with respect hereto, including failure to obtain Confirmation of this Committee Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects such Exculpated Persons will be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under this Committee Plan or with respect to the Bankruptcy Case. Provided, however, that the foregoing provisions of this paragraph will have no effect on the liability of any Exculpated Person that results from any such act or omission that is determined in a Final Order to have constituted fraud or other willful misconduct.

6. **Terms Binding.**

The Committee Plan provides that, upon the entry of the Confirmation Order, all provisions of the Committee Plan, including all agreements, instruments and other documents filed in connection with the Committee Plan and executed by the Dairies or the Reorganized Debtors in connection with the Committee Plan, will be binding upon the Dairies, the Reorganized Debtors, all Claim and Equity Interest holders and all other Persons that are affected in any manner by the Committee Plan. All agreements, instruments and other documents filed in connection with the Committee Plan will have full force and effect, and will bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually will be executed by parties other than the Dairies or the Reorganized Debtors, or will be issued, delivered or recorded on the Effective Date or thereafter.

7. **Continuation of Pre-Confirmation Injunction or Stays.**

All injunctions or stays, whether by operation of law or by order of the Bankruptcy Court, provided for in the Chapter 11 Case pursuant to sections 105, 362, or 525 of the Bankruptcy Code or otherwise that are in effect on the Confirmation Date will remain in full force and effect until the Final Decree pursuant to the Committee Plan.

H. **Retention of Jurisdiction.**

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date under the Committee Plan, until such time as all payments and distributions required to be made and all other obligations required to be performed under the Committee Plan have been made and performed by the Reorganized Debtors, the Bankruptcy Court will have and retain the maximum jurisdiction as is legally permissible over the Causes of Action. The Committee Plan sets forth in more detail the jurisdiction to be retained by the Bankruptcy Court.

### J. Miscellaneous Committee Plan Provisions.

#### 1. Modifications or Amendment.

The Committee Plan provides that it may be modified or amended prior to confirmation as allowed by the Code or Rules. Following confirmation, amendments or modifications to the Committee Plan may be made by a voting process similar to the voting process for acceptance of the Committee Plan. These procedures are set out in detail in Article X of the Committee Plan.

#### 2. Exemption from Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, the Confirmation Order, and any sale orders entered in the Chapter 11 Case, the transfer or making or delivery of any instrument whatsoever in furtherance of or in connection with the Committee Plan, including, without limitation, any transfer of the Assets, all transfers to Creditors or purchasers since the Petition Date, and any assignments, documents, instruments and agreements and other conveyance documents executed and delivered by the Dairies or the Reorganized Debtors in connection with the sale of any property to any purchaser or creditor in furtherance of the execution of the Committee Plan, will not be subject to any stamp, real estate transfer, personal property, recording or other similar tax.

#### 3. Effectuating Documents, Further Transactions and Corporate Action.

The Reorganized Debtors, all holders of Allowed Claims receiving distributions under the Committee Plan, and all other parties in interest will, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Committee Plan.

#### 4. Successors and Assigns.

The rights, benefits and obligations of any Person or Entity named or referred to in the Committee Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entities.

#### 5. Governing Law.

Except to the extent that the Bankruptcy Code is applicable, or the laws of the State of Colorado may be applicable with respect to the merger and entity changes contemplated under this Plan with respect to the Substantive Consolidation of the Debtors, the rights and obligations arising under the Committee Plan and Disclosure Statement will be governed by and construed and enforced in accordance with the laws of the State of Georgia.

#### 6. Conflicts.

As provided in the Committee Plan, to the extent any provision of the Disclosure

Statement, and any documents executed in connection with the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to the foregoing) conflicts with or is in any way inconsistent with the terms of the Committee Plan, the terms and provisions of the Committee Plan will govern and control.

## VI.   FINANCIAL INFORMATION

The Debtors have filed their Schedules with the Bankruptcy Court as required by the Bankruptcy Code.  The Debtors will supplement and amend its Schedules as necessary and appropriate from time to time.  The Trustee will file post-confirmation quarterly operating reports after the Effective Date through the earlier of closure of the case or court order excusing further filings.

 The Debtors' previous monthly operating reports are on file with Court, and may be examined at the Clerk's Office, United States Bankruptcy Court, Middle District of Georgia, 433 Cherry Street, Macon, Georgia 31201, or on line through PACER©.

