IN THE UNITED STATES BANKRUPTCY COURT
UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **DAIRY PRODUCTION SYSTEMS-** | ) | Case No. 10-11752-JDW |
| **GEORGIA LLC, DAIRY** | ) | |
| **PRODUCTION SYSTEMS, LLC,** | ) | |
| **DAIRY PRODUCTION SYSTEMS-** | ) | |
| **MISSISSIPPI, LLC, NEW FRONTIER** | ) | |
| **DAIRY, LLC, and HEIFER** | ) | |
| **HAVEN, LLC** | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

# DISCLOSURE STATEMENT TO
# JOINT CHAPTER 11 PLAN OF REORGANIZATION
# OF THE PLAN DEBTORS

## October 5, 2011

JACK K. HOLLAND
SEAN C. KULKA

ARNALL GOLDEN GREGORY LLP

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
(404) 873-8500

Counsel for the Debtors and Debtors in Possession

## DISCLOSURE STATEMENT TO JOINT PLAN OF REORGANIZATION
## OF THE PLAN DEBTORS

### DISCLAIMER

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE SUMMARY OF THE PLAN, AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN FILED BY THE PLAN DEBTORS CONTEMPORANEOUSLY HEREWITH, THIS DISCLOSURE STATEMENT, AND ANY EXHIBITS ANNEXED HERETO. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF. NO ASSURANCES EXIST THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME HEREAFTER.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE PLAN DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY OTHER REPRESENTATIONS OR INDUCEMENTS MADE TO SOLICIT YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN. FURTHERMORE, SUCH OTHER REPRESENTATIONS OR INDUCEMENTS SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTORS. COUNSEL FOR THE DEBTORS SHALL, IN TURN, COMMUNICATE SUCH INFORMATION TO THE COURT FOR APPROPRIATE ACTION.

WITH RESPECT TO ADVERSARY PROCEEDINGS, CONTESTED MATTERS, OR OTHER ACTIONS OR THREATENED ACTIONS, NEITHER THIS DISCLOSURE STATEMENT NOR ANY PARTY'S FAILURE TO OBJECT THERETO SHALL CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER. INSTEAD, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE STATEMENTS MADE IN CONNECTION WITH SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY. NO PERSON SHALL CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, OR FINANCIAL ADVICE,

INCLUDING, BUT NOT LIMITED TO, ADVICE REGARDING THE TAX EFFECTS OF THIS PLAN. EACH PERSON SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, OR TAX ADVISORS AS TO ANY SUCH MATTERS.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED. THE INFORMATION SET FORTH HEREIN WAS DERIVED FROM THE DEBTORS' BOOKS AND RECORDS. THE DEBTORS' BOOKS AND RECORDS ARE DEPENDENT UPON INTERNAL ACCOUNTING METHODS. AS A RESULT, VALUATIONS OF ASSETS AND CLAIM LIABILITIES ARE ESTIMATED. ALTHOUGH SUBSTANTIAL EFFORT HAS BEEN MADE TO BE COMPLETE AND ACCURATE, THE PLAN DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THE FULL AND COMPLETE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

## I.  INTRODUCTION

On October 7, 2011 (the "Petition Date"), Dairy Production Systems - Georgia LLC ("DPS-Georgia"), Dairy Production Systems, LLC ("DPS"), Dairy Production Systems - Mississippi, LLC ("DPS-Mississippi"), New Frontier Dairy, LLC ("New Frontier"), and Heifer Haven, LLC ("Heifer Haven"; DPS-Georgia, DPS, DPS-Mississippi, New Frontier, and Heifer Haven are collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Bankruptcy Cases"). On October 13, 2010, the Court entered an order [Docket No. 23] pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") providing for the joint administration of the Bankruptcy Cases for procedural purposes only. The Debtors have retained possession of their assets, and are authorized to continue to operate their businesses as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

On October 5, 2011, DPS-Georgia, DPS, DPS-Mississippi, and Heifer Haven (the "Plan Debtors") filed their *Joint Plan of Reorganization of the Plan Debtors* [Docket No. 507] (as hereinafter modified or amended, the "Plan")[1] in the Bankruptcy Cases pursuant to 11 U.S.C. § 1125 and Rule 3016 of the Bankruptcy Rules. The Plan is a new value plan, which includes an infusion of new capital in the amount of not less than $5 million (the "New Value Contribution"). The Plan provides for the substantive consolidation (merger) of the Plan Debtors into a single entity (the "Reorganized Debtor"). The Reorganized Debtor will utilize the New Value Contribution to fund the payments that are necessary to allow the Reorganized Debtor to emerge from Chapter 11 and to recapitalize the Reorganized Debtor so that it will be able to satisfy its liabilities under the Plan. In exchange for the New Value Contribution, the New Value Sponsor will receive 100% of the equity in the Reorganized

---

[1]     Capitalized terms that are used herein, but not defined in this Disclosure Statement, shall have the meanings ascribed to such terms in the Plan.

Debtor. THE PLAN RELEASES AND DISCHARGES SUMRALL FROM THE SUMRALL CAUSES OF ACTION, BUT DOES <u>NOT</u> RELEASE OR DISCHARGE ANY OTHER PERSON WHO IS SUBJECT TO ANY CAUSE OF ACTION AS A RESULT OF RECEIVING A PAYMENT OR TRANSFER FROM SUMRALL. IN ADDITION, THE PLAN DOES <u>NOT</u> RELEASE SUMRALL FROM ANY THIRD PARTY CLAIMS.

The Plan Debtors submit this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Plan, a copy of which is annexed hereto as **Exhibit A**.

## A.    <u>The Disclosure Statement</u>

The purpose of this Disclosure Statement is to set forth information that (i) outlines the history of the Debtors, their businesses, and the reasons the Debtors were forced to file the Bankruptcy Cases, (ii) summarizes the Plan, and (iii) assists any Holder of a Claim against, or Equity Interest in, the Plan Debtors entitled to vote for acceptance or rejection of the Plan in making an informed decision of whether to vote to accept or reject the Plan. No solicitation for votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any other information concerning the Plan Debtors or their businesses for such purpose.

This Disclosure Statement does not purport to be a complete description of the Plan, the financial status of the Plan Debtors, the applicable provisions of the Bankruptcy Code, or of other matters that may be deemed significant to Holders of Claims or other parties-in-interest. The Disclosure Statement necessarily involves a series of compromises between extensive "raw data" and the legal language in documents or statutes on the one hand and considerations of readability and usefulness on the other. For further information, you should examine the Plan directly and consult your legal, financial, business, and tax advisors.

## B.    <u>Bankruptcy Court Approval of this Disclosure Statement</u>

After notice and a hearing, the Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable each Holder of a Claim against or Equity Interest in the Debtors to make an informed judgment as to whether to vote to accept or reject the Plan.

## II. <u>VOTING PROCEDURES AND REQUIREMENTS</u>

## A.    <u>Eligibility to Vote</u>

The Plan Debtors are soliciting acceptances of the Plan from each Class that is identified in the Plan as impaired and is not deemed to have rejected the Plan. A class is "impaired" unless the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the Holder of a Claim is entitled; or (2) cures any default, reinstates the original terms of such obligation, compensates the Holder of a Claim for any damages incurred as a result of non-performance of the contract, and otherwise does not alter the legal, equitable, or contractual rights to which the Holder of a Claim might otherwise be entitled. A Class is deemed to have rejected the Plan

under Section 1126(g) of the Bankruptcy Code if the Class will receive no distribution under the Plan.

This Disclosure Statement and the accompanying Plan are being sent to all Holders of Claims and Equity Interests, whether or not that Holder is entitled to vote. Under Section 1141 of the Bankruptcy Code, the Plan, if approved (or confirmed) by the Court, will bind all parties, whether or not such parties are entitled to vote for or against the Plan.

## B.    **Ballots and Voting Deadlines**

### 1.    **Ballots**

Holders of Claims entitled to vote on the Plan will receive a Ballot accompanying this Disclosure Statement. All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement (or manually executed copies thereof). No other votes will be counted.

Please fill out the Ballot and return it to the Court at the address listed below:

> Clerk, United States Bankruptcy Court
> Middle District of Georgia
> P.O. Box 1957
> Macon, GA 31202-1957

DO NOT RETURN ANY SECURITIES, NOTES OR PROOFS OF CLAIM WITH YOUR BALLOT.

If delivery is by mail, enough time should be allowed to ensure timely delivery to and actual receipt by the Court by the Voting Deadline established in the Disclosure Statement Order.

**AS PROVIDED IN THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND ACTUALLY RECEIVED IN PROPER FORM BY THE COURT AT THE ABOVE ADDRESS ON OR BEFORE MIDNIGHT (EASTERN TIME) ON THE DATE SPECIFIED IN THE NOTICE (THE "VOTING DEADLINE"), OR SUCH LATER DATE TO WHICH THIS SOLICITATION IS EXTENDED BY THE PLAN DEBTORS OR THE COURT. BALLOTS RECEIVED AFTER THIS TIME MAY NOT BE COUNTED IN THE VOTING UNLESS THE COURT SO ORDERS. IF YOU HAVE ANY QUESTIONS ABOUT PROCEDURES FOR VOTING, OR IF YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR HAVE ANY QUESTIONS ABOUT THE PLAN OR DISCLOSURE STATEMENT, PLEASE CALL COUNSEL FOR THE PLAN DEBTORS AS SET FORTH ON THE COVER PAGE OF THIS DOCUMENT.**

The Plan Debtors in their sole discretion may waive objections to Ballots filed after the Voting Deadline, or related to Disputed Claims. Otherwise such Ballots will not be counted

unless ordered otherwise by the Court.

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, such Persons should indicate such capacity when signing.

### 2. Revocation of Ballots

Ballots to accept or reject the Plan may be revoked or changed at any time prior to the Voting Deadline by notifying the Court in a writing received by the Court prior to the Voting Deadline. Thereafter, Ballots may be revoked or changed only with the approval of the Court.

### 3. Voting Multiple Claims

Holders of Claims in more than one Class will vote such Claims in each Class.

### 4. Incomplete Ballots

Any Ballot received which is unsigned or does not indicate either an acceptance or a rejection of the Plan will not be counted. Incomplete Ballots may be amended by the Holder of the Claim on account of which the Ballot is cast to cure the deficiency, provided the amendment is filed before the beginning of the Confirmation Hearing.

### 5. Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, change, or withdrawal of Ballots will be determined by the Court, which determination will be final and binding. The Plan Debtors reserve the absolute right to contest the validity of any change, revocation, or withdrawal. The Plan Debtors also reserve the right to request the Court to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Plan Debtors or their counsel, be unlawful. The Plan Debtors further reserve the right to request the Court to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The Court's interpretation (including its interpretation of the Ballot and the respective instructions thereto), unless otherwise directed by the Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Court determines. Neither the Plan Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. The Plan Debtors will provide copies of any contested Ballots to the Debtors, counsel for the Committee, counsel for AFS, the proponent of any competing plan, and to the United States Trustee contemporaneously with the filing of the "balloting report" with the Court.

## C. Confirmation Hearing

The Confirmation Hearing will be held on the date and time specified in the accompanying Notice before the Honorable James D. Walker, Jr., United States Bankruptcy Judge, in the Courtroom of the United States Bankruptcy Court for the Middle District of

Georgia, Albany Division, in The C. B. King U.S. Courthouse, 201 West Broad Avenue, 3rd Floor, Albany, Georgia 31701, as stated above. Such Confirmation Hearing, held pursuant to Section 1128 of the Bankruptcy Code, may be adjourned from time to time by additional notice prior the hearing or by announcement in the Court on the scheduled date of such hearing, with notice of such continued hearing being given to only such parties as directed by the Court. At the Confirmation Hearing, the Court will: (i) determine whether the requisite votes have been obtained for each of the Classes that are entitled to vote under the Plan, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, and (iii) determine whether to confirm the Plan.

In the Disclosure Statement Order, attached hereto, the Court has directed that all objections, if any, to confirmation of the Plan must be filed with the Court and served in a manner so as to be actually received by counsel to the Plan Debtors, Arnall Golden Gregory LLP, 171 17th Street, NW, Suite 2100, Atlanta, Georgia 30363-1031, to the attention of Sean Kulka and Jack K. Holland, and by the Office of the United States Trustee, Middle District of Georgia, to the attention of Elizabeth Hardy, 440 Martin Luther King, Jr., Blvd. Suite 302 Macon, Georgia, 31201, on or before 12:00 midnight on the objection deadline specified in the Order and Notice.

## D. Recommendations

***THE PLAN DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST AND MOST EFFICIENT APPROACH TO THE PAYMENT OF CLAIMS IN THE PLAN DEBTORS' BANKRUPTCY CASES THROUGH THE CONTINUING OPERATION OF THE PLAN DEBTORS' BUSINESSES AND MAXIMIZES THE VALUE OF THE PLAN DEBTORS' ASSETS FOR THE BENEFIT OF THE PLAN DEBTORS' CREDITORS AND EQUITY INTEREST HOLDERS. THE PLAN DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.***

## III. HISTORY OF THE DEBTORS AND EVENTS LEADING TO CHAPTER 11

### A. Description of the Debtors

#### 1. The Debtors' Ownership Structure

Each of the Debtors is a single-member limited liability company that is 100% owned by David P. Sumrall ("Sumrall" or "Mr. Sumrall"). The Debtors are organized under the laws of the State of Colorado.