## VII.   ACCEPTANCE AND CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Committee Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a Committee Plan are that (i) the Committee Plan is accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the Committee Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) the Committee Plan is feasible, and (iii) the Committee Plan is in the "best interests" of creditors and holders of Claims and Interests impaired under the Committee Plan.

### A.     Acceptance of the Committee Plan.

In order for an Impaired Class of Claims or Interests to accept the Committee Plan, (a) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims or number of Interests actually voting in such Class must have voted to accept the Committee Plan and, with respect to Claims only, (b) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Committee Plan.

Holders of Claims in Impaired Classes are entitled to vote to accept or reject the Committee Plan.

The Committee Plan provides that the Committee Plan will constitute a request that the Bankruptcy Court confirm the Committee Plan over such rejection in accordance with section 1129(b) of the Bankruptcy Code, the so-called "cram down" provision.  The Committee reserves the right to alter, amend, modify, revoke or withdraw the Committee Plan or the Disclosure

Statement, including any exhibit or attachment, if necessary to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### B. Feasibility.

As a condition to confirmation of the Committee Plan, section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Committee Plan is not likely to be followed by the liquidation of the reorganized Dairies unless such liquidation is proposed in the Committee Plan. See the discussion concerning feasibility in Section VII, below.

### C. "Best Interests of Creditors" Test.

Confirmation of the Committee Plan also requires that each claimant either (i) accept the Committee Plan or (ii) under the Committee Plan, receive or retain property with a value, as of the Effective Date, that is not less than the value such claimant would receive or retain if the Dairies were liquidated under Chapter 7 of the Bankruptcy Code.

In order for the Committee Plan to be confirmed, section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired Class of claims or interests, that such Class either accept the Committee Plan or the each holder in such Class "will receive or retain under the Committee Plan on account of such claim or interest, property of a value as of the Effective Date of the Committee Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of this title on such date . . . ."

Under the Committee Plan, all Classes of Claims, except Unclassified Claims, are impaired and must vote to accept the Committee Plan. The payments proposed under the Committee Plan will propose a dividend in excess of what could be expected if the Dairies were "liquidated under Chapter 7." The following table represents the Dairies' projection of their liquidation value under Chapter 7. In order to understand the projection which follows, a short discussion of the priorities in payment of claim established by the Bankruptcy Code is in order.

In a Chapter 7 bankruptcy case, a Chapter 7 trustee administers all assets of the Debtor. The Chapter 7 trustee investigates each asset of the debtor to determine whether the asset has sufficient value to produce "equity" for general creditors. "Equity" is generally defined as an asset's realizable liquidation value significantly in excess of the aggregate amount of all claims secured by that asset. A Chapter 7 trustee's commissions, and expenses of liquidation and professional fees, further reduce the "Equity." If a Chapter 7 trustee concludes that there is no "Equity" in any particular asset, the asset is usually "abandoned." If a Chapter 7 trustee concludes that an asset does have potential to produce "Equity," then the asset is liquidated, the secured liens against the asset are paid off, the trustee recovers his costs of administering and liquidating the asset, and any remaining proceeds are placed in a general fund for distribution to creditors in accordance with the priority scheme of the Bankruptcy Code.

Therefore, under the distribution scheme of Chapter 7 of the Bankruptcy Code, secured creditors must be paid in full from the proceeds of its collateral. Only the "Equity" portion of the

collateral, if any, is available for Unsecured Creditors.

Once a "fund" for distribution to Creditors is established, a Chapter 7 trustee must pay claims in the order of their statutory priority under section 507 of the Bankruptcy Code. In this case, Creditors with Allowed Secured Claims comprise Class 1. Priority Claims are grouped into Class 2. These Classes are entitled to payment in full before Unsecured Creditors are entitled to distribution.

If the Case were converted to a Chapter 7, all Chapter 11 administrative expenses would be entitled to payment ahead of unsecured claims, but after the expenses of the Chapter 7 administration and a Chapter 7 trustee's professional fees. Chapter 11 administrative expenses will include any outstanding trade debt incurred since the Petition Date but unpaid as of the date of any liquidation, and unpaid Professional compensation and any administrative taxes due. If the Dairies were liquidated on September 20, 2011, the Committee estimates that Chapter 11 unpaid administrative expenses would total approximately $400,000.