#### 2. The Debtors' Businesses

##### a. *Background and Overview*

The Debtors consist of five (5) limited liability companies, four (4) of which operate five (5) large commercial dairies and one of which operates a heifer-growing operation, all in the South and Southeast United States. The four (4) dairy operating companies own and operate five (5) dairy farms located in Florida, Georgia, Mississippi, and Texas (the "Dairies").

Mr. Sumrall acquired his interests in the Dairies during a series of transactions with Marcus Peperzak ("Mr. Peperzak"). The Dairies had been founded or previously operated by Mr. Peperzak through a number of limited liability companies controlled by Mr. Peperzak. The Dairies are "traditional" dairies, i.e. they do not produce milk to the standards set by the U.S.D.A. for "organic" milk products. Prior to 2004, Mr. Peperzak entered the "organic" dairy business. Thereafter, he made the strategic decision to get out of the "traditional" dairy business, and operate exclusively "organic" dairies.

Mr. Peperzak had hired Mr. Sumrall as the manager of his "traditional" dairy operations. Upon deciding to exit the "traditional" dairy market, Mr. Peperzak offered to sell the Dairies to Mr. Sumrall, under terms, which required both the refinancing of the Dairies, with owner financing for a portion of the purchase price. Mr. Sumrall agreed, and in 2004, Mr. Peperzak began the process of transferring the Dairies to Mr. Sumrall.

The five (5) limited liability companies are: DPS, DPS-Georgia, DPS-Mississippi, New Frontier, and Heifer Haven. DPS was formed in October, 2004 and owns and operates two (2) dairy operations in Florida: one in Bell, Florida and the other in Branford, Florida. DPS-Mississippi was formed in May, 2005 and owns and operates a dairy farm located in Edwards, Mississippi. DPS-Georgia was formed in November, 2008 and owns and operates a dairy farm located in Baconton, Georgia. New Frontier[2] was formed in December 2007 and owns and operates a dairy farm located in Dublin, Texas. Each of these operations is a member in a dairy cooperative to which it sells all of its milk. In August, 2011, the Debtors produced approximately 160,000 hundredweight of milk, which in turn generated approximately $4.2 million in proceeds.

Heifer Haven was formed in May, 2007 and raises the heifer calves born at DPS, DPS-Georgia, and DPS-Mississippi from approximately three (3) months in age until they are mature. At that time, they are impregnated and returned to the Debtors' dairy herds to produce milk.

The operations of the Dairies are conducted partially on real estate owned by the Debtors and partially on leased real estate. As of September 30, 2011, the Debtors maintained a total herd count of approximately 10,625 head of mature cows, and 4,573 head of young stock. In addition, the Debtors each own or lease all the assets necessary to conduct their operations, including buildings, improvements, fixtures, equipment, permits, and licenses. Combined, the Debtors employ approximately three hundred (300) people.

### b.    *DPS*

#### i.    *The Bell Dairy*

DPS owns and operates two (2) dairy operations in Florida. The first such operation is located in Bell, Florida (the "Bell Dairy"). The Bell Dairy is comprised of 456 acres of land owned by the DPS and of 322 acres of leased property. The Bell Dairy currently has the

---

[2]    New Frontier is not one of the Plan Debtors. Any reference to New Frontier in this Disclosure Statement is for background and informational purposes only.

4314111v1

capacity to house approximately one thousand one hundred (1,100) total cows, including eight hundred fifty (850) milking cattle. Renovation and expansion of barns already on the Bell Farm premises will double the Bell Dairy's milking capacity.

As of the end of September, 2011, the Bell Dairy had approximately one thousand twenty five (1,025) head of cattle, of which seven hundred sixty eight (768) were milking.

The Bell Dairy's facilities include a facility to raise young calves. Calves born at the Debtors' dairy operations in Florida, Georgia, and Mississippi are transferred to the Bell Dairy and raised there until they are three (3) months in age. At that time they are transferred to Heifer Haven, where they are raised until they are ready to be incorporated into one of the Debtors' herds for milk production or sold in the open market as determined by Debtors' management team.

### ii. *The Branford Dairy*

The second of DPS's dairy operations is located in Branford, Florida (the "Branford Dairy"). The Branford Dairy is located on 593 acres of land owned by DPS and approximately 130 acres of leased land. The Branford Dairy has the capacity to house approximately two thousand five hundred (2,500) head of cattle, including two thousand fifty (2,050) milking cattle, at any time. As of the end of September, 2011, the Branford Dairy's herd was comprised of two thousand seventy (2,070) head of cattle, of which one thousand six hundred sixty three (1,663) were milking.

### c. *DPS-Georgia*

DPS-Georgia operates a dairy located in Baconton, Georgia (the "DPS-Georgia Dairy"). The DPS-Georgia Dairy is located on 1,500 acres of land leased under two (2) separate leases and has a total herd capacity of four thousand three hundred twenty (4,320) cows and milking capacity of three thousand four hundred (3,400) cows. As of the end of September, 2011, the DPS-Georgia's Dairy herd was comprised of three thousand seven hundred ninety seven (3,797) head of cattle, of which two thousand nine hundred ninety three (2,993) were milking.

### d. *DPS-Mississippi*

DPS-Mississippi operates a dairy located in Edwards, Mississippi (the "Edwards Dairy"). The Edwards Dairy is comprised of approximately 220 acres of land owned by DPS-Mississippi and approximately 250 acres of leased land. DPS-Mississippi has a milking capacity of one thousand five hundred (1,500) cows. As of the end of September, 2011, the Edwards Dairy's herd was comprised of one thousand four hundred ninety one (1,491) head of cattle, of which one thousand eighty six (1,086) were milking.

### e. *New Frontier*[3]

New Frontier operates a dairy located in Dublin, Texas (the "New Frontier Dairy"). The New Frontier Dairy is comprised of approximately 826 acres of land owned by New Frontier and an additional 250 acres of land that are leased. The New Frontier Dairy has a maximum herd capacity of four thousand five hundred (4,500) head of cattle and milking capacity of three thousand six hundred (3,600) cows.

As of the end of September, 2011, the New Frontier Dairy's herd was comprised of two thousand two hundred forty two (2,242) head of cattle, of which one thousand eight hundred fourteen (1,814) were milking.

### f. **Heifer Haven**

Heifer Haven administers a calf-raising operation and does not own or operate dairies. Heifer calves birthed on the Dairies owned by DPS, DPS-Georgia, and DPS-Mississippi are transferred to the Bell Dairy to be raised until they are three (3) months in age, and then are transferred to Heifer Haven. Heifer calves birthed at the New Frontier Dairy are sold to third parties for approximately $100 per heifer calf. Male calves birthed at all of the Debtors' farms are sold to third party cattle purchasers for approximately $20 per head.

Once relocated to the Bell Dairy, heifer calves are housed, fed, and raised for approximately sixteen (16) weeks until they reach three hundred (300) pounds. At this point, these heifer calves are transferred to Heifer Haven and raised to maturity. Eventually, each heifer grows into a "Replacement Springer," i.e. a mature heifer impregnated for the first time, and is transferred back to DPS, DPS-Georgia, or DPS-Mississippi prior to calving and commencing milking. Heifer Haven does not own any operating assets other than calves, and it contracts out all calf-raising responsibilities to third parties.

## B. The Debtors' Pre-Petition Debt Structure

### 1. DPS

On or about September 6, 2007, New Frontier Bank of Greeley, Colorado ("NFB") made a loan to DPS in the original principal amount of $2.825 million (the "First DPS Loan"). The First DPS Loan is secured by a deed to secure debt on the Aurora Dairy - Georgia, LLC ("Aurora-Georgia") owned by DPS-Georgia Dairy, and all furniture, fixtures, and equipment owned by DPS and Aurora-Georgia.

On or about October 19, 2007, NFB made a loan to DPS in the original principal amount of $6.8 million (the "Second DPS Loan"). The Second DPS Loan (and all other debts of DPS to NFB and its successors and assigns up to the original principal amount of the Second DPS Note) is secured by Branford Dairy. In addition to serving as collateral for the Second DPS Loan, Branford Dairy is also encumbered by a second mortgage securing an $800,000 promissory note

---

[3]     New Frontier is not one of the Plan Debtors. Any reference to New Frontier is this Disclosure Statement is for background and informational purposes only.

4314111v1

from Mr. Sumrall, personally, to Mr. Peperzak. Mr. Peperzak transferred and assigned this note to AFS (as defined herein and below) or to one of its affiliates pursuant to a settlement agreement by and between Mr. Peperzak and AFS.

On or about January 15, 2009, NFB made a loan to DPS in the original principal amount of $2,978,129.00 (the "Third DPS Loan"). The Third DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by Bell Farm. In addition to serving as collateral for the Third DPS Loan, the Bell Farm is also encumbered by a second mortgage securing a $900,000 promissory note from Sumrall, personally, to Mr. Peperzak. Mr. Peperzak transferred and assigned this note to AFS or one of its affiliates pursuant to a settlement agreement by and between Mr. Peperzak and AFS.

On or about March 19, 2009, NFB made a loan to DPS in the original principal amount of $8.6 million (the "Fourth DPS Loan"; together with the First DPS Loan, the Second DPS Loan, and the Third DPS Loan, the "DPS Loans"). The Fourth DPS Loan (and all other debts of DPS to NFB and its successors and assigns) is secured by, among other things, DPS's accounts, crops, equipment, farm products, general intangibles, inventory, livestock, and milk sale proceeds.

On or about November 30, 2010, AFS filed a proof of claim [Case No. 10-11754, Claim No. 26-1, as amended by Claim No. 26-2] that asserts, among other things, that AFS is the holder of the notes that evidence the DPS Loans, and that as of the Petition Date, DPS owed AFS $25,732,257.17 in principal, interest, fees, and other charges.

DPS's Schedules indicate that as of the Petition Date, DPS owed $5,324,113.07 in unsecured non-priority claims (the "DPS Scheduled Claims"). Prior to the Bar Date, creditors filed non-priority unsecured claims against DPS asserting claims totaling $3,857,046.21. When timely filed non-priority unsecured claims against DPS are compared against the DPS Scheduled Claims, the total amount of non-priority unsecured claims against DPS, exclusive of any deficiency claim held by AFS, could be as high as $6,135,972.66. Many of the proof of claims filed against DPS may be subject to a valid claim objection.

## 2. DPS-Georgia

On or about January 20, 2009, NFB made a loan to DPS-Georgia in the original principal amount of $10.1 million (the "DPS-Georgia Loan"). The DPS-Georgia Loan (and all other debts of DPS-Georgia to NFB and its successors and assigns) is secured by, among other thing, DPS-Georgia's accounts, equipment, feed, general intangibles, livestock, and milk sale proceeds.

On or about November 30, 2010, AFS filed a proof of claim [Case No. 10-11752, Claim No. 15-1] that asserts, among other things, that AFS is the holder of the note that evidences the DPS-Georgia Loan, and that as of the Petition Date, DPS-Georgia owed AFS $11,891,042.12 in principal, interest, fees, and other charges.

DPS-Georgia's Schedules indicate that as of the Petition Date, DPS-Georgia owed $4,504,615.24 in unsecured non-priority claims (the "DPS-Georgia Scheduled Claims"). Prior to

the Bar Date, creditors filed non-priority unsecured claims against DPS-Georgia asserting claims totaling $5,505,087.21. When timely filed non-priority unsecured claims against DPS-Georgia are compared against the DPS-Georgia Scheduled Claims, the total amount of non-priority unsecured claims against DPS-Georgia, exclusive of any deficiency claim held by AFS, could be as high as $7,467,183.03. Many of the proof of claims filed against DPS-Georgia may be subject to a valid claim objection.

### 3.    DPS-Mississippi

On or about July 11, 2005, NFB made a loan to DPS-Mississippi in the original principal amount of $3.25 million (the "First DPS- Mississippi Loan"), as modified from time to time. The First DPS-Mississippi Loan (and all other debts of DPS-Mississippi to NFB and its successors and assigns) is secured by the Edwards Dairy.

On or about May 22, 2006, NFB made a loan to DPS-Mississippi in the original principal amount of $4.512 million (the "Second DPS-Mississippi Loan"; together with the First DPS-Mississippi Loan and the Second DPS-Mississippi Loan, the "DPS Mississippi Loans") as modified from time to time. The Second DPS-Mississippi Loan (and all other debts of DPS-Mississippi to NFB and its successors and assigns) is secured by, among other things, DPS-Mississippi's accounts, crops, equipment, farm products and supplies, feed, inventory, and livestock.

On or about November 30, 2010, AFS filed a proof of claim [Case No. 10-11755, Claim No. 8-1] that asserts, among other things, that AFS is the holder of the notes that evidence the DPS Mississippi Loans, and that as of the Petition Date, DPS-Mississippi owed AFS $8,812,161.98 in principal, interest, fees, and other charges.