In a Chapter 7 liquidation, all assets will be sold by a commissioned trustee, or abandoned to secured creditors. The Debtors believe that in a Chapter 7 liquidation the trustee would cause a "fire sale" liquidation. A Chapter 7 trustee could also abandon the estate's interest in the Debtors' Property, and allow the Senior Secured Lenders to foreclose. Under either scenario, the Debtors believe that, in light of the valuation of the Property in relation to the amount of the Claims held by AFS, a Chapter 7 liquidation would result in payments only to the holders of ad valorem secured tax Claims (Class 1A) and Senior Secured Lenders Claims (Class 1B). The Debtor projects that a Chapter 7 liquidation would result in little or no payments to other creditors, including creditors holding a mechanic's lien or a general unsecured claim. Projected Net Litigation Proceeds could be insufficient to pay the Chapter 7 Trustee's administrative expenses and the unpaid Chapter 11 administrative expenses. Therefore, the Debtor believes that this Committee Plan is more favorable than Chapter 7 liquidation because the Committee Plan provides for a higher payment to creditors than they would likely receive in a liquidation.

### Chapter 7 Liquidation Analysis

(all figures are best approximations of the Committee)

| Asset | Liquidation Value | Costs of Collection (not including Chapter 7 trustee commission and professional | Amount of Secured Claims | Gross Value to Unsecured Creditors |
|---|---|---|---|---|
| | | | | |

|  |  | fees) |  |  |
|---|---|---|---|---|
| **Cash** | $948,367.79 | $0.00 | $0.00 | $948,367.79 |
| **Dairies Property, Equipment, livestock and supplies.** | $30,100,000.00 | $1,505,000.00 | $72,000,000.00 | $0.00 |
| **Motor Vehicles and Rolling Stock** | $55,265.40 | $8,289.81 | $0.00 | $46,975.59 |
| **Potential Recoveries from Actions Against Insiders and Affiliates** | Unknown | Unknown | $0.00 | $0.00 |
| **Recoveries from Bankruptcy Causes of Action (excluding insiders)** | $1,190,527.54 | $396,842.12 | $0.00 | $793,685.42 |
| **Total** | **$32,294,160.73** | **$1,910,131.93** |  | **$1,789,028.80** |

| | |
|---|---|
| Chapter 7 Trustee's Commissions | ($76,670.00) |
| Chapter 7 Trustee's Professional Fees | ($115,000.00) |
| Chapter 11 Administrative Expenses (including (503(b)(9) claims | ($2,600,000.00) |
| Priority Claims | ($0.00) |
| **Net Liquidation Value** | $0.00 |
| **Percentage of payment to General Unsecured Claims:** | **0%** |

| | |
|---|---|
| **Proposed approximate distribution to General Unsecured Claims under the Committee Plan (assuming Class 5 elects stock):** | **65%** |
| **Proposed approximate distribution to General Unsecured Claims** | **19%** |

| under the Committee Plan (assuming Class 5 participates): | |
|---|---|

The chart above assumes that, if the case were converted to Chapter 7, the Chapter 7 trustee would liquidate the Dairies at an auction sale. In the event the Chapter 7 trustee simply abandoned the Dairies to AFS, the Debtors believe that the Chapter 7 trustee would not be able to generate sufficient recoveries to allow for meaningful distributions to holders of Unsecured Claims.

FOR THE FOREGOING REASONS, THE COMMITTEE BELIEVES THAT THE COMMITTEE PLAN IS IN THE BEST INTEREST OF EACH CLASS OF CREDITORS AND THAT EVERY IMPAIRED CLASS WILL RECEIVE DISTRIBUTIONS UNDER THE COMMITTEE PLAN.

## VIII.    FEASIBILITY OF THE COMMITTEE PLAN

The Dairies' business Committee Plan is attached hereto as **Exhibit E** (the "Business Plan"). The Business Committee Plan projects sufficient revenues to make the payments proposed to all Allowed Claims in each Class. Certain assumptions were made in connection with the Business Plan, which the Committee suggests are conservative, are itemized on the Exhibit. Because the projections are based on averages, the actual results will probably vary from the projection, but the projection should be substantially accurate over its term. There will be no event of default under the Committee Plan if the Dairies fail to meet their projected revenues in a given year.

The Dairies believe the Committee Plan is fair and equitable, and provides the best potential for payment of the claims of creditors.

## IX.    CERTAIN TAX CONSEQUENCES

The confirmation and execution of the Committee Plan may have tax consequences to holders of Claims and Interests, as well as to the Dairies.