DPS- Mississippi's Schedules indicate that as of the Petition Date, DPS-Mississippi owed $2,143,199.45 in unsecured non-priority claims (the "DPS-Mississippi Scheduled Claims"). Prior to the Bar Date, creditors filed non-priority unsecured claims against DPS- Mississippi asserting claims totaling $613,089.21. When timely filed non-priority unsecured claims against DPS- Mississippi are compared against the DPS-Mississippi Scheduled Claims, the total amount of non-priority unsecured claims against DPS-Mississippi, exclusive of any deficiency claim held by AFS, could be as high as $2,260,666.93. Many of the proof of claims filed against DPS-Mississippi may be subject to a valid claim objection.

### 4.    New Frontier Dairy[4]

On or about December 28, 2007, NFB made a loan to New Frontier in the original principal amount of $8.6 million, as modified from time to time (the "First New Frontier Loan"). The First New Frontier Loan (and all other debts of New Frontier to NFB and its successors and assigns) is secured by the New Frontier Dairy.

On or about July 3, 2008, NFB made a loan to New Frontier in the original principal

---

[4]    New Frontier is not one of the Plan Debtors. Any reference to New Frontier is this Disclosure statement is for background and informational purposes only.

amount of $12.03 million (the "Second New Frontier Loan", together with the First New Frontier Loan, the "New Frontier Loans").

On or about December 6, 2010, AFS filed a proof of claim [Case No. 10-11756, Claim No. 19-4] that asserts, among other things, that AFS is the holder of the note that evidences the Heifer Haven Loan, and that as of the Petition Date, New Frontier owed AFS $24,758,518.55 in principal, interest, fees and other charges.

### 5.    Heifer Haven

On or about June 21, 2007, NFB made a loan to Heifer Haven in the original principal amount of $5.012 million (the "Heifer Haven Loan", together with the DPS Loans, the DPS-Georgia Loan, the DPS-Mississippi Loans, and New Frontier Loans, the "NFB Loans"), as modified from time to time. The Heifer Haven Loan (and all other debts of Heifer Haven to NFB and its successors and assigns) is secured by Heifer Haven's livestock.

On or about November 30, 2010, AFS filed a proof of claim [Case No. 10-11757, Claim No. 2-1] that asserts, among other things, that AFS is the holder of the note that evidences the Heifer Haven Loan, and that as of the Petition Date, Heifer Haven owed AFS $5,972,980.24 in principal, interest, fees and other charges.

Heifer Haven's Schedules indicate that as of the Petition Date, Heifer Haven owed $90,229.25 in unsecured non-priority claims (the "Heifer Haven Scheduled Claims"). Prior to the Bar Date, creditors filed non-priority unsecured claims against Heifer Haven asserting claims totaling $100.71. When timely filed non-priority unsecured claims against Heifer Haven are compared against the Heifer Haven Scheduled Claims the total amount of non-priority unsecured claims against Heifer Haven, exclusive of any deficiency claim held by AFS, could be as high as $90,329.96. Many of the proof of claims filed against Heifer Haven may be subject to a valid claim objection. The Plan Debtors note that the contract that gave rise to the filed claims was assumed and cured during the pendency of these Bankruptcy Cases.

As of the Petition Date, according to the proof claims filed by AFS in these Bankruptcy Cases, the principal and accrued interest under the NFB Loans related to the Plan Debtors was $52,408,441.51. The NFB Loans are each personally guaranteed by Mr. Sumrall. To the extent that Mr. Peperzak was a guarantor on some of the NFB Loans, he was released from such loans by AFS pursuant to a settlement agreement between Mr. Peperzak and AFS.

### 6.    Aggregate Claims Against the Plan Debtors

#### a.    *AFS Secured and Unsecured Claims Against the Plan Debtors*

The notes and related loan documents that evidence the NFB Loans are not cross-collateralized. As of the Petition Date, according to the proof claims filed by AFS, the principal and accrued interest under the NFB Loans related to the Plan Debtors (excluding the First New Frontier Loan and the Second New Frontier Loan) was $52,408,441.51 (the "AFS Claim"). The

Plan Debtors assert that the AFS Claim may be subject to one or more valid claim objections and/or subordination.

Section 506 of the Bankruptcy Code separates or bifurcates claims secured by property of a Debtor into a "secured" portion equal to the value of the lender's collateral on the effective date of a plan, and an "unsecured" portion for any deficiency. The Plan Debtors value the secured portion of the AFS Claim at $20,000,000 (the "Secured Claim of AFS"). This valuation leaves AFS an unsecured deficiency claim of approximately $32.4 million (the "Deficiency Claim of AFS"). The treatment of those two claims under the Plan is discussed below.

**b.** **Unsecured Claims Against the Plan Debtors Not Including AFS's Deficiency Claim**

The Plan Debtors' Schedules indicate that as of the Petition Date, the Plan Debtors owed $12,062,157.01 in unsecured non-priority claims (the "Plan Debtors' Scheduled Claims"). Prior to the Bar Date, creditors filed non-priority unsecured claims against the Plan Debtors asserting claims totaling $9,975,323.34. When timely filed non-priority unsecured claims against the Plan Debtors are compared against the Plan Debtors' Scheduled Claims the total amount of non-priority unsecured claims against the Plan Debtors, exclusive of any deficiency claim held by AFS, could be as high as $15,954,152.58. Many of the proof of claims filed against the Plan Debtors may be subject to a valid claim objection.

**C.** **Events Leading to Chapter 11**

On April 10, 2009, the Colorado Division of Banking closed NFB, and the Federal Deposit Insurance Corporation ("FDIC") was named the receiver for NFB. The FDIC subsequently auctioned the NFB Loans, and upon information and belief, AFS acquired the NFB Loans with an outstanding balance (principal and interest) on the date of auction of approximately $70 million for approximately $22 million.[5]

The failure of NFB coincided with a severe downturn in the U.S. dairy industry that continued into 2010. From November, 2008 to February, 2009, the all-milk price fell precipitously from $17.10 per hundredweight to $11.60 per hundredweight. Prices remained below $12.00 per hundredweight until they began to rise in August of 2009.

There were a number of reasons for this precipitous decline. The global recession appears to be a major factor. In addition to reducing domestic demand, the global recession had a dramatic effect on over-all U.S. agricultural exports, falling from a peak of $10.6 billion in October, 2008 to a low of $7.3 billion in September, 2009, before rebounding to $10.0 billion in December, 2009. On a ME (mature equivalent) skim-solids basis, U.S. dairy exports reached a high of 7.6 billion pounds in the second quarter of 2008 and then declined to a low of 5.1 billion pounds in the first quarter of 2009, before rising to 6.3 billion pounds in the fourth quarter

---

[5]     Upon information and belief, AFS obtained "insider information" providing it with an unfair advantage in the auction of the NFB Loans, and in violation of the FDIC's rules and regulations, as well as, Federal Law. Through the AFS Litigation, the Debtors intend to prove that AFS's use of such information and other conduct merits subordination of AFS' claims pursuant to Section 510(c) of the Bankruptcy Code and applicable law.

of 2009. The increase in milk production through 2008, sluggish domestic demand in 2008 and 2009, and falling export volumes in late 2008 and early 2009, created a milk surplus, driving down milk prices in early 2009.

The sharp decline in milk prices described above occurred in conjunction with significant increases in feed prices and other operational costs. From September, 2007 until September, 2008, corn prices averaged $4.20 per bushel and from October, 2007 until October, 2008, soybean meal prices averaged $335.94 per ton. These prices can be compared against expected average costs for corn and soybean meal for the September/October, 2009 to September/October, 2010 period of $3.35 to $3.95 per bushel and $270 to $320 per ton, respectively, which prices still are high by historic measures.

Together, the decrease in milk prices and the increase in feed costs created a negative impact on the Debtors' respective revenues, causing severe negative cash flow problems and compromising the Debtors' ability to service the NFB Loans. The Debtors' gross revenue on a consolidated basis dropped from $57,248,119 in 2008 to $47,967,685 in 2009.

These cash flow problems were exacerbated by the failure of NFB that left the Debtors without a banking relationship during one of the tightest credit markets in history. Although the Debtors diligently pursued and exhausted all possible refinancing sources that were available at that time, every attempt to refinance the NFB Loans - both while the NFB loans were held by the FDIC and after AFS purportedly purchased the NFB loans - failed. Further, after the FDIC auction, AFS contacted the Debtors to restructure the NFB Loans and to provide additional financing of $3.5 million to finance the purchase of additional dairy cows needed to fill the Debtors' dairies to capacity (as of the Petition Date the Dairies were at approximately 60 to 65% of capacity) and completion of construction on the Bell Farm (the "Additional Financing"). The Debtors in good faith attempted on numerous occasions to arrive at an acceptable restructuring of the NFB Loans and terms for the Additional Financing with AFS; however, all of the Debtors' efforts proved fruitless.

On or about September 15, 2010, AFS filed a lawsuit (Circuit Civil Case No. 2010-CA-0103) against DPS, Mr. Sumrall, and several other defendants in the Circuit Court of the Eighth Judicial Circuit, Gilchrist County, Florida (the "Florida Action") seeking, among other things, foreclosure, the appointment of a receiver, and the collection of the NFB Loans. On October 5, 2010, AFS filed an Emergency Motion for Appointment of a Receiver and Request for Expedited Hearing in the Florida Action. AFS did not provide notice of this emergency motion to the Debtors until October 6, 2010. On or about October 6, 2010, AFS filed a lawsuit against DPS-Georgia in the Superior Court of Mitchell County Georgia seeking, among other things, the appointment of a receiver, and the collection of the NFB Loans. On or about October 6, 2010, AFS filed a lawsuit against DPS-Mississippi in the Chancery Court for the Second Judicial District of Hinds County, Mississippi seeking, among other things, the appointment of a receiver, and the collection of the NFB Loans. On or about October 6, 2010, AFS filed a lawsuit against New Frontier in the 266th Judicial District Court, Erath County, Texas seeking, among other things, the appointment of a receiver, and the collection of the NFB Loans.

Given (i) the Debtors' severe negative cash flow problems in large part caused by the decrease in milk prices and the increase in feed costs over the last several years, (ii) AFS's refusal to provide the Additional Financing as represented to enable the Debtors to purchase the dairy cows needed to fill the Dairies to capacity and to complete the construction on the Bell Farm, (iii) the Debtors' inability to refinance or restructure the NFB Loans, and (iv) to prevent AFS's pending foreclosure and receivership actions, the Debtors decided to file the Bankruptcy Cases.

Additional information about the Debtors' businesses and the events leading up to the commencement of the Debtors' Bankruptcy Cases can be found in the Declaration of David P. Sumrall, President and CEO of the Debtors, in Support of Chapter 11 Petitions and First-Day Orders [Docket No. 24] (the "Sumrall Declaration"), and is incorporated herein by reference.

## IV. SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES

Since the Petition Date, the Debtors have continued to operate their businesses as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and during that time period, the Debtors' overall condition has improved and/or stabilized. For example, since the Petition Date, the Plan Debtors' Dairies have increased the size of their mature herds from 7,984 to 8,383 cows as of September 30, 2011, and Heifer Haven has increased the number of calves from 1,412 to 2,853. The Debtors' individually filed Monthly Operating Reports (the "Operating Reports") provide financial information with respect to the Debtors' financial performance since the Petition Date. The following is a description of significant events that have taken place during the Bankruptcy Cases.

### A. Retention of Professionals

On October 21, 2010, the Debtors filed *Debtors Application Pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014 For An Order Authorizing the Retention and Employment of Arnall Golden Gregory LLP as Attorneys for the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 61] (the "AGG Retention Application") seeking the entry of an order authorizing the retention and employment of the Arnall Golden Gregory LLP ("AGG") as counsel in the Debtors' Bankruptcy Cases *nunc pro tunc* to the Petition Date. On November 2, 2010, the Court entered its *Order Pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Retention and Employment of Arnall Golden Gregory LLP as Attorneys for the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 90] approving the AGG Retention Application.

On March 28, 2011, the Debtors filed their *Application for Authority to Retain Morgan Joseph TriArtisan LLC as Financial Advisor and Investment Banker to the Debtors, Nunc Pro Tunc to March 24, 2011* [Docket No. 256] (the "Morgan Joseph Application") requesting entry of an order authorizing the employment and retention of Morgan Joseph TriArtisan LLC ("Morgan Joseph") as Financial Advisor and Investment Banker to the Debtors, *nunc pro tunc* to March 24, 2011. On March 30, 2011, the Court entered its *Order Approving Application for Authority to Retain Morgan Joseph TriArtisan LLC as Financial Advisor and Investment Banker to the Debtors, Nunc Pro Tunc to March 24, 2011* [Docket No. 262] approving the

Morgan Joseph Application. On July 5, 2011, the Court entered its *Order Resolving Motions for Reconsideration Related to Order Approving Application for Authority to Retain Morgan Joseph Triartisan LLC as Financial Advisor and Investment Banker to the Debtors, Nunc Pro Tunc to March 24, 2011* [Docket No. 391], which modified its previous order approving the Morgan Joseph Application, which, among other things, made it within the discretion of the Court whether Morgan Joseph receives a "success fee" for any investment banking services provided to the Debtors.

On May 4, 2011, the Debtors filed their *Application for Authority to Retain James Moore & Co. P.L. as Accountants for the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 314] (the "James Moore Retention Application") seeking entry of an order authorizing the retention and employment of James Moore & Co. P.L. ("James Moore") as accountants for the Debtors, *nunc pro tunc* to the Petition Date. On May 6, 2011, the Court entered its *Order Approving Application for Authority to Retain James Moore & Co. P.L. as Accountants to the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 321] approving the James Moore Retention Application.