### A.    In General.

The federal income tax consequences of the implementation of the Committee Plan to a Creditor will depend in part on (a) whether the Creditor's Claim constitutes a security for federal income tax purposes, (b) whether the Creditor reports income on the accrual basis, (c) whether the Creditor receives consideration in more than one (1) tax year, and (d) whether all the consideration received by the Creditor is deemed to be received by that Creditor as part of an integrated transaction. The federal tax consequences upon the receipt of cash and notes allocable to interest are discussed in "Receipt of Interest" below.

**B.      Gain or Loss on Exchange.**

While the Dairies do not believe that any of its trade creditor's claims will constitute securities for tax purposes, the New Stock and certain of its long-term obligations, including Claims classified in Classes 1B and 5 could be classified as tax securities.  Whether a debt instrument constitutes a security is based on the facts and circumstances surrounding the origin and nature of the debt and its maturity date.  Generally, claims arising out of the extension of trade credit have been held not to be securities.  Instruments with a five-year term or less rarely constitute securities.  Accordingly, a Creditor will recognize gain or loss on the exchange of his existing Claim (other than a Claim for accrued interest) for any consideration.  The amount of such gain or loss will equal the difference between (a) the "amount realized" in respect of such Claim and (b) the adjusted tax basis of the Creditor in such Claim.  Pursuant to Section 1001 of the Internal Revenue Code, the "amount realized" will be equal to the sum of the cash plus the fair market value of any other property received in such exchange.  The Committee intends the New Stock to be exempt from taxation under Section 351(e)(2) of the Internal Revenue Code.

(a)      Receipt of Cash.

A Creditor who received cash in full satisfaction of his claim will be required to recognize gain or loss on the exchange.  The Creditor will recognize gain or loss equal to the difference between the "amount realized" in respect of such Claim and the adjusted tax basis of the Creditor in the Claim, and the tax treatment of the exchange will parallel the tax treatment set forth under "Gain or Loss on Exchange" above.

(b)      Determination of Character of Gain or Loss.

In the case of a Creditor whose existing Claim does not constitute a capital asset, the gain or loss realized on the exchange will give rise to ordinary income or loss.  In the case of a Creditor whose existing Claim does constitute a capital asset in his hands, the gain or loss required to be recognized will generally be classified as a capital gain or loss, except to the extent of interest.  Any capital gain or loss recognized by a Creditor will be long-term capital gain or loss with respect to those Claims for which the holding period of the Creditor is more than twelve (12) months, and short-term capital gain or loss with respect to such Claims for which the holding period of the Creditor is twelve (12) months or less.

(c)      Receipt of Interest.

The Bankruptcy Tax Act of 1980 reversed prior law by providing that consideration attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Creditor's existing Claims are capital assets in his hands and the exchange is pursuant to tax reorganization.  A Creditor who, under his accounting method, was not previously required to include income accrued, but unpaid interest attributable to his existing Claims, and who exchanges his interest Claim for Cash, other property or Stock, or a combination thereof, pursuant to the Committee Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest,

regardless of whether that Creditor realizes an overall gain or loss as a result of the exchange of his Claims.

        (d)      Backup Withholding.

Under the Internal Revenue Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" at a thirty-one percent (31%) rate.  Withholding generally applies if the holder:  (i) fails to furnish his social security number or other taxpayer identification number ("<u>TIN</u>"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.

        (e)      Tax Consequences to Interest Holders.

With respect to the Dairies and the Equity Interest Holders of interests, the tax considerations of confirmation of the Committee Plan are potentially more complex.  Each Debtor is a limited liability company and is therefore not a tax-paying unit.  Rather, each Debtor is "flow-through" entity and the tax consequences of its operations and disposition of assets are determined at the Member or Partner level.  The Committee Plan and the eventual liquidation of the Dairies pose potential tax issues concerning allocation of capital gains and losses as well as net operating losses among the Equity Interest Holders, and create the potential for recognition of cancellation of debt ("<u>COD</u>") income by the Equity Interest Holders.

        (f)      <u>Cancellation of Debt ("COD") Income</u>

Cancellation of debt income (or COD income) arises when a debtor does not repay the full amount of a debt.  The general rule is that the amount of COD income equals the excess of the face amount of the debt over the amount paid to discharge it.