On November 8, 2011, the Official Committee of Unsecured Creditors (the "Committee") filed its *Application to Approve Employment of Attorneys for Official Committee of Unsecured Creditors* [Docket No. 96] (the "Stone & Baxter Retention Application") seeking the entry of an order authorizing the retention and employment of Stone & Baxter, LLP ("Stone & Baxter") as its attorneys. On November 9, 2011 the Court entered its *Order Approving Employment of Attorneys for Official Committee of Unsecured Creditors Nunc Pro Tunc to October 19, 2010* [Docket No. 100] approving the Stone & Baxter Retention Application.

On March 3, 2011, the Committee filed its *Application of the Official Committee of Unsecured Creditors of Dairy Production Systems – Georgia, LLC, et al., to Employ Odyssey Capital Group, LLC as its Financial Advisor* [Docket No. 220] (the "Odyssey Capital Retention Application") seeking the entry of an order authorizing the retention and employment of the Odyssey Capital Group, LLC ("Odyssey Capital") as its financial advisor. On March 31, 2011, the Court entered its *Order Authorizing Retention of Odyssey Capital Group, LLC as Financial Advisor for the Official Committee of Unsecured Creditors of Dairy Production Systems – Georgia, LLC, et al.* [Docket No. 264] approving the Odyssey Capital Retention Application.

## B.    Cash Collateral

On October 12, 2010, the Debtors filed a motion seeking, among other things, authorization and approval, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b), for the Debtors to use AFS's cash collateral and to provide adequate protection to AFS [Docket No. 18]. On October 13, 2010, the Court entered its First Interim Cash Collateral Order [Docket No. 21], authorizing the Debtors' use of cash collateral on an interim basis pursuant to a budget attached thereto. As adequate protection for use of the cash collateral, the Court granted AFS, among other things, a replacement lien in the Debtors' post-petition accounts receivable and a super-priority administrative claim.

The Court has subsequently entered several orders extending the Debtors' authority to use the cash collateral [Docket Nos. 81, 147, 231, 291, 350, 447].[6]  On September 27, 2011, over the objection of AFS, the Court orally ruled that the Debtors' use of cash collateral was extended to November 3, 2011 (the date of the hearing on the Proposed Disclosure Statement of the Committee and the Proposed Disclosure Statement of AFS) and that absent a material adverse change in these Bankruptcy Cases, the Debtors' authority to use cash collateral would likely be continued to the date of the hearing on confirmation of any plans proposed in these Bankruptcy Cases.

## C.     The Official Committee of Unsecured Creditors

On October 19, 2010, the United States Trustee, pursuant to its authority under Section 1102 of the Bankruptcy Code, appointed the following members to the Committee [Docket No. 49]: Bradley Wayne Mills, Dairy Replacement Management, LLC, Century-Plus, LLC, Norvel Reed, Jr., Furst-McNess Company, Kay Enterprises, Inc., Wendelin Industries, LLC.  As stated above, the Committee is represented by Stone & Baxter, LLP as its counsel and Odyssey Capital Group, LLC as its financial advisor.

## D.     Claims Process and Bar Date

### 1.     Schedules and Statements

On November 11, 2010, each of the Debtors filed their schedules and statements of financial affairs required by Rule 1007 of the Bankruptcy Rules (collectively, the "Schedules").[7] The Schedules provide a detailed analysis of the Debtors' financial condition on or about the Petition Date.

### 2.     Proof of Claim Bar Date for Pre-Petition Claims Other Than Governmental Claims

In the Notice of Filing Chapter 11 Bankruptcy Case dated October 12, 2010, the Debtors set the deadline for all persons, other than Governmental Units (as that term is defined in Section 101(27) of the Bankruptcy Code), to file proofs of claim in the Bankruptcy Cases as November 14, 2011 [Docket No. 16]. This notice was sent to various entities via first class United States mail and electronic transmission [Docket No. 33].  Pursuant to Section 502(b)(9) of the Bankruptcy Code, the deadline for Governmental Units to file proofs of Claim expired on April 8, 2011.

---

[6]     On October 27, 2010, the Court entered its Second Interim Cash Collateral Order [Docket No. 81].  On December 21, 2010, the Court entered its Third Interim Cash Collateral Order [Docket No. 147].  On March 11, 2011, the Court entered its Fourth Interim Cash Collateral Order [Docket No. 231].  On April 23, 2011, the Court entered its Order Modifying the Fourth Interim Cash Collateral Order [Docket No. 291].  On June 1, 2011, the Court entered its Fifth Interim Cash Collateral Order [Docket No. 350].  On August 30, 2011, the Court entered its Order Modifying the Fifth Interim Cash Collateral Order [Docket No. 447].

[7]     Each Debtor filed its own set of Schedules in its respective bankruptcy case.  The values in the Plan Debtors' Schedules were based on a number of factors including, relatively stale appraisals and book value.  The Plan Debtors reserve the right to amend the Schedules as they deem appropriate.

4314111v1

The total amount of Priority Unsecured, Non-Priority Unsecured, and Secured Claims for which a proof of claim was filed against each Debtor (excluding proofs of Claim filed by AFS) as compared to the total amount of Priority Unsecured, Non-Priority Unsecured, and Secured Claims scheduled by each Debtor (excluding Claims scheduled for AFS) are set forth in the charts below:

### Priority Unsecured Claims As Filed and As Scheduled
### (excluding AFS's Claim)

| Debtor | Priority Unsecured Claims Filed | Priority Unsecured Claims Scheduled |
|---|---|---|
| DPS | $140,554.84 | "Unknown" |
| DPS-Georgia | $64,778.92 | $120,122.00 |
| DPS-Mississippi | $0.00 | "Unknown" |
| Heifer Haven | $0.00 | $0.00 |

### Non-Priority Unsecured Claims As Filed and As Scheduled
### (excluding AFS's Claim)

| Debtor | Non-Priority Unsecured Claims Filed | Non-Priority Unsecured Claims Scheduled |
|---|---|---|
| DPS | $3,857,046.21 | $5,324,113.07 |
| DPS-Georgia | $5,505,087.21 | $4,504,615.24 |
| DPS-Mississippi | $613,089.21 | $2,143,199.45 |
| Heifer Haven | $100.71 | $90,229.25 |

### Secured Claims As Filed and As Scheduled
### (excluding AFS's Claim)

| Debtor | Secured Claims Filed | Secured Claims Scheduled |
|---|---|---|
| DPS | $658,457.81 | $744,337.88 |
| DPS-Georgia | $823,427.78 | $146,293.00 |
| DPS-Mississippi | $636,661.08 | $487,891.42 |
| Heifer Haven | $0.00 | $0.00 |

The Plan Debtors believe that the Secured Claims as filed may be substantially overstated. Further, the Secured Claims as scheduled include certain amounts that are either subject to a right of off-set or have been paid since the Petition Date. Accordingly, the Plan Debtor's estimate that the Other Secured Claims scheduled are currently approximately $500,000.

The total amount of Claims held by AFS for which a proof of claim was filed against each Debtor as compared to the total amount of Claims held by AFS which was scheduled by each Debtor is set forth in the chart below:

**AFS Claims As Filed and As Scheduled**

| Debtor | AFS Claims Filed | AFS Claims Scheduled |
|---|---|---|
| DPS | $25,732,257.17 | $27,525,355.60 |
| DPS–Georgia | $11,891,042.12 | $14,411,876.79 |
| DPS-Mississippi | $8,812,161.98 | $8,381,306.64 |
| New Frontier | $24,758,516.55 | $20,188,350.90 |
| Heifer Haven | $5,972,980.24 | $5,682,982.69 |

The data in the above-referenced charts encompasses purported claims that may be unsecured, secured, priority, unknown, and administrative. Further, this data is raw data, and the claims scheduled and filed have not yet been reviewed for duplicity, accuracy, or veracity. Additionally, these amounts do not include potential claims that might be incurred as a result of the rejection or assumption of executory contracts. Therefore, the actual amounts of the allowed claims that may be asserted against each Plan Debtor may differ from the numbers provided in the chart above.

### 3. Administrative Expense Bar Date

On August 26, 2011, the Debtors filed their *Motion to Establish Bar Date for Filing Motions Requesting Allowance or Payment of Administrative Expense Claims Pursuant to 11 U.S.C. § 503(b)(9) and to Approve the Form and Manner of Notice Thereof* [Docket No. 441]. On September 23, 2011, the Court granted the motion and established October 21, 2011, at 4:00 p.m. (Eastern Time) as the deadline for filing motions requesting allowance or payment of administrative expense claims under Section 503(b)(9) of the Bankruptcy Code [Docket No. 481].

On September 9, 2011, AFS filed its *Motion for Entry of Order (a) Fixing Bar Date for Requests for Allowance of Certain Administrative Expenses; (B) Fixing Deadline for Professionals to File Fee and Expense Estimates; and (C) Approving the Form and Manner of Notice Thereof* [Docket No. 460] ("AFS's Motion"). AFS's Motion requests that the Court establish a deadline for asserting administrative expense claims that arose after the Petition Date and through the date of entry of an order approving AFS's Motion. AFS's Motion further requests that the Court establish a deadline by which professionals employed pursuant to Section 327, 328, or 1103 of the Bankruptcy Code submit "professional fee and expense estimates" to the Court. AFS's Motion is currently scheduled to be heard by the Court on November 3, 2011.

As part of the Plan, unless otherwise ordered by the Court by virtue of AFS's Motion or otherwise, a separate bar date will be determined for Administrative Expense Claims (other than Section 503(b)(9) administrative expense claims, which is already established) arising after the date of the entry of an order confirming this Disclosure Statement.

## E.    Assumption of Certain Executory Contracts and Unexpired Leases

### 1.    Assumption of Non-Residential Real Estate Leases

On March 21, 2011, the Debtors filed the *Debtors' Omnibus Motion to Assume Unexpired Nonresidential Real Property Leases* [Docket No. 247], requesting entry of an order authorizing the Debtors to assume nine (9) leases of non-residential real estate.

One of the leases at issue was a ground lease (the "Aurora Lease") effective March 1, 2007, between DPS-Georgia and Aurora Dairy-Georgia, LLC ("Aurora"). DPS-Georgia was in default under the Aurora Lease for failure to make certain payments required under the Aurora Lease, and Aurora had moved for relief from the automatic stay or, in the alternative, to compel DPS-Georgia to assume or reject its lease and fulfill its post-petition lease obligations [Docket No. 110].

On April 8, 2011, the Court entered an order authorizing the assumption of eight of the nine leases of non-residential real estate, each with a cure claim amount of $0.00 [Docket No. 275]. However, the Court did not approve DPS-Georgia's request to assume the Aurora Lease because the parties could not agree on the correct cure claim amount. Aurora contended that DPS-Georgia owed it approximately $2,400,000 under the Aurora Lease, and DPS-Georgia contended that it owed a much lower amount. To allow time for the parties to resolve their disagreement related to the Aurora Lease, and by agreement of the Debtors and Aurora, and pursuant to Section 365(d)(4)(B)(ii) of the Bankruptcy Code and various orders of the Court[8]: the Court extended the Debtors time to assume or reject the Lease.

On September 27, 2011, after an evidentiary hearing, the Court made its oral findings of fact and conclusions of law related to the Debtors' motion to assume the Aurora Lease, which among other things, determined that DPS-Georgia is authorized to assume Aurora Lease, provided that, it pays a cure claim in the amount of $740,121.11 within one year of entry of the Court's order memorializing its September 27 findings of fact and conclusions of law related to the Aurora Lease. By order of the Court, the cure claim amount shall be paid in twelve (12) equal monthly installments beginning upon the Court's order memorializing its September 27 findings of fact and conclusions of law related to the Aurora Lease. As part of the Plan, DPS-Georgia intends to assign the Aurora Lease to the Reorganized Debtor.

### 2.    Dairy Replacement Management, LLC

On April 23, 2011, the Court entered an order authorizing Heifer Haven to assume a certain Management Agreement (the "Management Agreement") with Dairy Replacement Management, LLC ("DRM"). As part of Heifer Haven's assumption of the Management Agreement, Heifer Haven was required to cure certain monetary defaults under the Management Agreement. Heifer Haven has made all of the payments required to cure the Management Agreement. By the Management Agreement, DRM agreed to manage and care for dairy cattle

---

[8]    See April 8, 2011, Order [Docket No. 275], June 15, 2011, Order [Docket No. 364], and August 26, 2011, Order [Docket No. 440].

owned by the Debtors, including providing feed, hay, vaccines, medicine, worming, veterinary care, and breeding to such cattle. The Reorganized Debtor intends to continue to utilize DRM to manage and care for dairy cattle that it will be own if the Plan is confirmed, and Heifer Haven intends to assign the Management Agreement to the Reorganized Debtor

## F. Adversary Proceeding Brought by the Debtors Against AFS

On January 31, 2011, the Debtors filed a complaint commencing Adversary Proceeding No. 11-01008 against AFS (the "AFS Litigation"), seeking, among other things, equitable subordination of AFS's claim due to its conduct prior to the filing of the Bankruptcy Cases. AFS has denied the allegations made by the Debtors in the AFS Litigation.