IRC section 108(a)(1)(A) provides that there is excluded from gross income of a taxpayer the amount realized from COD income if the discharge occurs in a Title 11 case.  This exception has limited utility in the context of partnerships and partners because, pursuant to IRC Section 108(d)(6), the bankruptcy exception applies at the <u>partner</u> level.  Accordingly, for the bankruptcy exception to apply to a partner's share of COD income from a partnership, the discharge of <u>partnership</u> liabilities must occur in a Title 11 case and the <u>partner</u> must also be a debtor in a Title 11 case.  As such, COD income in a partnership environment has the potential to trigger significant taxable income inclusion implications to the partners of the enterprise that would not exist in a corporate structure.

The projected debt forgiveness from a "sale" of the assets of the Debtors may not be material, and any such sale is not projected to produce any COD income because all debts are projected to be paid in full.

        C.      **<u>Tax implications of the creditor trust created under the Plan.</u>**

Qualification of the Liquidation Trust under the Internal Revenue Code.  The Trust established pursuant to the Trust Agreement is established for the purpose of satisfying claims by Liquidation the Trust Assets transferred to it, and the Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to, and consistent with, the Liquidation purpose of the Trust.  Additionally, the Trust is to provide a mechanism for the liquidation of the Trust Assets conveyed by the Debtors, and to distribute the proceeds of the liquidation, net of all claims, expenses, charges, liabilities, and obligations of the Trust, to the holders of Beneficial Interests in accordance with the terms of the Plan and the Trust Agreement. No business activities will be conducted by the Trust other than those associated with or related to the liquidation of the Trust Assets.  It is intended that the Trust be classified for federal income tax purposes as a "Liquidation trust" within the meaning of Treas. Reg. § 301.7701-4(d) (26 C.F.R. § 3 UL. 7701-4).  All parties hereto shall treat the transfers in trust described herein (to the extent relating to Allowed Claims) as transfers to the Beneficiaries for all purposes of the Internal Revenue Code of 1986, as amended (including sections 61(a)(12), 483, 1001, 1012, and 1274).  All the Parties hereto shall treat such transfers in trust as if the transferred assets, including the Trust Assets, had been first transferred to the Beneficiaries and then transferred by the Beneficiaries to the Trust.  The Beneficiaries shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as the grantors of the Trust and the owners of the Trust.

Tax Returns.  The Liquidation Trustee shall file returns for the Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a), to the extent interests of the Trust are attributable to Allowed Claims.  The Parties hereto, including the Liquidation Trustee and the Beneficiaries shall value the property transferred to the Trust consistently and such valuations shall be used for all federal income tax purposes.  Each Beneficiary with an Allowed Claim shall be responsible for payment of any taxes attributable to their share of the Trust Assets or income, and the Trust shall pay the taxes attributable to the shares of the Trust Assets or income allocable to the estimated amount of Disputed Claims (which will reduce the amount available to distribute to holders of Disputed Claims that may become Allowed Claims).

Minimization of Tax Liabilities of the Trust.  During its existence, the Trust shall not receive or retain Cash or Cash equivalents in excess of a reasonable amount necessary to meet claims and contingent liabilities or to maintain the value of its assets during liquidation.  The Liquidation Trustee shall use its continuing best efforts to dispose of the Trust Assets, make timely Distributions, and shall not unduly prolong the duration of the Trust.  The Liquidation Trustee is authorized to take any action as may be necessary or appropriate to minimize any potential tax liability of the Trust and, thereafter, the Beneficiaries arising out of the operations of the Trust.  The Liquidation Trustee is directed to allocate all costs, charges, expenses and deductions, or any of them in whole or in part, to income or principal at such time and in such a manner as the Liquidation Trustee shall determine will reduce or eliminate the Trust's taxes, if any.

Minimum Distributions to Beneficiaries.  Subject to Section 8.2.1 and Section 8.2.2, the Liquidation Trustee shall distribute at least annually to the holders of Beneficial Interests all net Cash income plus all net cash proceeds from the liquidation of assets of the Trust; provided,

<u>however</u>, the Liquidation Trustee shall be required to make such distributions only if Cash exists to be distributed after retaining and setting aside such amounts of Cash (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Trust during liquidation, the amount of which will be determined by the Liquidation Trustee in its discretion, (ii) to pay existing and anticipated Trust Costs and to fund the Expense Reserve Fund, as set forth herein, and (iii) to satisfy other existing or anticipated liabilities incurred or assumed by the Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Trust Agreement, the amount of which will be determined by the Liquidation Trustee in its discretion. In addition, the Liquidation Trustee shall, not less often than annually, provide to Beneficiaries such information as is appropriate or necessary, to enable the Beneficiaries to determine their respective tax obligations, if any, arising out of the operations of the Trust.