On March 7, 2011, AFS moved to dismiss the Debtors' counts for alleged breach of implied duty of good faith and fair dealing and for alleged tortious interference with business relations. The Debtors did not oppose AFS's motion to dismiss and, on April 5, 2011, the Court entered an order dismissing Counts III and IV of the complaint in the AFS Litigation.

The remaining counts in the complaint in the AFS Litigation allege that AFS is liable under theories of breach of oral contract, promissory estoppel, and fraud and seek to equitably subordinate AFS's liens and obtain litigation expenses and punitive damages from AFS. The Debtors additionally seek to set off and recoup AFS's claims against any liability for an alleged anticompetitive "tying arrangement" (as defined under the federal securities laws) that was purportedly formed between certain of the Debtors' principals and former principals and AFS's predecessor-in-interest. Further, the Debtors allege that certain of their debts to AFS and the corresponding liens are unenforceable if AFS is unable to locate the original instrument evidencing such debts.

On September 27, 2011, the Court orally stayed the AFS Litigation pending further order of the Court or confirmation of a plan of reorganization in the Debtors' Bankruptcy Cases. The Reorganized Debtor intends to prosecute the AFS Litigation post-confirmation for the benefit of the Plan Debtors' unsecured creditors.

## G. Expiration of the Debtors' Exclusive Time Periods to File and Solicit Plans

The Debtors' exclusive right to file a plan of reorganization and to solicit acceptances thereof provided under Section 1121 of the Bankruptcy Code expired on August 29, 2011. On September 8, 2011, AFS filed its proposed plan of reorganization and accompanying disclosure statement [Docket Nos. 456 and 457] (the "AFS Plan"), and on September 20, 2011, the Committee filed its proposed plan of reorganization and accompanying disclosure statement [Docket Nos. 474 and 475] (the "Committee Plan") The disclosure statements related to the AFS Plan and the Committee Plan are both currently scheduled for consideration by the Court on November 3, 2011.

# V. **PLAN SUMMARY**

*THE DISCUSSION OF THE PLAN SET FORTH BELOW IS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN AND ITS EXHIBITS, THE TERMS OF WHICH ARE CONTROLLING. HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN IN ITS ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.*

All exhibits to the Plan will be contained in a Plan Supplement, which will be filed with the Clerk of the Court fifteen (15) days prior to the deadline for filing objections to confirmation of the Plan, or in accordance with such other deadline as may be established in the Disclosure Statement Order or another Final Order of the Court. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement, once filed, by making a written request or telephone call to the Plan Debtors' counsel of record:

> Sean C. Kulka
> Jack K. Holland
> Arnall Golden Gregory, LLP
> 171 17th Street, N.W., Suite 2100
> Atlanta, Georgia 30363-1031
> (404) 873-8500

In addition, there may be other agreements and documents that have been filed or that are referenced in the Plan and/or the Disclosure Statement and which are available for review or will be made available prior to the Confirmation Hearing. No solicitation materials, other than the Disclosure Statement, have been authorized by the Court for use in soliciting acceptances or rejections of the Plan.

## A. **General Description and Means of Implementation**

The Plan is a new value plan. If the Plan is confirmed by the Court, Resilience Capital Partners (or its affiliate, the "New Value Sponsor") shall contribute at least $5 million in new equity to the Reorganized Debtor in order to fund the payments that are necessary to allow the Plan Debtors to emerge from Chapter 11 as the Reorganized Debtor, and to recapitalize the Reorganized Debtor so that it will be able to satisfy the Assumed Liabilities. In exchange for the New Value Contribution, the New Value Sponsor will receive 100% of the equity in the Reorganized Debtor.

The Plan provides for the substantive consolidation (merger) of the Plan Debtors into the Reorganized Debtor, with all assets of the Plan Debtors vesting in the Reorganized Debtor on the Effective Date. Following the Effective Date, the Reorganized Debtor will continue to operate the Plan Debtors assets as going concerns. The Reorganized Debtor will be responsible for making distributions under and in accordance with the provisions of the Plan. The Reorganized Debtor will have standing and the authority to resolve any Disputed Claims, and continue and pursue any litigation, including Estate Causes of Action, the Bankruptcy Causes of Action, and the AFS Litigation following confirmation of the Plan. Subsequent to the Effective Date, the

Reorganized Debtor shall have the right and authority to settle or compromise such actions, subject to Court approval.

The Reorganized Debtor shall use the New Value Contribution to make any Cash payments that are contemplated under Sections 5 and 6 of the Plan, including any Cash payments to Holders of Allowed Administrative Expense Claims, Allowed Priority Claims, Priority Tax Claims, Allowed Convenience Class Claims, Allowed Secured Claims of Other Secured Creditors that elect to receive lump sum payments contemplated under Section 6.4 of the Plan, and Allowed At Risk Farmer Unsecured Claims that elect to receive the accelerated payments under the Unsecured Creditor Note contemplated under Section 6.8.3 of the Plan. The Reorganized Debtor shall use any remaining portions of the New Value Contribution, which are not utilized to make the Cash payments required under Sections 5 and 6 of the Plan, to buy additional cattle and fund any construction and/or maintenance costs that are necessary to bring the Reorganized Debtor's dairy farms to full capacity, and to otherwise continue and maximize the Reorganized Debtor's business operations.

It is contemplated that the New Value Sponsor will retain all or substantially all of the Plan Debtors' current employees in order to operate and maintain the Reorganized Debtor's continuing business operations. In addition, because the New Value Sponsor views the commitment and dedication of the Plan Debtors' management team as a critical factor in the long term success of its investment and to maximize the productivity of the Reorganized Debtor, the New Value Sponsor has agreed to provide the Plan Debtors' key senior management team with employment contracts with the Reorganized Debtor. A copy of the employment contracts between the New Value Sponsor and Plan Debtors' key senior management team will be provided in the Plan Supplement as Exhibit 7.3.1 to the Plan.

## B.     <u>Substantive Consolidation</u>

<u>Summary</u>. The Plan provides for the substantive consolidation of the Plan Debtors. This Plan shall serve as a motion seeking entry of an order by the Court substantively consolidating the Estates of the Plan Debtors, and shall also constitute the articles of merger for such substantive consolidation, which shall be treated as a merger of the Plan Debtors under the laws of the State of organization of each respective Plan Debtor. Notices of such merger shall be recorded by the Reorganized Debtor as required by applicable State and Federal Law. If necessary under applicable law to accomplish such merger, the New Value Sponsor, in its sole discretion, may elect to change the form of organization of the Plan Debtors from limited liability companies to another form or incorporation or organization. The Confirmation Order authorizing substantive consolidation shall constitute an order of the Court approving the substantive consolidation of the Plan Debtors. On the Confirmation Date, and effective thereafter, the Estate of each of the Plan Debtors shall be substantively consolidated for all purposes.

<u>Effect of Substantive Consolidation</u>. On and after the Confirmation Date, (a) all assets and liabilities of the Plan Debtors shall be treated as though they were merged into and transferred to the Reorganized Debtor, (b) all recorded security interests and Liens against the Plan Debtors shall remain in effect with respect to the Reorganized Debtor, but only to the extent

limited and modified by the Plan, in accordance with applicable State or Federal Law (if requested by the Holder of any recorded Lien, the Reorganized Debtor will execute and record any additional document reasonably requested by the Holder of an Allowed Secured Claim in order to continue the effectiveness of any recorded Lien or security interest), (c) any intercompany Claims among the Plan Debtors will be discharged, (d) for all purposes associated with confirmation (including, without limitation, for purposes of tallying acceptances and rejections of the Plan) and distributions under the Plan, the Estates of the Plan Debtors shall be deemed to be consolidated in the Reorganized Debtor, (e) any guarantees of any Plan Debtor of the obligations of any other Plan Debtor shall be eliminated so that any Claim against any Plan Debtor and any guarantee thereof executed by any other Plan Debtor and any joint and several liability of any Plan Debtor shall be one obligation of the Reorganized Debtor, as limited and modified by the Plan, and (f) each and every Claim filed or to be filed in the Bankruptcy Cases against the Plan Debtors shall be deemed filed against one Estate, and post-confirmation shall be Claims against and obligations of the Reorganized Debtor as limited and modified by the Plan.

Reasons for Substantive Consolidation. In the Debtors' view, substantive consolidation of the Estates of the Plan Debtors is appropriate for the following reasons:

i.      the Plan Debtors have generally operated as a single economic enterprise, with a high degree of integration;

ii.     the Plan Debtors share common ownership and common officers;

iii.    it would be difficult or impossible to determine the appropriate Plan Debtor entitled to any proceeds from the pursuit of Estate Causes of Action and Bankruptcy Causes of Action, because of the comingling of funds and management withdrawals and compensation arrangements;

iv.     there will be no harm to AFS under the Plan, because AFS's Secured Claim is cross-collateralized under the Plan.

In addition, no harm will result to creditors if the Estates are substantively consolidated. Instead, Holders of Allowed Unsecured Claims of all of the Plan Debtors' Estates will benefit by such consolidation. Further, substantive consolidation under the Plan will allow the Plan Debtors to avoid unnecessary duplicative costs of preparing individual Plans and seeking acceptance of those individual Plans, and it would eliminate claim objections by the Plan Debtors based on a creditor's filing a proof of claim in the wrong case due to confusion among the separate Debtors.

As currently structured, intercompany receivables have been created. By consolidating Plan Debtors, such intercompany receivables are eliminated by discharge through merger.

The due process rights of all creditors, equity security holders, and other interested parties will be protected. All such interested parties will receive notice of the hearing on the Disclosure Statement and will receive notice of the confirmation hearing on the Plan, and will be afforded the opportunity to review such documents and to object, if so desired. Additionally, the

Plan Debtors' creditors holding Allowed Claims will receive substantial benefits if the Plan is confirmed, since they will likely receive more in a consolidation than if the Bankruptcy Cases were either converted to Chapter 7 or if Plan Debtors each filed individual Chapter 11 plans.

In sum, in the view of the Plan Debtors, substantive consolidation provides substantial benefits to creditors of the Plan Debtors and is in the best interests of the Plan Debtors' Estates. Moreover, the Plan Debtors believe that the prejudice to creditors resulting from substantive consolidation, if any, is substantially outweighed by the benefit to the Plan Debtors' Estates.

Effect if Substantial Consolidation is Denied. In the event that the Court does not order substantive consolidation of the Plan Debtors, the Plan Debtors will modify the Plan in order to satisfy the confirmation requirements of Section 1129 of the Bankruptcy Code for each of the Plan Debtors. In addition, the event that the Court does not order substantive consolidation, then except as specifically set forth in the Plan, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor.

## C. **Classification of Claims and Equity Interests**

All Claims and Equity Interests in these Bankruptcy Cases are classified in the Classes below. Notwithstanding any other provision of the Plan, a Claim in a particular Class is entitled to receive distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and only to the extent such Claim has not been paid, released, or otherwise satisfied prior to the Effective Date.

Claims and Equity Interests under the Plan are classified as follows:

**Class 1** - Priority Claims.

**Class 2** - Secured Claim of AFS.

**Class 3** - Secured Claims of the Other Secured Creditors.

**Class 4** - Co-Op Setoff Claims.

**Class 5** - Convenience Claims.

**Class 6** - General Unsecured Claims.

**Class 7** - At Risk Farmer Unsecured Claims.

**Class 8** - Deficiency Claims.

**Class 9** - Subordinated Claims.

**Class 10** - Equity Interests.

## D. Description, Treatment, and Impairment of Claims and Equity Interests

The Classes of Claims and Equity Interests, as well as their treatment and an analysis of whether they are impaired or unimpaired, are described as follows:

### *Class 1 - Priority Claims*

(1)     Description and Treatment:  Class 1 consists of Unsecured Claims that are entitled to priority under Section 507 or Section 364 of the Bankruptcy Code, excluding Priority Tax Claims.  The Plan Debtors estimate that no payments will be required under the Plan to Holders of Priority Claims.  To the extent that a Holder of a Priority Claim exists, each Holder of an Allowed Priority Claim shall be paid in Cash in an amount equal to their Allowed Priority Claim on the Effective Date.

(2)     Impairment:  Class 1 is unimpaired by the Plan.

### *Class 2 - Secured Claim of AFS*

(1)     Description and Treatment:  Class 2 consists of the Secured Claim of AFS.  As set forth above, the Plan Debtors believe that the value of AFS's Lien is less than the amount of the AFS's Claim and, therefore, AFS is under-secured.  Unless AFS elects Alternative Option A or B under Section 6.3.2 or Section 6.3.3 of the Plan, and AFS does not have any portion of its claim subordinated, as of the Effective Date, AFS's Claim shall be bifurcated into a Class 2 Secured Claim in the amount of $20 million, or such other amount as determined by the Court, and a Class 8 Deficiency Claim in the amount of approximately $32.4 million.

The Reorganized Debtor shall provide AFS with a note (the "Secured Claim Note") on account of its Secured Claim with a ten (10) year term bearing interest at the fixed interest rate of 5.25% per annum.  The Secured Claim Note shall be amortized over a twenty (20) year period of time, paid in forty (40) consecutive equal quarterly amortization payments of approximately Two Hundred Fifty Thousand Dollars ($250,000), plus interest, commencing on the fifteenth (15th) day of the calendar month following the Effective Date, with a balloon payment equal to the unpaid principal balance of the Secured Claim Note payable the fifteenth (15th) day of the calendar month ten (10) years from the Effective Date.  The Secured Claim Note shall be secured by Liens on the Reorganized Debtor's assets of the same extent, validity, and priority as the Liens held by AFS upon the Plan Debtors' assets on the Petition Date.  AFS's Unsecured Claim will be treated as a Class 8 Deficiency Claim and will receive a Pro Rata distribution on account of such Unsecured Claim in accordance with Section 6.9 of the Plan.