<u>Tax Reporting by Beneficiaries</u>.  The Beneficiaries shall each report their share of the net income of the Trust as reported to them by the Liquidation Trustee and pay any tax owing thereon on a current basis.  Each taxable year, all income of the Trust will be taxed either to the Beneficiaries or to the Trust.  No Beneficiary shall have any claim to or with respect to any specific Property held in trust and shall have no claim to or for a Distribution of Property in kind.

<u>Valuation of Trust Assets</u>.  As soon as possible after the Effective Date, but in no event later than January 31st of the year following the Effective Date, (i) the Liquidation Trustee shall determine the fair market value of the Trust Assets transferred to the Trust, based on the good faith determination of the Liquidation Trustee, in consultation with the Trust Committee, and (ii) upon written request the Liquidation Trustee shall apprise the Beneficiaries in writing of such valuation.  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidation Trustee and the Beneficiaries) for all federal income tax purposes.

<u>Withholding</u>.  The Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions made by the Trust shall be subject to any withholding and reporting requirements. The Liquidation Trustee may withhold from the amount distributable from the Trust at any time to any Person such sum or sums as may be sufficient to pay any tax or taxes or other charge or charges that have been or may be imposed on such Person or upon the Trust with respect to the amount distributable or to be distributed under the income tax laws of the United States or of any state or political subdivision or entity by reason of any Distribution provided for in <u>Article 8</u>, whenever such withholding is determined by the Liquidation Trustee in its discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement, and the Liquidation Trustee, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this section.  Notwithstanding the foregoing but without prejudice to the Liquidation Trustee's rights under the Liquidation Trust, such Person shall have the right with respect to the United States, or any state, or any political subdivision of either, to contest the imposition of any tax or other charge by reason of any distribution hereunder.

Allocation of Income and Losses.  Unless otherwise determined by the Liquidation Trustee in its reasonable discretion, allocations between Beneficiaries of taxable income of the Trust for each of its tax years shall be determined by reference to the manner in which an amount of cash equal to the amount of such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately before such deemed Distribution, the Trust had, with respect to the portion of the Trust treated as a grantor trust, distributed all its other assets (valued for this purpose at their tax book value) in respect of the Beneficial Interests, taking into account all prior and concurrent Distributions from the Trust made in accordance with the Plan. Similarly, taxable loss generally will be allocated by reference to the manner in which an economic loss would be borne immediately after a Liquidation Distribution of the Trust assets of the Trust.  The tax book value of assets for purposes of the Liquidation Trust of the means their fair-market value on the Effective Date, or, if later, the date on which such assets were acquired by the Trust, adjusted in either case in accordance with applicable tax accounting principles.  With regard to transfers of Beneficial Interests under the Liquidation Trust, the Liquidation Trustee shall promptly establish a standard convention for allocating and apportioning taxable income and loss between a transferor and its transferee and shall not be required to so allocate and apportion based on the actual Trust activities prior and subsequent to the date of any transfer.  The Liquidation Trustee shall use its sole discretion to establish a fair and equitable convention to apply and may, but is not required to, adopt a monthly, quarterly, or similar record date convention.

Tax Treatment of Trust Assets and Income/Loss Attributable to Disputed Claims. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of a "private letter ruling" if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall (i) treat the portion of the Trust Assets attributable to the estimated amount of Disputed Claims as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of the estimated amount of each Disputed Claim, in accordance with the trust provisions of the Internal Revenue Code (sections 641, et seq.), (ii) treat the taxable income or loss of the Trust attributable to such portion of the Trust Assets allocated to the estimated amount of Disputed Claims as taxable income or loss with respect to which the Trust will pay the tax liability (but only with respect to the portion of the year with respect to which such claims are Disputed Claims), (iii) after a Disputed Claim is Allowed by Final Order of the Bankruptcy Court, treat the holder of such Allowed Claim as a grantor of the Liquidation trust as described in Section 9.1 hereof, and as the party responsible for payment of all taxes on its share of any income of the Trust after the Claim is Allowed, and (iv) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Expedited Determination of Taxes.  The Trust may request an expedited determination of taxes of the Debtors and of the Trust, including the Disputed Claims Reserve Accounts, under 11 U.S.C. § 505(b) for all returns filed for, or on behalf of, the Debtors and the Trust for all taxable periods through the termination of the Trust.