In the event that all or a portion of AFS's Claim is subordinated by a Final Order of the Court, the payments contemplated under 6.3.1 of the Plan shall instead be made to Holders of Claims in Classes 6, 7, and 8 under the Plan, to the extent of such subordination. In addition, in the event that the Court enters a Final Order determining that all or part of AFS's Secured Claim is a Subordinated Claim then the Liens granted in favor of AFS on the Reorganized Debtor's

assets shall be transferred to the benefit of the Reorganized Debtor to the extent of such subordination.

Alternative Option A. In lieu of the treatment set forth above, AFS may elect to receive a lump sum payment in the amount of Ten Million Dollars ($10,000,000). If such an election is timely made, AFS shall receive such lump sum payment within ninety (90) days after the Effective Date, in full and complete satisfaction of all the indebtedness and of any Administrative, Secured or Unsecured Claims that AFS may have against the Plan Debtors or the Reorganized Debtor or property of the Plan Debtors or any property vested in the Reorganized Debtor under the Plan. In addition, if such an election is timely made, on the Effective Date the Reorganized Debtor shall dismiss the AFS Litigation with prejudice.

*Alternative Option B.* In lieu of the treatment set forth above, AFS may elect treatment as afforded by Section 1111(b) of the Bankruptcy Code. In the event such an election is timely made, AFS's entire Allowed Claim shall be deemed a Secured Claim, and such Claim shall be secured by Liens on the Reorganized Debtor's assets of the same extent, validity, and priority as the Liens held by AFS upon the Plan Debtors' assets on the Petition Date.

The Reorganized Debtor shall provide AFS with two (2) notes on account of its Secured Claim. The first note will be the Secured Claim Note, and shall have a ten (10) year term bearing interest at the fixed interest rate of 5.25% per annum. The Secured Claim Note shall be amortized over a twenty (20) year period of time, paid in forty (40) consecutive equal quarterly amortization payments of approximately Two Hundred Fifty Thousand Dollars ($250,000), plus interest, commencing on the fifteenth (15th) day of the calendar month following the Effective Date, with a balloon payment equal to the unpaid principal balance of the Secured Claim Note payable the fifteenth (15th) day of the calendar month ten (10) years from the Effective Date. The face amount of the second note shall equal AFS's Allowed Claim less the sum of the total payments to be made over the term of the Secured Claim Note, amortizing on a straight line basis over fifty (50) years, without interest. The payments due on the second note shall commence on the fifteenth (15th) day of the calendar month following the Effective Date, and continue each quarter thereafter. The payments under the two (2) notes contemplated under Alternative Option B shall be in full and complete satisfaction of all the indebtedness and of any Administrative, Secured or Unsecured Claims that AFS may have against the Plan Debtors or the Reorganized Debtor or property of the Plan Debtors or any property vested in the Reorganized Debtor under the Plan.

In the event that all or a portion of AFS's Claim is subordinated by a Final Order of the Court, the payments contemplated under Section 6.2.3 of the Plan shall instead be made to Holders of Claims in Classes 6, 7, and 8 under the Plan, to the extent of such subordination. In addition, in the event that the Court enters a Final Order determining that all or part of AFS's Secured Claim is a Subordinated Claim then the Liens granted in favor of AFS on the Reorganized Debtor's assets shall be transferred to the benefit of the Reorganized Debtor to the extent of such subordination.

(2)     Impairment: Class 2 is impaired by the Plan.

### *Class 3 - Secured Claims of the Other Secured Creditors*

(1) Description and Treatment: Class 3 consists of Secured Claims of the Other Secured Creditors. Class 3 does not include the Secured Claim of AFS or the Co-Op Setoff Claims. Each Holder of an Allowed Secured Claim in Class 3, the Other Secured Creditors, will receive either a new note or capital lease from the Reorganized Debtor under the same terms and conditions that existed between each respective Other Secured Creditor and each respective Plan Debtor on the Petition Date; provided that, the maturity date contained in such new note or capital lease shall be extended ninety (90) days. To the extent that it is determined by the Court that, pursuant to Section 506(a) of the Bankruptcy Code, any portion of a Claim in Class 3 is an Unsecured Claim, such Claim will be treated as a Class 8 Deficiency Claim and will receive a Pro Rata distribution on account of such Unsecured Claim in accordance with Section 6.9 of the Plan.

Lump Sum Payment Option: In lieu of the treatment set forth in Sections 6.4.1 and 6.4.2 of the Plan, each Holder of an Allowed Secured Claim in Class 3, the Other Secured Creditors, may elect to receive a lump sum payment in the amount equal to ninety percent (90%) of such Holder's Allowed Claim. If such an election is timely made, each Holder of an Allowed Secured Claim in Class 3 making such election shall receive their respective lump sum payment contemplated in this Section of the Plan within sixty (60) days after the Effective Date, in full and complete satisfaction of all the indebtedness and of any Administrative, Secured or Unsecured Claims that such Holder maintains against the Plan Debtors or the Reorganized Debtor or property of the Plan Debtors or any property vested in the Reorganized Debtor under the Plan. The Plan Debtors estimate the total amount of Secured Claims in Class 3 are approximately $500,000.

(2) Impairment: Class 3 is impaired by the Plan.

### *Class 4 - Co-Op Setoff Claims*

(1) Description and Treatment: Class 4 consists of the Claims of the Co-Op Secured Creditors against one or more of the Plan Debtors that are secured by a right of setoff and/or recoupment that is preserved under Section 553 of the Bankruptcy Code and applicable non-bankruptcy law and/or the Court's *Order Providing Debtors' Co-Ops Adequate Protection of Setoff Rights Pursuant to Section 361, 363, and 553 of the Bankruptcy Code and Fed. R. Bankr. 4001* [Docket No. 14]. Each Holder of a Co-Op Setoff Claim in Class 4 shall be entitled to setoff and/or recoup their respective Co-Op Setoff Claims against the Reorganized Debtor's post-petition account receivables, over a four (4) month period after the Effective Date. Each Holder of a Co-Op Setoff Claim shall be entitled to setoff and/or recoup one quarter (1/4) of their respective setoff and/or recoupment rights on the fifteenth (15th) day of the calendar month following the Effective Date, and setoff and/or recoup an additional one quarter (1/4) of their respective setoff and/or recoupment rights on the fifteenth (15th) day of the following three (3) calendar months.

(2) Impairment: Class 4 is impaired by the Plan.

### Class 5 - Convenience Claims

(1)     Class 5 consists of all Convenience Claims defined as any Claim that otherwise would be an Allowed Unsecured Claim against one or more of the Plan Debtors in an amount: (i) equal to or less than the sum of One Thousand Dollars and No/Cents ($1,000.00), or (ii) greater than One Thousand Dollars and No/Cents ($1,000.00), but which is reduced to One Thousand Dollars and No/Cents ($1,000.00) by an irrevocable written election of the Holder of such Claim made on a validly executed and timely delivered Ballot. The Plan Debtors estimate the total amount of Convenience Claims is approximately $63,000, but may increase if a significant number of Holders of Unsecured Claims opt into Class 5. Each Holder of an Unsecured Claim in Class 5 shall receive Cash in an amount equal to seventy-five percent (75%) of the Allowed amount of such Claim within sixty (60) days after the Effective Date in full satisfaction, release, and discharge of such Claim.

(2)     Impairment: Class 5 is impaired by the Plan.

### Class 6 - General Unsecured Claims

(1)     Description and Treatment: Class 6 consists of Unsecured Claims, but does not include Unsecured Claims that are Convenience Claims, Deficiency Claims, At Risk Farmer Unsecured Claims, or Subordinated Claims. The Plan Debtors estimate that the total amount of General Unsecured Claims are between $10,056,597.47 and $13,948,593.04. Each Holder of an Unsecured Claim in Class 6 will receive: (i) a Pro Rata share of the Unsecured Creditor Note, (ii) a Pro Rata share of any distributions to be made to AFS under Sections 6.3.1 or 6.3.3 of the Plan to the extent that AFS's Claim is determined to be a Subordinated Claim by a Final Order of the Court, (iii) a Pro Rata share of the proceeds of the Bankruptcy Causes of Action, and (iv) a Pro Rata share of the proceeds of the Estate Causes Actions, in full satisfaction, release, and discharge of such Claim.

(2)     Impairment: Class 6 is impaired by the Plan.

### Class 7 - At Risk Farmer Unsecured Claims

(1)     Description and Treatment: Class 7 consists of the Unsecured Claims of the At Risk Farmers identified in Exhibit 2.8 of the Plan.  The Plan Debtors estimate that the total amount of At Risk Farmer Unsecured Claims are between $971,949.96 and $973,434.07. Each Holder of an At Risk Farmer Unsecured Claim in Class 7 will receive: (i) a Pro Rata share of the Unsecured Creditor Note, (ii) a Pro Rata share of any distributions to be made to AFS under Sections 6.3.1 or 6.3.3 of the Plan to the extent that AFS's Claim is determined to be a Subordinated Claim by a Final Order of the Court, (iii) a Pro Rata share of the proceeds of the Bankruptcy Causes of Action, and (iv) a Pro Rata share of the proceeds of the Estate Causes Actions, in full satisfaction, release, and discharge of such Claim.

In the alternative, each Holder of an At Risk Farmer Unsecured Claim in Class 7 has the option under the Plan to receive: (i) the present value of such Holder's Pro Rata share of the Unsecured Creditor Note in a lump sum Cash payment payable within ninety (90) days after the

Effective Date, (ii) a Pro Rata share of any distributions to be made to AFS under Sections 6.3.1 or 6.3.3 of the Plan to the extent that AFS's Claim is determined to be a Subordinated Claim by a Final Order of the Court, (iii) a Pro Rata share of the proceeds of the Bankruptcy Causes of Action, and (iv) a Pro Rata share of the proceeds of the Estate Causes Actions, in full satisfaction, release, and discharge of such Claim.

(2)     Impairment: Class 7 is impaired by the Plan.

### *Class 8 - Deficiency Claims*

(1)     Description and Treatment: Class 8 consists of the Deficiency Claims of Secured Creditors. The Plan Debtors estimate that the total amount of AFS's Deficiency Claim is approximately $32.4 million. The Plan Debtors do not anticipate that any of the Other Secured Creditors will have a Deficiency Claim under the Plan. Each Holder of an Unsecured Claim in Class 8, a Deficiency Claim, will receive: (i) a Pro Rata share of the Unsecured Creditor Note, (ii) a Pro Rata share of any distributions to be made to AFS under Sections 6.3.1 or 6.3.3 of the Plan to the extent that AFS's Claim is determined to be a Subordinated Claim by a Final Order of the Court, (iii) a Pro Rata share of the proceeds of the Bankruptcy Causes of Action, and (iv) a Pro Rata share of the proceeds of the Estate Causes Actions, in full satisfaction, release, and discharge of such Claim. In the event that, all or a portion of AFS's Deficiency Claim is determined to be a Subordinated Claim by a Final Order of the Court is determined to be a Subordinated Claim by a Final Order of the Court, such Claim shall not be considered in determining the Pro Rata payments to be made to Holders of Unsecured Claims in Classes 6, 7, and 8 under the Plan to the extent of such subordination.

(2)     Impairment: Class 8 is impaired by the Plan.

### *Class 9 - Subordinated Claims*

(1)     Description and Treatment: Class 9 consists of any Allowed Claim that is subordinated for purposes of distribution to all or part of another Allowed Claim pursuant to Section 510(c) of the Bankruptcy Code and applicable law. The Plan Debtors estimate that the amount of Subordinated Claims are between $0.00 and the entire balance of the AFS's Claim. In the event that there is sufficient property to pay the entire amount of each Allowed Claim in Classes 6, 7, and 8 under the Plan, each Holder of a Class 9 Subordinated Claim will receive a Pro Rata share of the remaining portion of the Unsecured Creditor Note, if any, the remaining portion of any distributions under Sections 6.3.1 or 6.3.3 of the Plan to be made to Holders of Classes 6, 7, and 8 under the Plan resulting from the subordination of AFS's Class 2 or Class 8 Claim, if any, the remaining portion of the Bankruptcy Causes of Action, if any, and the remaining portion of the Estate Causes of Action, if any, in full satisfaction, release, and discharge of such Claim.

### *Class 10 - Equity Interests*

(1)     Description and Treatment: Class 10 consists of the Equity Interests in the Plan Debtors. The Equity Interests shall be cancelled under the Plan.

(2)     Impairment: Class 10 is impaired by the Plan. Holders of Equity Interests are not entitled to vote to accept or reject the Plan and Class 10 is deemed to have rejected the Plan.