BECAUSE THE FINAL OUTCOME DEPENDS SO MUCH ON EACH INDIVIDUAL CREDITOR'S OR INTEREST HOLDER'S SITUATION, IT IS IMPERATIVE THAT EACH CREDITOR OR INTEREST HOLDER SEEK INDIVIDUAL TAX COUNSEL FOR ADVICE ON ITS PARTICULAR SITUATION.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO ANY FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE COMMITTEE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR OR INTEREST HOLDER.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE COMMITTEE PLAN

If the Committee Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Dairies under Chapter 7 of the Bankruptcy Code or (b) an alternative Committee Plan of reorganization. The Dairies believe that if the Committee Plan is not confirmed and the case is converted to a case under Chapter 7 of the Bankruptcy Code, holders of Allowed Claims will receive a smaller dividend than proposed under the Committee Plan.

### A. Liquidation Under Chapter 7.

If no Committee Plan can be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. A Chapter 7 trustee would be appointed to liquidate the remaining assets of the Dairies for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. A Chapter 7 trustee would need time to investigate the Dairies' pre-petition transactions, and its assets and liabilities. A Chapter 7 trustee would retain and liquidate the Dairies' remaining assets, and, if necessary, investigate and pursue Causes of Action. The liquidation of the Dairies' assets would result in distressed recoveries and would therefore reduce significantly the recovery to Unsecured Creditors. The Dairies also believe that the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code and the appointment of a Chapter 7 trustee would increase the costs of administration, and reduce and postpone any distribution to holders of Allowed Claims.

For all of the foregoing reasons, the Dairies have concluded that Creditors are likely to receive an amount under the Committee Plan that is substantially greater than the amount such Creditors would receive under a Chapter 7 liquidation.

### B. The AFS Plan.

On September 9, 2011, AFS filed its Plan of Liquidation of the Debtors. Under such Plan, the Assets of the Debtors would be transferred to a designee of AFS, Administrative Expense Claims, and unsecured claims totaling $750.00 or less, would be paid in full, and general unsecured claims, excluding the AFS deficiency claim, would divide a total of $250,000

plus the proceeds of Causes of Action, less a "loan" of $1,000,000 to pay administrative costs – a maximum dividend of approximately 0% of Allowed Unsecured Claims.

### C. Alternative Committee Plan of Reorganization.

If the Committee Plan is not confirmed, the Dairies, or any other party-in-interest could attempt to formulate a different Plan. The Committee believes that the Committee Plan described herein enables the Creditors and all parties-in-interest to realize the best payout under the circumstances.

## XI. <u>SOLICITATION</u>

The Disclosure Statement you are reading is submitted by the Committee in compliance with its obligations under the Bankruptcy Code to provide "adequate information" to enable you to reach an informed decision regarding whether it is in your best interest to vote to accept the Committee Plan. All Claims are to receive the maximum distribution possible under the circumstances at a much earlier date than distributions would be paid if the Case were converted to a Chapter 7 case.

The Committee urges all holders of claims and interests to carefully consider the Committee Plan of Reorganization and complete the attached Ballot accepting the Committee Plan.

The Committee thanks you, in advance, for your support.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have caused this Disclosure Statement to be duly executed as of the date written below, which execution may be in multiple identical counterparts.

This 20th day of September, 2011.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF DAIRY PRODUCTION SYSTEMS – GEORGIA, LLC, DAIRY PRODUCTION SYSTEMS, LLC, DAIRY PRODUCTION SYSTEMS – MISSISSIPPI, LLC, NEW FRONTIER DAIRY, LLC AND HEIFER HAVEN, LLC

By:
/S/ Martha Furst
Martha Furst, Chairperson

STONE & BAXTER, LLP

By:    */s/ Ward Stone, Jr.*
       Ward Stone, Jr.
       Georgia Bar No. 684630
       Jerome L. Kaplan
       Georgia Bar No. 407100
       David L. Bury, Jr.
       Georgia Bar No. 133066
       Matthew S. Cathey
       Georgia Bar No. 759547
       Fickling & Co. Building
       Suite 800
       577 Mulberry Street
       Macon, Georgia 31201
       (478) 750-9898; (478) 750-9899 (*fax*)
       Counsel for the Committee