## E.     Provisions Relating to Administrative Expense and Priority Tax Claims

The Plan contains provisions that set forth the treatment of Claims of a kind specified in Sections 507(a)(2) through 507(a)(10) of the Bankruptcy Code. Such treatment is consistent with the requirements of Section 1129(a)(9) of the Bankruptcy Code, and the Holders of such Claims are not entitled to vote on this Plan. Notwithstanding any other provision of this Plan, pursuant to Section 1123(a)(1) of the Bankruptcy Code, Claims under Sections 507(a)(2) through 507(a)(10) of the Bankruptcy Code are not designated as Classes of Claims under the Plan.

To the extent that any Administrative Expense Claims have not been satisfied prior to the Effective Date, the Holders of Allowed Administrative Expense Claims shall be paid (a) Cash on the Effective Date or as soon thereafter as the such Claim can be determined and, if necessary, Allowed by the Court, or (b) such other treatment as to which the Plan Debtors or the Reorganized Debtor and the Holder of such Allowed Administrative Expense Claim will have agreed upon in writing, in full satisfaction, release, and discharge of such Administrative Expense Claim.

To the extent that any Priority Tax Claim has not been satisfied prior to the Effective Date of the Plan, the Holder of Allowed Priority Tax Claims shall receive: (a) Cash on the Effective Date equal to the amount of such Priority Tax Claim or as soon thereafter as such Claim can be determined and, if necessary, Allowed by the Court, (b) regular installment payments in Cash over a period of not more than five (5) years from the Petition Date in accordance with Section 1129(a)(9)(C)(ii) of the Bankruptcy Code, or (c) such other treatment as to which the Plan Debtors or the Reorganized Debtor and the Holder of such Priority Tax Claim will have agreed upon in writing, in full satisfaction, release, and discharge of such Claim.

## F.     Treament of Executory Contracts and Unexpired Leases

All executory contracts or unexpired leases not identified on Plan Exhibit 7.10.1 as executory contracts and unexpired leases to be assumed and assigned or assigned, shall be deemed rejected by the Plan Debtors as of the Effective Date. Any defaults arising under the executory contracts or unexpired leases to be assumed by the Plan Debtors and assigned to the Reorganized Debtor or to be assigned by the Plan Debtors to the Reorganized Debtor under the Plan shall be promptly cured to the extent required by Section 365 of the Bankruptcy Code. The cure claim for each executory contract or unexpired lease to be assumed by the Plan Debtors and assigned to the Reorganized Debtor or to be assigned by the Plan Debtors to the Reorganized Debtors under the Plan shall be deemed to be $0.00 unless the counterparty to such executory contract or unexpired lease files a cure claim objection at least ten (10) days prior to the hearing held in these Bankruptcy Cases to consider confirmation of the Plan, and after filing a timely objection the Court determines that such counterparty is entitled to a different cure claim amount as a condition to the Plan Debtors.

A Claim for damages arising from the rejection of an executory contract or unexpired lease shall be FOREVER BARRED and shall not be enforceable against the Plan Debtors, the Reorganized Debtor or the Estates of the Plan Debtors, and no Holder of any such Claim shall participate in any distribution under the Plan with respect to that Claim unless: (i) a proof of claim is served on the Plan Debtors and filed with the Court within thirty (30) days from the Confirmation Date, or such other deadline (whether earlier or later) as may be set by the Court generally or with respect to any executory contract or unexpired lease rejected under the Plan, and (ii) such proof of claim is determined to be an Allowed Claim, either because no timely objection is filed or because the Court allows the Claim after a timely filed objection.

## VI. ACCEPTANCE AND CONFIRMATION

The Bankruptcy Code requires the Court to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). At the Confirmation Hearing, the Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that: (i) the Plan is accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) the Plan is feasible (that is, confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization), and (iii) the Plan is in the "best interests" of creditors and Holders of Claims and Equity Interests impaired under the Plan.

## A. Acceptance of the Plan by Impaired Creditors

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following sections, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (2) cures any default, reinstates the original terms of such obligation, compensates the holder for any damages incurred as a result of non-performance of the contract, and otherwise does not alter the legal, equitable or contractual rights to which the holder of the claim might otherwise be entitled.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Pursuant to Section 1129 of the Bankruptcy Code, the Holders of Claims in the those Classes entitled to vote must accept the Plan in order for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. Class 1 is Unimpaired under the Plan and is conclusively deemed to have voted to accept the Plan. Holders of Claims in Classes 2, 3, 4, 5, 6, 7, 8, and 9 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. Class 10 is Impaired under the Plan and will not be receiving Distributions under the Plan; therefore, Class 10 is conclusively deemed to have

voted to reject the Plan. The Plan Debtors reserve the right to seek non-consensual confirmation of the Plan with respect to any Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan. However, because Class 10 is deemed to have voted to reject the Plan, it is not anticipated that the Plan Debtors will be able to seek confirmation of the Plan on a non-consensual basis.

## B. Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits the bankruptcy court to confirm a Chapter 11 plan over the rejection or deemed rejection of a plan by any class of claims or interests as long as the standards in Section 1129(b) of the Bankruptcy Code are met. Section 1129(b) allows a bankruptcy court to confirm the plan - even if all other impaired classes entitled to vote on the plan have not accepted it; provided that, the plan has been accepted by at least one impaired class - so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. This power to confirm a plan over dissenting classes - commonly known as "cram down" - is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code, and is in the interests of the other constituents in the case.

Because Holders of Equity Interests in Class 10 are deemed to reject the Plan, the Plan Debtors will seek to have the Plan approved and confirmed by the Court pursuant to Section 1129(b) of the Bankruptcy Code. In addition, it is possible that other Impaired Classes may vote to reject the Plan, in which case the Plan Debtors will request a ruling that the Plan meets the requirements of the Bankruptcy Code with respect to such Class.

In order for an impaired Class of Claims to accept the Plan, Holders of Claims (excluding claims designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in dollar amount of the Allowed Claims in such Class of Claims and more than one half in number of the Allowed Claims actually voting in such Class (excluding claims designated under Section 1126(e) of the Bankruptcy Code), vote to accept the Plan.

### 1. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The Plan, as proposed, does not unfairly discriminate given that Classes of Claims or Equity Interests of equal priority are similarly treated under the Plan. While the distribution to Holders of Class 5 (Allowed Convenience Class) Claims (seventy five percent (75%) of the Allowed amount of their Claim not to exceed $1,000) is significantly higher than the anticipated

33

distribution to Holders of Claims in Classes 6, 7, 8 (pro rata distribution on the Allowed amount of their Claim), such treatment is for the purposes of convenience only and does not cause the Plan to unfairly discriminate.

## 2. Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

**Secured Claims**: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; (ii) for a sale under Section 363 of the Bankruptcy Code, the liens securing such claims attach to the proceeds of such sale; or (iii) the holders of such secured claims realize the indubitable equivalent of such claims. See 11 U.S.C. § 1129(b)(2)(A).

**Unsecured Claims**: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain, on account of such claim, property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan, on account of such junior claim or junior equity interest, any property. See 11 U.S.C. § 1129(b)(2)(B).

**Equity Interests**: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greatest of: the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan, on account of such junior claim or junior equity interest, any property. See 11 U.S.C. § 1129(b)(2)(C).

The Plan Debtors believe that the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 10 is deemed to reject the Plan. Class 10 Equity Interests are being cancelled under the Plan, and are not receiving any distribution under the Plan. The Plan is fair and equitable with respect to the Secured Creditors in Classes 2, 3, and 4 because such Secured Creditors are retaining Liens on the Reorganized Debtor's property securing their Claims to the extent of the allowed amount of such Secured Claims under Section 506 of the Bankruptcy Code,

and on account of such Secured Claims are receiving the indubitable equivalent of such Secured Claim or deferred cash payments totaling at least the allowed amount of such Secured Claims, of a value, as of the Effective Date of the Plan, of at least the value of the Secured Creditors' interest in the Reorganized Debtor's interest in such property. Moreover, no Class that is junior to Classes 6, 7, or 8 under the Plan will receive or retain under the Plan, on account of such Claims or Equity Interest, any property, unless all of the Holders of Allowed Claims in Classes 6, 7, and 8 are paid in full.

## C. Feasibility

As a condition to confirmation of the Plan, Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtor unless such liquidation is proposed in the Plan. See the discussion concerning feasibility in Section VII, below.

## D. "Best Interests of Creditors" Test

Confirmation of the Plan also requires that each Holder of a Claim either (i) accept the Plan or (ii) under the Plan, receive or retain property with a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests of the creditors test." To determine what Holders of Claims and Equity Interests of each Impaired Class would receive if the Plan Debtors were liquidated under Chapter 7, the Court must determine the dollar amount that would be generated if the Plan Debtors assets were liquidated under Chapter 7 of the Bankruptcy Code.

The Plan Debtors conducted a liquidation analysis to determine what Holders of Claims and Equity Interests would receive if the Plan Debtors' Estates were liquidated under Chapter 7 (the "Liquidation Analysis"), which is attached to the Disclosure Statement as **Exhibit B**. In undertaking the Liquidation Analysis, the Plan Debtors determined an estimated liquidation value of the assets of each Plan Debtor, including estimating the net realizable proceeds of each Plan Debtors' current assets, such as their accounts receivable, supplies, feed inventory and crops, livestock, and fixed assets such as real estate and equipment.

In addition, in a Chapter 7 bankruptcy case, a Chapter 7 trustee would be elected or appointed to liquidate the Plan Debtors' assets. Therefore, the Liquidation Analysis takes into account the costs of liquidation, such as Chapter 7 trustee fees, brokerage commissions, wind down costs, and payments of taxes and insurance necessary to protect the assets of the Plan Debtors' Estates during the Chapter 7 liquidation. These Chapter 7 expense claims would be paid prior to Chapter 11 administrative expense claims, however, both types of administrative claims would take priority over Unsecured Claims. Chapter 11 administrative expenses will include, among other things, any outstanding trade debt incurred since the Petition Date but unpaid as of the date of any liquidation, and unpaid professional compensation and any administrative taxes due.

As illustrated in the Liquidation Analysis, the Plan Debtors project that a Chapter 7 liquidation would likely result in no payments to Unsecured Creditors. Projected proceeds from

the liquidations of the Estate Causes of Action may be insufficient to pay the Chapter 7 Trustee's administrative expenses and the unpaid Chapter 11 administrative expenses. Therefore, the Plan Debtors believe that this Plan is more favorable than a Chapter 7 liquidation because the Plan provides for a higher payment to Holders of Administrative Expense Claims and Unsecured Creditors than those creditors would likely receive in a Chapter 7 liquidation.

## VII. FEASIBILITY OF THE PLAN

The Plan Debtors' business plan and financial projection is attached to the Disclosure Statement as **Exhibit C** (the "Business Plan"). The Business Plan projects sufficient revenues to make the payments proposed to all Allowed Claims in each Class under the Plan, including the Assumed Liabilities. Certain assumptions were made in connection with the Business Plan - which the Plan Debtors suggest are conservative - are itemized on the Exhibit. Because the projections are based on averages, the actual results will likely vary from the projection, but the projection should be reasonably accurate over its term. Provided that the Reorganized Debtor timely satisfies its payment obligations under the Plan, there will be no event of default under the Plan if the Reorganized Debtor fails to meet its projected revenues in a given year.

The Plan Debtors believe that the Plan is feasible, and provides the best potential for payment of the claims of creditors.

## VIII. CERTAIN TAX CONSEQUENCES

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Equity Interests.

### A. In General

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim will depend in part on (a) whether the Holder's Claim constitutes a security for federal income tax purposes, (b) whether the Holder of the Claim reports income on the accrual basis, (c) whether the Holder of the Claim receives consideration in more than one (1) tax year, and (d) whether all the consideration received by the Holder is deemed to be received by that Holder as part of an integrated transaction. The federal tax consequences realized upon receipt of Cash and notes allocable to an interest are discussed in "Receipt of Interest" below.

### B. Gain or Loss on Exchange

The Plan Debtors do not believe that any of their trade creditor's Claims will constitute securities for tax purposes. Whether a debt instrument constitutes a security is based on the facts and circumstances surrounding the origin and nature of the debt and its maturity date. Generally, claims arising out of the extension of trade credit have been held not to be securities. Instruments with a five-year term or less rarely constitute securities.

Accordingly, a Holder of a Claim will recognize gain or loss on the exchange of his existing Claim (other than a Claim for accrued interest) for any consideration. The amount of

such gain or loss will equal the difference between (a) the "amount realized" in respect of such Claim and (b) the adjusted tax basis of the Holder in such Claim. Pursuant to Section 1001 of the Internal Revenue Code (the "IRC"), the "amount realized" will be equal to the sum of the cash plus the fair market value of any other property received in such exchange. The Plan Debtors intend the New Equity be exempt from taxation under Section 351(e)(2) of the IRC.

## 1. Receipt of Cash

A Holder of a Claim who received Cash in full satisfaction of his Claim will be required to recognize gain or loss on the exchange. The Holder of a Claim will recognize gain or loss equal to the difference between the "amount realized" in respect of such Claim and the adjusted tax basis of the Holder in the Claim, and the tax treatment of the exchange will parallel the tax treatment set forth under "Gain or Loss on Exchange" above.

## 2. Determination of Character of Gain or Loss

In the case of a creditor whose existing Claim does not constitute a capital asset, the gain or loss realized on the exchange will give rise to ordinary income or loss. In the case of a Holder of a Claim whose existing Claim does constitute a capital asset in his hands, the gain or loss required to be recognized will generally be classified as a capital gain or loss, except to the extent of interest. Any capital gain or loss recognized by a Holder of a Claim will be long-term capital gain or loss with respect to those Claims for which the holding period of the Holder of a Claim is more than twelve (12) months, and short-term capital gain or loss with respect to such Claims for which the holding period of the Holder of the Claim is twelve (12) months or less.

## 3. Receipt of Interest

The Bankruptcy Tax Act of 1980 reversed prior law by providing that consideration attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Holder of such Claim's existing Claims are capital assets in his hands and the exchange is pursuant to tax reorganization. A Holder of a Claim who, under his accounting method, was not previously required to include income accrued, but unpaid interest attributable to his existing Claims, and who exchanges his interest Claim for Cash, other property or Stock, or a combination thereof, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Holder of a Claim realizes an overall gain or loss as a result of the exchange of his Claims.

## 4. Backup Withholding

Under the IRC, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" at a thirty-one percent (31%) rate. Withholding generally applies if the Holder: (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.

5. **Tax Consequences to Interest Holders**

With respect to the Plan Debtors and the Equity Interest Holders, the tax considerations of confirmation of the Plan may be more complex. Each Plan Debtor is a limited liability company and is therefore not a tax-paying unit. Rather, each Plan Debtor is a "flow-through" entity and the tax consequences of its operations and disposition of assets are determined at the member or partner level. The Plan poses potential tax issues concerning allocation of capital gains and losses as well as net operating losses among the Equity Interest Holders, and creates the potential for recognition of cancellation of debt income and/or depreciation recapture by the Equity Interest Holders.

6. **Cancellation of Debt Income**

Cancellation of debt ("COD") income arises when a debtor does not repay the full amount of a debt. The general rule is that the amount of COD income equals the excess of the face amount of the debt over the amount paid to discharge it.

Section 108(a)(1)(A) of the IRC provides that the amount realized from COD income is excluded from gross income of a taxpayer if the discharge occurs in a Title 11 case. This exception has limited utility in the context of partnerships and partners because, pursuant to Section 108(d)(6) of the IRC, the bankruptcy exception applies at the partner level. Accordingly, for the bankruptcy exception to apply to a partner's share of COD income from a partnership, the discharge of partnership liabilities must occur in a Title 11 case and the partner must also be a debtor in a Title 11 case. As such, COD income in a partnership environment has the potential to trigger significant taxable income inclusion implications to the partners of the enterprise that would not exist in a corporate structure. However, the projected debt forgiveness from a "sale" of the assets of the Plan Debtors may not be material.

## IX. SECURITIES REGISTRATION EXEMPTION

A. **Securities Registration Exemption**

The securities to be issued pursuant to the Plan, to the extent there are any, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in Section 1145 of the Bankruptcy Code. To the extent Section 1145 of the Bankruptcy Code is inapplicable, the issuance of securities pursuant to the Plan would otherwise be exempt from registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in Section 4(2) of the Securities Act or Regulation D promulgated thereunder.

B. **Section 1145 of the Bankruptcy Code**

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under Section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering. Therefore, the securities issued pursuant to the exemption under Section 1145(a)(1) of the Bankruptcy Code may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided

by Section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in Section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan should consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in Section 2(a)(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that a person that is deemed an "underwriter" receives securities under the Plan, resales of such securities by such person would not be freely transferable unless such person complies with the safe harbor provided by Rule 144 (other than the holding period), another exemption from registration for resale is available or such resale is registered under the Securities Act; provided, however, that any such resale will be subject to the restrictions on transfer and assignment contained in the operating agreement of the Reorganized Debtors.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES PURSUANT TO THE PLAN MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ISSUER OF SUCH SECURITIES, THE PLAN DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER THE SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN

SHOULD CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES.

## X. RISK FACTORS

Holders of Claims against and Equity Interests in the Plan Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or referred to herein by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A. Bankruptcy Considerations

Although the Plan Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

The Plan contemplates occurrence of the Effective Date within between 15 and 45 days after entry of the Confirmation Order. However, the Effective Date of the Plan is based upon the occurrence of certain conditions precedent enumerated in the Plan, the occurrence of which are not a certainty. Further, although the Plan Debtors intend at present to support the Plan, the Plan Debtors may, at their discretion, withdraw from the Plan at any time before entry of the Confirmation Order.

### B. The New Value Sponsor has Not Yet Executed a Binding Agreement

The Plan is predicated on Resilience Capital Partners or one of its Affiliates (the "New Value Sponsor") investing not less than Five Million Dollars ($5,000,000) in the Reorganized Debtor in exchange for the New Equity. The Plan also provides that the Reorganized Debtor will assume the Assumed Liabilities, and that the New Value Sponsor's investment will be subordinate to the Assumed Liabilities. The participation of the New Value Sponsor and infusion of the New Value Contribution are essential to the feasibility of the Plan.

To date, the Plan Sponsor has only executed a non-binding letter of intent, which is attached hereto as **Exhibit D**. As of the date that this Disclosure Statement was filed, the New Value Sponsor had not signed a binding commitment letter. Accordingly, there can be no assurance that the New Value Sponsor will execute a binding commitment. Moreover, the New Value Sponsor has reserved the right to terminate the letter of intent in its sole discretion. However, the New Value Sponsor has performed a significant level of due diligence, including reviewing documents and updated financial information provided by the Debtors' financial advisor, discussed the contents of the Plan with Debtors' counsel and financial advisor, visited the Debtors' corporate headquarters, and interviewed the Debtors' management team. Therefore, subject to additional confirmatory due diligence, the Plan Debtors expect that the New Value

Sponsor will execute a binding commitment letter on or before the date of the hearing on this Disclosure Statement. The Plan Debtors will supplement the Disclosure Statement, if and when the New Value Sponsor signs a binding commitment letter.

## C. The Plan Debtors Cannot State with any Degree of Certainty the Number or Amount of Claims that will be Allowed

The Plan Debtors cannot know with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed in each of the Classes that are eligible to vote for or against the Plan. Since the Distribution made to the Holders of Claims in Classes 6, 7, and 8 will be *pro rata* based on the available assets to distribute and the aggregate amount of Allowed Claims in Classes 6, 7, and 8, the Distribution that any Holder of an Allowed Claim in Classes 6, 7, and 8 will receive on account of any Claim is not certain.

## D. Risk that Proceeds from Causes of Action will be Less than Projected

The Plan provides that Holders of Claims in Classes 6, 7, and 8 will recover, in part, from any proceeds of Estate Causes of Action, including avoidance actions under Chapter 5 of the Bankruptcy Code. Although the Plan Debtors anticipate that the Estate Causes of Action will, in time, be resolved in a manner that provides a net benefit, there can be no guarantee that the result will be favorable or that any recoveries for allowed Claims in Classes 6, 7, and 8 will be generated by such Estate Causes of Action.

## E. Risk that, if the Plan is Not Confirmed, then the Debtors' Bankruptcy Cases May Be Converted To Liquidations under Chapter 7

There is a risk that, if the Plan is not confirmed, the Plan Debtors' Bankruptcy Cases may be converted to a Chapter 7 liquidation pursuant to Section 1112 of the Bankruptcy Code. Whether such conversion may occur will be at the discretion of the Court and may turn on the existence of factors that the Plan Debtors do not now know, such as the cost of attempting to confirm the Plan and the Plan Debtors' continuing financial performance.

## F. Alternative/Competing Plans

In addition to the AFS Plan and the Committee Plan, there is a risk that other parties-in-interest may propose competing plans of reorganization or liquidation. If the process of attempting to confirm a plan becomes too costly and/or lengthy, the Bankruptcy Cases may convert to Chapter 7 liquidation cases. If the Chapter 11 cases of the Plan Debtors are converted to Chapter 7 liquidation cases, the creditors likely will receive a lower (or possibly no) recovery.

## G. Relief from the Automatic Stay

There is a risk that Holders of Secured Claims may move for relief from the automatic stay imposed by Section 362 of the Bankruptcy Code or continue the prosecution of previously filed or continued motions for stay relief in order to assert their rights against the Plan Debtors'

encumbered property. The entities that may seek such relief are AFS, Holders of Other Secured Claims (Class 3), or Holders of Co-Op Setoff Claims (Class 4).

On November 11, 2010, AFS filed a Motion for Relief from Stay against certain of the Debtors' assets [Docket No. 102], which the Court has continued on various occasions and most recently was continued through and including November 3, 2011. The Plan Debtors do not anticipate that any Holders of Secured Claims will be successful in moving or prosecuting a motion for relief from stay. However, depending on the complexity, duration, and expense of the plan confirmation process related to the Plan, the AFS Plan, and the Committee Plan, and other external factors, there is a risk that such motions may be filed or further prosecuted.

## XI. ALTERNATIVES TO CONFIRMATION OR CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include (a) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code or (b) an alternative plan of reorganization. The Plan Debtors believe that if the Plan is not confirmed and the Plan Debtors' Bankruptcy Cases are converted to cases under Chapter 7 of the Bankruptcy Code, holders of Allowed Claims against the Plan Debtors will receive a smaller dividend than proposed under the Plan.

### A. Liquidation Under Chapter 7

If no Plan can be confirmed, the Bankruptcy Cases may be converted to cases under Chapter 7 of the Bankruptcy Code. A Chapter 7 trustee would be appointed to liquidate the remaining assets of the Plan Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. A Chapter 7 trustee would need time to investigate the Plan Debtors' pre-petition transactions and their assets and liabilities. A Chapter 7 trustee would retain and liquidate the Plan Debtors' remaining assets, and, if necessary, investigate and pursue Causes of Action. The liquidation of the Plan Debtors' assets would result in distressed recoveries and would therefore reduce significantly the recovery to unsecured creditors. The Plan Debtors also believe that the conversion of the Plan Debtors' Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code and the appointment of a Chapter 7 trustee would increase the costs of administration, and reduce and postpone any distribution to holders of Allowed Claims.

For all of the foregoing reasons, the Plan Debtors have concluded that creditors are likely to receive an amount under the Plan that is substantially greater than the amount such creditors would receive under a Chapter 7 liquidation.

### B. The AFS Plan

On September 9, 2011, AFS filed the AFS Plan. Under the AFS Plan, the assets of the Debtors would be transferred to a designee of AFS, referred to as "DairyCo," and a Liquidation Trust would be established to resolve disputed claims, prosecute avoidance actions, liquidate any assets not transferred to DairyCo, and make distributions under the AFS Plan. Administrative expense claims, priority claims, allowed secured claims (excluding AFS's secured claim), and unsecured claims totaling $750.00 or less would be paid in full; and general unsecured claims (excluding AFS's deficiency claim) would be paid their pro rata share of the Liquidation Trust

Proceeds (the proceeds of any judgment, settlement or compromise of any of the avoidance action, net of the expenses of the Liquidation Trust, distributions made to holders of those claims to be paid in full (listed above), and repayment of a $1,000,000 "loan" made by DairyCo to the Liquidation Trust.

### C.    The Committee Plan

On September 20, 2011, the Committee filed the Committee Plan. Under the Committee Plan, the Debtors, with the exception of Heifer Haven, which will be liquidated, would continue to operate, and payments to Allowed Claims in the Bankruptcy Cases would be made out of operating revenues of the Reorganized Debtors (as such term is defined in the Committee Plan). That portion of AFS's claim designated as secured, holders of all other allowed secured claims, allowed non-tax priority claims, and allowed convenience class claims totaling less than $2,500 would be paid in full; and that portion of AFS's claim designated as unsecured and all other allowed unsecured claims would be paid pro rata pursuant to the terms of the Committee Plan. Unlike the Plan, the Committee Plan does not contemplate the infusion of any new capital. The Plan Debtors believe that the infusion of new capital is important in the consideration of the Debtors' ability to service debt and/or provide a meaningful recovery to Unsecured Creditors over a reasonable period of time.

### D.    Alternative Plan of Reorganization

If the Plan is not confirmed, any other party-in-interest could attempt to formulate a different plan or reorganization. The Plan Debtors believe that the Plan described herein enables the creditors of the Plan Debtors and all parties-in-interest to realize the best payout under the circumstances.

4314111v1

# X.    CONCLUSION

Based on the foregoing analysis of the Debtors and the Plan Debtors, their remaining assets, and the Plan, the Plan Debtors believe that the best interests of all parties-in-interest would be served through confirmation of the Plan. **ALL CREDITORS ARE URGED TO VOTE TO "ACCEPT" THE PLAN.**

Dated: October 5, 2011.

DAIRY PRODUCTION SYSTEMS - GEORGIA LLC,
DAIRY PRODUCTION SYSTEMS, LLC,
DAIRY PRODUCTION SYSTEMS - MISSISSIPPI, LLC,
AND HEIFER HAVEN, LLC

By:    /s/ David P. Sumrall
      David P. Sumrall
      Title:   Sole Manager Sole Member
      Dairy Production Systems - Georgia LLC,
      Dairy Production Systems, LLC,
      Dairy Production Systems Mississippi, LLC,
      and Heifer Haven, LLC

Prepared by:

ARNALL GOLDEN GREGORY LLP
Sean C. Kulka (Georgia Bar No. 648919)
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
Telephone: (404) 873-8500
Facsimile: (404) 873-8501

4314111v1